```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE WESTERN DISTRICT OF TEXAS

 3                       WACO DIVISION

 4   VLSI TECHNOLOGY, LLC          *
                                   *
 5                                 *
     VS.                           *  CIVIL ACTION NO. W-19-CV-254
 6                                 *
     INTEL CORPORATION             *    July 31, 2019
 7
         BEFORE THE HONORABLE ALAN D ALBRIGHT, JUDGE PRESIDING
 8                        MOTION HEARING

 9   APPEARANCES:

10   For the Plaintiff:        Morgan Chu, Esq.
                               Benjamin W. Hattenbach, Esq.
11                             Charlotte J. Wen, Esq.
                               Irell & Manella, L.L.P.
12                             1800 Avenue of the Stars, Suite 900
                               Los Angeles, CA 90067-4276
13
                               Andy W. Tindel, Esq.
14                             Mann, Tindel & Thompson
                               112 East Line Street, Suite 304
15                             Tyler, TX 75702

16                             Craig D. Cherry, Esq.
                               Haley & Olson, P.C.
17                             100 N Ritchie Road, Suite 200
                               Waco, TX 76712
18
     For the Defendant:        J. Stephen Ravel, Esq.
19                             Kelly Hart & Hallman LLP
                               303 Colorado Street, Suite 2000
20                             Austin, TX 78701

21                             Gregory H. Lantier, Esq.
                               Wilmer Cutler Pickering Hale Dorr LLP
22                             1875 Pennsylvania Avenue, N.W.
                               Washington, DC 20006
23
                               William F. Lee, Esq.
24                             WilmerHale
                               60 State Street
25                             Boston, MA 02109
```

1    Court Reporter:          Kristie M. Davis
                              United States District Court
2                             PO Box 20994
                              Waco, Texas 76702-0994
3

4

5         Proceedings recorded by mechanical stenography, transcript

6    produced by computer-aided transcription.

1    (July 31, 2019, 2:01)

2         THE BAILIFF:  All rise.

3         (Call to Order of the Court)

4         THE BAILIFF:  Court is now in session.  Please be seated.

5         THE COURT:  Good afternoon.

6         DEPUTY CLERK:  Motion hearing/scheduling conference in

7    Civil Action W-19-CV-254, styled VLSI Technology, LLC vs. Intel

8    Corporation.

9         THE COURT:  Counsel, if you would be so kind as to

10   introduce yourselves, introduce any clients you might have.

11   Primarily let me know who is going to be speaking on each

12   side's behalf.

13        And then -- Mr. Ravel, you're not willing to wait your

14   turn?

15        (Laughter.)

16        THE COURT:  I'm kidding.  Go ahead.

17        MR. TINDEL:  Good afternoon, Your Honor.  Andy Tindel.

18   I'm here on behalf of the plaintiff VLSI, Inc., and with me

19   today we have Morgan Chu.

20        MR. CHU:  Good afternoon, Your Honor.

21        THE COURT:  What an honor to have you here.

22        MR. CHU:  Thank you.

23        THE COURT:  We met earlier this year at a dinner I believe

24   either in California or in Virginia.  I was giving a speech at

25   a CLE and -- was it in Virginia?  There was a --

1      MR. CHU:  It was actually California and I think Judge

2  Schroeder introduced us.

3      THE COURT:  That's absolutely right.  Okay.  I forgot.  I

4  gave three speeches that week and I couldn't remember where it

5  was, but it was a privilege.  And that's right.  And then we

6  had the wonderful talk at that speech where they honored you.

7  That was a wonderful evening.

8      MR. CHU:  My honor to be in your courtroom.

9      THE COURT:  Pleasure to be here.

10      MR. TINDEL:  Your Honor, we also have Ben Hattenbach with

11  the Irell & Manella firm.

12      MR. HATTENBACH:  Good afternoon, Your Honor.

13      THE COURT:  Okay.

14      MR. TINDEL:  Charlotte Wen of Irell & Manella.

15      MS. WEN:  Good afternoon, Your Honor.

16      MR. TINDEL:  And last and certainly least is our local

17  counsel Craig Cherry.  We're ready to proceed, Your Honor.

18      (Laughter.)

19      THE COURT:  Hard to do better than that, Mr. Ravel?

20      MR. RAVEL:  I'll do my best, Judge.  Steve Ravel.  Pleased

21  and proud to be here representing Intel Corporation.  Along

22  with me are two people from the Wilmer firm Greg Lantier and

23  Bill Lee.

24      MR. LEE:  Good afternoon, Your Honor.

25      THE COURT:  Mr. Lee, quite an honor to have you here.

1    This is a -- this -- I'm going to go on the record and say I

2    doubt lawyers of this -- I don't want to insult -- I'm sure in

3    other cases there have been lawyers of this caliber, but I

4    would suggest that in patent cases this is probably a landmark

5    day.  And so I appreciate everyone who's here.

6        MR. RAVEL:  And back in the pews is our client Mashood

7    Rassam, and you know Sven Stricker my colleague.

8        THE COURT:  I do.

9        MR. STRICKER:  Good afternoon, Your Honor.

10       THE COURT:  Before we get started, I need to put on the

11   record I think I'm going to list everyone.  As you all know, at

12   least a couple of you know, I did practice in this area a

13   little bit and I think I've got it straight.  Maybe I'm missing

14   something, but as best I can tell, during the course of my

15   practice of those people who are in this case, I've represented

16   Intel.  I represented Freescale.  I've represented SigmaTel.

17   I've sued SigmaTel.  But I have never represented the

18   plaintiff.  And so I don't believe I have any conflict.  All of

19   that was a substantial amount of time ago that I represented

20   any of those companies, probably at least six or seven or eight

21   years since I've had that representation, but I wanted to let

22   you all know that -- especially because I practiced in Austin,

23   you know, I'm familiar with the Austin companies.  And so if

24   someone has a problem with that and wants to at some point

25   raise it, let me know.  You know, I think I can be fair and

1  impartial, given how I've represented companies on -- you know,

2  on every side, but, you know, I wanted to make sure I

3  disclosed.

4      So with that being said, I believe probably the motions

5  that I want to take up were filed by the defendant and I'm

6  happy to hear from you.

7      MR. RAVEL:  You'd like to hear the transfer motion first?

8      THE COURT:  Entirely up to you.

9      MR. RAVEL:  All right.  Mr. Lee is going to take care of

10 that for us.  How many booklets for the Court and staff, Judge?

11     THE COURT:  I need one.  Lewis probably needs one and the

12 court reporter for sure will want one.

13     Yes, sir.

14     MR. LEE:  May I proceed, Your Honor?

15     THE COURT:  Please.

16     MR. LEE:  Thank you.  Your Honor, I'll address the

17 transfer motion first, and let me start by saying two things

18 that I think distinguish this from many of the transfer motions

19 Your Honor saw in practice and Your Honor has seen since you

20 assumed the bench.  The first is that this is a different type

21 of transfer motion where the focus is on forum shopping.  The

22 second is this is a different type of transfer motion because

23 the chronology of events that bring us to your courtroom are

24 largely undisputed.  They're just events that happened on

25 specific days and specific things occurred, and it is those

1  series of events that we suggest and have argued to Your Honor

2  justify transfer.

3  So if, Your Honor, I would take you to Slide -- go

4  immediately to the chronology because I think it's the

5  chronology that distinguishes this case from others and it's a

6  chronology that makes fights about who did what, when, where

7  less relevant in this case than it would be in another transfer

8  motion.

9  So if I take Your Honor to that first Slide 2, this is, as

10  Your Honor knows, the third, fourth and fifth case among the

11  parties.  And the first case was in California and Slide No. 2

12  gives Your Honor the background of the California case before

13  it was stayed.

14  And without taking Your Honor through each of the events,

15  let me just identify some of the important events.  First, it

16  was indisputably the first case filed.  As Your Honor can see,

17  it was filed on October 2nd, 2017.

18  Second, a lot occurred in that case, including, if Your

19  Honor goes to June 21st, 2018, the filing of damages

20  contentions claiming damages in the neighborhood of one to $8

21  billion, a number that's been made on the public record.

22  After that point in time several important things

23  occurred.  First, the magistrate judge in California found the

24  defendant -- the plaintiff's damages contentions deficient and

25  ordered them to be revised or represented.

1        Second, we sought IPRs on all of the eight patents.  They

2   were allowed as to six.  Those are proceeding.

3        And then there was a claim --

4        THE COURT:  May I interrupt you?

5        MR. LEE:  Surely.

6        THE COURT:  On the IPRs that were instituted between

7   December 4 and March 1st of 2019 on the six patents, are those

8   on all the claims of those six patents?

9        MR. LEE:  All the asserted claims.  Yes, Your Honor.

10       THE COURT:  Okay.

11       MR. LEE:  And after that occurred so that we had six

12  patents where IPRs had been asserted on all the asserted

13  claims, two not instituted, there was a Markman hearing where

14  Judge Freeman allowed us to argue and she construed

15  approximately ten terms.  At the end there was not a dispute

16  about a couple.

17       After that series of events after the damages contentions

18  and the billions of dollars have been found to be deficient,

19  after the IPRs had been instituted, after the Markman hearing

20  occurred and had been decided, we told VLSI we were going to

21  move to stay the proceeding.  They ultimately agreed.  Then

22  what happens?  If I turn Your Honor to Slide 3, I'm going to

23  take you through the chronology again because I think it speaks

24  volumes.

25       On June 28th, 2018 VLSI files Action No. 2, what we call

1    the first Delaware action.  It was filed seven days after the

2    district court in California found the infringement contentions

3    of VLSI to be deficient.

4        If I take you to Slide No. 4, Your Honor, the next event

5    is a motion to transfer where we suggested that the case be

6    transferred to California in part because Judge Freeman had

7    done an awful lot of work, was up to speed and that there were

8    efficiencies to be gained.  I think what's important for our

9    purposes today, Your Honor, is what VLSI said in opposition to

10   that motion.  And I think I'm going to be able to show Your

11   Honor shortly that what they said then is the opposite of what

12   they said to you.

13       So if I turn you to Slide No. 5, these are quotes from

14   their brief.  And I'm not going to go through each, in the

15   interest of time, but to focus Your Honor on the third quote

16   from the brief, it says:  Delaware has a strong interest in

17   adjudicating disputes among its corporate citizens.  As Your

18   Honor knows, both VLSI and Intel are Delaware corporate

19   citizens.  But they went further in an effort to defeat the

20   transfer motion and they filed an affidavit by Michael

21   Stolarski, the only employee of VLSI and the CEO.

22       And I take you to Paragraph 9 which is the second

23   paragraph on Slide No. 6:  I am not aware of any VLSI witnesses

24   who would be unwilling or unavailable to travel to the District

25   of Delaware for trial or any other court proceeding.

1          Those are the arguments that were made in opposition to

2     the motion to transfer.

3          THE COURT:  Well, who would VLSI witnesses be?

4          MR. LEE:  Your Honor, it's hard for me to predict, but the

5     VLSI witnesses could include Mr. Stolarski.

6          THE COURT:  Got that.

7          MR. LEE:  They also could include some of the inventors

8     who have been described to you of the patents inventions

9     originally who might travel to the trial to testify about their

10    inventions, their patents.

11         THE COURT:  But they couldn't be compelled to go to

12    Delaware?

13         MR. LEE:  They could not be compelled.  They are not

14    within the subpoena power of Delaware.  Some of them would be

15    within the subpoena power of this Court, and that's an argument

16    that VLSI has made to you.

17         THE COURT:  And that's an important argument I think.  How

18    many of the -- with respect to the patents that are asserted in

19    this case, what is Intel's position with respect to how many of

20    the inventors are in this district?

21         MR. LEE:  It's 14 out of 16.  And, Your Honor, if I could

22    just add one point to that fact.

23         THE COURT:  You have -- take all the time you want.

24         MR. LEE:  All right.  Thank you, Your Honor.

25         The fact that 14 of the 16 of these inventors are in this

1    district and in Austin, that was a fact that was true the day

2    this case was filed in -- the second case was filed in

3    Delaware.  That was a fact which was true while the case was

4    pending in Delaware.  Not withstanding that fact, VLSI filed on

5    six of the eight patents before Your Honor in Delaware.  So

6    that fact hasn't changed.

7         THE COURT:  I understand.  Again, that's why -- I'll ask,

8    you know, Mr. Chu as well, but, you know, I'm not sure what

9    VLSI witnesses which they're talking about.  In other words,

10   I'm actually also saying maybe -- maybe this was a statement

11   that may have looked bold in Delaware without really meaning

12   very much, because when you peel it back, Mr. Stolarski may

13   have been the only VLSI witness he was talking about.

14        MR. LEE:  Your Honor, I think that may well be true.  I

15   don't know because I wasn't involved, but I had to take it at

16   face value.  I think if Your Honor looks at Paragraphs 8 and 9,

17   Paragraph 8 talks about the convenience to him of the case

18   being in Delaware.  Paragraph 9, at least as I read it and

19   fairly interpret it, is talking about others.

20        THE COURT:  Well, and also -- I mean, look.  I know a

21   lawyer wrote this and I'm not letting Mr. Stolarski slide, but

22   by him saying I'm not aware of any VLSI witnesses who would be

23   unwilling or unable to travel to the District of Delaware for

24   trial or any other court proceedings, the reality is -- and

25   you've tried probably a thousand more patent trials than I ever

1    had.  Maybe I'll catch up to you on this side of the bench, but

2    it'll take awhile, but, I mean, the reality is that in this

3    district the inventors can be compelled to testify.

4         MR. LEE:  Your Honor, we don't dispute that for a second.

5         THE COURT:  And in Delaware or California they cannot.

6         MR. LEE:  Your Honor, that's -- we don't dispute that for

7    a second.

8         THE COURT:  Okay.

9         MR. LEE:  Now, in California there would have been Intel

10   witnesses and former Intel employees who were involved in

11   designing the products -- designing the products that were at

12   issue in the California case that could have been compelled.

13   Some of them are current employees would have brought them.

14        THE COURT:  But my experience typically from the handful

15   of times I was on the plaintiff's side, one of which

16   unfortunately your firm was on the other side and I think it's

17   the only case I lost.  Not that I would hold it against your

18   firm for that.  They did a great job, but I think as far as the

19   plaintiff is concerned in terms of being able to compel

20   witnesses, they can depose those guys and then Intel decides

21   whether or not to call them to trial or present them by -- is

22   my experience.  Here as far as the plaintiff's concerned -- I'm

23   going to ask these hard questions of the other side too.

24        MR. LEE:  Sure.

25        THE COURT:  But here in fairness to the plaintiff and what

1    they want to do, certainly this district allows them to have

2    folks that I think most plaintiffs would want to be able to

3    call in their case and be able to compel them.

4        MR. LEE:  Your Honor, we don't dispute for a second that

5    what you said is correct that 14 of the 16 are here.  They can

6    be compelled.  As I said, that was known before when the case

7    was filed in Delaware.  So the disadvantages that Your Honor is

8    articulating are in fact true based upon your experience and

9    mine which is the same.  They were precisely the same

10   disadvantages on the day that they filed the suit, and if I

11   could, I'd like to skip ahead with that in mind just -- and

12   then I'll come back to the chronology.

13       THE COURT:  However you want to do it.

14       MR. LEE:  If I could take Your Honor to Slide No. 15, and

15   I'm going to come back to the series of events that lead to the

16   filing of the second Delaware action, but what I'd like to do,

17   having in mind the hard question Your Honor has just asked is

18   to do this:  As I said, on the date Delaware 2 is filed, these

19   14 folks, or actually a substantial portion of them, lived in

20   Austin.  They were here.  They knew about it, but the case was

21   filed in Delaware.  So when we moved to transfer to California,

22   largely for efficiency reasons because it was so far along, I

23   think it's helpful to see what VLSI said, and I'm just going to

24   show you VLSI's words.

25       So if I take you to Slide 16.  And the reason I want to

1   skip ahead is because the very first comparison is I think at

2   least relevant to what Your Honor has identified as an issue

3   for us.  So on Page 16 when they were opposing the motion to

4   transfer, VLSI said, quote:  Delaware is more convenient for

5   VLSI witnesses in this case.  Now, it's just not talking about

6   Mr. Stolarski now.  It's witnesses, plural.  When they oppose

7   the motion before Your Honor, the District of Delaware is

8   remote from all known witnesses and relevant events.

9        Now, for sure these are drafted by lawyers, but they're

10  drafted for a reason.  In one case a defeated transfer motion,

11  in a second case a defeated transfer motion, and to me they are

12  the opposite, but it's not the only occurrence.

13       If I take Your Honor to Slide 17, this goes to the

14  question of design and development, and Your Honor knows from

15  the papers that have been filed the question of whether these

16  were designed and developed within this district is we think

17  undisputed, but VLSI has suggested it is disputed, but let's

18  just look at what they said again, again their words.  Quote:

19  In opposing the motion in Delaware as a matter of law, a claim

20  for patent infringement arises wherever someone has committed

21  acts of infringement.  Intel attempts to shift the analysis to

22  the location of the design and development of accused products.

23       What do they say to Your Honor?  The accused Intel

24  products include key features that are accused of infringement

25  here, the technology for which appears to have been designed

1    and developed at least in significant part by Intel engineers

2    in this district.

3          Slide No. 18, Your Honor.

4          THE COURT:  Let me ask you this.

5          MR. LEE:  Sure.

6          THE COURT:  Leaving that aside for a second what the

7    lawyers may have said in trying to protect wherever they were

8    trying to protect at the moment, does Intel have a position on

9    whether or not -- ignoring just for a second the Delaware

10   statement, does Intel have a position on whether or not the

11   statement that was made that you just read about Texas is

12   correct or not?

13         MR. LEE:  Your Honor, the answer is the statement is the

14   principle's correct.  It factually doesn't have an effect here

15   because what Your Honor has before you is a sworn declaration

16   from one of our witnesses Mr. Herrgott who says, based upon his

17   investigation, none of the design and development work for the

18   accused products in this case was done in Austin.  And that's

19   the only sworn statement before you.  So the reason I'm trying

20   to break down and I --

21         THE COURT:  No.  No.  That's a perfect answer.

22         MR. LEE:  Yeah.

23         THE COURT:  That's what I'm trying to get to is leaving

24   aside the potential inconsistency between the two statements,

25   is it Intel's position that the accused Intel products and the

1    features therein were not designed in the Western District?

2        MR. LEE:  As far as we can determine based upon what we

3    have now, yes.

4        THE COURT:  Okay.

5        MR. LEE:  And that's the declaration that we've put in.

6    And so that's why I say, Your Honor, the principle's correct,

7    has no factual application here.

8        THE COURT:  And I've reviewed that.  I knew that, but it's

9    helpful because I -- obviously when counsel for the plaintiff

10   gets up, I'm assuming he's going to say something different,

11   but I just wanted on the record to have your position on this.

12       MR. LEE:  No.  I appreciate it.  And, you know, I'm sure

13   they will say something different.  I guess the point I'm

14   trying to make is they already have said something different --

15       THE COURT:  Yeah.

16       MR. LEE:  -- on two different occasions.

17       So if I take you to Slide No. 18, Your Honor.  When

18   they're opposing the motion in Delaware, quote:  Delaware has a

19   strong interest in adjudicating disputes among its corporate

20   citizens.  I had mentioned that to Your Honor before.

21       To Your Honor they say:  The Federal Circuit has reversed

22   courts that have allowed cases to proceed in venues to which

23   the only real connection was party incorporation.

24       THE COURT:  I bet they'd have ten Federal Circuit cases

25   that supported both of those statements.

1        MR. LEE:  I think you can have them go both ways, but I

2    think, Your Honor, when you have the same case or the same set

3    of cases and the same parties and you're articulating a

4    principle in order to get an advantage because the motion to

5    transfer to California was denied.  To then reverse course and

6    take a different position is at least something that Your Honor

7    can consider.  And I'm not suggesting that it's all by itself

8    ipso facto dispositive, but it's something that Your Honor can

9    consider for sure, and there's a couple more --

10       THE COURT:  I hate to interrupt you, but -- and you'll all

11   appreciate why I am though.  We have a jury out and I just got

12   a couple of notes, and so if I could have the other lawyers

13   step up for just a second so I can respond to the jury.  I

14   apologize, Mr. Lee, but I bet you've been in this position as

15   well.

16       MR. LEE:  I have.

17       THE COURT:  And so...

18       MR. LEE:  And I know that when I was, I thought they were

19   much more important than me.

20       (Recess taken from 2:23 to 2:24.)

21       THE COURT:  Mr. Lee, you're back up.

22       MR. LEE:  Thank you, Your Honor.

23       Your Honor, I took you to Slide 19.

24       THE COURT:  Okay.

25       MR. LEE:  And I won't read the quotation, but again this

1   is just another contradiction, in our view, in representations

2   made to the two different courts, Judge Connolly in Delaware

3   and Your Honor here.  I think the important point here, Your

4   Honor, and the reason I skipped to this part quickly is in

5   light of Your Honor's question about the undisputed fact it's

6   the location of the inventors.  What the cases say and the

7   cases that follow on Page 19, 21 and 22, and I won't belabor

8   them, is they say when forum shopping has occurred, when the

9   privilege of picking your own forum has in some sense been

10  manipulated for whatever reason, that can trump the traditional

11  factors of convenience of the parties, convenience of the

12  witnesses.  So what I would say to Your Honor is if you just

13  focused exclusively on the location of the inventors and that

14  were dispositive in some way, it would be a harder motion for

15  us to bring to Your Honor.

16          THE COURT:  Well, tell me this, Mr. Lee.  What -- in terms

17  of the things I am supposed to consider, I don't care which of

18  the -- regardless of where else we're talking about, the

19  reality is that this Court can get you to trial 12 months from

20  now, 16 months from now.  And whatever Delaware is, it's longer

21  and probably at least twice as long if that.  I mean, and so

22  what -- and I'll ask plaintiffs of course, but where does that

23  rank in the scale of things I should consider that the reality

24  that really virtually compared to any other court you could

25  mention I can get you to trial quicker?

1    MR. LEE:  Your Honor, it's a perfect question and I think

2  crystalizes what I hope was correct when I first started this

3  which is this case is different.  And what makes it different?

4  The first is there is a case with related technologies,

5  overlapping inventors, almost overlapping products that's

6  scheduled in Delaware for November of 2020.  So we have a trial

7  date.  It's not two and a half years off.  It's in November of

8  2020, and Judge Connolly has had three or four different

9  hearings already and has a Markman hearing scheduled for

10 November of this year.

11    I think, Your Honor, what the cases say, and the cases I'm

12 referring to are the ones at 21, 22 and 23, are saying is --

13 and without belaboring the law because I know Your Honor has

14 seen it before, Section 1404 says in the interest of justice.

15    THE COURT:  Uh-huh.

16    MR. LEE:  And forum shopping is not in the interest of

17 justice.  And if you have forum shopping, even if you were to

18 create a checklist of the public and private factors and that

19 checklist in a particular case might counsel you to denying

20 transfer, you can't ignore the forum shopping.  And I think the

21 reason this case is different, Your Honor, is this:  These are

22 the third, fourth and fifth cases.  There has been, in our

23 view, they'll disagree, forum shopping at the outset when

24 California was stayed and we moved to Delaware.  Then a series

25 of events occurred which I'd like to take Your Honor through

1    very briefly because there's a reason that the Delaware case

2    got dismissed when it got dismissed and we appeared here.

3         THE COURT:  Okay.

4         MR. LEE:  So what these cases say, Your Honor, is VLSI

5    would like Your Honor to think that the Volkswagen case has

6    created a checklist and you just go through and you check them

7    off plus, minus, neutral and see where you come out.  What

8    Volkswagen and the Fifth Circuit said is, no.  That's not what

9    the law is.  The law looks at all the factors, and they even

10   say, even if you look at the location of the inventors, 1404

11   here, even if we take as given that Your Honor could get us to

12   trial on these cases let's say ten months earlier, we can't

13   look at that in isolation.  And if we look at it in the context

14   of the California action, the first Delaware action, what

15   occurred in the Delaware action before the cases came to Your

16   Honor, that type of forum shopping is not in the interest of

17   justice.  And I understand that the lawyers drafted the briefs

18   that create what I think are the contradictions, but part of

19   the interest of justice analysis, Your Honor, is, is it in the

20   interest of justice for Your Honor to deny a transfer motion

21   when this is what has occurred?  And that's why if this were a

22   garden variety transfer case, Your Honor, I'd be the first

23   person to suggest -- to admit in response to Your Honor's

24   questions that it is, but what the case is at Slide 20 says if

25   you have someone who takes one position at one time and then

1    changes it for another, you at least ought to look at it

2    skeptically.

3         When you move to Slide 21, it says:  Judicial economy and

4    the interest of justice are paramount considerations.

5         And at Slide 22, Your Honor, and I'm hoping this is the

6    answer to Your Honor's specific question, the cases have

7    specifically said that even if you look at the public and

8    private factors and they would indicate to you that the motion

9    should be denied, the interest of justice can trump those, and

10   the cases have specifically said -- if I turn Your Honor to

11   Slide 25 and 26, they have specifically said forum shopping is

12   the type of public interest that justifies transferring even if

13   walking through the public and private factors would lead you

14   to a different result in isolation.

15        So I think the answer to Your Honor's question is it is a

16   critically important question.  The facts that Your Honor has

17   identified are probably the most difficult for me to address.

18   My response is, you can't view them in the abstract.  You have

19   to view them in the context of what occurred before we arrived

20   in Waco.  We have to view them in the context of the two cases

21   that occurred before and we have to view them in the context of

22   whether this series of events could fairly be characterized by

23   Your Honor as someone acting in the interest of justice.

24        THE COURT:  Okay.

25        MR. LEE:  If I --

1      THE COURT:  Can I ask you a couple of questions?

2      MR. LEE:  Sure.  Sure.

3      THE COURT:  First I understand that there is a -- there

4  are patents with related technology that would go to trial in

5  November of 2020 with -- the Markman is in November of this

6  year.

7      MR. LEE:  Right.

8      THE COURT:  And then trial would be November of 2020.  Did

9  I --

10      MR. LEE:  November 2020.

11      THE COURT:  What would your estimate be if this case were

12  transferred to Delaware?  What is your estimate for when it

13  would be tried?

14      MR. LEE:  Your Honor, I'll give the honest answer.  I

15  don't know.  Right before the cases were brought to Your Honor,

16  we had moved to consolidate the two, the two sets of cases.

17  Now, there are some differences in the patents in the

18  technology to be sure, but for us the overlap in the accused

19  products, the overlap in the witnesses, the overlap in the

20  damages theory led us to move to consolidate.  So what

21  occurred, Your Honor, and it's in the slides, but let me

22  summarize it if I could is once the second -- what happened is

23  this:  The California action is stayed.  On the very same day

24  VLSI files the second Delaware action.  And that's on Slide No.

25  8, Your Honor, just in terms of the chronology.  So we now have

23

1    six of the patents before Your Honor in Delaware as of March of

2    this year.  We tell VLSI we're going to move to consolidate

3    them for efficiency purposes and we move on March the 20th.  So

4    we tried to do it promptly.  They opposed.  On March the

5    26th -- so all of this is happening close to the same time.

6        THE COURT:  Of this year?

7        MR. LEE:  This year.

8        Judge Connolly has a motion that is the mirror image of

9    the motion you have on indirect infringement, induced

10   infringement, contributory infringement and willfulness.  He

11   did not have the patent issue that Your Honor has.  Judge

12   Connolly grants that motion.  It's virtually identical to the

13   motion Your Honor's being asked to hear and decide now.  We

14   tell VLSI immediately that we're going to move in the second

15   action for the same six patents that are before Your Honor that

16   we're going to move to dismiss those same claims.  Then

17   something happens that I didn't quite figure out at the time

18   but I now have figured it out.  VLSI's response is to say,

19   we'll give you a two week extension of the time to answer.

20   Well, we didn't --

21       THE COURT:  Which means they can -- which means they can

22   dismiss it?

23       MR. LEE:  What it means is in that two week period there's

24   a hearing before Judge Connolly.  They can see what happens at

25   the hearing and they can then decide, and that's in fact what

1    occurred.  And, Your Honor, I've asked for extensions a lot of

2    times.  It's very infrequent that you are granted one when you

3    haven't even picked up the phone to ask.  So this one was

4    granted unilaterally, and then what happens is there's a

5    hearing before Judge Connolly, and this is on Slide No. 12 just

6    chronologically, and it occurs on April 13th.  And I'm not

7    going to -- Mr. Hattenbach and I argued it.  We probably

8    disagree about what happened and what the end result was, but I

9    think I can fairly say to Your Honor we argued it.  The end

10   result was an order requiring substantial claim narrowing and

11   the judge asked the question about consolidation with the

12   second case.  So that's on April the 8th.  If I then take --

13   April the 3rd.

14       If I then take you eight days later, the case is

15   voluntarily dismissed and refiled before Your Honor on the same

16   day.  Now, let me just say three things.  One is to reiterate

17   that on April -- in March -- on March 1st when the case was

18   filed in Delaware, the inventors lived where they lived.  Most

19   of them live within the district.  The documents and the

20   designs occurred years ago.  This is all fixed and VLSI filed

21   in Delaware and made those express representations to the

22   Delaware court.  And again, if they hadn't made them, it would

23   be different.

24       The second is that they suggest that the decision to file

25   was because Your Honor had arrived on the bench.  You might be

1  able to get us to trial faster, but as the slides demonstrate,

2  Your Honor had been seated seven months before.  The catalyzing

3  event was not Your Honor being seated on the bench but things

4  that were happening in Delaware.

5      And the third thing is the motion on indirect infringement

6  and willfulness -- enhancement based upon willfulness I think

7  is a fair characterization of it had been denied with opinion

8  by Judge Connolly.  We were going to renew it because the

9  allegations were virtually identical, and instead what happens

10  is cases are dismissed.  Cases are refiled here.  Allegations

11  are substantially identical and Your Honor is now being asked

12  to decide differently the very same motion that Judge Connolly

13  has decided between the same parties in the same general area

14  of technology involving the same accused products.  So that's

15  why we would suggest, Your Honor, that this is different, and

16  Slide No. 14 just pulls it all together and identifies the

17  seven month period that lapsed between Your Honor's taking the

18  bench and the filing of these cases.

19      So if we put it all together, if we don't try to just look

20  at a checklist in the abstract and check off plus, minus.  Your

21  Honor remembers from your practice days when experts would get

22  up with the Georgia Pacific factors and just go plus, minus,

23  neutral.  That's not the exercise.  The statute says in the

24  interest of justice for a reason.  It just doesn't say for the

25  convenience of the parties.  It just doesn't say for the

1    convenience of the witnesses.  It says in the interest of

2    justice.  And so the question for Your Honor that we've argued

3    is in the context of these five different lawsuits, in the

4    context of these events, in the context of the representations

5    that I took you through, the difference, in our view, between

6    what was said to the judge in Delaware, and he denied the

7    motion, and what is being said to you today, what is the only

8    fair characterization of that, and that is we're moving from

9    forum to forum to forum.  And we're not only moving from forum

10   to forum to forum.  We're asking you, Judge Albright, to decide

11   the very same motion Judge Connolly decided, and the way we can

12   be sure that Judge Connolly is not going to decide it is we

13   dismiss the case in front of him.  And that's why the cases in

14   those pages, without going through them, say what they say,

15   which is the interest of justice is paramount.  The interest of

16   justice can trump the private and public factors, number of

17   inventors, subpoena power, and it's why it says at the end of

18   the day if there has been forum shopping, and the facts of the

19   cases that are cited in the slides are in some ways I think

20   more benign than what we have here, but the words are there.

21   They say forum shopping is not an interest of justice.

22       Now, Your Honor, even if --

23       THE COURT:  Can I ask you a question?

24       MR. LEE:  Surely.

25       THE COURT:  And this is completely off track.  So if it'd

1    be easier for you to keep going, I'll let you keep going.  If

2    not --

3         MR. LEE:  No.  If I give you a completely off track

4    answer, you'll know why.

5         THE COURT:  Okay.  I want to go back for just a second.

6    With respect -- we were talking about where folks -- both the

7    inventors are located here.

8         MR. LEE:  Right.

9         THE COURT:  And then I asked you questions about whether

10   or not there are relevant Intel witnesses here.

11        MR. LEE:  Yes.

12        THE COURT:  Do you know whether or not anyone that was

13   involved in designing the accused features, allegedly

14   infringing features is located in the Western District?  Is

15   it -- do you know what -- are there any here?  I couldn't tell

16   from y'all's briefing whether it was clearly a goodly

17   percentage are in California.

18        MR. LEE:  Yeah.  Let me confirm with Mr. Lantier.

19        THE COURT:  Because I know that y'all have a big operation

20   in Austin and so I'm curious.

21        MR. LEE:  Let me say what I think is correct, and if he

22   gives me the look, Your Honor will know why.  The answer is for

23   the accused features of the products that are at issue before

24   Your Honor, our best information is none of them were designed

25   here.  Not -- they're not made here.  There are 1,700 Intel

1   employees in Austin, but they're not associated with these

2   accused products.  And in fact if I skipped ahead, Your Honor,

3   to Slide 31, it's an effort by us to identify the locations of

4   the witnesses.  So Intel's witnesses who were involved in

5   designing, developing and manufacturing these products are

6   located in Arizona, Portland, Oregon, and Israel which is what

7   the far right has intended to show.  We have put the Intel logo

8   round about Austin because we do have employees here, but as

9   Mr. Herrgott says in his declaration, they were not involved in

10  the design and development of the accused products.  So we are

11  going to have to bring witnesses, which we will, from Arizona,

12  Oregon and Israel.

13       Now, Your Honor, to anticipate the next question, we would

14  have to bring them to Delaware too.  The real question is if

15  these two cases had stayed in Delaware in parallel or in

16  companion, whether they were consolidated or not, would these

17  witnesses have to be deposed twice in Delaware?  Probably not.

18  Would they have to appear twice for trial?  Maybe not.  So what

19  I think the law recognizes is when you have cases that could be

20  consolidated for some purposes, and I should say Your Honor has

21  recognized that by saying our three cases will be consolidated

22  for discovery purposes at least, there are efficiencies that

23  can be gained.  Witnesses that overlap technically won't have

24  to be deposed once in Texas, once in Delaware.  They could have

25  been done together.  I think it's the reason -- I don't know

1   for sure, but I think it's the reason that Judge Connolly

2   inquired about the motion to consolidate because we were just

3   entering the heavy duty discovery period.

4        So I took Your Honor to Slide 27.  I do think that even if

5   you try to tote up the private and public interest factors, and

6   I think Your Honor has asked us about the two that are most

7   difficult for us which is one is the location of the inventors

8   and the question is whose testimony can you compel or whose

9   attendance can you compel, along with the question of time.

10  There are other factors though that if you balance it all out

11  would at least make it neutral, we suggest maybe balance in our

12  favor, but when you balance all of that together with what I've

13  focused the argument on, it doesn't make sense to us that you

14  should be able to, to quote the cases, abuse the privilege of

15  selecting a forum not once, not twice but three times.  Now --

16       THE COURT:  I'm sorry.

17       MR. LEE:  No.  I'm sorry.  You go ahead.

18       THE COURT:  With respect to the folks -- the Intel folks

19  who are located primarily in California, do you have a sense --

20  and again you can turn to your learned co-counsel.  I think

21  it's nice of him to let you have an opportunity to stand on

22  your feet and speak in court.  But can you give me an idea of

23  what the frequency is or how ordinary it is in the Intel world

24  for the folks who are located in California who are doing the

25  design work to travel to Texas to work on projects?  That may

1    be too ambiguous for you, but in terms -- you know, I think --

2    I think we're headed -- I'll just give you -- this isn't

3    particular to this case, but it seems to me -- and you and your

4    opposing counsel are probably two of the smartest people in the

5    world on patent issues.  I think a coming issue that courts

6    will have to address is for a company like Intel, Apple,

7    Google, Dell, doesn't matter, if they are making the argument

8    that their people are located wherever they're located,

9    California or Austin or wherever, if it is the practice of that

10   company for those people to routinely travel to this area --

11   you know, if your engineers are working on a project with

12   Austin people and Engineer Smith is in Austin three weeks out

13   of the year doing stuff, then it seems to me the burden on him

14   of having to be here maybe for a day of trial isn't as extreme

15   as another situation.  That's just an issue I see coming.  I

16   don't even know that people have been making that argument yet.

17   I haven't seen cases where that's been a factor, but it seems

18   to me it's something that's coming that I'm curious.

19        MR. LEE:  I agree.  I've had some cases where the location

20   of the witness had to be amplified by what their duties were

21   and where they traveled to.  I think my best information is

22   that the people designed in the design of the accused features

23   are not traveling to Austin to work on those or other purposes.

24   They -- we're sufficiently large that people in Austin are

25   doing something different.  For different of these features so

1   for some of the accused features the work's entirely done in

2   Israel.

3        THE COURT:  I got it.

4        MR. LEE:  We're going to bring some of those folks whether

5   the case is in Delaware or here.

6        THE COURT:  I had forgotten that y'all had such a big

7   Israel presence.

8        MR. LEE:  And the Portland, Oregon facility is quite large

9   too.  So, you know, would I say that, you know, whatever

10  travel's done -- no.  My guess is --

11       THE COURT:  Of course for the Israeli folks probably

12  flying to Delaware or Austin or California probably is a really

13  long flight regardless.  So there's that too.  But I'd

14  forgotten there were -- do you have off the top of your head a

15  sort of a broad picture breakdown of what percentage of them

16  are located primarily in California versus the number that

17  might have to travel somewhere regardless?

18       MR. LEE:  I don't, Your Honor.  We're in -- you know, the

19  best indication I can give you is that in the first Delaware

20  case but the second case but what we call Delaware 1, we're in

21  the process of scheduling depositions now and some of them are

22  going to take place in Israel.  Some of them are going to take

23  place in California.  Some of them are going to take place in

24  Oregon.  It's going to be where folks are located.  Now, part

25  of this is just trying to work things out as agreements between

1  counsel.  What I can fairly say to Your Honor is this:  Whether

2  the case is in Texas, in Waco, Austin, Delaware, for each of

3  the patents that remain when we get to trial -- I mean, there

4  are eight now, but as Your Honor knows, it could be eight,

5  could be two.

6        THE COURT:  Yeah.

7        MR. LEE:  We will have an engineer who is intimately

8  involved in the design and development of our accused feature

9  come to testify, and if it's in Waco, it would be in Waco.  If

10  it's in Wilmington, Delaware, it will be in Wilmington.  I

11  think the real question is whether before you get to that point

12  if I -- to use a hypothetical, if Your Honor had all of these

13  cases, one, two, three, four, five, and a witness, an engineer,

14  had something to say about one of the California patents, one

15  of the Delaware 1 patents, one of the Waco 3 patents, there

16  would be a way for Your Honor to say, okay.  He's going to

17  testify for eight hours, but have your day and that's going to

18  be it.

19        The way things work now or as the landscape is now, they

20  could get him once in Delaware.  They could get him once here

21  and we have two separate judges, and the best indication that

22  that's what's going on is why should Your Honor have to decide

23  the motion to dismiss that we're going to maybe find time to

24  argue to Your Honor when Judge Connolly has already decided it?

25  Same parties, same allegation, and what he found specifically

1   was there wasn't any allegation or sufficient allegation of

2   willful blindness of the act of infringements presuit.  Why

3   should Your Honor have to decide it?  And then, equally

4   important, why should there be competing determinations from

5   two district courts?  If Your Honor had all five cases, my bet

6   is it'd be very unlikely that you would reach two different

7   decisions in two different cases.  That's -- that's the issue.

8   I mean, Intel's got 1,700 folks in Austin.  We do important

9   work there.  We sell nationally.  We're going to be in Your

10  Honor's court.  And if there are garden variety transfer cases,

11  you're not going to hear the arguments that we're making today.

12  That's why I think that we've made the argument to you on the

13  overlap in the accused products.  We've made the argument to

14  you on the general overlap in technologies.  We've made the

15  argument to you about the possibility that there will be

16  witness overlap and duplication, and we've made the argument to

17  you that some of that can be ameliorated if all the cases are

18  before Your Honor or all the cases are before Judge Connolly or

19  all the cases are before Judge Freeman.  The one thing I'm

20  certain of at my advanced age is having over three different

21  judges in three different locales is not going to promote

22  efficiency, and that's why we suggest, Your Honor, that at the

23  end of the day if you take all of the things that are in the

24  remaining slides, and I won't go through them, the issues that

25  Your Honor has identified, the competing considerations of

1  where Intel's witnesses are, where the documents are, the fact

2  the witnesses are going to have to travel in any event, the

3  possibility of repetitive depositions, repetitive discovery --

4      THE COURT:  Well, I can assure you if -- and I haven't

5  made up my mind at all.  I mean, I really was looking forward

6  to this.  It's an odd person that really looks forward to a

7  hearing like this, but I spent all morning sentencing.  So it

8  gives you an idea of how my day was, but I can assure you if

9  with respect to at least the issues on duplicative discovery,

10  if the case were to stay here, I would be pretty sensitive to

11  make sure that there was no unfair burden on any of the parties

12  because the cases were in different locations.

13      MR. LEE:  And, Your Honor, we assumed so and we trust it

14  would be so.  I don't think it -- I'm not sure it's the most

15  efficient thing for us to have to come back and explain to you

16  that it's duplicative because in Delaware Judge Connolly

17  ordered this.  In California Judge Freeman --

18      THE COURT:  I bet you I could resolve that issue.  I bet

19  you, number one, having said this, it would be unlikely the

20  plaintiffs would make it an issue that had to be brought back

21  to me, but I resolve discovery issues within a 24-hour period.

22  Just -- and I'm saying I don't know what I'm going to do in

23  this case and maybe that's just information going forward.

24  Like you said, Intel may very well be a plaintiff here tomorrow

25  for all I know.  And so -- but just for the record, you know,

1    discovery motions don't -- that's not going to persuade me.  I

2    get your point.

3         MR. LEE:  Right.

4         THE COURT:  There's no question I get it, but that's

5    something that I can handle pretty quickly.

6         MR. LEE:  And, Your Honor, if you go to the last slide and

7    then I'll yield the floor unless Your Honor has additional

8    questions.

9         THE COURT:  Okay.

10        MR. LEE:  Sometimes I found that it helps to step back

11   from the details and the checklists and just look at the

12   chronology and the sequence of events and say to ourselves, so

13   what happened here?  And we would suggest that if we do that,

14   the big picture's pretty clear.  We start in California.  It's

15   not going so great.  We file a second case in Delaware.  It's

16   going fine, but then California gets stayed and we filed a

17   second case in Delaware.  And in March or April of this year,

18   our characterization, not theirs, things are not headed in

19   their direction.  And what happens?  Case gets voluntarily

20   dismissed.  They get refiled here.

21        At the end of the day, as I said, the chronology is what

22   the chronology is.  It speaks volumes.  When you overlay, Your

23   Honor, those competing quotations that I gave Your Honor on

24   that chronology, it tells you -- tells us exactly what the

25   Volkswagen case said.  The interest of justice is paramount.

36

1    And if someone has abused the privilege of picking their own

2    forum, then a transfer motion should be granted.  And this is

3    not a question of VLSI having come to Your Honor as its first

4    stopping point.  This is the third, fourth and fifth stopping

5    point and the questions are why and what's the right remedy?

6         THE COURT:  I apologize.  I focused I think primarily on

7    the issue that is Delaware or Austin.  Can you tell me exactly

8    where the California -- I don't know that I'm -- I know as well

9    as I should what the status of the California case is.

10        MR. LEE:  The California action is stayed.

11        THE COURT:  Okay.

12        MR. LEE:  The IPRs are proceeding.  There are a whole host

13   of arguments in November -- the fall, the later fall of this

14   year.

15        THE COURT:  Okay.

16        MR. LEE:  The California action is stayed pending those

17   determinations.  There has been some third party discovery from

18   the California court that has continued because it's relevant

19   to Delaware.

20        THE COURT:  Okay.

21        MR. LEE:  If Your Honor's -- it may be implicit in Your

22   Honor's question of --

23        THE COURT:  No.  There was nothing implicit.

24        MR. LEE:  Okay.

25        THE COURT:  I just -- I realized that I'd focused -- I was

1  doing the what I should do and I realized I wasn't as intimate

2  with -- because your point is California, Delaware, Waco, and I

3  just want to make sure I understood where it was at in

4  California.

5      MR. LEE:  Yeah.  Your Honor, that's exactly where it is at

6  now.  The reason that we're not moving to ask Your Honor to

7  transfer it to California is twofold.  One is it's stayed.  The

8  second is the Court that has gotten up to speed further in the

9  period of time since California was stayed is the Delaware

10  court.  And because it's had two or three hearings, because

11  it's -- the Markman briefing is almost done, the hearing's in

12  November, witnesses are being deposed today, we're arguing over

13  discovery and contention issues, the logic of it said to us

14  that send this back to where it came from.

15      THE COURT:  Doesn't the fact that the Markman briefing is

16  almost done for the cases in Delaware right now though indicate

17  to you -- I know I'm asking you to -- it's a mystical question,

18  but it would indicate to me if I were -- if someone -- if I

19  had -- if I knew I was going to a Markman in X couple of months

20  and the Markman briefing was done in that case right now, I'm

21  not sure how I would consolidate other -- six more patents into

22  the case without either the plaintiff saying they don't have

23  enough time or you saying you don't have enough time.  So I

24  will confess I'm skeptical that a motion to consolidate that

25  would keep -- that would put these patents on the same track as

1  your other case is really very likely.

2      MR. LEE:  Your Honor, I think that's a very fair question.

3  It's one we thought about, but I think here's the answer I've

4  at least given myself.  We were going to move in March.  If the

5  case hadn't been pulled out from under us, that would have been

6  decided by now and Judge Connolly could easily have

7  consolidated the Markman briefing for November of this year

8  around that.  You're right in terms of what you just

9  articulated as the challenges now, but that would be rewarding

10  VLSI for having taken the case from Judge Connolly at the very

11  moment that he was asking about the motion to consolidate,

12  bring it down here, taking the time for Your Honor to get your

13  arm's around this collective dispute, get the briefing, get it

14  argued, have Your Honor have a chance to decide it.  And I

15  guess the best argument I can make to you is if there's a

16  problem that results from that delay, I don't think it should

17  be visited on us because we moved to consolidate three days

18  after we could, and if the judge had been able to decide it

19  then, all of the things that Your Honor has defined as problems

20  wouldn't have been problems.

21      THE COURT:  So let me summarize what I'm taking away from

22  this.  Correct me, I mean, if I'm wrong.  But it seems to me

23  that the issue we're discussing right now cuts a little bit in

24  both ways, and what I mean by that is it cuts against probably

25  to some extent your argument that if I send this back, there's

1  a likelihood it will get on the same track and it is going to

2  be -- these folks will get to trial anywhere as close as what I

3  could get to trial just because even though he has a Markman

4  hearing set in November and a trial set in the following

5  November, I think it's unlikely.  The thing that enures to your

6  benefit out of that argument though is, if anything, it

7  strengthens your argument about the concept of forum shopping

8  that, well, that's too bad, but it's their fault because if we

9  had heard the motion to consolidate in Delaware in March, the

10  Court could have had the opportunity at that time to integrate

11  a Markman on all the patents and a trial on all the patents

12  into the same schedule and we wouldn't be facing.  Is that a

13  fair summary?

14       MR. LEE:  That's a very fair summary.

15       THE COURT:  Okay.

16       MR. LEE:  And, Your Honor, the best articulation I can

17  give you to end the argument is this.  We would ask Your Honor

18  to put yourself -- let's reverse the positions so that Your

19  Honor had the second and third cases.  Your Honor decided in

20  another case, maybe not even between Intel and VLSI, a motion

21  under 101, a motion for induced infringement, and as Your Honor

22  has done, you did just a day or two before you issued an

23  opinion.  And what happens is one of the parties gets to look

24  at it and says, we don't want to be here anymore.  And --

25       THE COURT:  I can't imagine anyone not wanting to be here.

1        MR. LEE:  That's why --

2        THE COURT:  But I'll -- just hypothetically.

3        MR. LEE:  This is all hypothetical.

4        THE COURT:  Yes.

5        MR. LEE:  And all of a sudden the cases are dismissed from

6   your docket and they reappear on Judge Connolly's docket with

7   the very same motions that you've already decided.  I think if

8   we asked ourselves just the broad question is, is this really

9   the way the system's supposed to work?  Is this the efficient

10  way for the system to work?  Is this in the interest of

11  justice?  We think the answer is no.

12       THE COURT:  Understood.

13       MR. LEE:  Thank you, Your Honor.

14       THE COURT:  Thank you.

15       And before I forget, when you see John Regan, please give

16  him my best.  He was one of the best lawyers I've ever had the

17  pleasure of being in a case against.

18       MR. LEE:  So was he on the other side of that one case?

19       THE COURT:  Yes.  He was.

20       MR. LEE:  All right.  I'll remind him both of two things.

21       THE COURT:  Okay.

22       Yes, sir.

23       MR. HATTENBACH:  Ready for us to respond, Your Honor?

24       THE COURT:  I am.

25       MR. HATTENBACH:  My colleague Mrs. Wen will hand out some

1   slides.  By the way, I'm Mr. Hattenbach from Irell & Manella.

2   It's good to meet you.

3       THE COURT:  My pleasure.

4       MR. HATTENBACH:  I don't think we've met before.

5       THE COURT:  We have the best firms in America here.  It's

6   an honor to be sitting in front of you.

7       MR. RAVEL:  Your Honor, may we trouble the VLSI side for

8   copies of their slides, please?

9       MS. WEN:  I just -- my arms aren't long enough.

10      MR. HATTENBACH:  Before jumping into our slides, I think

11  I'm going to start by addressing some of the things that Mr.

12  Lee had to say, and before I do that, I suppose I want to say

13  I've only been doing this 23 years, not as long as Mr. Lee, but

14  I don't think I've ever had a case where the case actually had

15  more of a connection to the jurisdiction in which it was

16  pending than this case.  And I'll describe some of the reasons

17  for that as we proceed.

18      THE COURT:  Well, I'm going to speak on Mr. Lee's behalf

19  here, and he can tell me if I'm wrong.  My sense is from the

20  concessions he made which showed you why he has the reputation

21  he does, any of us would have to make in terms of that.  I

22  think you would do best spending your time on Mr. Lee's point

23  which is doesn't matter.  I mean, for example no one can

24  contest that 95 percent of the inventors are in the Western

25  District, and I think he would concede, but he can tell me

1    later if he wouldn't, had you all filed here first, he probably

2    wouldn't have filed this motion in this case.  Maybe he would

3    have because Intel probably wouldn't want him to, but I'm

4    saying it would be a lot tougher starting off with that.  I

5    think Mr. Lee is telling the Court that in this situation

6    because of the unique facts that you are in California and what

7    happened in Delaware and what happened that you shouldn't get a

8    third bite at the apple as a public policy matter and that in

9    an ordinary course this would be the perfect place to file the

10   suit.  Maybe they'd want me to transfer it to Austin instead of

11   Waco, but they would be conceding the Western District is

12   appropriate.  So I would focus primarily on persuading me that

13   Mr. Lee's wrong about the forum shopping argument.

14        MR. HATTENBACH:  Sure.  Will do, Your Honor.

15        So I suppose to start off with on that point, if it was

16   the same case that had been filed in California and then

17   Delaware and then here, it'd be a very different subject, but

18   the fact is each of the patents that were filed in each of

19   those cases is different.  Each patent is its own cause of

20   action, and I'd like to just start out by saying it wasn't that

21   anything bad happened in either of those forums that caused us

22   to come here.  It was that we learned about Your Honor's

23   expertise in this area.  We put it together with the fact that

24   almost all of the inventors and the companies at which the

25   inventions took place were based here and it made perfect sense

1    to have the case filed here.  Now, why didn't we do it to begin

2    with?  I'll take the blame for that.  I didn't know about Your

3    Honor's expertise in the area until around the second half of

4    March of this year.  That's -- that's what happened.  It wasn't

5    that we had a bad ruling and we decided to run from some judge,

6    and, in fact, there weren't bad rulings.  The way they've

7    described those rulings to you I believe was -- is not only

8    incomplete but misleading, and I will get to that.  If you want

9    me to address it now, I could.

10       THE COURT:  No.  No.  You do it however you want.  You

11   don't need to spend a lot of time persuading me that this is an

12   appropriate forum.

13       MR. HATTENBACH:  Okay.  Very well.

14       To start with, Mr. Lee said the focus here is on forum

15   shopping.  Forum shopping is not in the interest of justice,

16   and the interest of justice can trump the public and private

17   interest factors.  That's what he told you.  That is not the

18   law, and if you turn to Slide 4 of VLSI's slide, you'll see

19   this is a quote from the Eastern District of Texas, but it's

20   quoting a U.S. Supreme Court case and they say, plaintiffs are

21   ordinarily allowed to select whatever forum they consider most

22   advantageous, consistent with jurisdictional and venue

23   limitations.  And there's no argument here that the selection

24   of this forum is consistent with jurisdictional and venue

25   limitations.  And this isn't news to Mr. Lee or to Intel

1   because they made the same argument in Delaware.  They told

2   Judge Connolly exactly the same thing.  And you'll see on Page

3   5 what Judge Connolly told them in response, and we cut the

4   quote short, but he went on to say, the Supreme Court has

5   actually held this twice.  The principle that a plaintiff can

6   lawfully engage in forum shopping is fundamental to our federal

7   system.  And so what the Supreme Court and Judge Connolly and

8   the Fifth Circuit has said is fundamental to our system is what

9   he says is not the law.  We respectfully disagree with his

10  statement of the law.

11      I think there's another related point on Slide 10 as to

12  Mr. Lee's point that the interest of justice can trump the

13  other factors.  This is the Volkswagen case itself out of the

14  Fifth Circuit.  And the standard is for the convenience of the

15  parties and witnesses and in the interest of justice, not or,

16  but it's and.  And that's an issue that we also addressed in

17  greater length in our brief, but you can't just look at part of

18  the analysis and call it a day.  You need to look at the full

19  analysis that the Fifth Circuit says needs to be undertaken.

20      So let's -- just a quick factual matter.  Mr. Lee said in

21  the California case all of the asserted claims were currently

22  subject to IPRs except for the one patent where the IPR wasn't

23  instituted.  That's factually incorrect.  They didn't even file

24  IPRs on multiple of the asserted claims in the case.

25      Your Honor had a question about --

1          THE COURT:  Do you have any -- and you may have -- I don't

2    remember it being in the briefing.  I don't remember quite that

3    focus, but do you -- are you -- do you have available to you

4    right now a couple of examples of that, or --

5          MR. HATTENBACH:  Could I look that up?  I remember there

6    was at least one patent.  It was --

7          (Conference between plaintiff counsel.)

8          MR. HATTENBACH:  We'll try to find that.

9          THE COURT:  If you could find that, I'd like it to be on

10   the record.  That way Mr. Lee can respond.

11         MR. HATTENBACH:  Sure.  I know the '836 patent was the one

12   that IPR was not instituted on, but, again, I'd say this --

13   frankly, I don't see the connection between it and anything

14   that's going on here today.  I only mention it because it came

15   up while he was speaking and it's just not correct.

16         THE COURT:  That's fine.  I just want to make sure you

17   give us enough specific information if possible that Mr. Lee

18   can -- you know, I want to make sure he has a chance to respond

19   to that.

20         MR. HATTENBACH:  Certainly.

21         Okay.  Well, let's -- if we could turn to Mr. Lee's Slide

22   No. 6.  This was one that Your Honor had a few questions about.

23   It's the one where Mr. Stolarski said it would be more

24   convenient for him to travel to Delaware.  Now, and the

25   suggestion was made that this supports the position that it'd

1   be more convenient for him to travel to Delaware than here.

2   What Mr. Stolarski was saying is it would be more convenient

3   for him to travel from Chicago to Delaware than from Chicago to

4   San Jose, California.  This is in a different case where a

5   motion was being made to transfer to California, not here, and

6   this is just one of many examples where suggestions were made

7   about statements being inconsistent with our positions here

8   where the statements are being taken massively out of context.

9       Your Honor's question about Paragraph 9 where

10  Mr. Stolarski said, I'm not aware of any other VLSI witnesses,

11  et cetera, on that slide.  He, I believe, was just referring to

12  himself.  He's the only employee of VLSI.  And in that -- in

13  that section.  That's my understanding.  He was just referring

14  to himself.  I think -- my sense of it is that it's probably

15  equally convenient for him to come to Waco as it would be to

16  Delaware from Chicago.  I haven't checked the airline routes,

17  but I don't think that's something that this motion should turn

18  on.

19      I do want to talk about Slide 19 from Mr. Lee's

20  presentation.  That's where he had those four points and he

21  presented them as alleged inconsistencies between our positions

22  in Delaware and our positions here, and I want to go through

23  each one of them because I don't think there is any

24  inconsistency between any of them.

25      So the first one -- and, again, it's Mr. Lee's Slide 19.

1  We said Delaware is more convenient for VLSI's witnesses in

2  this case.  He skipped over the in this case part.

3      THE COURT:  Oh, I caught it.

4      MR. HATTENBACH:  Yeah.  We have different patents.  We

5  have different inventors.  Here the inventors, as we've said,

6  17 out of 18 of them are in the district.  Zero of them are in

7  Delaware.

8      Now, the suggestion was that there's a very similar

9  situation going on in the Delaware case, and that's not

10 correct.  We have inventors from -- I think there are two

11 inventors from Arizona in that case.  There's an inventor from

12 the Netherlands.  There are three inventors from Israel.  And

13 so the locust or the sort of the center of all of those people

14 probably is closer to Delaware than here, but certainly it's

15 not here.  So it's just to suggest that that's inconsistent

16 with what we're saying here where the facts are different I

17 think is very misleading.

18     The second one.  The quote on the left from Delaware was

19 about where a claim for patent infringement arises.  The quote

20 on the right is about -- it's from a section that was talking

21 about witness convenience or the ability to subpoena witnesses.

22     THE COURT:  I got that too.

23     MR. HATTENBACH:  Just a -- okay.  It's a non sequitur.

24     THE COURT:  I actually understand some of this stuff.

25     MR. HATTENBACH:  I'm glad to hear it.

48

1      The third one.  We did say Delaware has an interest in

2  adjudicating disputes among its citizens.  That doesn't mean

3  it's the only place that that can be done, and that was just

4  one of eight factors.  And we certainly think here there are

5  other factors that support keeping the case here.

6      The fourth one.  I don't really know what the

7  inconsistency was even supposed to be on this one because we

8  said the time to trial is 2.5 years.  I'm not great at math,

9  but by my calculations that's 30 months which is exactly what

10  we told Your Honor was the case here.  The new fact, which we

11  didn't have I don't think at the time we made that statement in

12  Delaware, was from Judge Connolly.  He says -- he was

13  relatively new at the time.  He got hit with a lot of cases and

14  he actually told us he's overwhelmed with cases.  So that's

15  just a new fact and I don't think it's inconsistent with 2.5

16  years being 30 months.  So that's all I have to say about Slide

17  19.

18      There was some discussion of this.  I think he's a

19  financial person, Mr. Herrgott at Intel who provided a

20  declaration about where certain events have and have not

21  occurred.  And Mr. Lee said it supports the view that there's

22  essentially no relevant information among these 1,700 Intel

23  employees in the district and Mr. Lee said it was a direct

24  quote.  He said it's the only sworn statement before you.

25  That's not correct either.  Mrs. Wen my colleague here supplied

1   a sworn declaration as well.  Paragraphs 20 to 26 of that

2   declaration not just speculated about but actually demonstrated

3   that numerous of the people at that R&D facility in Austin have

4   been working on technologies that are implicated squarely by

5   our claims in this case.  And we didn't do it in a general

6   manner.  We did it patent by patent and technology by

7   technology and we mapped them together and we didn't have the

8   ability to go and depose those people because discovery isn't

9   open yet, but we looked at their publications and their

10  patents, and just as an example, there's a very specific

11  technology that we're accusing in one of the cases called QPI.

12  It's an Intel acronym for quick path interconnect which is an

13  Intel proprietary technology.  That's the very specific

14  technology we're accusing.  And the employees at Intel in this

15  district have over 100 patents describing or claiming that

16  technology.  And so the notion that they don't know anything

17  about it or didn't have anything to do with it is a really

18  difficult one for us to accept.  And so I went back and looked

19  at Mr. Herrgott's declaration, and he didn't say the things

20  that Mr. Lee described to you in broad terms about not having

21  anything to do with the products.  What he said was those

22  people didn't develop the, quote, "product features."  And so

23  what I think is going on here is it's an artfully drafted

24  declaration that's meant to suggest they don't know anything

25  about them, but it's limited to the product features, not the

1   development of the technology underlying those features that

2   went into those features, and that would make perfect sense

3   because it's not a production facility as far as I know.  It's

4   a research and development facility where they develop the

5   technology that then goes on to the productization people to

6   turn it into a product.  So for Mr. Herrgott to say they didn't

7   develop the product features really doesn't answer the relevant

8   question of whether they'll have information bearing on our

9   claims in this case about the technology and our evidence which

10  is again under oath from Mrs. Wen in her declaration supplied

11  with our opposition brief absolutely does.  It's directly on

12  point.

13          Another claim that we heard repeatedly from counsel was

14  about the motion to dismiss.  Said it's the very same motion

15  with the same allegations.  Those are direct quotes.  Very same

16  motion, same allegations as in Delaware.  And I submit that if

17  Your Honor looks at the -- really all you have to do is look at

18  the order in Delaware.  You will see that that is quite far

19  from correct.  There were two issues adjudicated in that -- in

20  that order.  One was as to a single patent.  VLSI did not plead

21  knowledge by Intel of the patent.  We've pled knowledge of

22  every patent here, as Mr. Chu will describe later today.  So

23  it's not the same issue at all.  We dealt with that issue in a

24  very different way.  Not only are the patents different.  The

25  pleadings are different.  It's not -- just not the same.  It's

1    completely different.  It's completely contrary to what the

2    situation was there.

3         The same applies to the other issue that was adjudicated

4    in that ruling which was Intel's knowledge of infringement.

5    And in the second part of that order Judge Connolly said that

6    VLSI had not pled knowledge by Intel of its infringement of

7    particular patents.  Well, guess what?  In this case we

8    explicitly pled knowledge by Intel of its infringement of each

9    of the asserted patents.  And so again the pleadings in this

10   case are actually responsive to the order in that case.  They

11   eliminate the problem that Judge Connolly said existed.  It's

12   very much not the same motion with the same allegations.  It's

13   the opposite.

14        So those are the principle points I wanted to raise in

15   response to what counsel said.  Let me just, if you don't mind,

16   address a couple more points from our slides.

17        THE COURT:  Please do.

18        MR. HATTENBACH:  In Slide 6 this is responsive to some of

19   the arguments they made in their reply brief suggesting that

20   the strong deference to a plaintiff's choice of forum will

21   disappear if the plaintiff happened to have filed a similar

22   case somewhere else previously.  Well, that's not the law in

23   this district.  The Eastern District here says the deference

24   never disappears under any circumstances.  And the only

25   contrary law they cite are I call them corner cases where, for

1   example, one of them had to do with an accident that occurred

2   in Puerto Rico and the parties litigated the case for four

3   entire years in Puerto Rico before the plaintiff dismissed the

4   case and then filed it somewhere else.  Well, that's nothing of

5   the sort like what we're dealing with here.  In fact, if --

6   just to be clear, I want to be clear about what happened and

7   didn't happen in the Delaware case where six patents of -- six

8   patents from which were moved here, add it to two other patents

9   that we filed here to make the current cases.

10          If you'll go to Slide 9 in VLSI's deck, we're talking

11  about a case that first of all didn't even have all of the

12  patents that are asserted here.  Secondly, it was dismissed as

13  a matter of right within six weeks, and there was a suggestion

14  that we did something wrong by giving them the extension.  They

15  were asking us to dismiss claims.  We were considering whether

16  we wanted to dismiss them or do something else.  We didn't want

17  them to have to file or prepare and file a motion to dismiss

18  under the circumstances because we're thinking about moving

19  things to a different place, and essentially we said, we'll

20  give you two weeks while we think about what we're going to do,

21  and the reason was we didn't want to put them through

22  unnecessary work.  It wasn't some kind of conspiracy.

23  Anyways...

24          THE COURT:  Save chicanery.

25          MR. HATTENBACH:  Yeah.

1          THE COURT:  It's one of the C words.

2          MR. HATTENBACH:  So what did not happen in the -- what did

3     not happen in that second Delaware case over those less than

4     six weeks -- I mean, there were no hearings.  There was no

5     answer.

6          THE COURT:  Well, let me -- while you're on 9 -- and I've

7     lost touch just a little bit.  But I think one of Mr. Lee's

8     points is -- and I think I've got this -- is that one thing

9     that they -- that Intel had told you they were going to do in

10    this period though was move to consolidate, correct?

11         MR. HATTENBACH:  Right.  They filed a motion and we

12    opposed the motion and there was no reply brief filed is my

13    recollection.

14         THE COURT:  So they filed a motion to consolidate before

15    they answered?

16         MR. HATTENBACH:  Yes.  That's correct.

17         THE COURT:  Okay.  And did you all file a response to

18    that?

19         MR. HATTENBACH:  We did.  We opposed it.  And by the way

20    so just to put this in perspective, this was a motion to

21    consolidate a case, but in their reply brief in this case they

22    called it sprawling and unmanageable.  And their motion was to

23    take that sprawling and unmanageable case, as they called it,

24    and add six patents to it and now they're asking Your Honor to

25    add eight patents to it even though it's almost an entire year

1    ahead, as Your Honor observed, scheduling wise from these

2    cases.  So it's just -- the notion that any justice or

3    consolidation or efficiency could occur by doing that is very

4    hard to fathom.  I think what's much more likely to occur is

5    frustration by Judge Connolly who already says he has enough

6    cases or too many cases and delay and prejudice.  What they

7    really -- I mean, I'll tell you -- since we're talking about

8    conspiracy theories today, I'll tell you this isn't a theory.

9    This is what they told us they were going to do.  They wanted

10   to consolidate the cases and then they were going to claim

11   there were too many patents in the cases -- in the case and

12   then they were going to ask the Court to force us to remove

13   patents from the case, that we couldn't pursue all the patents

14   that we had asserted against them.  They literally told me

15   that.

16        THE COURT:  Well, okay.  Well, here is what I was going to

17   ask since I -- with Mr. Lee.  I summarized things just to make

18   sure I'm following.  Would it not be fair -- how many patents

19   are in the current Delaware case that are going to be at the

20   Markman?

21        MR. HATTENBACH:  There's five.

22        THE COURT:  Five.  How many claim terms are being disputed

23   in that case at the Markman?

24        MR. HATTENBACH:  It's either nine or ten I think

25   approximately.

1    THE COURT:  And so another way of looking at what you all

2    did, which is a different viewpoint than Mr. Lee and Intel

3    have, is that when they told -- when Intel told you they wanted

4    to consolidate that case and add this case that you could have

5    been concerned that that would make that other case even more

6    unmanageable by having whatever number that equals, 11, 12, 13,

7    whatever, and that a reason for coming to this Court to avoid

8    the motion to consolidate was to keep both cases more

9    manageable by at least plaintiff, if not both parties.

10    MR. HATTENBACH:  Well, certainly we think -- we think that

11   coming here makes both cases more manageable, and in fact I

12   will say the reason -- one of the main reasons we filed it as

13   three separate cases instead of one case was because they had

14   complained about five patents being too many and so we wanted

15   everything by everyone's standards to be of manageable size.

16   So that is -- I think that was probably part of the thinking,

17   but it wasn't avoiding -- it wasn't so much of avoiding

18   Delaware but it was finding a place that was even more

19   sensible.

20    THE COURT:  I'm on your side on this one.  I handled a

21   case for AT&T against IV where they sued us on 19 patents and

22   that resulted in the case taking about a million years to -- it

23   eventually settled, but it took a very long time on the docket.

24   So I certainly understand that there can be a legitimate

25   concern about making a big patent case even bigger by adding

1    other patents.

2        MR. HATTENBACH:  Right.  And we're in front of a judge who

3    already says he's overwhelmed and things are unmanageable as it

4    is.

5        THE COURT:  Well, we all think we're overwhelmed.  That's

6    in a federal judge's DNA is to think we're all overwhelmed.

7        MR. HATTENBACH:  All right.

8        THE COURT:  I don't think that though.  I'm happy every

9    minute I'm sitting up here.

10       MR. HATTENBACH:  All right.  Quick aside.  So you'd asked

11   about the claims on which Intel didn't even -- didn't attempt

12   to institute an IPR or on which an IPR wasn't instituted.  So

13   the patent I had in mind is 8020014 and the asserted claims on

14   which IPRs were not instituted included at least '6, '10, '11,

15   '17, '21, '22 and '23.

16       THE COURT:  Okay.  Thank you for that.

17       MR. HATTENBACH:  So I'll try to wrap up here quickly.

18       THE COURT:  You don't -- I'm in no hurry.

19       MR. HATTENBACH:  Okay.  I thought -- you should hear from

20   Mr. Chu too.  He has some excellent points.

21       THE COURT:  I will hear from anyone who wants to stand up

22   and talk.  This is why this is the best job on the planet.  I

23   had great lawyers in the trial before you for a couple of days

24   and now I'm getting to do this.  I ought to pay the federal

25   government to get to sit up here.

1          MR. HATTENBACH:  Good job security as well, I hear.

2          THE COURT:  They tell me that.

3          MR. HATTENBACH:  Some of the best.

4          All right.  So if we look at VLSI's Slide 29, this is also

5    something that Mr. Lee glossed over but didn't really get into.

6    As far as the benefits that would come from having all of these

7    patents in Delaware and here put together, the best they could

8    do in describing the overlap is to tell you they relate to

9    semiconductor technologies.  That's the overlap.  Now, we're

10   talking about a semiconductor company.  Of course the claims

11   relate to semiconductor technologies.  If that was enough to

12   allow consolidation of claims, Intel could consolidate any case

13   ever brought against them.  The reality, and Your Honor

14   probably knows something about this, the products -- and I'll

15   give them a compliment here.  The products they make have been

16   described as the most complicated machines ever made by

17   mankind.  They literally have more transistors in some of them

18   than there are people on the face of planet earth.  And it's

19   all semiconductor technology, but that doesn't mean it's the

20   same semiconductor technology.  And in fact if you look at the

21   patents individually -- and I won't put you through that today

22   unless you really want to -- it's not.

23        If you turn to Slide 31 in their reply brief, they tried

24   to do a little better.  They said it's not just semiconductor

25   technology but it's that several of the patents, not all of

1    them, relate to power management in integrated circuits.  But

2    here's what they told Northern California, and it's true, that

3    every semiconductor chip includes power management features.

4    They said you can't look at it at that level of abstraction.

5    You have to look at the particular technology and see if

6    there's an overlap at that level, and I would say when looking

7    at consolidation you want to see if it's overlap at a level

8    that will result in an overlap of technology or evidence to a

9    substantial degree, and here the approaches that are taken to

10   power management in the various patents are for the most part

11   extraordinarily different and certainly different enough that

12   there wouldn't be significant overlap in evidence in a way that

13   would result in consolidation promoting judicial efficiency.

14        Slide 33 gives you a bit more of an idea into what's

15   happened in the Delaware case in the almost extra year that

16   it's been pending relative to this case.  Here we just

17   exchanged infringement contentions.  There we've also done

18   invalidity contentions.  We've done some narrowing of the

19   claims in prior arts.  By the way, on that point let me mention

20   because it was suggested to you that the judge's ruling --

21   Judge Connolly's ruling on case narrowing was extraordinarily

22   unfavorable to VLSI and we were running away from it.  There

23   were four issues in that -- in that hearing.  One was the

24   initial narrowing sort of interim narrowing in the middle of

25   discovery.  The second was the narrowing right before trial.

1   So how many claims and pieces of prior art do people get to

2   present at trial?  The third had to do with how prior art was

3   counted, whether it was individual references or combinations,

4   and the fourth had to do with whether VLSI could add additional

5   claims if they could demonstrate they were unique issues raised

6   by those claims.  Mr. Lee didn't tell you this for obvious

7   reasons.  VLSI won on three out of four of those issues.  The

8   only issue we didn't win on was on the interim selection during

9   discovery of the number of claims, but obviously what matters

10  the most is the number of claims you get to present at trial.

11  So we ran the board on everything else.  And that is not an

12  order from which we're running in any way, shape or form.  Nine

13  months of fact discovery.  330 requests for production.

14  Between the parties over 500 pages of interrogatory responses

15  and four hearings at the last of which the judge said to Intel

16  that unless they started producing documents that they were

17  supposed to be producing he was going to sanction them.  We're

18  not running from that either, Your Honor.

19      Let's look at Slide 35.  This is just Intel in its reply

20  brief saying the Delaware case as it stands -- I mentioned this

21  earlier -- is already sprawling and unmanageable.  The Court

22  was saying he thinks that essentially the number of claims that

23  already were asserted in the case are unworkable and they're

24  saying, well, add -- add eight more patents to it.  I don't

25  think he's going to find that any more workable.

1      I think, given Your Honor's admonitions at the beginning,

2   those are the principle points that I wanted to mention.   I

3   think I'll close by just saying two key points.  Clearly the

4   trial here would be faster.  The judge in Delaware is really

5   bogged down by cases now in a way that he wasn't a year ago.

6   And, secondly, the prospects of consolidation in Delaware are

7   not just bleak, but it wouldn't make any sense at all, given

8   the amount of subject matter already at issue there, the

9   differences between that subject matter and the subject matter

10  here and the procedural posture of that case to try and combine

11  the cases at this stage.

12      Unless there are any questions, that's all I have.

13      THE COURT:  I'm good.

14      Mr. Lee, I'm going to take a short break just because I

15  need a short break.  We'll resume in about ten minutes.

16      THE BAILIFF:  All rise.

17      (Recess taken from 3:32 to 3:44.)

18      THE BAILIFF:  All rise.

19      THE COURT:  Thank you.  You may be seated.

20      Mr. Lee, before I -- may I ask you a question before I

21  forget it?

22      MR. LEE:  Sure.

23      THE COURT:  I know if you're like me, and you're a much

24  better lawyer than me, I know whatever I'm going to say ready

25  to go and I wouldn't remember it.  So if it'd be easier for you

1    to go first.

2          MR. LEE:  No.  You go first, Your Honor.

3          THE COURT:  Okay.  So I understand your argument pretty

4    well I think, but in terms of public policy, if that's what

5    this is going to turn on, why wouldn't it be perfectly rational

6    for a plaintiff who is in any court in America, including --

7    you earlier said how would I feel if it had been in my court

8    and they went somewhere else?  But let's apply actually what

9    the reality of the patent world here.  The plaintiff is in

10   Delaware.  They've got a big case against you guys in Delaware,

11   lots of patents, lots of claims asserted.  And they file -- as

12   plaintiffs are want to do, they file another suit with even

13   more patents.  And Intel's response to that is in a very -- in

14   a heavily burdened district, Intel's response to that is to

15   file a motion to consolidate.  Perfectly your right to do.  I

16   probably -- I would have considered doing it myself if I was

17   representing Intel.  But what is the policy argument against a

18   plaintiff in that situation looking up and saying I don't want

19   to have eight, six, 12 patents added to the case.  I filed --

20   you know, I filed X number of patents in California.  I -- and

21   that's stayed.  I now filed patents in Delaware, a substantial

22   number, and I'm asserting a substantial number of claims and I

23   know already that we're at peril of it taking a great while for

24   our extant case to get to Markman and get to trial.  We've got

25   a new judge.  I believe he's a Trump nominee.  I mean, he's

1    with me.  He's one of the new judges.  So he's got, as you can

2    imagine, a ton of new cases.  Welcome to Delaware.  Here's

3    1,000 cases, some of which start with the number 10 because

4    they were filed in 2010.  He's got that.  You all know it's in

5    a district that's pretty burdened.  What is the policy argument

6    against any plaintiff looking up and saying, wait a second.  I

7    don't want this case -- I don't even want to have the risk of

8    my third set of patents being consolidated on what is already

9    maybe too big a case?  I want to go somewhere else.  And I'm

10   going to pick somewhere else.  First I'm going to make sure

11   that it's a legitimate place to file it.  I look around, and

12   you could have filed it in Northern California.  You could have

13   filed it in Oregon or you could file it in the Western District

14   because, you know, that would be acceptable.  And then you say,

15   well, and gosh.  There's a judge in Waco whose docket at least

16   currently is in good shape.  You know, it's growing, but it's

17   much -- regardless, it's -- I don't know about Oregon, but this

18   docket has to be faster than Northern District.  I know for a

19   fact from talking to the judges faster than Northern District,

20   faster than Delaware.  What is -- why is it a bad -- why would

21   it be against any public policy, A, for a rational plaintiff to

22   say, I'm going to get out of Delaware for this next case while

23   I can and get to a docket that makes more sense for me getting

24   to trial with a competent judge and, B, also policy, why

25   wouldn't a judge in Delaware who's got as many patent cases as

1   he can do if he works every minute for the next 30 years, why

2   would that district judge be unhappy that a plaintiff said I'm

3   going to burden a different judge with some of these patents

4   too because I've got plenty?

5        MR. LEE:  Your Honor, it's a great question and there's an

6   answer, and the answer is in the chronology in this case.  And

7   the second half of your question at the end is a huge part of

8   Mr. Hattenbach's argument to you is about what Judge Connolly

9   might have done or how he might have viewed the case.  He never

10  got a chance.  Now, the answer to Your Honor's question is the

11  public policy is --

12       THE COURT:  Well, let me interrupt you here.

13       MR. LEE:  Sure.

14       THE COURT:  I'm sorry.  But it seems to me -- I'm not --

15  I'm really not taking that into consideration about how he --

16  it seems to me when you guys filed the motion to consolidate,

17  it was binary.  Only two things could happen.  One, it would be

18  granted, and the other is it wouldn't be granted.  I can't -- I

19  think that's fair.

20       MR. LEE:  Actually, Your Honor --

21       THE COURT:  What else could he --

22       MR. LEE:  I actually think -- and Your Honor's order in

23  this case is the best indication.  My experience over the years

24  is when you get cases like that, either they're not

25  consolidated at all or the likelihood is they're consolidated

1  for some pretrial purposes including discovery and then the

2  Court comes back to you at that point in time and says, all

3  right.  Let's figure out what we're going to try.  And that's

4  part of --

5       THE COURT:  But in either way -- in either -- regardless,

6  a rational plaintiff could look and say, there is a different

7  venue -- as long as it's a legitimate venue.  I mean, you --

8  maybe in -- I'll pick -- maybe in Arkansas there's a

9  division -- a district that's even faster than this one because

10 it has less cases, but you would say, well, there's no

11 connection to Arkansas.  It can't be there.  But why is it

12 against policy for a plaintiff to say that Intel's filed a

13 motion to consolidate.  That is going to -- whatever happens,

14 it's not going to help our case.  In terms of pure procedure,

15 leaving aside running away from an order on a motion to dismiss

16 or any other reason, if a rational plaintiff says, we would be

17 better off in a different legitimate district and procedurally

18 it's okay to do it because no answer has been filed yet, what

19 is -- what is the public policy against that?

20      MR. LEE:  Your Honor, I -- two parts of the answer.  The

21 public policy first it's embodied in the phrase in the statute

22 in the interest of justice.  So that is the principle.  Here's

23 the policy.  If Your Honor looks at Slide 12 --

24      THE COURT:  Okay.

25      MR. LEE:  -- in our binder.

1          THE COURT:  Yes, sir.

2          MR. LEE:  And this is where, and I don't know if I've been

3     successful in convincing Your Honor, but this is what I believe

4     which is the chronology speaks volumes.  Remember this dispute

5     between the parties has been pending since 2017.  That's when

6     the first California action was filed.  If you look at Slide

7     12, the California action is stayed by agreement on March 1 and

8     the Delaware action is filed on March 1.  We file the motion to

9     consolidate on March 20.  Now, we've met and conferred before,

10    but the one date that's indisputable is March 20.  If the

11    rational plaintiff was making the determination, the decision

12    you just made, they would have moved to dismiss on March 21st.

13    What happens instead, Your Honor?  What happens instead is

14    after March 21st there is Judge Connolly's decision on the

15    motion for direct infringement and enhancement by willfulness.

16    What happens after that is our telling them we're going to move

17    to dismiss those same claims in the Delaware 2 action.  What

18    happens after that is a hearing on April 3rd.  So --

19         THE COURT:  But if I understand opposing counsel, they

20    weren't concerned about the threat of the motion to dismiss

21    because they had addressed the reasons that the Court had

22    given for -- to the extent it had granted the motion to

23    dismiss, they had already addressed in the current -- and I am

24    pretty familiar with what they've done because I am pretty up

25    to speed on y'all's motion to dismiss as well.

1        MR. LEE:  Your Honor, there are some words missing, but if

2   the person who could have decided whether they had done

3   something that would cure the problems for the first was Judge

4   Connolly because he decided the first, and if the question is

5   is there enough to reach a different decision, he could have

6   done that.  It's not to say Your Honor can't do that, and we

7   know Your Honor has entered some orders on cases that are

8   similar but different, but, Your Honor, if I take your

9   hypothetical, that rational actor either would never have filed

10  in Delaware because by March 1st the question of what Judge

11  Connolly's docket looked like was well-known, and I have a good

12  seven or eight other cases before him.  They were all known.

13  They had trial dates actually going off into the latter part of

14  this year.  Certainly by March 20th when we told -- when we

15  filed the motion to consolidate, if what they wanted to do was

16  just what you said, rather than oppose, they would have

17  dismissed and filed here in Waco.

18       Your Honor, at the outset you asked them to focus not so

19  much on the private and public factors because we have conceded

20  some are, you know, a challenge for us here.  We can argue

21  about whether the others are neutral or not, but you asked him

22  to address the forum shopping, and the answer to Your Honor's

23  question is they forum shopped here.  And the idea, honestly,

24  that on April 3rd they ran the table before Judge Connolly and

25  then eight days later all of a sudden the second case gets

1   dismissed is just not credible.  So the answer to Your Honor's

2   question is if they had not filed the second case in Delaware

3   and filed it here, the transfer motion would be very, very

4   different.  If we had moved to consolidate and their response

5   had been on that day to move to dismiss and file before Your

6   Honor, I think that could fall within Your Honor's

7   hypothetical, but you can't -- I don't think we can fairly

8   ignore everything that happens in March and April, and the only

9   explanation, the only explanation Your Honor got is that Mr.

10  Hattenbach, who accepted responsibility, didn't know of Your

11  Honor's expertise and your docket until April.

12       THE COURT:  Does it make a difference in my analysis that

13  the Delaware court had, as best I can tell, done literally

14  nothing on this case on these patents?

15       MR. LEE:  No, Your Honor.  The answer -- the fair answer

16  is it's not dispositive in either direction, but I think that's

17  not a fair characterization.  The -- first the parties are the

18  same.  The accused products overlap substantially the same.

19  The damages analysis is going to be very much the same.

20       THE COURT:  Well, the district court hasn't done anything

21  with regard to the damages.

22       MR. LEE:  Actually, the California court had.

23       THE COURT:  I understand, but I'm saying the Delaware --

24       MR. LEE:  Other than require us to answer contentions, and

25  one of the issues that has arisen there is the adequacy of

1   their damages answer to an interrogatory.  I don't think Your

2   Honor -- we don't need to get into it with Your Honor here, but

3   there's been a disagreement is the best way to put it.

4       Your Honor, the question of whether there were

5   efficiencies to be gained by -- as Your Honor has with these

6   three cases consolidating for pretrial purposes is a decision

7   that either could have been made by Judge Connolly.  I don't

8   disagree with you that they could have filed here originally

9   and it would look different.  I think if they had filed on

10  March 21st after we moved to consolidate, I think we'd still be

11  having the argument before Your Honor, but I think what they're

12  asking Your Honor to do is based upon the representation that

13  they were unaware of Your Honor's expertise and docket is to

14  ignore what happened on March 20th, 26th, 30th and April 3rd.

15  And the answer, Your Honor, at the end, one of the very first

16  things Mr. Hattenbach cited for Your Honor is a slide, their

17  Slide 5, which talks about lawfully engaging in forum shopping.

18  That was the phrase.  It's lawfully engaging in forum shopping.

19  Now, what our cases at Slide 22 and 26 show is there is

20  unlawful forum shopping, and what we have here is -- and I'm

21  not going to characterize it as legal or illegal.  What we have

22  here is forum shopping without an explanation because of

23  events, and the only explanations, Your Honor, is, well, Judge

24  Connolly is over burdened, but when he asked about the motion

25  to consolidate, he didn't say he was overburdened.  They -- the

1    quote they gave you about the case being too sprawling was his

2    admonition of them that they needed to narrow their case.

3    That's where that phrase came from.  And when he asked about

4    the motion to consolidate, I think he was doing what most new

5    or experienced district court judges would do is to figure out

6    whether there's some efficiencies to be gained.

7        THE COURT:  I want to go back -- what I care about is as a

8    policy matter.  And I will spot you your concern about forum

9    shopping.  But I'm saying as a policy matter when you have a

10   situation where a party before the district court -- a party

11   that has a case filed in a court like Delaware that has an

12   extremely heavy -- I think they're number one still.  They'll

13   always be number one in terms of the most cases.  If a party

14   moves to dismiss a case that is on the heaviest docket in

15   America and elects to move it to another docket that's

16   legitimate where they could have filed it to begin with without

17   much chance of it being argued it didn't belong there under the

18   Supreme Court stuff.  As a policy matter, how is that not

19   something I should also consider as a benefit to the system in

20   the same way if they'd filed it originally in Marshall and

21   said, wow.  There's a better -- by better there's a faster

22   option by going to the Western District instead of the Eastern

23   District?

24       MR. LEE:  And, Your Honor, the answer to that question

25   which is in the cases we cited, Your Honor, is I think what the

1    cases suggested is Your Honor has to say in the interest of

2    justice what's the answer to the question of why did this

3    happen?

4         THE COURT:  They wanted to get to trial faster.

5         MR. LEE:  Your Honor, if that were true, we would have

6    been filed here on March 1st.  If that were true, we would have

7    been filed here on March 21st.

8         THE COURT:  Okay.

9         MR. LEE:  And that's why the chronology speaks volumes,

10   and I think if I take Your Honor's hypothetical in the most

11   general sense, within that hypothetical there are circumstances

12   where it would be an interest of justice.

13        THE COURT:  But actually, Mr. Lee, it's not really that

14   much of a hypothetical.  It's -- I mean, it's what happened

15   here.

16        MR. LEE:  I guess, Your Honor, where I would respectfully

17   disagree is that's not what happened here.  What happened here

18   is not -- they didn't decide -- I knew about Your Honor's

19   appointment in September.  We knew about the Waco docket seven

20   months ago.  On March 1st of this year we knew about Your

21   Honor's docket and Your Honor's appointment and we knew about

22   the cases coming here.  On that day they could have filed here

23   and my transfer motion would have been even more an uphill

24   battle than it might be now.  On March 21st I sure as shooting

25   knew about Your Honor's docket and Your Honor's appointment.

1    We said we're going to move to consolidate.  Did anybody

2    suggest we should come here?  No.  What happened between March

3    21st and April 8th?  And what the cases say is in the interest

4    of justice it's important for the Court at least to ask the

5    question why, and if the answer that Your Honor reaches is it's

6    just a rational plaintiff exercising their reasonable rights

7    just like the forum, then that's a problem for us.  If the

8    answer is, if I look at what happened from March 1st to April

9    8th and I look at it in the context of what happened in

10   California and Delaware, this is forum shopping and that's

11   what's described in the cases at 22 and 26.  And, Your Honor,

12   there's even the case where someone filed it in East Texas,

13   decided to come to a different division of Texas and they said,

14   no.  No.  No.  You can't do that.  That's the key.  And when I

15   say to Your Honor it's not -- we know you have an awful lot and

16   a lot of cases before you.  When we say it's different, I know

17   everybody comes and says our case is different.  What makes

18   this different is there are a set of occurrences.  And you

19   don't have to believe me if I say they didn't run the table.

20   You don't have to believe Mr. Hattenbach when he says he ran

21   the table.  All you have to do is look at the events that occur

22   in what order over 45 days and that will answer your question.

23        THE COURT:  Okay.  And I need to thank you.  I told the

24   counsel yesterday when they were arguing with me about

25   something that they should always start it off by saying the

1    word "respectfully" which you just did.  When you're about to

2    tell me that I'm wrong, you should -- I corrected -- yesterday

3    they were telling me I was wrong and I said you should start

4    with -- by saying respectfully like that.  That was a great

5    lesson for everyone in the room.  That's the way to tell a

6    judge he's wrong by starting with the word "respectfully" and

7    then doing a great job of it.  So...

8         MR. LEE:  And mine wasn't to tell you you were wrong, just

9    I disagreed.  That's all.

10        THE COURT:  I understand.  Thank you very much, Mr. Lee.

11   Counsel?

12        MR. HATTENBACH:  May I respond briefly?

13        THE COURT:  Of course.  Take all the time you need.

14        MR. HATTENBACH:  I'll keep it short.  And I've been asked

15   to speak more slowly so I'll do my best.  I've had a little

16   caffeine this morning.

17        THE COURT:  If it was by my reporter, I get told the same

18   thing.  So...

19        MR. HATTENBACH:  That makes me feel better.

20        Okay.  Just a few points.  It was alleged that we were

21   suggesting that sprawling and unmanageable quote came from the

22   Court and that we were not quoting Intel.  We were quoting

23   their reply brief at Page 2, the penultimate bullet in the list

24   on that page and they repeated the phrase in their own language

25   on Slide 12 of Mr. Lee's deck to which I would like to turn

73

1   next.

2        THE COURT:  I'm there.

3        MR. HATTENBACH:  Okay.  I'm going to guess Your Honor is

4   familiar with Occam's razor, --

5        THE COURT:  I am.

6        MR. HATTENBACH:  -- the notion that sometimes the simpler

7   explanation is the correct one.  You don't need to go through

8   13 slides setting up this conspiracy theory to know what

9   happened here because I've already told you and I will tell you

10  again and I am happy to tell you under oath.  Maybe news of

11  this Court and Your Honor's experience made it to Boston faster

12  than Los Angeles or to my office, but I wasn't aware of it

13  until the second half of March, which is what I said earlier,

14  not what Mr. Lee just said which was until April.  It related

15  to a particular discussion I had with someone, and I don't

16  think it's necessary to get into the details, but I could pin

17  it down to an exact day.

18       What happened within the two weeks following that

19  discussion was that we completed a prefiling investigation on

20  two additional patents that weren't at issue in Delaware.  We

21  prepared new complaints.  We divided the patents up into cases

22  that we thought were not just bite sized but related in terms

23  of subject matter so that it would actually make sense to

24  present them to a jury independently.  We hired local counsel.

25  We dismissed the case in Delaware and we filed the case the

1  same day, because if we hadn't done that, we were under the

2  expectation that they would file a declaratory judgment

3  somewhere like California where things would be extraordinarily

4  slow.  So that's what happened in that two week period.  It

5  wasn't tied to rulings, bad or good, in Delaware.  That's the

6  end of the story.  It doesn't require looking at 13 slides to

7  figure out what happened.

8      And if you have any questions about that, I'm happy to

9  answer them.

10     Two more -- actually, I'll just make one more point which

11 is earlier today Mr. Lee was saying again that there's no one

12 at Intel's Austin premises that knows about the technology, and

13 it was pointed out to me, and I didn't mention this earlier, in

14 Mr. Herrgott's declaration, this is Intel's own declaration at

15 Page 10 he says, two of the inventors on the patents in suit

16 are employed by Intel now.  Intel went out and hired VLSI's

17 inventors and they're working for Intel in Austin.  So the

18 notion that the inventors of the patents in suit don't know

19 anything about the technology at issue in this case is one

20 that's very difficult for me to understand.

21     Thank you.

22     THE COURT:  Yes, sir.

23     MR. LEE:  Your Honor, I think what I precisely said was

24 that the people who design and develop the accused features and

25 products were not in Austin.

1        THE COURT:  I understood that too.

2        Now we have the motion to dismiss.  If you'd like to take

3    that up.

4        MR. LEE:  Our motion again, Your Honor, so I'll go first.

5    We have a separate set of slides.

6        So, Your Honor, I'll try to move through this a little bit

7    more quickly than we moved through the transfer motion because

8    we're aware of the opinion Your Honor issued I think yesterday

9    or the day before that addressed, as I said, some similar

10   issues in the area of direct infringement, indirect

11   infringement, and I thought what might be most useful is if we

12   point out what we think are the differences between the issues

13   Your Honor addressed.

14        THE COURT:  Okay.

15        MR. LEE:  Because I think we agree with you and I'm not

16   sure we disagree terribly with VLSI on what the law is.

17        So as Your Honor knows, if I turn to Slide 2, there are

18   the eight patents asserted, and the focus here is just on one

19   of the patents.  And this is not an effort to just fire off a

20   shotgun at their eight patents.  This is an effort to peel the

21   onion back I think is what we'll try to do because my bet is

22   that by the time they come to trial before Your Honor or

23   wherever there's going to be fewer than eight patents that are

24   probably left to be tried.  So if we take the Iqbal Twombly

25   standard and apply it to the '373 patent, that's the source of

1    our argument.

2        Let me just make one comment on the law very briefly.

3    VLSI cites a case called In Re Bill of Lading to Your Honor to

4    suggest that their allegations are sufficient and this sort of

5    pervades much of the motion to dismiss.  That was a case that

6    was before the federal rules of procedure were amended and Form

7    18 was abandoned.

8        THE COURT:  Well, Mr. Lee, you may or may not know this.

9    For reasons I have absolutely no idea, I actually wrote a long

10   article on the amendment of that rule and what needed to be

11   pled under in there.  So I'm actually -- this is probably the

12   only area of law I actually know anything about because I had

13   to write a paper and I couldn't find an associate to do it so I

14   had to do it myself.  So I'm pretty up to speed on what needs

15   to be pled in a patent case.

16       MR. LEE:  And, Your Honor, with that backdrop, let me just

17   move quickly the '373 patent.

18       THE COURT:  I keep trying to find that article so I can

19   put a footnote to it in one of my orders, but I haven't cared

20   enough to do it to actually find it.  So maybe I'll have a law

21   clerk find my article on the amended rule -- on the amended

22   pleading requirements.

23       MR. LEE:  If I turn you to Slide 4, Your Honor, the patent

24   concerns minimum memory of operating voltage techniques.  Most

25   importantly for our purposes today, if I turn you to Slide 5,

1   the only asserted claim is Claim 16, and this really is simply

2   a question of whether the allegations of the complaint are

3   inconsistent with what the claim says on its face and that's

4   the only reason that we're moving, unlike Your Honor's decision

5   of a couple days ago where there were arguably sufficient

6   allegations to support the limitation.  Here what we're saying

7   is they're simply inconsistent and there are really two

8   important points.  The claim itself says you're going to

9   provide a first voltage some of the time and you're going to

10  provide a second voltage some of the time.  It doesn't matter

11  actually what a voltage is.  Doesn't matter what the times are.

12  The claim says you provide first regulated voltage some of the

13  time and you provide a second regulated voltage other times.

14  But the complaint says you always provide the second voltage.

15       THE COURT:  Okay.

16       MR. LEE:  It can't be the same.  They're just simply

17  inconsistent.  And we were looking at the infringement

18  contentions to see if the allegation would be different.  I

19  don't think they are.  They may say they are, but they didn't

20  seem different to me.

21       The second inconsistency is from Paragraph 57 of the

22  complaint.  It's on Slide 7.  And the claim limitation says the

23  second regulated voltage is greater than the first regulated

24  voltage.  But then the complaint says that they're the same.

25  Right?  If you put together Paragraph 56 and 57 which is the

1   second voltage is always being supplied and they could be the

2   same, you can't satisfy the limitation of the claim.

3       THE COURT:  Got it.

4       MR. LEE:  And it's just an inconsistency.

5       The other argument that we've made to Your Honor is more

6   just a classic Iqbal Twombly argument which is that the claim

7   requires testing.  You have to do more than just say the words.

8   What they do is say the words.  They make an argument to Your

9   Honor about Paragraph 47 in a reference to a chart, but there's

10  no tie other than attorney argument and not even an allegation

11  saying that that's what's at issue.  So this, Your Honor, is a

12  very narrow and specific motion.  It's basically one that says

13  without any claim construction, without any need for technology

14  tutorial, the claims require two things.  They need to be

15  different.  The complaint says that they're either the same or

16  that one's always supplied.  It can't be both.  And that's why

17  we've moved on this patent.

18      If I move to the indirect infringement allegations, to

19  maintain -- and I'm going to do this very quickly, but to

20  maintain the claim, they have to show we either knew or we were

21  willfully blind.

22      THE COURT:  Right.

23      MR. LEE:  And they have to show we knew or were willfully

24  blind to the patents and the acts of infringement.

25      THE COURT:  Right.

1      MR. LEE:  There is, I think as Your Honor knows, if I turn

2   to the first requirement, knew of other patents or were

3   willfully blind -- if I turn Your Honor to Slide 11, there's no

4   allegation that we knew of the patents before the suits were

5   filed.  So the six Delaware patents -- the six patents that

6   were in the Delaware case before the Delaware action was filed,

7   the latter two that Mr. Hattenbach referred to when this case

8   was filed.  I don't think there's any real disagreement.  There

9   is an argument made to Your Honor that, well, some of Intel's

10  employees are actually named as inventors on these patents;

11  therefore, Intel knew about them.  That knowledge of that

12  individual about that patent is not something that's imputed to

13  Intel as actual notice.  And that's what the cases that are

14  cited on Slide 12 say.  It's a commonsensical resolution.  If

15  you have 17,000 employees, the fact that I know about it but

16  the people making decisions don't is not enough to impute

17  knowledge.

18      So since -- because there's no actual notice, the focus

19  before Your Honor has been on willful blindness.  And again the

20  law's pretty clear.  You have to subjectively believe that

21  there's a high probability that the patents exist and you have

22  to take deliberate actions to avoid learning about the patents.

23      I think, Your Honor, one way to view this is this:

24  They're relying upon willful blindness for both knowledge of

25  the patents or notice on the patents and notice of infringement

1    for both.  So if you take those two and put them together,

2    they're saying there was a subjectively -- we had a subjective

3    belief that there was a high probability the patents existed

4    but we took steps to avoid learning about them but yet we had a

5    subjectively -- there was a subjective belief that there was a

6    high probability that we infringed the patents and took steps

7    to avoid that.  It's very hard to put those four things

8    together and have them hang together, and there's a reason why.

9    If I take you to Slide 14, the only basis for willfull

10   blindness, and I think this distinguishes Your Honor's order of

11   a couple days ago.  I think I have it correctly.  In Your

12   Honor's order of a couple days ago there was actually a notice

13   letter sent that says you have a problem under these patents.

14   I think it was sent twice in consecutive orders.

15        THE COURT:  That made the lack of notice a little tougher.

16        MR. LEE:  Yeah.  I wouldn't be arguing it if I was stuck

17   with those facts.

18        Here there's nothing like that.  So what's the basis of

19   the willful blindness?  It is that Intel knew about other NXP

20   patents or Intel knew of other patents that the inventors of

21   these patents were inventors on.  So it's basically an argument

22   with that from this large NXP portfolio you know of some other

23   patents you've been accused of infringing or you knew that

24   these inventors were also inventors on other patents and that's

25   enough for a subjective belief that there's a high probability

1    that the patents in suit existed, and we would suggest that's

2    not enough.  Even if it were, the question is, what's the

3    deliberate action we took to avoid learning of these patents?

4    And if I turn Your Honor to Slide 16, the focus is on Intel's

5    corporate policy basically encouraging their engineers not to

6    consult patents of others when they're designing products, and

7    it's got a very commonsensical reason which is if you don't

8    consult the patent, it's pretty -- it's much easier to say we

9    didn't copy.

10          THE COURT:  Right.

11          MR. LEE:  Right.  And we --

12          THE COURT:  And you're not going to end up with

13   inequitable conduct.

14          MR. LEE:  Right.  And it's hard to say you copied.  It's

15   easier to say you independently developed.

16          As a consequence, if I turn you to Slide 17, the courts

17   have looked at policies like this and said, no.  That's not

18   enough to satisfy the willful blindness.  But even if they

19   could show willful blindness to the existence of these

20   patents -- and, Your Honor, remember these are NXP patents that

21   didn't even make it into the hands of VLSI until like the last,

22   in some cases, 12 months or so.  The idea that we should know

23   about them and we were willfully blind to them where they're

24   moving around these corporate entities is a little bit not

25   commonsensical.

1      But even if you could satisfy the willful blindness as to

2   knowledge, you'd have to satisfy willful blindness as to

3   infringement as well.  It's both.  And this is where -- not to

4   leave us at the argument we spent most of our time on today --

5   if I take Your Honor to Slide 19, this is where Judge Connolly

6   addressed the indirect infringement claims.  Now, there and

7   here we're focused on the presuit indirect infringement claims,

8   and what he says is, VLSI never alleges that Intel had been

9   willfully blind to the infringement of those patents.

10      Now, the question Your Honor asked me was, well, they say

11   that they've added allegations.  Isn't that enough?  I think

12   there are two answers.  One is, no.  What they've added is just

13   conclusions for Your Honor on the presuit infringement.

14   There's really nothing there substantively, but just for a

15   minute reverting to the earlier motion, the person who could

16   have decided whether it was enough additional would have been

17   Judge Connolly, and that's what we're going to ask him to do.

18      Setting aside that, the question of whether additional

19   words are enough, the additional words are a conclusion and not

20   much more, and if you look at Slide 20, the cases have reached

21   the commonsensical result that that's not enough.  And really

22   what VLSI does is it argues the same thing.  It sort of does a

23   rephrase which says, well, we accused you of infringing some

24   NXP patents, therefore, you should know that you infringed all

25   NXP patents, but that doesn't make any sense at all.

83

1          There were accusations that Intel infringed other patents

2    naming the same inventors, but they named some of the same

3    inventors in many others.  All of willful blindness is focused

4    on the patents in issue.

5          THE COURT:  Right.

6          MR. LEE:  Right?

7          What you know about other things doesn't make a

8    difference.

9          And then lastly, Your Honor, the question of

10   enhancement -- and I hope in our prayer for relief in the

11   motion I think we are hopefully specific in the request.  For

12   the indirect infringement claims we are seeking dismissal of

13   the presuit allegations because that's the place where there's

14   no notice.  There's no willful blindness.  There's no knowledge

15   of infringement.

16         For enhancement their allegation is enhancement based upon

17   willfulness, and that is an allegation that has a meeting post

18   Halo, and what it says is you need to allege sufficiently

19   egregious conduct that it rises to the level of piracy,

20   copying, that sort of thing.  There are no allegations here and

21   they don't really say that there are.  And the consequence of

22   this in order to basically take sprawling cases, if that's what

23   Your Honor has before you now, and bring them down to a level

24   where they can be litigated, if you go to Slide 24, the

25   question is this:  If you look at the allegations of their

1    complaint, have they alleged basically what you would see in a

2    garden variety patent case, or have they described conduct that

3    is sufficiently egregious based upon willfulness that they

4    should be able to pursue the enhancement claim?  And there have

5    been multiple cases throughout the country but in the Texas

6    district courts which has said, no.  Halo really meant

7    something, and now that Halo's there, if you don't have facts

8    to allege that demonstrate that egregious conduct, the claim

9    should be dismissed.

10         Thank you, Your Honor.

11         THE COURT:  Let's assume for a second I grant the motion

12    to dismiss without prejudice of course.

13         MR. LEE:  Right.

14         THE COURT:  And once discovery begins in this case, if I

15    retain it, the plaintiff wants to send you discovery that would

16    establish knowledge or the elements that would allow them to

17    plead both the indirect infringement and/or the claim for

18    enhanced damages, is Intel going to say, sorry.  You haven't

19    pled it so it's not relevant and we're not going to allow it to

20    take place?

21         MR. LEE:  Your Honor, the answer is no.  I mean, if the

22    claims are dismissed because the allegations are insufficient

23    but they seek discovery, for instance, on when we knew about

24    the patents, what we knew about infringement, they're going to

25    be seeking discovery on whether our conduct was egregious to

1    some nature.  They're seeking all the engineers, all the

2    documents.  We're not going to -- we're not going to do that.

3        THE COURT:  And at what point in the case, assuming that

4    the plaintiff were diligent -- now remembering if I keep the

5    case there won't be any discovery taking place until after the

6    Markman.  It'll happen very quickly after the Markman because

7    we'll get a decision out very quickly.  God.  I sound like

8    President Trump.  You know, it'll be the best decision ever.

9        But -- and let's assume Markman is on X date.  Discovery

10   begins when it can begin.  At what point -- how long, in your

11   opinion, does the plaintiff have an opportunity without

12   objection from Intel to amend its complaint to add these

13   elements back in if they were to establish -- you know, not

14   prove it but just say, based on these -- now that we have this

15   discovery, we want to add one or both of these issues?

16       MR. LEE:  And, Your Honor, could I answer it in two parts?

17       THE COURT:  However you want.

18       MR. LEE:  I think that as a matter of time, the -- they

19   ought to move promptly after they get the information.

20       THE COURT:  Sure.

21       MR. LEE:  So if they get it in the first two weeks of

22   discovery, they ought to move relatively promptly and be able

23   to let us know that they're going to move relatively promptly.

24       (Conference between Mr. Lee and Mr. Ravel.)

25       THE COURT:  Mr. Ravel isn't just a pretty face.  He

86

1   actually knows what's going on.

2       MR. LEE:  Why don't you just -- you go ahead.

3       THE COURT:  Mr. Ravel, go ahead.

4       MR. LEE:  Yeah.  Go ahead.

5       MR. RAVEL:  An idea that we had in that regard, Judge, is

6   the pleading amendment deadline that's sometime into fact

7   discovery would be an appropriate time and one we would stick

8   by.

9       THE COURT:  Okay.  Very good.

10      MR. LEE:  And, Your Honor, the only reason I was giving

11  you the answer in two parts is assuming they timely move, we

12  would not oppose on the basis it was untimely.  We might, for

13  instance, under Section 284 we might still challenge whether

14  the amendment was futile.

15      THE COURT:  Oh, absolutely.  Sure.  But let me hear from

16  the plaintiff.

17      MR. LEE:  Thank you, Your Honor.

18      THE COURT:  Mr. Chu, what a pleasure to have you here.

19      MR. CHU:  Thank you, Your Honor.

20      You have slides on our opposition, but let me start

21  without the slides.  One of the arguments has to do with direct

22  infringement, and the position of Intel is that for Claim 16 of

23  the '373 patent the allegations of direct infringement are

24  insufficient.  That claim is a method claim with eight

25  limitations.  Part of the claim language involves just plain

1   vanilla stuff, a processor, a processor with memory.  There are

2   seven detailed pages in the complaint going through each of the

3   limitations and providing clear, direct allegations of direct

4   infringement.

5        So let me give you one example.  And this is an example

6   that Intel points to in their brief.  They say, well, we're not

7   on notice under current pleadings standards with respect to

8   testing.  Testing is mentioned in one of the limitations.

9   Well, there is a direct allegation that Intel's involved in

10  testing, exactly what they're testing, that they're storing it

11  in a particular kind of memory, a nonvolatile memory.  That

12  alone would be sufficient.  What more do you need?  Suppose the

13  claim says a temperature is taken.  Does someone have to say

14  it's a thermometer under the tongue, a little device put into a

15  child's ear or something else?  No.  So the paragraph on

16  testing by itself is sufficient.

17       The very next paragraph says, for example, here is

18  evidence we know about on testing, and there's a graph that was

19  created by Intel I believe in the public domain now and it has

20  data points, seven different data points, and in the Intel

21  reply brief they attack that allegation by saying, well, that's

22  still not enough because they don't really explain how that

23  screen shot applies as if we have to say what's already on the

24  screen shot, what's on the X axis?  What's on the Y axis?  What

25  are each of the seven data points?  That's apparent, evident,

88

1   and it's also apparent and evident for one of the accused

2   processors called out by name Ivy bridge.  So the more

3   generalized allegation is enough.  The for example is not

4   required by any case that I know of in any district at any

5   time.  We gave them more and we gave them more than that by

6   showing them their own screen shot, and there are other

7   examples along the same line.

8        I'm going to leave the arguments about direct

9   infringement.

10       THE COURT:  Yes, sir.

11       MR. CHU:  The arguments about indirect infringement and

12  willful infringement.  There are a variety of different

13  elements, but almost all the arguments are trained on whether

14  or not there is sufficient allegations of knowledge.  Well,

15  there's a great big point not addressed today.  They obviously

16  have knowledge of the exact patents at issue since the filing.

17  They obviously from all the other allegations have knowledge

18  about the other elements for inducement, contributory and the

19  like, since filing.

20       THE COURT:  I didn't take it that there was a complaint

21  of this -- with regard to this since filing.

22       MR. LEE:  No.  The brief in the motion it's for presuit.

23       MR. CHU:  Okay.

24       THE COURT:  That was the way -- right.  I mean, I -- yeah.

25       MR. CHU:  So what I'm saying is that allegations,

1    including willful infringement post filing, should remain in

2    the case.

3         Now I'm going to go to prefiling.

4         THE COURT:  I don't think they disagree with that.

5         MR. CHU:  Okay.  I just wanted to know that we're all

6    together.

7         THE COURT:  Yeah.  We're all together.

8         MR. CHU:  So let's think about it in terms of prefiling.

9    All the arguments this afternoon and the great bulk of their

10   arguments in their brief they take one little factoid.  They

11   find a case that kind of stands for the proposition that that

12   little factoid standing alone is not enough.  But here's what

13   the law is.

14        THE COURT:  Mr. Chu, let me ask you this because this is

15   what I asked Mr. Lee.  What prejudice is there to you and your

16   client of me dismissing presuit only the indirect claims and

17   the claims for enhanced damages without prejudice with the

18   understanding, as Mr. Ravel pointed out that in this Court when

19   we -- we spent a lot of time -- it doesn't matter what we did,

20   but we kind of took these kind of issues into consideration as

21   we spent a lot of time coming up with the scheduling order, and

22   part of the reason we put in the deadline that we put in was I

23   get this tension of you guys feel -- plaintiff feels like they

24   need to put everything in there or the defense is going to say,

25   oh, we didn't have notice so you can't add it and defendant's

1  unhappy because you're saying you're accusing us of enhanced

2  damages and we didn't even know about it.  What prejudice is

3  there to you if I were to dismiss those claims without

4  prejudice clearly only until you're given an opportunity in

5  this case and under my scheduling order you don't get to do

6  discovery until after the Markman.  Once the Markman is

7  completed and the order is -- and I give you the constructions,

8  then you could immediately take discovery on these issues,

9  30(b)(6), whatever you needed to do, and if you complied with

10 the intermediate pleading deadline, I can tell you I would

11 allow these claims in for presuit -- for the presuit

12 allegations.  I can't figure out where there's prejudice to

13 you, but maybe I'm just missing it.

14     MR. CHU:  There are eight different patents in the three

15 suits.

16     THE COURT:  Okay.

17     MR. CHU:  There's a real practical issue of timing.  Let's

18 say within three weeks we have sufficient evidence with the

19 first patent but it takes more time to get it for the second

20 patent and more time for the third patent, more time for the

21 fifth patent and so forth.

22     THE COURT:  Well, let me interrupt you for just a second.

23     MR. CHU:  Yes.

24     THE COURT:  Mr. Ravel, remind me how long after the

25 Markman is the deadline to amend the pleadings?

1    MR. RAVEL:  In our proposal which is a little richer than

2  theirs, it's about four months.

3    THE COURT:  So you would have four months to -- there

4  would be -- you'd have four months to complete discovery and

5  move to amend.

6    Hopefully he passed you a note so that's a good deal.  You

7  ought to take it, but I'm not sure what he's...

8    (Laughter.)

9    THE COURT:  I mean, I'm very sympathetic to you all not

10  wanting to give up your claim, but if I leave them in, you're

11  still going to have to do discovery to prove them up, and it

12  seems to me that this is just a different way of skinning the

13  cat.  Intel's happy because they don't have what they feel are

14  unfounded claims currently pending against them.  You're not

15  prejudiced because if -- if you can do the -- once you do the

16  discovery you want to add them in, I can assure you I'm going

17  to be generous in allowing you to add them in.  So help me out

18  here.

19    MR. CHU:  Okay.  So let me -- first, a small technical

20  matter.

21    THE COURT:  Yes, sir.

22    MR. CHU:  Six of the eight patents they were put on notice

23  earlier in the Delaware action so there was presuit here, small

24  matter, to add to this.  So what I was starting to explain was

25  the timing issue.

1    THE COURT:  Okay.

2    MR. CHU:  Whether it's four months, there's some competing

3    proposals.  Whether it's four months or some other period of

4    time.  They will make an argument, I believe, that we should

5    have come forward earlier if we got sufficient evidence at an

6    earlier point in time.

7    THE COURT:  I can tell you without any fear of

8    contradiction that that would not be a wise thing after having

9    moved to have these claims dismissed at this time to then argue

10   you should have done it sooner.  I'm -- they've asked them to

11   be removed.  I understand why they want them to be removed

12   without prejudice, and again I'm trying to paint a map for you

13   here that I'm going to be very generous.  I want to have as

14   much equity between the parties as possible.  I'm going --

15   whatever it takes you to get this information, if I feel that

16   it's reasonable in the manner that you did it to get it, I'm

17   going to allow you to add those claims in.  With respect to the

18   defendants, for example, if the defendants have problems on

19   some of these and they can't get you the discovery that you

20   need until three months and three weeks after the Markman,

21   well, then I don't expect Mr. Ravel to allow the great firm of

22   Wilmer Cutler to argue that you're cut off.  And so that

23   wouldn't be wise, and I'm sure they wouldn't even ask them to

24   do that.  And so I'm trying to paint you a picture here that

25   I've done all this stuff, and as long as you all come back in

1   here -- you all, that being a collective -- and show me that

2   you acted promptly in trying to obtain the discovery as soon as

3   Intel was reasonably able to get you the discovery because, you

4   know, you're going to have to set up those depositions and all

5   that stuff too.  As soon as -- and I don't want you all to be

6   going, well, we've got to -- you know, it's not the most

7   important part of your case is proving this up.  And so what

8   I'm saying is I'm going to dismiss without prejudice these

9   claims, the claims of indirect infringement and the claim for

10  enhanced damages without prejudice.  I want it to be as clear

11  as possible that if plaintiff acts promptly and reasonably to

12  obtain information to be able to fully articulate -- I'm not

13  saying you've got to write a book, but I'm saying as long as

14  you are able to have a Rule 11 basis to file the claims and you

15  do so relatively quickly after Intel gets them to you -- and

16  they may not be able to get you that stuff for six months.  I

17  mean, I don't know how busy Intel is, but we -- there's going

18  to be a rule of reasonableness that is going to be favorable to

19  the plaintiff in being allowed to add these claims back in with

20  Intel having asked me to take them out.

21      MR. CHU:  So let me answer directly the question that

22  you've asked.

23      THE COURT:  Okay.

24      MR. CHU:  It's a fair question.  And then I want to in

25  general talk about the question of prejudice and then with Your

1   Honor's permission talk about the state of the pleadings and

2   the law that should be applied.

3       THE COURT:  Okay.

4       MR. CHU:  So, first, Intel's position is that only of

5   Intel.  So let me give you an example of facts that would

6   support willfull infringement knowledge of the patent before

7   the filing in Delaware or the actions before Your Honor.

8       Freescale, which was the owner of some of the patents,

9   went to Intel and said, as we understand it, we would like to

10  discuss with you taking a license to the portfolio.  So we

11  subpoena, let's say it's Freescale or maybe individuals who no

12  longer work for Freescale.  Their counsel will be free to stay,

13  you don't have any allegations in your complaint.  We're not

14  going to answer that.

15      NXP at some point in time became owner of the patents.

16  Same thing.  We go to NXP.  They of course don't want to get

17  involved in a litigation where they're not directly involved.

18  From their point of view it's just not a good investment of

19  their time and they take the same position.  It's not a

20  farfetched position.  They're not before Your Honor.  They're

21  not in this hearing.  They can say there are no allegations.

22      And it goes on and on.  There will be other former

23  employees of Intel or other individuals who were never employed

24  by Intel and we will have those discovery battles lumped one on

25  top of the other.

1          Second point on prejudice.  Since we have allegations of

2    willful infringement post filing of the complaints, I don't see

3    much prejudice to Intel.  It's not as if the Intel board of

4    directors or the shareholders of Intel will say, oh, my

5    goodness.  We're so embarrassed by these allegations of presuit

6    filing of willful infringement as opposed to the kinds of

7    prejudice that I've mentioned, Your Honor, that we, VLSI, will

8    find when we're trying to take discovery of non parties.

9          And the third issue that I mentioned that I wanted to get

10   to is, what is the law?  So the Intel argument has been

11   basically here is a particular factual allegation and then they

12   point to summaries saying that's not enough, but here's what

13   the law is that controls.  The law is not to look at individual

14   factual allegations.  It's to look at all of the allegations as

15   a whole taken together.  And that in fact is the decision in

16   SoftView vs. Apple a decision by Judge Stark in Delaware.  That

17   in fact is the decision in Sovereign vs. Microsoft, an Eastern

18   District of Texas decision.  And so you're trying to look at

19   all the facts together, not individual facts, and to be able,

20   as we believe Intel is trying to do, to nitpick them apart.

21         So there's knowledge which includes willful blindness.

22   Let me focus on willful blindness.  First, we have the

23   situation where Intel has a stated policy, we don't want our

24   people looking at patents.  This is a policy of an ostrich

25   sticking its head in the ground.

1      Second, Intel's chief architect for many years, as we have

2   alleged, has stated the reason for Intel's policy is we just

3   want to have a defense against treble damages, and that's

4   exactly why we have this policy.  So it's not just in general

5   willful blindness.  It's willful blindness specifically with

6   respect to patent cases and the possibility of treble damages.

7   So we add to that -- so it's not just willful ostrich like

8   behavior in the abstract.  We add to that a series of other

9   facts.  As an example, they hired named inventors on the

10  patents in suit.  What's the law about that?  In the Abstract

11  case, Abstract vs. Dell the Court said, if you're hiring an

12  employee from another company who knows about the patents, and

13  obviously the named inventors know about their own patents,

14  that's sufficient for knowledge.

15      In NASDAQ vs. IEX, the Court is looking at the fact that

16  IEX, the defendant, hired certain employees.  I think it was

17  four employees.  And they had knowledge of the patents and in

18  that case the Court said that is sufficient.  That's NASDAQ

19  vs. IEX.  The first case, Abstract vs. Dell.

20      What about notice not of a specific individual patent but

21  notice about a portfolio?  That exact situation came up in the

22  Raytheon case, and the Court in the Raytheon case said, if you

23  have knowledge in general about the portfolio, that's

24  sufficient, and we allege here that there is such knowledge

25  because Freescale went to Intel and said, we want to license

1   our portfolio to you and that includes the patents here.

2       There are other facts too.  There were NXP patents that

3   were asserted against Intel.  Intel was involved in the

4   litigation with respect to working on claim charts about those

5   patents, not necessarily the specific patents here but part of

6   the portfolio that is relevant.  So they knew about those

7   patents.  They knew about other NXP patents in addition to

8   those being asserted against them, and NXP isn't some random

9   patent donor.  So here's another fact.  They are competitors.

10  Intel knows that NXP is a competitor.  These are some of the

11  complex of facts taken together.

12      Now maybe I'm going to go to a slide just to summarize

13  this.  If you go to Slide No. 15, it says, the allegations

14  should be taken in combination.  It cites the SoftView case,

15  but I've already told you about the Sovereign vs. Microsoft

16  case from the Eastern District of Texas.

17      And if you look at the next Slide 16, we see Intel's

18  ostrich policy.  Knowledge from the filing of suit, explicit

19  pleading of knowledge, previous lawsuits involving the same

20  inventors, Intel's prior notice of the competitor's portfolio,

21  previous lawsuits involving the same NXP portfolio, Intel

22  instructing its customers with guides on infringing usage.  Of

23  course they know what acts they're telling their customers to

24  do and how to practice the method from their own guides.  So

25  they obviously have both knowledge, and this would fit a number

1    of the requirements for indirect infringement, and then of

2    course Intel's hiring of the inventors in suit.  So that's

3    Slide 16.  It is a mere summary of some of the facts taken

4    together under the SoftView decision, under the Sovereign

5    decision is sufficient for purposes of pleading in a context

6    where the prejudice to Intel will be modest, if at all, but the

7    prejudice in discovery to VLSI in fighting multiple discovery

8    battles with non parties will be significant.

9         Thank you.

10        THE COURT:  Mr. Lee?

11        MR. LEE:  Let me just make three points.  I think that

12   Your Honor's proposal or suggestion on how to deal with it

13   makes sense to Intel.  We hear Your Honor's admonition about

14   what's expected of us during discovery, and I think that at

15   some point in time you may be asked to decide whether this

16   would be sufficient when there are facts to support it, but

17   there's nothing today.  And the one interesting thing about

18   this Slide 16 is for everything that's on the puzzle, there's

19   nothing about the patents in suit or the infringement of the

20   patents in suit.  Not a thing at all.  And there's a reason

21   because there's no allegation of such.

22        Second point, Your Honor, is on the '373 patent.  I'll

23   just point out that Mr. Chu didn't address the contradictions.

24   He addressed only the testing limitation.

25        And then lastly, Your Honor, to answer the question you

1    asked earlier today about the IPRs in California and the

2    claims, whether all of the claims were subject to IPRs, there

3    are some claims that Mr. Hattenbach identified of the '014

4    patent that were not subject to the IPRs.  I think, and we'll

5    confirm and correct if we need to, that's because we did not

6    seek an IPR on those claims.

7         THE COURT:  Thank you, sir.

8         MR. LEE:  Thank you, Your Honor.

9         MR. CHU:  Both our papers as well as that single summary

10   slide refer to facts that have been alleged that relate to

11   specific patents in suit before the filing of the Delaware suit

12   or the filing of the suits here.  So we plainly allege that

13   Intel hired as employees named inventors of the patents in

14   suit.  I've already made mention of the Abstract case and the

15   NASDAQ case saying that's sufficient by itself.

16        The '373 patent which we were discussing earlier, one of

17   the named inventors was hired by Intel.  The '522 patent, the

18   '187 patent and the '357 patents, all of those patents in suit

19   before Your Honor, Intel hired named inventors of those

20   patents.  They plainly had actual knowledge under existing case

21   law and Intel has continued since the date of first knowledge,

22   since the date of the suits to continue to engage in practicing

23   infringing acts.  They haven't come forward with an opinion.

24   We think that that conduct is egregious and we alleged

25   egregious conduct.  Under existing law these allegations are

1   more than sufficient to maintain willfulness as well as

2   indirect infringement before the date the suits were filed.

3       Thank you.

4       THE COURT:  Okay.  Let me just throw out a random question

5   that if you say -- my guess is both of you have dealt with this

6   a million times that I'm curious about.  Will there be any

7   issue -- I remember having a case from Microsoft where the

8   inventor of one of the patents we were being sued on had moved

9   from Bell labs who was suing us to Microsoft and I remember

10  there being issues with respect to what the inventor could and

11  couldn't say in terms of certainly I think with regard to

12  invalidity perhaps.  Are those -- are we going to have issues

13  that we need to be prepared for in this case about that, or am

14  I just imagining this?

15      MR. CHU:  It's a great question.  I've had this occur a

16  lot of times.  So it's not uncommon of course for a

17  semiconductor engineer that was working at Freescale or NXP and

18  maybe Intel and then has moved on to another semiconductor

19  company.  Maybe it's Quallcomm.  Maybe Apple has become a

20  semiconductor company and it goes on and on.  And what does

21  their new employer say to the employee?  When we contact the

22  employee, we'd like to interview you.  If necessary we'll take

23  your deposition.  For some reason there is this tried and true

24  path where the new employer tells the employee not to cooperate

25  because they're concerned the patents might be asserted against

1    them as an example.  So it's a big issue and it's not just the

2    sole former employee that might hire a lawyer to fight the

3    discovery.  It's the new employer that usually fights the

4    discovery and fights hard.

5        THE COURT:  Okay.  We don't need to take up a lot.  I

6    just -- it's something I want to be proactively letting you

7    know I have some familiarity so if there's an issue with this

8    in discovery down the road.

9        MR. LEE:  Yeah.  I actually took Your Honor's question

10   differently.  There is a doctorate called assignor estoppel I

11   think is what you're thinking of from the Microsoft case where

12   if I assign -- I'm an employee and I assign the patent, then I

13   go off -- I assign it to you.  I go off and --

14       THE COURT:  That's right.  And then I want -- I have a new

15   patent and it would help me to -- that's what I'm thinking of.

16       MR. LEE:  You then sue me.  I can't say, no.  That

17   patent's invalid because I assigned it to you.  There's no

18   assignor estoppel issue in this case.  That's the issue.

19       THE COURT:  And if for some reason we have an issue with

20   respect to any discovery issues that Mr. Chu may have foretold,

21   we'll just deal with them as they come.

22       MR. LEE:  That's the right way to do it, Your Honor.

23       THE COURT:  Okay.  Mr. Chu?

24       MR. CHU:  One sentence.  We're not giving up assignor

25   estoppel as an issue in the case.  It may apply.

1      THE COURT:  That's fine.  I would expect.

2      Here's what we're going to do.  I received a note from the

3 jury that they have a verdict.  What I'd like for counsel to do

4 while we're taking care of that is to huddle and come back in.

5 I don't know what I'm going to do with respect to the Intel's

6 motion to transfer; however, I do know that my -- in terms of

7 getting you guys on the docket for a Markman is something that

8 every day I wait it's harder to do.  So I have the following

9 dates available to do -- I'm going to set aside two days.  If

10 you all don't need two days, let me know you don't need two

11 days.  And if I decide to transfer it, I'll -- the Markman

12 won't happen.  But -- and something that's unusual for me is

13 that the Markman will take place in Waco.  Ordinarily it would

14 be in Austin, but all my Fridays are booked now pretty solidly

15 on other cases.  So I have available Wednesday, December 4th

16 and December 5th.  We have December 5th and December 6th.  And

17 I have January 22nd and January 23rd.  I'm sensitive to the

18 fact that you guys have, I'm sure, extraordinarily busy

19 dockets.  And so but you guys go confer.  If there is a date --

20 if there's one set that works better for everyone, let me know,

21 and I'll take care of this other matter with regard to the

22 jury.

23      MR. TINDEL:  Do we need to move our --

24      THE COURT:  I don't think you need to move anything, but

25 y'all physically should go -- there's a room right around the

1    corner if you turn to the right that you can go discuss.

2        (Recess taken from 4:56 to 5:08.)

3        THE COURT:  Mr. Chu, I'll go with you just because you're

4    the plaintiff.  Mr. Lee is welcome to stand by you.  Have you

5    all picked a date that you think would be best?

6        MR. CHU:  Yes.

7        THE COURT:  And what would that be?

8        MR. CHU:  December 6th.

9        THE COURT:  Just the 6th?

10       MR. CHU:  Just the 6th.  Yeah.

11       THE COURT:  Okay.

12       MR. LEE:  We're good with that.

13       THE COURT:  I can get -- I could probably do -- I hate to

14   say this out loud.  I could probably get 20 claim terms done in

15   a day I would think.  I've done -- I haven't had more than a

16   dozen, but I could probably -- and if we needed to go a long

17   day, we could do that.

18       MR. LEE:  That'd be great.

19       THE COURT:  So if that works best for you all -- here's

20   what we're going to do.  I'm going to -- if you all want to

21   provide me with a tutorial, that's fine.  I doubt I will take

22   up any time on the 6th with the tutorial.  My law clerk to be

23   Josh Yi is sitting in the back of the courtroom.  He has a

24   Ph.D. EE so I'm hoping that he -- you know, anything I don't

25   understand, which will be most of it, he'll be able to help me

1    with as well as you will on a tutorial, but certainly if you

2    want to submit a PowerPoint tutorial -- let me explain what I

3    need -- what helps me in a tutorial.  What doesn't help me at

4    all is for you all to take disparate quotes from the -- from

5    the -- why am I blanking on it?  This isn't good.  From the

6    patent.  You know --

7        MR. CHU:  Specification.

8        THE COURT:  Specification.  And say, here are 11 sections

9    of the specification.  I can read that.  What would help me is,

10   you know, this is a chip.  You know, this is the functionality

11   in this patent.  This was the problem we were having.  You

12   know, we couldn't keep power -- we couldn't keep a power supply

13   long enough.  When we got -- you know, when we fixed it, you

14   know, this is -- this is one of the ways of fixing it.  In

15   other words, something that will put a practical non -- not on

16   the record.  You don't get to use the other sided's PowerPoint

17   and say, oh, look what -- they just claimed something in

18   their -- I mean, this is -- you know, if it were an oil and gas

19   case, this is pipe and it goes in the ground and when we put

20   pipe in the ground, we have a problem sometimes with getting

21   saline back in and this is how it was -- how we fixed it using

22   this valve.  That's what will be helpful on the tutorial.

23   Obviously on the -- at the Markman that is a different kettle

24   of fish and that will be a very normal Markman.

25       So you know, with respect to the Markman, I don't care who

1    goes first.  You know, there's no -- there's no limit.  In

2    other words, if Mr. Lee goes first on the first claim term and

3    Mr. Chu goes second or whoever, you all will go back and forth

4    until I either feel like I know it or it doesn't help, but

5    there's no -- there's no advantage to going first or second

6    with the exception if one party, and it's usually the

7    plaintiff, says plain and ordinary meaning, I don't need

8    someone to stand up and say, plain and ordinary meaning.  I

9    prefer to start with the party that is out proffering a

10   construction.  Now, that being said, for example, in a case I

11   had -- I did a Markman about a week ago, whatever it was we

12   were talking about even though I wound up going with plain and

13   ordinary meaning, we did have a discussion over whether or not

14   the plain and ordinary meaning could include hardware, hardware

15   and software or software, and I on the record made it clear

16   that it would -- the plain and ordinary meaning would only

17   include hardware or hardware and software but would not include

18   software alone.  So I've done that as well.  But I still would

19   prefer if the plaintiff who typically submits a plain and

20   ordinary meaning, I will probably -- I would go with Intel -- I

21   will allow Intel to argue first and explain the basis and then

22   the other side would have the freedom to do whatever they want

23   in responding.

24        Typically what I'll do, I've done in every case so far.

25   This may be more technical or may be a little longer, but so

1  far at the end of every argument on each claim term I've given

2  you my claim construction at that time and then within

3  hopefully about three weeks you'll get an order that gives you

4  the substance and the basis for the claim.  It won't change it.

5  I have one time in that process corrected something where I

6  left a word out and I realized it as I was typing it and I

7  added that word in, but y'all still got it relatively quickly

8  where I didn't think anyone had been harmed.  It was just a

9  scribner's error when I read it.  But you should expect a very

10  quick Markman ruling.  If I don't do it that day, it would be

11  the next day.  And so it's not -- and then as soon as you have

12  the Markman ruling, discovery can commence.  I have had parties

13  in the past -- I doubt it would be helpful in this case, given

14  all of the litigation that's going on, but I have had parties

15  in the past ask for a week or two stay on that.  So them having

16  the constructions, they could have a discussion over whether or

17  not they wanted to, you know, settle.  Doubt it would happen in

18  this case, but I would be open to that.

19      At the end of the hearing I will set a trial date.  You

20  should anticipate a trial date that is roughly -- if y'all are

21  December 6th, it would happen -- the trial will happen almost

22  for sure by the end of 2020.

23      In terms of length of the trial, depending on how many

24  patents there are -- the lawyers from the last case got --

25  especially after this trial, but after every trial, I am a

1    bigger believer than ever in time limits on lawyers, but

2    they're not time limits where I'm trying to accomplish, for

3    example, getting the trial done by the end of the day Friday or

4    cutting anyone off.  What I'm going to do is I'm going to ask

5    you all to suggest how many hours you need and then back it up

6    by saying, we've got this many -- we've got to put on these

7    witnesses, these inventors, these experts.  I anticipate,

8    Judge, we'll need 15 hours, and I'll probably give you 15

9    hours.  It's just -- I will never again start a trial where the

10   time was unlimited because that doesn't work for anybody.  And

11   so lawyers just can't help themselves if they have no ultimate

12   time limit, but y'all will probably get to pick the time limit

13   that I use within reason.  It's not a punitive effort.  It's --

14   I just want people to have some bumper that they've got to

15   finish within.

16        Again, I will work on the order.  I don't know what I'm

17   going to do, but we've set the Markman which is good because

18   you have a date.  Is there anything else we can take up while

19   you gentlemen are here?

20        MR. RAVEL:  Just a question, Judge.

21        THE COURT:  Sure.

22        MR. RAVEL:  The parties are both asking for variances from

23   the default order, more discovery limits, more time to do it.

24   It doesn't seem like that's a pressing question right now, but

25   it will be when Markman comes up.  So how would you like to

1    resolve that?

2        THE COURT:  My attitude is this.  And this is probably for

3    Mr. Lee and Mr. Chu to understand.  My goal when we came up

4    with the default scheduling discovery, all that stuff, was to

5    hopefully come up with an order that was fair enough to both

6    sides that neither side wouldn't cooperate in amending it

7    because they already had an advantage.  So my attitude is you

8    guys can agree to anything you want.  In terms -- how much

9    discovery you do, when it's done, I don't care.  You can agree

10   on however you want to do the case.  And if you agree to it,

11   God bless you.  If you can't agree to it, we've got -- you have

12   the default.  And if you can't agree to it and you want to

13   be -- somebody wants to change it, you just need to call me and

14   say, we have an issue over how many -- we'd like to do X and

15   Mr. Chu doesn't want to do X, and I understand you're

16   representing Intel and he's representing his client.  I won't

17   be unhappy about that.  That's an important part of your job

18   and I will listen to it and I will say, well, here's what we're

19   going to do.

20       And Mr. Ravel can correct me, but I do always -- I always

21   try and do my best to come to a resolution that I think is the

22   most helpful to the case and so I probably will ask you why you

23   need that and why you don't want it and then I'll probably try

24   and figure out the best solution that I can figure out for the

25   case.  So does that answer you?

1          MR. RAVEL:  Yes, Judge.

2          THE COURT:  Anything else?

3          MR. LEE:  Nothing from Intel, Your Honor.

4          MR. CHU:  Not on our side.  You were very clear.  It

5    sounds superb.

6          THE COURT:  Okay.  Again I hope you tell Mr. Regan he was

7    a phenomenal opponent and one of the greatest gentleman I've

8    ever met.

9          MR. LEE:  His office is right next door to mine.  So I

10   will for sure.

11         THE COURT:  Okay.  You all have a great week what's left

12   of it and I may or may not see this group -- hopefully I will

13   see all of you again.  I don't know if it will be in this

14   combination or not, but I appreciate all the lawyer arguments.

15   They were terrific.

16         MR. CHU:  Thank you very much, Your Honor.

17         (Hearing adjourned at 5:18 p.m.)

18

19

20

21

22

23

24

25

110

1  UNITED STATES DISTRICT COURT )

2  WESTERN DISTRICT OF TEXAS    )

3

4      I, Kristie M. Davis, Official Court Reporter for the

5  United States District Court, Western District of Texas, do

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8      I certify that the transcript fees and format comply with

9  those prescribed by the Court and Judicial Conference of the

10  United States.

11      Certified to by me this 6th day of August 2019.

12

13                         */s/ Kristie M. Davis*
                          KRISTIE M. DAVIS
                          Official Court Reporter
14                        800 Franklin Avenue, Suite 316
                          Waco, Texas 76701
15                        (254) 340-6114
                          kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25