IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |
|---|---|
| VLSI TECHNOLOGY LLC, <br><br> Plaintiff, <br><br> v. <br><br> INTEL CORPORATION, <br><br> Defendant | **PUBLIC VERSION** <br><br> Lead Case: 1:19-cv-977-ADA <br><br> (*Consolidated for pretrial purposes only with* Nos. 6:19-cv-254-ADA, 6:19-cv-255-ADA, 6:19-cv-256-ADA) |

**DEFENDANT INTEL CORPORATION'S RESPONSE TO
PLAINTIFF VLSI TECHNOLOGY LLC'S *DAUBERT* MOTIONS
TO EXCLUDE DAMAGES-RELATED TESTIMONY OF INTEL'S EXPERTS[1]**

---

[1]   This response addresses VLSI's motions filed in Case Nos. 6:19-cv-254, -255, and -256. Pursuant to the Court's consolidation order, Intel has filed this response only in the consolidated proceeding, Case No. 1:19-cv-977.

# TABLE OF CONTENTS

**Page(s)**

I.   VLSI'S *DAUBERT* MOTION REGARDING MR. PASCARELLA'S ROI OPINIONS
     SHOULD BE DENIED. ........................................................................................ 3

     A.    Background of Mr. Pascarella's ROI Opinion .............................................3

     B.    Argument ....................................................................................................7

           1.    Mr. Pascarella Is Qualified To Offer His ROI Analysis. .............................7

           2.    Mr. Pascarella's Opinions And Testimony Are Reliable. ............................8

           3.    Mr. Pascarella's Opinions And Testimony Are Specifically Tied To The
                 Asserted Patents And Accused Products. ....................................................11

           4.    █████████████████████████████████████
                 .................................................14

II.  VLSI'S *DAUBERT* MOTION REGARDING DR. COLWELL
     SHOULD BE DENIED. ...................................................................................... 15

     A.    Background of Dr. Colwell's Opinion .......................................................15

     B.    Dr. Colwell's Opinions On The Value Of The Asserted Patents Are
           Reliable, Relevant, And Admissible Under *Daubert*. ..............................17

           1.    Dr. Colwell Properly Assumes Infringement For His Damages Analysis
                 And Opinions. ............................................................................................17

           2.    Dr. Colwell's Opinions On The Value Of The Asserted Patents Are
                 Relevant To The Hypothetical Negotiation. ...............................................18

           3.    VLSI's Cited Cases Are Inapposite. ..........................................................21

     C.    Dr. Colwell's Analysis Of The Comparable Patents Is Reliable, Relevant,
           And Admissible Under The *Daubert* Standard. ........................................22

           1.    VLSI Mischaracterizes Dr. Colwell's Opinions And Methodology. ..........23

           2.    Dr. Colwell's Analysis Regarding Whether The Comparable Patents Relate
                 To Technology That Intel Used Or Could Use Is Reliable. ........................25

           3.    Dr. Colwell's Analysis Is The Product Of Reliable Methodologies. ..........27

4.  Dr. Colwell's Comparison Of The Relative Value Of The Comparable Patents To The Asserted Patents Is Reliable And Does Not Prejudice VLSI.............................................................28

III.  VLSI'S *DAUBERT* MOTION REGARDING MR. HUSTON SHOULD BE DENIED. 31

A.  Background of Mr. Huston's Opinion ....................................................31

B.  Argument ..............................................................................34

1.  None of VLSI's Arguments Impact Mr. Huston's Hypothetical Negotiation Damages Number. .........................................................34

2.  Mr. Huston's Use of the ROI Analysis Is Reliable. ...................................34

3.  Mr. Huston Properly Applies the Assumption of Infringement and Validity in His Damages Analysis. .............................................37

4.  Mr. Huston Does Not Adjust the Royalty Rate Downwards Based on Hypothetical Countersuits between Competitors. ...................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012)................................................................................30

*AVM Technologies, LLC v. Intel Corp.*,
   2017 WL 1787562 (D. Del. 2017) ...................................................................10, 27

*Bayer HealthCare LLC v. Baxalta Inc.*,
   2019 WL 330149 (D. Del. 2019)................................................................................22

*Bio-Rad Laboratories, Inc. v. 10X Genomics Inc.*,
   967 F.3d 1353 (Fed. Cir. 2020)................................................................................38

*California Institute of Technology v. Broadcom Ltd.*,
   2019 WL 8807926 (C.D. Cal. 2019)................................................................29, 30

*Carnegie Mellon University v. Marvell Technology Group, Ltd.*,
   2014 WL 1320154 (W.D. Pa. 2014)........................................................9, 15, 36

*Carnegie Mellon University v. Marvell Technology Group, Ltd.*,
   807 F.3d 1283 (Fed. Cir. 2015)................................................................26, 29

*Comcast Cable Communications, LLC v. Sprint Communications Co.*,
   262 F.Supp.3d 118 (E.D. Pa. 2017)................................................................10

*Evolved Wireless, LLC v. Apple Inc.*,
   2019 WL 1178517 (D. Del. 2019)................................................................10

*Exmark Manufacturing Co. v. Briggs & Stratton Power Products Group, LLC*,
   879 F.3d 1332 (Fed. Cir. 2018)................................................................23

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010)................................................................39

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970)................................................................20

*Image Processing Technologies, LLC v. Samsung Electronics Co.*,
   2020 WL 3414675 (E.D. Tex. 2020)................................................................30, 31

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
   331 F.3d 860 (Fed. Cir. 2003)................................................................10

*Intellectual Ventures I LLC v. Symantec Corp.*,
    2015 WL 82052 (D. Del. 2015) ................................................................14

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001) ............................................................11

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ................................................................29

*Lucent Technologies, Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ................................................5, 25, 35

*Moore v. Ashland Chemical Inc.*,
    151 F.3d 269 (5th Cir. 1998) ................................................................28

*Network-1 Technologies, Inc. v. Alcatel-Lucent USA, Inc.*,
    2017 WL 4769037 (E.D. Tex. 2017) ..............................................21, 22

*Oracle America, Inc. v. Google Inc.*,
    2012 WL 877125 (N.D. Cal. 2012) ......................................................10

*Pacific Biosciences of California, Inc. v. Oxford Nanopore Technologies, Inc.*,
    2020 WL 954938 (D. Del. 2020) ....................................................14, 15

*Rite-Hite Corp. v. Kelley Co., Inc.*,
    56 F.3d 1538 (Fed. Cir. 1995) ..............................................................23

*Smartflash LLC v. Apple, Inc.*,
    2015 WL 11072175 (E.D. Tex. 2015) ..................................................10

*Speedfit LLC v. Woodway USA, Inc.*,
    2019 WL 1436306 (E.D.N.Y. 2019) ....................................................11

*TVIIM, LLC v. McAfee, Inc.*,
    2015 WL 4148354 (N.D. Cal. 2015) ....................................................11

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ......................................................13, 36

*VirnetX, Inc. v. Cisco Systems, Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ......................................................13, 14

*Webasto Thermo & Comfort North America, Inc. v. BesTop, Inc.*,
    2019 WL 3334563 (E.D. Mich. 2019) ............................................21, 22

**Exhibits**

The exhibits cited in this response as "Ex. __" are attached to the declaration of Kate Saxton, filed as an attachment to this response.  Exhibits cited as "VLSI Ex. __" are attached to the declaration

of Charlotte J. Wen, filed as an attachment to VLSI's motions (D.I. 276-01).

## PRELIMINARY STATEMENT

Intel's experts have compiled a compelling record demonstrating █████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████ how Intel and others in the industry have valued comparable patents. In its present motion, VLSI asks the Court to exclude much of this the real-world analysis offered by three of Intel's damages experts, but without any proper basis to do so.

**First**, Intel's expert Drew Pascarella opines that the litigation Return on Investment (ROI) VLSI is seeking here for the asserted patents is ████████████████████████ ██████████████████████████████████████████. VLSI argues that Mr. Pascarella is not qualified to offer this opinion, but Mr. Pascarella has decades of experience calculating ROI analyses in his work as an investment banker (at Goldman Sachs and Citigroup) and teaching at a prominent MBA program. VLSI also claims that an ROI analysis is inherently unreliable and untested—despite unrefuted evidence confirming that ROI is commonly used to value technology companies and their patents, and that Mr. Pascarella has performed that very type of analysis literally hundreds of times in real-world transactions. VLSI also wrongly accuses Mr. Pascarella of applying a "rule of thumb" not tethered to the asserted patents or accused products. The record shows that Mr. Pascarella firmly grounded his analysis in: (1) the ROI **the asserted patents themselves** have generated from prior purchases and sales; (2) the ROI generated from Intel's technology, **including the accused products**; ██████████████████████ ██████████████████ (4) the ROI of investments **comparable to an investment in the asserted patents**.

**Second**, Intel's expert Dr. Robert Colwell—who has more than 40 years of experience in the field of processor design, including at Intel—has opined that the asserted patents have low

value to Intel, including (1) because Intel's products did not suffer from the problems the asserted patents purport to address and Intel had no need for the inventions those patents purport to disclose, and (2) based on a comparison between the asserted patents and more than 20 comparable patents that Intel has licensed or acquired.  VLSI argues that Dr. Colwell's analysis is unreliable because he supposedly did not assume the asserted patents are infringed.  But in his report, Dr. Colwell unequivocally and repeatedly confirmed his opinions rest on assumed infringement for each asserted patent.  VLSI also attacks Dr. Colwell's comparable license analysis as not tethered to the specific technology disclosed by the patents.  However, Dr. Colwell applies a methodology for analyzing the value of comparable patents that is (1) consistent with Intel's own real-world patent transaction practices, (2) relevant to how Intel would have approached the hypothetical negotiation, and (3) reliable.

***Third***, Intel's damages expert Hance Huston has offered an opinion as to what a reasonable royalty would be for the asserted patents.  VLSI asks the Court to exclude that testimony from Mr. Huston because he relies, in part, on Mr. Pascarella and Dr. Colwell.  But as explained above, VLSI offers no proper basis to exclude testimony from either Mr. Pascarella or Dr. Colwell; thus, there is no basis to preclude Mr. Huston from relying on either for their well-supported opinions (and certainly no basis for VLSI's sweeping request to exclude other opinions from Mr. Huston that do not rely on either expert—including Mr. Huston's calculation of the hypothetical negotiation damages number, which does not rely on inputs from Mr. Pascarella or Dr. Colwell). The record also refutes VLSI's claims that Mr. Huston did not assume infringement in rendering his opinions.  Indeed, if Mr. Huston had assumed no infringement, as VLSI argues, his damages number would be $0.  Instead, Mr. Huston assumed infringement and validity and offered different damages numbers in each of the three cases to account for the specifics of each case.

In the end, VLSI has it backwards.  It uses a multi-step, made-for-litigation damages methodology that has never been published or tested to seek ███████████ while at the same time complaining that Intel's use of real-world evidence—transactions involving the asserted patents and a return on investment analysis that has been used hundreds of times in the real world—is somehow unreliable.  VLSI should not be permitted to ask the jury for a damages award ████████████████████████████████████████████████████████████ ████████ while preventing Intel from refuting those claims by having its experts offer relevant, reliable, real-world evidence reflecting the true (low) value of the asserted patents.  Accordingly, the present motion should be denied.

## I.    VLSI'S *DAUBERT* MOTION REGARDING MR. PASCARELLA'S ROI OPINIONS SHOULD BE DENIED.

### A.    Background of Mr. Pascarella's ROI Opinion

Mr. Pascarella is the Associate Dean for the MBA program at Cornell University.  In that capacity, he leads the Investment Banking Immersion Program for MBA students seeking a career in banking.  He also teaches several finance-related MBA courses (e.g., Managerial Finance, Investment Banking Essentials, Investment Banking Immersion Practicum) in which he covers how to calculate the return on investment for various assets.  (VLSI Ex. 9 [Pascarella -254 Rep.] ¶¶ 16-17, App. A (C.V.).)

Mr. Pascarella also has significant industry experience analyzing real-world returns on investment.  For example, he worked as an investment banker at Goldman Sachs and Citigroup for more than 16 years, where he regularly valued technology companies and their assets, including patents.  And he currently serves as Managing Director and Head of East Coast Investment Banking for Vista Point Advisors, where he frequently performs return on investment analyses for his many clients.  (*Id.* ¶¶ 18-19.)

In the expert reports that he submitted in these cases, Mr. Pascarella explains that when valuing technology companies—including their patents—it is common in the industry to perform a return on investment analysis by (1) calculating the amount invested in the asset, and (2) applying an economically reasonable return to the investment. (*Id.* ¶¶ 4-6, 43.)[2] Mr. Pascarella then applies his decades of experience to calculate the expected return on investment for the specific patents asserted in this case—utilizing a type of analysis that Mr. Pascarella has performed hundreds of times in the real world to value assets such as patents. (*Id.* ¶¶ 18-19, 45, 61; Ex. A [Pascarella Dep.] 93:24-94:7, 120:5-10.)

***First***, Mr. Pascarella analyzes the investments made in the asserted patents. He first analyzes the investments made in the patents by the parties to the hypothetical negotiation—NXP and Freescale.



Mr. Pascarella then analyzes VLSI's investments in the asserted patents using

─────────────

[2]  For example, Mr. Pascarella explains that if a company invests $5 million in an asset and investments in similar assets generate 20% returns, it is reasonable to expect to make $6 million when selling the asset. (*See* VLSI Ex. 9 [Pascarella -254 Rep.] ¶ 45.)

[3]  A few of the asserted patents originated from another company—SigmaTel. For these patents Mr. Pascarella also considers the amounts Freescale spent to acquire the patents. (*See, e.g.*, VLSI Ex. 9 [Pascarella -254 Rep.] ¶ 67 (calculating Freescale's investment in the '759 patent at the time of the hypothetical negotiation using amount paid to acquire the patent from SigmaTel).)

[4]  Mr. Pascarella explains that he used this approach because ███████████████████████████████████████████████████████████. (VLSI Ex. 9 [Pascarella -254 Rep.] ¶¶ 42, 64, 106.)  VLSI therefore is wrong to suggest in its motion that Mr. Pascarella calculated the investments in the asserted patents by simply "assum[ing]" all patents have equal value. (Mot. 4.)

██████ (VLSI Ex. 9 [Pascarella -254 Rep.] ¶¶ 105-106, App. J (██████████████████

██████████████); Ex. B [Pascarella Dep.] 309:22-310:1.)[5]

***Second***, Mr. Pascarella determines the reasonable rate of return on the investments in the asserted patents by analyzing the rate of return generated by comparable investments.  (VLSI Ex. 9 [Pascarella -254 Rep.] ¶¶ 73-101, 107-26.)  Mr. Pascarella takes the following returns and applies them to the investments in the asserted patents:

- ***Returns from prior purchases and sales of the asserted patents***.  Mr. Pascarella determines the return on investment generated from each of the prior sales of the asserted patents ████████████████████████████████████████ ████████████████████████████████████████. (*Id.* ¶¶ 90-92, 118, App. O.)

- ***Returns from investments in Intel***.  Because VLSI alleges that Intel uses the asserted patents and the patents have provided additional revenues and profits to Intel, Mr. Pascarella also looks at Intel's ROI—the return on Intel's stock.  (*Id.* ¶¶ 89, 117, App. M.) Mr. Pascarella then applies (1) Intel's ROI at the time of the hypothetical negotiation to the investment made by the parties to the hypothetical negotiation, (*id.* ¶ 89, App. E), and (2) Intel's ROI at the time ████████████████████████████████████ ████████████████ (*id.* ¶ 117, App. M).

---

[5]  Mr. Pascarella explains that the parties to the hypothetical negotiation would have considered VLSI's ROI in the patents because ████████████████████████████████████████████ ████████████████████████████ (VLSI Ex. 9 [Pascarella -254 Rep.] ¶ 103); *see Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333 (Fed. Cir. 2009) (under the "book of wisdom … the hypothetical negotiation analysis permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators" (quotations omitted)).

- ████████████████████████████████████████

  ████████████████████████████████████████

  ███████████████████████████████ (*Id.* ¶¶ 112-13.)

- ***Returns from investments most similar to the asserted patents***.  Mr. Pascarella explains that the investments in the asserted patents are comparable to investments in: (1) microprocessor companies (because VLSI alleges that the asserted patents relate to microprocessor functionalities and provide benefits to microprocessors) (*id.* ¶¶ 85-87); and

  ████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████

  █████████████████████████[6]

Mr. Pascarella applies each of these different return rates to the investments in the asserted patents and averages the results.  His analysis shows that a reasonable ROI on the investment made in the asserted patents by the parties to the hypothetical negotiation is ████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████.  He also determined that a reasonable return on VLSI's investment in the asserted patents is ███████████████

████████████████████████████████████████

████████████████████████████████████████

---

[6]  Again, Mr. Pascarella applies the returns from the time of the hypothetical negotiation to the investment made by the parties to the negotiation (VLSI Ex. 9 [Pascarella -254 Rep.] ¶¶ 81-82, 86), and the returns from the time of ████████████████████████████████ (*id.* ¶¶ 109, 111, 115).

██████████████████████████████████████.

Based on his analyses, Mr. Pascarella concludes that the ROI that VLSI is seeking in these cases is █████████████████████████████████████████████

████████. (VLSI Ex. 9 [Pascarella -254 Rep.] ¶¶ 136-42).  In the -254 case, for example, ██████

███████████████████████████████████████████████

██████████████████████████. (*Id.* ¶¶ 133-34, 137.)  Mr. Pascarella cites to voluminous evidence contradicting that assertion (and supporting his opinions), including

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████. (*Id.* ¶¶ 42, 137.)

Contrary to VLSI's characterizations, Mr. Pascarella did not provide an opinion on the **result** of the hypothetical negotiation.  (Mot. 6-9.)  Instead, he provided his ROI analysis to Hance Huston.  (VLSI Ex. 9 [Pascarella -254 Rep.] ¶ 26-27; Ex. A [Pascarella Dep.] 132:8-15.)  Mr. Huston (not Mr. Pascarella) analyzes the hypothetical negotiation and explains that ROI is one of dozens of datapoints the parties to the negotiation would have considered.  (VLSI Ex. 12 [Huston -254 Rep.] ¶ 1137.)

### B.    Argument

#### 1.    Mr. Pascarella Is Qualified To Offer His ROI Analysis.

VLSI asserts that Mr. Pascarella is unqualified to offer his opinion because he allegedly does not have experience "in the field of calculating or determining a reasonable royalty for a patent relating to microprocessor technology." (Mot. 7.)  VLSI is wrong for three reasons.

**First**, it is Mr. Huston—not Mr. Pascarella—who offers the damages number and analyzes the result of the hypothetical negotiation.  Mr. Pascarella merely provides a **datapoint** that Mr.

Huston explains the parties to the hypothetical negotiation would have considered in evaluating whether a proposed royalty payment is reasonable.  (VLSI Ex. 9 [Pascarella -254 Rep.] ¶ 7-8, 26-27.)  Mr. Pascarella does not need experience analyzing the results of patent license negotiations or calculating a reasonable royalty because he is not offering those opinions in this case.

**Second**, VLSI's own damages expert Dr. Sullivan bases his reasonably royalty opinions on inputs from ████████████████████████████████████████████.  (*E.g.*, Ex. H [Sullivan -254 Rep.] ¶¶ 221, 224, 227 (██████████████████████████████ ████████████████████████████████████████████).)  If Mr. Pascarella cannot provide his input to Mr. Huston's damages analysis, VLSI's technical experts should be excluded from providing their inputs to Dr. Sullivan as well.

**Third**, VLSI cannot reasonably dispute that Mr. Pascarella is qualified to offer the opinion that he does provide.  Mr. Pascarella teaches investment banking (including ROI topics) for a prominent MBA program and has worked in the investment banking field for decades, where he has performed hundreds of real-world ROI analyses to value assets—including patents.  (VLSI Ex. 9 [Pascarella -254 Rep.] ¶¶ 16-19, 53; Ex. A [Pascarella Dep.] at 19:12-16 ("████████ ████████████████████████████████████████████ ████████████████████████████████████████████"); *id.* 120:5-10 (similar); *see* VLSI Ex. 9 [Pascarella -254 Rep.] ¶¶ 17-18, 45.)  Mr. Pascarella, in other words, is exactly what he says he is—an expert in valuing assets, including patents, using ROI analyses.  Nothing in VLSI's motion can change that result.

## 2.    Mr. Pascarella's Opinions And Testimony Are Reliable.

VLSI next argues that Mr. Pascarella's opinions and testimony are not reliable because his analysis has purportedly never been accepted or used.  (Mot. 8-9.)  VLSI again is incorrect.

**First**, VLSI never disputes that ROI is a reliable, well-accepted economic tool for valuing

assets.  (VLSI Ex. 9 [Pascarella -254 Rep.] ¶ 46.)  Nor could it.  As Mr. Pascarella explains based

on his decades of experience, financial analysts and investment bankers regularly use ROI analyses

when negotiating acquisitions and transactions involving assets (*id.* ¶¶ 45-46)—precisely because

they provide a ***well-tested and reliable*** way to value assets subject to a sale or acquisition,

including technology companies and their patents (*id.* ¶¶ 5, 8, 45-46, 48-49, 52; Ex. A [Pascarella

Dep.] 120:5-10 (" ██████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ "); *id.* 93:24-94:1 (similar)).

In short, the suggestion that Mr. Pascarella uses some sort of unproven, untested

methodology is simply not true.  *See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 2014 WL

1320154, at *38 (W.D. Pa. 2014), *rev'd in part, vacated in part on other grounds*, 807 F.3d 1283

(Fed. Cir. 2015) (considering patentee's "financial investment in the research and development of

the patents" as compared to the "return on investment" represented by damages award as part of

damages analysis).[7]

***Second***, despite VLSI's claim to the contrary, the Federal Circuit and courts around the

country have repeatedly endorsed analyses, like Mr. Pascarella's ROI analysis, that value patents

using prior purchases and sales of the patents, the patentee's own valuation of the patents, the

defendant's financial performance, and the value of comparable assets.  For example, courts have

held that:

- Damages can be determined using real-world, historic transactions involving the asserted

---

[7]  In fact, earlier in this case, VLSI itself stated that ██████████████████████████
████████████████████████████████████████████████████ VLSI cannot properly seek
to exclude Mr. Pascarella's opinions by taking the opposite position here—based on a claim that
ROI analyses are inherently unreliable and not a permitted subject for a damages analysis.

patents.  *See Integra Lifesciences I, Ltd. v. Merck KGa*A, 331 F.3d 860, 871 (Fed. Cir. 2003), *vacated on other grounds*, 545 U.S. 193 (2005) (overturning damages award that failed to account for the fact that that the plaintiff "purchased [company that previously owned patents] (together with all of its products, patents and know-how) for $20,000,000 in 1996"); *Evolved Wireless, LLC v. Apple Inc.*, 2019 WL 1178517, *4-5 (D. Del. 2019) (expert can determine damages using "the purchase price of the patents-in-suit"); *Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co.*, 262 F.Supp.3d 118, 144 (E.D. Pa. 2017) ("[T]he value of the consideration given in exchange for the patent may be relevant to the determination of a reasonable royalty.").  This is precisely what Mr. Pascarella does—he calculates his ROI numbers using the returns from the real-world, historic purchases and sales of the asserted patents.  (VLSI Ex. 9 [Pascarella -254 Rep.] ¶¶ 90-92, 118.)

- Damages can be determined using the patentee's own assessment of the patent's value.  *See Smartflash LLC v. Apple, Inc.*, 2015 WL 11072175, at *2 (E.D. Tex. 2015) (denying *Daubert* motion to exclude damages opinion based on patentee's "initial investment in the technology," "offers to sell interest in the patents-in-suit," and patentee's own statements regarding "return on investment" goals); *AVM Techs., LLC v. Intel Corp.,* 2017 WL 1787562, *2 (D. Del. 2017) (denying *Daubert* motion to exclude expert's reliance on plaintiff's prior offer to license patent-in-suit, finding that "[s]uch an offer is relevant to the parties' hypothetical negotiation"); *Oracle Am., Inc. v. Google Inc.*, 2012 WL 877125, at *3 (N.D. Cal. 2012) (the plaintiff's "valuation …. can shed light on the reasonableness of the royalty estimates by the parties' experts").  ██████████████

  ████████████████████████████████████████████████

  █████████████████████████  (VLSI Ex. 9 [Pascarella -254 Rep.] ¶¶ 112, 113.)

- Damages can in some circumstances be determined using the defendant's own financial performance.  *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001) (noting "an infringer's profit margin may be relevant to the determination of a royalty rate").  Again, Mr. Pascarella does just this—his ROI numbers are calculated using Intel's ROI.  (VLSI Ex. 9 [Pascarella -254 Rep.] ¶¶ 89, 117.)

- Damages can be determined using prior transactions involving comparable assets.  *TVIIM, LLC v. McAfee, Inc.*, 2015 WL 4148354, at *4 (N.D. Cal. 2015) (denying *Daubert* motion where expert considered transactions involving comparable assets, including "joint venture agreements" and purchase of a software program related to the asserted patent).  Mr. Pascarella's analysis is directly in line with this precedent; he calculates ROI numbers using returns from investments that he shows are comparable to an investment in the asserted patents—including investments in microprocessor companies. ███████████ ████████████.  (VLSI Ex. 9 [Pascarella -254 Rep.] ¶¶ 78-88, 108-11, 114-16.)

***Finally***, VLSI's argument is directly contrary to its own damages case.  VLSI's expert Dr. Sullivan uses a multi-step damages methodology that has never been endorsed, peer-reviewed, or vetted.  (Dkt. 264, at 6-8.)  It is VLSI's damages methodology, not Intel's, that is unreliable and should be excluded.

### 3.    Mr. Pascarella's Opinions And Testimony Are Specifically Tied To The Asserted Patents And Accused Products.

VLSI next argues that Mr. Pascarella's opinions should be excluded because he supposedly applies a "rule of thumb"—based on a claim that the investment returns he uses in his ROI analysis are not tied to the asserted patents, the alleged benefits of the patents, the accused features, or the revenue or profitability allegedly enabled the asserted patents.  (Mot. 8-12.)  VLSI is wrong.  Each of the returns that Mr. Pascarella uses in his ROI analysis is specifically connected to the asserted

patents or accused products.

**First**, Mr. Pascarella explains that the returns from the prior purchases and sales ***of the asserted patents*** themselves are directly tied to the asserted patents and any purported value, benefits, use, or revenue and profitability of the patents. (Ex. A [Pascarella Dep.] 55:19-25, 70:16-22.) For example, he explains that the parties who previously bought and sold the patents were sophisticated companies with information about the microprocessor market, the technologies valuable to the market, the use or potential use of the asserted patents, and the revenues and profitability associated with any such use. (*Id.* 67:14-21, 71:24-72:3, 116:25-118:4, 186:18-187:11.) He further explains that the prior owners of the patents would have accounted for any value, benefits, use, and revenues/profitability associated with the asserted patents when determining the appropriate price for the patents. (*Id.* at 188:21-189:6.) Thus, when Mr. Pascarella uses the returns from the prior purchases and sales of the asserted patents to determine the reasonable ROI for the asserted patents, he necessarily accounts for any value, benefits, and use of the asserted patents.

**Second**, Mr. Pascarella explains that Intel's ROI is directly tied to the alleged benefits of the asserted patents—given VLSI's allegation that Intel used the asserted patents to make additional revenue and profits, which would be captured in Intel's financial performance and its ROI. (VLSI Ex. 9 [Pascarella -254 Rep.] ¶ 89; Ex. B [Pascarella Dep.] 278:18-279:2 ███████ ███████████████████████████████████████████████████████ ████████████████████████████████████ As a result, when Mr. Pascarella uses Intel's ROI to determine a reasonable ROI on the asserted patents, he necessarily accounts for any value, benefits, or revenue/profitability that Intel allegedly received from the patents or accused features.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████

***Fourth***, Mr. Pascarella explains that ROIs from microprocessor companies are tied to the asserted patents.  Because VLSI alleges that the asserted patents relate to microprocessor products and provide benefits and value to microprocessors, the returns generated across the microprocessor industry are relevant to the returns that VLSI could hope to generate from the patents ██████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████

The cases VLSI cites do not support its argument.  VLSI relies on *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), and *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308 (Fed. Cir. 2014), to argue that "rules of thumb" cannot be used to determine damages. (Mot. 9-11.)  But these cases do not apply here because Mr. Pascarella does not apply any "rule of thumb" or fail to tie his opinions "to the facts of the case at issue."  *Uniloc*, 632 F.3d at 1315 (vacating damages award where expert's opinions were not grounded in the evidence of the case); *see VirnetX*, 767 F.3d at 1333 (same).  Instead, as shown above, Mr. Pascarella's analysis accounts

for—and indeed **stems from and depends on**—the specific facts of these cases and the particular asserted patents and accused products.

Similarly, *Speedfit LLC v. Woodway USA, Inc.* (Mot. 11-12) is inapposite.  In *Speedfit*, the patentee's expert determined damages in part by applying an 18% markup to the amount the defendant invested in improving the accused products.  2019 WL 1436306 at *2, *11 (E.D.N.Y. 2019).  The expert asserted that the 18% came from venture capital returns, but made no attempt to connect the 18% return or venture capital investments to the patents at issue or the facts of the case, and admitted he had no information regarding "what rate of return [the patentee] typically seeks."  *Id.* ████████████████████████████████████████████████████

████████████████████████████████████████████████████

**4.** ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████Courts have made clear that the fact that a patentee did not make, use, or sell technology that uses the asserted patents is directly relevant to the worth of the patents.  *See Pac. Biosciences of Cal., Inc. v. Oxford Nanopore Techs., Inc.*, 2020 WL 954938, at *1 (D. Del. Feb. 27, 2020) ("The undisputed fact that [plaintiff] does not practice the patents-in-suit is probative of issues including damages."); *Intellectual Ventures I LLC v. Symantec Corp.*, 2015 WL 82052, at *1 (D. Del. 2015) ("[E]vidence that [plaintiff] does

---

[8]  VLSI argues that some of the individual ROIs Mr. Pascarella analyzed are negative.  (Mot. 9). But Mr. Pascarella never concludes that Intel would be paid to take a license to the asserted patents, as VLSI incorrectly suggests, or that the result of the ROI analysis is a negative number.  Instead, he explains that when performing an ROI analysis in the real-world, individual returns are **averaged** to account for any outlier returns and the average is then applied to the investment amount to determine a reasonable return on the investment.  (VLSI Ex. 9 [Pascarella -254 Rep.] ¶¶ 95-96.)  This is exactly what Mr. Pascarella does in his analysis; he averages the returns in each investment category and applies the average to the investment amounts.  (*Id.* ¶¶ 93, 99, 119, 124.) Thus, the ROIs that VLSI identifies do not undermine the reliability of Mr. Pascarella's analysis.

not practice the patents-in-suit … is relevant to damages."); *Carnegie Mellon Univ.*, 2014 WL 1320154, at *38 (patentee's "extraordinarily insignificant" "financial investment in the research and development of the patents" is relevant to damages determination).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████

## II.   VLSI'S *DAUBERT* MOTION REGARDING DR. COLWELL SHOULD BE DENIED.

### A.   Background of Dr. Colwell's Opinion

Dr. Colwell has over 40 years of experience in the field of processor design, including over a decade of experience designing processors at Intel.  (VLSI Ex. 23 [Colwell Rep.] ¶ 6.)  In his roles at Intel, including as Chief Architect for Intel's IA-32 (x86 product line), he was responsible for deciding which features and functionalities to include in various Intel processors.  (*Id.* ¶ 7.)  As a result, he has first-hand knowledge of the technologies utilized by Intel's processors and the benefits and value of those technologies to Intel.  During his tenure at Intel, he also regularly worked with Intel licensing personnel to evaluate patents.  (*Id.*)

Dr. Colwell's rebuttal report offers numerous opinions, but VLSI takes issue with only two.[9]

███████████████████████████████████████████████████

---

[9]  Dr. Colwell also submitted an opening expert report on July 21, 2020.  VLSI does not challenge or seek to exclude those opinions.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

VLSI does not dispute the relevance of the value of the asserted patents to the hypothetical negotiation. Rather, VLSI erroneously claims that Dr. Colwell did not assume infringement in analyzing the value of the patents. However, contrary to VLSI's unfounded assertions, nowhere in Dr. Colwell's report does he opine that the asserted patents are not valuable or useful to Intel **because Intel does not infringe**; rather, Dr. Colwell repeatedly states that his analysis **assumes infringement**. Thus, VLSI's arguments are based on an incorrect factual premise and can be denied on that basis alone. VLSI's arguments also, at most, go to the weight of Dr. Colwell's opinions (as opposed to their admissibility), and therefore are not a proper basis for a *Daubert* challenge.

**Second**, Dr. Colwell analyzes patents covered by █ Intel agreements that Mr. Huston has identified as economically and technologically comparable to a hypothetical license to the asserted patents ("comparable patents").[10] In doing so, Dr. Colwell first analyzes each licensed patent and describes the specific invention taught by the patent, including a thorough discussion of the problems addressed, the solutions disclosed, and the benefits provided. He then analyzes each patent using the perspective that Intel's licensing department would have used at the hypothetical negotiation—namely, whether the licensed patent relates to technology that Intel uses or could use.

---

[10] VLSI incorrectly refers to these comparable patents as "third-party patents" (*e.g.*, Mot. 14), even though Intel owns many of them as a result of the comparable agreements.

Finally, Dr. Colwell relies on evidence such as Intel documents and peer-reviewed articles to describe the benefits Intel's products could experience by practicing each licensed patent.

VLSI distorts Dr. Colwell's opinions and methodologies and applicable Federal Circuit law in its effort to argue that his analysis of the value of the comparable patents is unreliable and therefore inadmissible.  Specifically, VLSI takes issue with:  (1) the fact that Dr. Colwell did not conduct an infringement analysis to determine whether each of the comparable patents was practiced by Intel's products; (2) Dr. Colwell's methodologies for ascertaining the benefits provided by the comparable patents; and (3) Dr. Colwell's comparison of the relative values of the comparable patents to the asserted patents.  When viewed in light of the accurate scope of Dr. Colwell's opinions and the proper legal standards, VLSI's arguments are meritless.

> **B.     Dr. Colwell's Opinions On The Value Of The Asserted Patents Are Reliable, Relevant, And Admissible Under *Daubert*.**

VLSI's argument for exclusion stems from the faulty premise that Dr. Colwell did not assume infringement in valuing the asserted patents.  (Mot. 14.)  As detailed below, however, Dr. Colwell's damages opinions explicitly rest upon an assumption of infringement, including his opinions concerning the value of the asserted patents, which are directly relevant to the hypothetical negotiation.

> **1.     Dr. Colwell Properly Assumes Infringement For His Damages Analysis And Opinions.**

VLSI requests that Dr. Colwell "be precluded from testifying as to matters of noninfringement in the context of damages."  (Mot. 19.)  But Dr. Colwell has not offered any opinions on noninfringement.  (VLSI Ex. 23 [Colwell Rep.] ¶ 18 ("████████████████████ ████████████████████████████████████████████.").) ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████  (*E.g.*, *id.* ¶¶ 39, 56, 75, 96, 116, 138, 158, 177.)

Ignoring these clear statements, VLSI contends that Dr. Colwell ████████████

████████████████████████████████████████████████████████████████████

██████████████████  (Mot. 18.)  But in none of these selective quotations did Dr. Colwell

purport to depart from the opinions that he clearly set forth in his expert report—for which he

assumed infringement.

For example, VLSI misleadingly cites Dr. Colwell's testimony, in response to deposition

questioning from VLSI, that he personally does not believe that Intel infringes.  (*E.g.*, Ex. D

[Colwell Dep.] 93:24-94:6 ("██████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  ").)  Whether Dr.

Colwell ***personally*** believes that Intel infringes is a separate question from whether he assumed

infringement ***for purposes of his opinion***.[11]  And on that front, the record is undisputed:  Dr.

Colwell repeatedly states in his report that he is assuming infringement and ***does*** in fact assume

infringement.

> ### 2.  Dr. Colwell's Opinions On The Value Of The Asserted Patents Are Relevant To The Hypothetical Negotiation.

VLSI does not dispute that the value of the asserted patents is relevant to the hypothetical

---

[11]  In addition, VLSI cites to a truncated excerpt of Dr. Colwell's testimony to suggest Dr. Colwell
did not assume infringement (Mot. 18 (citing VLSI Ex. 21 [Colwell Dep.] 100:19-101:5)), but
leaves out the very next question and answer which undermines its interpretation and shows that

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████  " (VLSI Ex. 21 [Colwell Dep.] 101:6-12 (emphasis added).)

negotiation, but claims that the Court should exclude as irrelevant Dr. Colwell's opinions that the asserted patents have little value to Intel because they describe alleged problems that Intel's products did not have and alleged solutions that Intel did not need.  (Mot. 17-19.)  Because these opinions are reliable and relevant, VLSI's motion fails.

*First*, VLSI argues that Dr. Colwell cannot properly assume infringement while also concluding that Intel did not have to deal with the alleged prior art problem that the asserted patent purports to address.  (Mot. 19.)  But an assumption of infringement does not ***necessitate*** an assumption that Intel also had the problem addressed by the patent.

By way of illustration, Dr. Colwell opines that



.  (VLSI Ex. 23 [Colwell Rep.] ¶ 142.)  In reaching his conclusion, Dr. Colwell considers that

Thus, Dr. Colwell could properly ***both*** assume infringement ***and*** conclude that the assumed infringement did not result from a need to address the prior art problem the patent identifies.  And there is no legitimate dispute that whether Intel had the problems the asserted patents sought to address is relevant to the value and usefulness of the patents to Intel under a proper *Georgia-Pacific* analysis.  *See, e.g., Ga.-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120

(S.D.N.Y. 1970) (reasonable royalty based on, *inter alia*, invention's benefits and usefulness over old modes used for working out similar results); *cf. id.* at 1133-34 (attributing minimal value to accused infringer's own patent, which "merely taught another way to solve an easy problem").

**Second**, VLSI relatedly argues that Dr. Colwell has no proper basis to assume infringement while also concluding that Intel did not ***need*** the alleged solution provided by the patent. (Mot. 16.) But again, nothing in the law precludes Dr. Colwell from opining that even if Intel is found to use the claimed inventions of the asserted patents, it had no need to do so, and thus would have derived no benefit from any such infringing use—i.e., that the patent would have little value to Intel even within the context of that assumed infringement.

As one example, Dr. Colwell opines that ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██ ██████████████████████████████████████████ Again, even assuming infringement, which Dr. Colwell did, the fact that Intel did not need the solutions the asserted patents describe is relevant to the value and usefulness of the patents to Intel.[13]

---

[12] Ivy Bridge is the only product that VLSI has accused of infringing the '357 patent. (VLSI Ex. 23 [Colwell Rep.] ¶ 38.)

[13] VLSI notes that Dr. Colwell at times cites to ████████████████████████████████

### 3.     VLSI's Cited Cases Are Inapposite.

VLSI cites to three cases in support of its argument that Dr. Colwell's opinions on the value of the asserted patents should be excluded, none of which supports VLSI's arguments.

***First***, in *Webasto*, the defendant's damages expert opined that the accused products themselves were non-infringing alternatives. *Webasto Thermo & Comfort N. Am., Inc. v. BesTop, Inc.*, 2019 WL 3334563, at *4 (E.D. Mich. 2019). The court found this opinion inconsistent with an assumption of infringement—including because the court had ruled on summary judgment that the accused products infringed. *Id.* But those facts are not present here. As noted above, Dr. Colwell has repeatedly and expressly stated that his opinions rest upon an assumption of infringement, and his damages opinions do not rely on any claim that the accused products are non-infringing alternatives.

Second, *Network-1* involved a damages expert that adjusted his royalty rate opinion using "'various statistics regarding uncertainty' [of the patentee prevailing] specific to patent litigation in the Eastern District of Texas." *Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.*, 2017 WL 4769037, at *5 (E.D. Tex. 2017). The court found this improper because the hypothetical negotiation assumes validity and infringement and thus excluded portions of the opinion that dealt with "venue specific statistics regarding uncertainty." *Id.* Again, no such facts exist here. Dr. Colwell's opinions assume valid and infringed patents, regardless of whether a jury in this venue might reach different conclusions on those issues.



Moreover, there is nothing inherently improper with

***Finally***, in *Bayer* the defendant's damages expert opined that the parties to the hypothetical negotiation would assign little value to the asserted patent in part because the patent disparaged a certain technique (random pegylation) that was supposedly a feature of the accused product. *Bayer HealthCare LLC v. Baxalta Inc.*, 2019 WL 330149, at *3 (D. Del. 2019). The court found this opinion inconsistent with the assumption of infringement because if infringement was assumed, then random pegylation would ***not*** actually be a feature of the accused product. *Id.* The court thus excluded the expert's "opinions based on the erroneous assumption that [the accused product] is the product of random pegylation," but allowed the rest of his opinions regarding the allegedly "minimal value" of the asserted patent. *Id.* at *2-4. Yet again, these facts are not present here. Dr. Colwell's opinions do not rely on the claim that the accused products include a feature disparaged by the asserted patents that would not be present under an assumption of infringement.

In sum, as noted above, Dr. Colwell properly assumed infringement for purposes of his valuation-based opinions, and also acted properly in concluding that the patents lacked any meaningful value to Intel even under that assumption because Intel had no need to avoid the alleged prior art problems or to adopt the alleged solution described in the asserted patents. VLSI's argument ***at most*** goes to the weight—not the admissibility—of Dr. Colwell's opinions. Therefore, VLSI's motion to exclude Dr. Colwell's opinions should be denied.[14]

### C.   Dr. Colwell's Analysis Of The Comparable Patents Is Reliable, Relevant, And Admissible Under The *Daubert* Standard.

VLSI relies on mischaracterizations of Dr. Colwell's opinions and methodology, as well as incorrect (and unsubstantiated) statements of patent damages law, to argue that Dr. Colwell's

---

[14]   Moreover, even under VLSI's flawed argument, the remedy it seeks—to exclude the entirety of Dr. Colwell's opinion on the asserted patents' value—is drastically overbroad and improper. Even VLSI's own cited cases only struck the offending portions of the expert's opinions, and otherwise permitted the expert to testify on other subjects. *Webasto*, 2019 WL 3334563, at *4-5, *7; *Network-1 Techs., Inc.*, 2017 WL 4769037, at *5; *Bayer*, 2019 WL 330149, at *2-4.

opinions on "the [comparable] patents' value" should be excluded.   (Dkt. 276-23 [VLSI's Proposed Order].)  As detailed below, Dr. Colwell's ***actual*** conclusions are entirely proper under the ***actual*** legal standards applicable to damages analyses.

### 1.    VLSI Mischaracterizes Dr. Colwell's Opinions And Methodology.

VLSI erroneously cabins Dr. Colwell's analysis to encompass only a comparative valuation of the comparable patents identified by Mr. Huston in his analysis to the asserted patents. (Mot. 25).  In reality, this is only a single portion of Dr. Colwell's multifaceted opinion.  Indeed, the primary thrust of Dr. Colwell's opinion is a qualitative assessment regarding the value of each comparable patent ***to Intel***.  (VLSI Ex. 23 [Colwell Rep.] ¶ 234.)

To make this assessment, Dr. Colwell utilizes a methodology



(*Id.* ¶ 509.)

(*Id.*; *see also id.* 192:19-193:6.)  Each step in Dr. Colwell's analysis is consistent with how Intel would have approached the hypothetical negotiation, and therefore Dr. Colwell's opinions and methodology are relevant to the damages analysis and reliable.  *See Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, *LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018) (expert's use of damages analysis that "accurately reflect[ed] the real-world bargaining that occurs, particularly in licensing" relevant to damages calculation); *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554-55 (Fed. Cir. 1995) (affirming damages theory that considered the real-world patent licensing practices of a party to the hypothetical negotiation).  Only after determining that each comparable patent was valuable to Intel does Dr. Colwell opine about the relative value of the comparable

patents compared to the asserted patents.  (VLSI Ex. 23 [Colwell Rep.] ¶ 234.)



The first step in Dr. Colwell's analysis involves ████████████ ██████████████████████████████████████████ ████████████ Dr. Colwell ██████████████████████ ██████████████████████████████████████████ ██████████████████████████████████ He then relies on a combination of his experience designing processors for Intel and his own research to conclude that, ██████████████████████████████████████ ██████████████████████████████████████████ (*E.g.*, *id.* ¶¶ 321-23.)  Thus, this first step in Dr. Colwell's actual methodology is a far cry from the "ill-defined, subjective, and undocumented" approach described by VLSI.  (Mot. 21.)

████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████ (*E.g.*, *id.* ¶ 234.)  Again, Dr. Colwell's methodology is consistent with ████████████████████ ████████ (Ex. E [Kovacs Dep.] 44:16-45:24, 192:19-193:6.)  To reach this conclusion, Dr. Colwell ██████████████████████████████████████ ████████████████████████ (*E.g.*, VLSI Ex. 23 [Colwell Rep.] ¶¶ 324-27.)  To account for the fact that Intel's processors are the product of all of the thousands of features of each product working in concert, Dr. Colwell notes that ██████████████████ ██████████████████████████████████████████ ██████████████

In its motion, VLSI argues that Dr. Colwell's opinions regarding the relative value of the

comparable patents as compared to the asserted patents should be excluded because Dr. Colwell supposedly reached that conclusion merely by comparing the quantitative benefits allegedly provided by both patents alone.  (Mot. 24-25.)  As detailed above, Dr. Colwell addresses those quantitative benefits only after conducting an extensive, detailed analysis to conclude that the comparable patents are valuable and useful to Intel.  This is because, as Dr. Colwell explains, "█

███████████████████████████████████████████████████████████████████████████"  (*See, e.g.*, VLSI Ex. 23 [Colwell Rep.] ¶ 328.)  However, Dr. Colwell offered evidence of quantitative benefits derived from testing conducted for peer reviewed articles as a rebuttal to the flawed testing conducted by VLSI's experts for purposes of this litigation.  (*See, e.g.*, *id.*)

### 2. Dr. Colwell's Analysis Regarding Whether The Comparable Patents Relate To Technology That Intel Used Or Could Use Is Reliable.

VLSI argues that Dr. Colwell's analysis that each comparable patent relates to technology that Intel uses or could use is defective because it relies on a "generalized" and "unreliable" standard of assessment.  (Mot. 26-28.)  This is incorrect.

*First*, VLSI criticizes Dr. Colwell for not construing the claims of any of the comparable patents or comparing them to any of Intel's products.  (*Id.* at 26.)  But VLSI cites no legal authority for the proposition that testimony regarding comparable patents is admissible only if the patents were practiced.  This is because no such restriction exists, and for good reason:  such a restriction would irrationally require a trial on infringement for each comparable patent before a damages expert could provide testimony regarding that patent.  Further, it would run contrary to well-settled Federal Circuit law by divorcing the damages discussion from how real-world negotiators— including Intel, NXP, and Freescale—would have approached the hypothetical negotiation.  *See, e.g.*, *Lucent Techs., Inc.*, 580 F.3d at 1325 ("The hypothetical negotiation tries, as best as possible, to recreate the ex-ante licensing negotiation scenario and to describe the resulting agreement").

That Dr. Colwell does not opine that an Intel product practiced each comparable patent provides no proper legal basis to exclude his detailed opinion.

**Second**, VLSI asserts that whether technology covered by the comparable patents relates to technology that Intel "uses or could use" should be excluded because it "does not precisely track the claims of the relevant patents."  (Mot. 27.)  But Dr. Colwell's analysis ██████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

Instead, he ██████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████   █████████████████████

██████████████████  directly relevant to the analysis Intel would have done during the hypothetical negotiation, and reliable as to how Intel would have valued the comparable patents during the execution of each Intel comparable agreement.  *See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d at 1303-04 (Fed. Cir. 2015) ("[p]ast licensing practices of the parties and licenses for similar technology in the industry may be useful evidence" for determining the price the parties would have negotiated during the hypothetical negotiation).

**Third**, VLSI argues that by not determining whether Intel's products actually practice each of the comparable patents, Dr. Colwell's analysis does not accurately capture the "benefits or value" the patents provide to Intel's products.  (Mot. 27.)  As an initial matter, Dr. Colwell's

analysis encompassed a determination of whether the disclosed technology in each comparable patent related to technology that Intel "█████████████" Therefore, to the extent that Intel's products practiced any of the comparable patents, they would be covered by Dr. Colwell's analysis. (*See, e.g.*, VLSI Ex. 23 [Colwell Rep.] ¶ 234 (emphasis added).)

Nevertheless, VLSI's argument is premised on the mistaken notion that a patent can only provide benefits or value if it is practiced by products. Practicing the claims of a patent is not the only way the patent can provide benefit or value. For example, a patent can be valuable to Intel because Intel is practicing in a related field and the patent is relevant to technologies that Intel is using, thereby enabling Intel to innovate freely in that area and to eliminate the risk of a potential infringement suit. (*E.g.*, VLSI Ex. 23 [Colwell Rep.] ¶ 496 (█████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████) Thus, Dr. Colwell's assessment of whether the comparable patents related to technology that Intel "█████████████" accurately captures the value of the patents to Intel. *See AVM Techs., LLC,* 2017 WL 1787562, at *4 (denying motion to exclude damages opinion regarding whether licensed patents related to technology Intel used or could use).

### 3. Dr. Colwell's Analysis Is The Product Of Reliable Methodologies.

VLSI argues that Dr. Colwell's comparable patent opinions are inadmissible because the benefits he identifies "have no relationship even to the technology areas, much less any relationship to the [comparable] patents themselves." (Mot. 28.) VLSI is wrong.

Specifically, VLSI points to Dr. Colwell's analysis of ██████████████████ Agreement as an example where he allegedly "identified every improvement associated with ████████████████████████████████████████." (*Id.* 28-29.)

This is misleading and incorrect. █████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████

Dr. Colwell conducted a similar analysis for ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

Contrary to VLSI's assertions, Dr. Colwell identified specific benefits provided by the comparable patents that are directly tethered to the technology disclosed.  This confirms that Dr. Colwell applied a reliable methodology that "can be properly applied to the facts at issue"—based on benefits he ascribes to the specific patents at issue.  *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276-77 (5th Cir. 1998).

       **4.     Dr. Colwell's Comparison Of The Relative Value Of The Comparable Patents To The Asserted Patents Is Reliable And Does Not Prejudice VLSI.**

VLSI contends that the portion of Dr. Colwell's opinions comparing the relative value of each comparable patent to the asserted patents is inadmissible because the opinions are purportedly

"highly misleading and prejudicial." (Mot. 29.)  Again, VLSI's arguments lack merit.

**First**, VLSI complains that Dr. Colwell did not apportion the value of each comparable patent to account for the incremental benefit associated with Intel's use.  (*Id.*)  But VLSI cites no legal authority requiring Dr. Colwell to do so as a prerequisite to opine on the relative values of the comparable patents as compared to the asserted patents.  Indeed, the cases cited by VLSI merely stand for the proposition that, when valuing a patent ***for purposes of determining a reasonable royalty rate***, "the benefits [the accused infringer] would expect to receive from using the technology and the alternatives it might have pursued" are key inquiries.  *Carnegie Mellon*, 807 F.3d at 1304; *see also LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) (requiring that "[w]hen relying on licenses ***to prove a reasonable royalty***" the proponent of the license must do more than allege "a loose or vague comparability between different technologies or licenses" (emphasis added)).

However, Dr. Colwell does not opine on a reasonable royalty rate—which is the subject of Mr. Huston's opinions—or on the technological comparability of any comparable patent—which is also covered by Mr. Huston.  (*E.g.*, VLSI Ex. 23 [Colwell Rep.] ¶ 233 (███████████████████ ████████████████████████████████████████████████████ ██████████████████ ); *id.* ¶ 504 (██████████████████████ ████████████ ).)  VLSI's argument is predicated on an improper conflation of a legal standard that does not apply to the analysis that Dr. Colwell conducted.[15]

---

[15]  VLSI cites a single out-of-circuit district court case—*California Institute of Technology v. Broadcom Ltd.*—in which a comparative valuation of a comparable patent to an asserted patent was excluded.  2019 WL 8807926, at *2 (C.D. Cal. 2019).  But that case does not hold that a comparative valuation requires an analysis of the fully apportioned benefits provided to specific products.  The comparative valuation of the licensed patent in *California Institute of Technology* comprised the following single sentence: "the [licensed] patent is at least as valuable but likely more valuable than [the asserted patent] since [the asserted patent] provides no discernable benefit

**Second**, VLSI asserts that Dr. Colwell's opinion is unreliable because he allegedly never attempted "to translate the generalized benefits he identified" to a "common denominator like system-level performance or system level power." (Mot. 31.) In making that argument, however, VLSI ignores the many places in Dr. Colwell's report where he **does** opine ███████ ████. (*E.g.*, VLSI Ex. 23 [Colwell Rep.] ¶ 246 (██████████████████████); *id.* ¶ 275 (████████████████████); *id.* ¶ 287 ("███████████████ ██████████████████████████████ ████████"); *id.* ¶ 299 (██████████████████████); *id.* ¶ 328 (████████████████); *id.* ¶ 343 (same); ¶ 423 (██████████ ████████); ¶ 437 (same); ¶ 449 (same); ¶ 473 (same).)

**Third**, VLSI's disagreements with the conclusions that Dr. Colwell reached—including the factual assumptions and considerations underlying those conclusions—go to the weight to be afforded the testimony, and not to its admissibility. *See, e.g.*, *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (denying *Daubert* motion, holding that disagreements regarding "the conclusions reached by [damages] expert and the factual assumptions and considerations underlying those conclusions…go to the weight to be afforded the testimony and not its admissibility"); *Image Processing Techs., LLC v. Samsung Elecs. Co.*, 2020 WL 3414675, at *4 (E.D. Tex. 2020) (denying *Daubert* motion on accused infringer's expert's opinion regarding value of patented technology, holding that arguments regarding assumptions and conclusions underlying valuation "should be made through cross-examination, not a *Daubert*

---

for the typical user." *Id.* The Court struck this sentence because it was "not supported by sufficient analysis." *Id.* In contrast, Dr. Colwell's comparative valuation is the product of a vigorous analysis of the value of both the comparable patents and the asserted patents to Intel. (*Supra* Section II.C.1.)

motion").  VLSI is free to challenge Dr. Colwell's opinions through cross-examination at trial.

## III.  VLSI'S *DAUBERT* MOTION REGARDING MR. HUSTON SHOULD BE DENIED.

### A.  Background of Mr. Huston's Opinion

Intel's damages expert, Mr. Huston, presents Intel's damages number, including by analyzing the hypothetical negotiation.  He is extremely qualified to offer this analysis.  Over more than two decades at IBM, including as IBM's Director of Patent Licensing and IP Strategy, Mr. Huston personally negotiated more than 500 microprocessor patent license agreements.  (VLSI Ex. 12 [Huston -254 Rep.] ¶¶ 11-35.)  He also is an engineer by trade and worked for years on microprocessor design for IBM.  (*Id*. ¶ 12.)

Mr. Huston explains that there is extensive real-world evidence of the value of the asserted patents.  This evidence—which comes from real-world transactions, unlike the ██████████ damages methodology that VLSI uses—shows that the parties to the hypothetical negotiation would have agreed that the value of a license to the asserted patents is not more than ██████████ dollars.  In reaching that conclusion, Mr. Huston analyzes the real-world data in three steps.

***First***, Mr. Huston explains repeatedly—66 times in his reports and 28 times at his deposition—that although Intel has presented noninfringement arguments, his hypothetical negotiation analysis assumes infringement and validity, that the patent owner is willing to grant a license, and that Intel is willing to take a license.  (*Id.* ¶¶ 4, 38, 255, 284-86, 326-28, 356-58, 371-73, 397-99, 442-44, 457-59, 509-11, 541-42, 569-71, 596-98, 625-27, 662-64, 690-92, 736-38, 767-69, 795-97, 824-26, 859-61, 890-92, 925-27, 960-61, 994-95, 1022-24, 1055-57, 1105-07; Ex. F [Huston Dep.] 31:25-32:12; 32:23-33:8; 68:17-69:6; 139:1-10; 177:10-12; 186:20-187:1; Ex. G [Huston Dep.] 196:22-197:6; 197:20-198:1; 198:2-14; 198:16-199:9; 240:14-24; 252:4-253:2; 253:3-25; 254:2-18; 258:12-259:7; 269:10-23; 270:21-271:10; 283:6-19; 284:18-285:13; 285:14-24; 295:3-296:11; 301:7-302:4; 302:6-303:4; 303:6-304:2; 304:20-305:5; 305:6-14; 307:22-

308:13; 309:23-310:12.)

***Second***, Mr. Huston analyzes the multiple categories of real-world evidence that show the value of the asserted patents assuming infringement and validity.  Just by way of example, Mr. Huston explains that:

- The asserted patents were bought and sold multiple times before this case was filed, ranging from ▮▮▮▮▮▮▮▮▮▮▮▮▮ (including many other patents as well).  (VLSI Ex. 12 [Huston -254 Rep.] ¶ 6.)  Mr. Huston ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* ¶¶ 161-242.)

- Mr. Huston explains that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- Mr. Huston explains that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- Finally, Mr. Huston analyzes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Mr. Huston uses these collective datapoints to determine his damages number.  Using the 254 case as an example, he explains that the range of real-world evidence shows a value for the asserted patents of ███████████████████████████████████ (*Id.* ¶¶ 1223, 1227, 1231.)  He then explains that ███████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

***Third***, Mr. Huston considers whether additional data is consistent with his damages number.  In connection with this step, for example, he considers the ROI analysis that Mr. Pascarella provided and explains that the ROI data is consistent with his damages analysis.  (*Id.* ¶ 1137; *id.* ¶¶ 1137-65.)  For example, in the 254 case, the ROI data from Mr. Pascarella ████████ ████████████████████████████████████████████████████ ████████████████████████

Mr. Huston also considers technical evidence from Dr. Colwell.  He explains that ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ All of this, Mr. Huston



16 ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████

17   Mr. Huston explains that an ROI analysis also can provide a valuation of the asserted patents outside the context of the hypothetical negotiation.  (VLSI Ex. 12 [Huston -254 Rep.] ¶¶ 1278-96.)  This is an alternative way to measure damages.  (*Id.*)

explains, is consistent with his damages number.  (*Id.* ¶¶ 151, 1185-87, 1193-94.)  Mr. Huston also

explains that Dr. Colwell ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████

### B.     Argument

#### 1.     None Of VLSI's Arguments Impact Mr. Huston's Hypothetical Negotiation Damages Number.

As explained below, VLSI's arguments attack only Mr. Huston's consideration of Mr.

Pascarella's ROI analysis and Dr. Colwell's valuation analysis—information that Mr. Huston

explains supports his number, but that are not inputs to his calculation of the damages number that

would result from the hypothetical negotiation.  (*Id.* ¶¶ 151, 1137, 1138-65, 1185-87, 1193-94.)

Thus, even if VLSI could prevail on its arguments (and it should not), there would be no impact

on Mr. Huston's hypothetical negotiation damages number.  On this basis alone, VLSI's attempt

to exclude Mr. Huston's damages opinion and testimony should be denied.

#### 2.     Mr. Huston's Use Of The ROI Analysis Is Reliable.

VLSI's arguments regarding Mr. Huston's use of the ROI analysis fail for the same reasons

discussed above in connection with Mr. Pascarella.

***First***, VLSI argues that Mr. Huston's use of ROI is "not relevant" because he uses ROI as

a "rule of thumb" and the ROI numbers purportedly are not connected to the asserted patents, the

alleged use of the patents, or the alleged value of the patents.  (Mot. 33-36.)  This is wrong for the

same reasons discussed in Section I.B.3 above.  The ROI analysis from Mr. Pascarella is not a

"rule of thumb"—it is specifically tailored to the facts of this case, the asserted patents, and the

accused products, including because the ROI calculations are based on (1) the prior purchases and

sales of the asserted patents; (2) Intel's ROI; (3) ███████████████████; and (4) returns from investments comparable to the asserted patents, including investments in microprocessor companies, ████████████████. (*See supra* Section I.B.3; VLSI Ex. 12 [Huston -254 Rep.] ¶¶ 1141, 1145, 1152-53, 1156, 1278, 1281-82, 1285-88, 1291.)[19]

*Second*, VLSI argues that Mr. Huston's use of ROI is "novel" and "has never been tested." (Mot. 35). This argument fails for the same reason discussed above in connection with Mr. Pascarella, including that: (1) it is well established that ROI is a reliable, well-accepted economic tool for valuing assets—indeed, ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████; (2) Mr. Huston explains that ROI analyses are used in license negotiations when the data is available (Ex. G [Huston Dep.] 246:5-13); (3) courts have expressly endorsed calculating damages using the same inputs used in Mr. Pascarella's ROI analysis, including real-world transactions involving the asserted patents (such

---

[18] VLSI asserts that its ROI is irrelevant because it was not a party to the hypothetical negotiation. (Mot. 36, n.8.) But Mr. Huston explains that ███████████████████████████████████████ ██████████████████████████████ would have been aware of and considered VLSI's ROI during the hypothetical negotiation pursuant to the "book of wisdom." (VLSI Ex. 12 [Huston -254 Rep.] ¶ 1152-53 (citing *Lucent Techs., Inc.*, 580 F.3d at 1333).) VLSI offers no rebuttal to that compelling evidence.

[19] VLSI incorrectly claims that Mr. Huston testified that ██████████████████ ████████████████. (Mot. 35-36.) Not true. In the testimony VLSI cites (VLSI Ex. 16 [Huston Dep.] 278:13-280:6), Mr. Huston stated that ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

as the purchases and sales that Mr. Pascarella uses), ██████████████████████

██████████████████████████████████████████████████ the defendant's

financial performance (such as Intel's ROI that Mr. Pascarella uses), and prior transactions

involving comparable assets (such as the comparable ROIs from microprocessor companies, ████

████████████████ that Mr. Pascarella uses) (*see supra* Section I.B.2); and (4) VLSI's

argument is directly contrary to its own damages methodology, which has never been used,

endorsed, peer-reviewed, or vetted (*see* Dkt. 264).

    ***Finally***, VLSI is incorrect that *Uniloc* precludes Mr. Huston from consulting the ROI

analysis to confirm his damages number.  (Mot. 36-38.)  In *Uniloc*, the Federal Circuit held that

the plaintiff could not use all of the defendant's revenues as a "check" on its damages analysis

without satisfying the entire market value rule.  632 F.3d at 1319-20.  In other words, an analysis

that is not reliable (e.g., using all the defendant's revenues) does not become reliable simply by

using it as a "check."  *Id.*

    That has nothing to do with how Mr. Huston uses ROI.  He does not use unreliable data as

a check; he uses ROI data that is specifically connected to the patents and products at issue and

explains why the data is consistent with his damages number.  (VLSI Ex. 12 [Huston -254 Rep.]

¶¶ 8, 1137-65, 1223, 1232, 1240, 1274.)  *See Carnegie Mellon*, 2014 WL 1320154, at *38

(appropriate to consider patentee's "extraordinarily insignificant" "financial investment in the

research and development of the patents" to confirm damages number).[20]

---

[20] VLSI's assertion that Mr. Huston relies on an ROI "rule of thumb" because he cites a publication
by Robert Goldscheider is incorrect.  (Mot. 37.)  Mr. Huston explains, based on his own experience
negotiating more than 500 licenses, that it is common for license negotiators to consider ROI.
(VLSI Ex. 12 [Huston -254 Rep.] ¶ 1137.)  Mr. Huston never cites or relies on Goldscheider's
25% rule of thumb, nor did Mr. Huston calculate ROI numbers based on any rule of thumb.
Instead, the ROI analysis is based on the specific facts of the case as set forth above.  (*See supra*
Section I.B.3; VLSI Ex. 12 [Huston -254 Rep.] ¶¶ 1141, 1145, 1152-53, 1156, 1278, 1281-82,

### 3. Mr. Huston Properly Applies The Assumption Of Infringement And Validity In His Damages Analysis.

VLSI argues that Mr. Huston's analysis is flawed because he purportedly relies on Dr. Colwell to assume noninfringement.  (Mot. 40-43.)  VLSI is wrong.

*First*, Mr. Huston explains repeatedly that his damages analysis and each of his damages numbers are based on the assumption of infringement and validity.  In fact, he states *66 times* in his expert report and *28 times* in his deposition that his analysis is based on the assumption of infringement and validity.  (*See supra* Section III.A.)  Mr. Huston's ultimate conclusion confirms this.  He explains that, had he assumed no infringement, damages would be $0.  (VLSI Ex. 12 [Huston -254 Rep.] ¶ 2.)  But he does not offer $0 as his damages number—instead, he provides damages numbers based on his analysis of real-world evidence precisely because he has assumed infringement and validity.  ██ ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

*Second*, VLSI omits from its citations the surrounding text where Mr. Huston reaffirms that his analysis *does* assume infringement and explains that he is simply stating that the accused features do not have significant value.  For example, VLSI cites one line from █████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████  VLSI

omits ████████████████████████████████████████████████████████

---

1285-88, 1291-92.)



(VLSI Ex. 12 [Huston -254 Rep.] ¶¶ 662-63.)

Indeed, for each paragraph of Mr. Huston's report that VLSI cites (Mot. 40-42), Mr. Huston

either ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████

### 4.    Mr. Huston Does Not Adjust The Royalty Rate Downwards Based On Hypothetical Countersuits Between Competitors.

VLSI argues that Mr. Huston assumes that the parties to the hypothetical negotiation—

who were competitors in the microprocessor industry—would agree to a lower payment than non-

competitors and "adjusts his royalty rate downwards" whenever analyzing licenses between non-

competitors.  (Mot. 43-44.)  This also is not true.

Mr. Huston never assumes that competitors pay less for patent license agreements.  In fact,

---

[21]   VLSI's complaint that Mr. Huston's "combin[es] Dr. Colwell's third-party valuation with Dr. Colwell's asserted patent valuation" (Mot. 41-42) is misplaced.  Mr. Huston explains that Dr. Colwell's analysis shows that the comparable licenses are if anything ██████████████████ ████████████████████  Specifically, he explains that Dr. Colwell shows that ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████  This comparison of the value of the asserted patents to the value of patents that Intel licensed or purchased is relevant and appropriate.  *See Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1373-74 (Fed. Cir. 2020) (district court properly allowed expert testimony comparing asserted patents to patents covered in comparable licenses).

he says that ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████

Nor does Mr. Huston "adjust the royalty rate downwards" when considering comparable

agreements between non-competitors.  (Mot. 43.)  Instead, he explains that ██████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████  In other words,

Mr. Huston does ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

This is exactly how the Federal Circuit has held comparable licenses should be analyzed.

See Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1211-12 (Fed. Cir. 2010) (approving

damages methodology where "the use of past patent licenses … account[ed] for differences in the

technologies and economic circumstances of the contracting parties").  Therefore, VLSI has

presented no basis to exclude any of Mr. Huston's opinions at trial.

Dated: October 22, 2020

OF COUNSEL:

William F. Lee (*Pro Hac Vice*)
Louis W. Tompros (*Pro Hac Vice*)
Kate Saxton (*Pro Hac Vice*)
WILMER CUTLER PICKERING HALE
   & DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Email: william.lee@wilmerhale.com
Email: louis.tompros@wilmerhale.com
Email: kate.saxton@wilmerhale.com

Gregory H. Lantier (*Pro Hac Vice*)
Amanda L. Major (*Pro Hac Vice*)
WILMER CUTLER PICKERING HALE
   & DORR LLP
1875 Pennsylvania Avenue
Washington DC 20006
Tel: (202) 663-6000
Email: gregory.lantier@wilmerhale.com
Email: amanda.major@wilmerhale.com

Respectfully submitted,

*/s/ Stephen Ravel*
J. Stephen Ravel
Texas State Bar No. 16584975
KELLY HART & HALLMAN LLP
303 Colorado, Suite 2000
Austin, Texas 78701
Tel: (512) 495-6429
Email: steve.ravel@kellyhart.com

James E. Wren
Texas State Bar No. 22018200
1 Bear Place, Unit 97288
Waco, Texas 76798
Tel: (254) 710-7670
Email: james.wren@baylor.edu

*Attorneys for Intel Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of the foregoing document via electronic mail on October 22, 2020.

*/s/ J. Stephen Ravel*
J. Stephen Ravel