**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

VLSI TECHNOLOGY LLC,

          Plaintiff,

    v.

INTEL CORPORATION,

          Defendant.

**Case No.:** 1:19-977-ADA

6:19-cv-256-ADA

PUBLIC VERSION

█████████████

█████████████████████
████████████████████
███████████████████████

**<u>PLAINTIFF VLSI TECHNOLOGY LLC'S
MOTION FOR SUMMARY JUDGMENT ON INTEL'S LICENSE DEFENSE</u>**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   STATEMENT OF UNDISPUTED FACTS ......................................................3

      A.    VLSI Technology LLC ..............................................................................3

      B.    The Finjan Companies And Finjan Settlement ......................................5

III.  PROCEDURAL BACKGROUND......................................................................6

      A.    This Court Previously Adjudicated Intel's License Defense And Found
            That VLSI Is Not Bound By The Finjan Settlement ...............................7

      B.    This Court Has Declined To Adopt The California Court's Non-
            Binding, Mooted Order On Intel's License Defense ...............................7

IV.   INTEL'S LICENSE DEFENSE FAILS AS A MATTER OF LAW...............8

      A.    There Is No Legal Basis To Bind VLSI To The Finjan Settlement.....8

            1.    The General Rule Is That Non-Signatories To A Contract
                  Cannot Be Bound By That Contract ...........................................9

            2.    No Exceptions To The General Rule Apply Here .................10

            3.    Intel's Defense Fails As A Matter Of Law .............................17

      B.    Finjan Could Not Have Granted Licenses To VLSI's Patents ..........17

            1.    Federal Law Governs The Right To Grant Patent Licenses .................18

            2.    Finjan Had No Power To License VLSI's Patents .................18

      C.    VLSI's Patents Are Not "Finjan's Patents" As Defined In The Finjan
            Settlement .................................................................................................20

            1.    VLSI Owes "The Requirement To Pay Consideration" To NXP
                  For The Grant Of A License To VLSI's Patents ...................21

            2.    VLSI Could Not Have Licensed Its Patents To Intel For Free .............23

      D.    VLSI's Patents Have Not Been Licensed To Intel Because VLSI Is Not
            An "Affiliate" Of Finjan .........................................................................25

            1.    VLSI Is Controlled By Its CEO And Board Of Directors ....................26

**Page**

2.   Finjan Holdings Is Controlled By Its Executive Chairman And
     Board of Directors....................................................................................28

3.   VLSI And Finjan Are Not Affiliates "Under Common Control"...........29

V.   CONCLUSION...........................................................................................31

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abraxis Biosci., Inc. v. Navinta LLC,*
    625 F.3d 1359 (Fed. Cir. 2010) ................................................................................18

*Alliance Data Sys. Corp. v. Blackstone Cap. Partners V L.P.,*
    963 A.2d 746 (Del. Ch. 2009) .................................................................1, 9, 12, 13

*Am. Legacy Found. v. Lorillard Tobacco Co.,*
    831 A.2d 335 (Del. Ch. 2003) .................................................................................12

*Amadeus Glob. Travel Distrib., S.A. v. Orbitz, LLC,*
    302 F. Supp. 2d 329 (D. Del. 2004) ..................................................................25, 31

*Arcadia Bioscis., Inc. v. Vilmorin & Cie,*
    356 F. Supp. 3d 379 (S.D.N.Y. 2019) ....................................................................12

*Bramble Constr. Co., Inc. v. Exit Realty, LLC,*
    2009 WL 3069686 (Del. Super. Ct. Aug 27, 2009) ...............................................10

*In re CFLC, Inc.,*
    89 F.3d 673 (9th Cir. 1996) ....................................................................................18

*Cincom Sys., Inc. v. Novelis Corp.,*
    581 F.3d 431 (6th Cir. 2009) ..................................................................................18

*Dunlap v. State Farm Fire and Cas. Co.,*
    878 A.2d 434 (Del. 2005) ........................................................................................24

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,*
    269 F.3d 187 (3d Cir. 2001) ....................................................................................11

*Fairchild Semiconductor Corp. v. Power Integrations, Inc.,*
    630 F. Supp. 2d 365 (D. Del. 2007) ........................................................................22

*Forderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.,*
    940 F.3d 1372 (Fed. Cir. 2019) ..............................................................................18

*Intell. Ventures I LLC v. Erie Indem. Co.,*
    850 F.3d 1315 (Fed. Cir. 2017) ..............................................................................18

*Klaassen v. Allegro Dev. Corp.,*
    No. 8626, 2013 WL 5967028 (Del. Ch. Nov. 7, 2013) ..........................................28

*Laborers' Int'l Union of North Am., AFL-CIO v. Foster Wheeler Energy Corp.*,
    26 F.3d 375, 398 (3d. Cir. 1994)......................................................................10

*Medicalgorithmics S.A. v. AMI Monitoring, Inc.*,
    No. 10948, 2016 WL 4401038 (Del. Ch. Aug. 18, 2016) ................................10, 15

*MicroStrategy Inc. v. Acacia Rsch. Corp.*,
    No. 5735, 2010 WL 5550455 (Del. Ch. Dec. 30, 2010) .......................................11

*Movora, LLC v. Gendreau*,
    No. N23C-05-034, 2024 WL 1675370 (Del. Super. Apr. 18, 2024) ...............22, 23

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010) .............................................................................24, 25

*Partners Healthcare Sols. Holdings, L.P. v. Universal Am. Corp.*,
    No. 9593, 2015 WL 3794535 (Del. Ch. June 17, 2015) .......................................28

*Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*,
    284 F.3d 1323 (Fed. Cir. 2002)...........................................................................18

*Robare Grp., Ltd. v. Sec. & Exch. Comm'n*,
    922 F.3d 468 (D.C. Cir. 2019).............................................................................29

*Savidge v. Pharm-Save, Inc.*,
    570 F. Supp. 3d 518 (W.D. Ky. 2021)..................................................................26

*Sheehan v. AssuredPartners, Inc.*,
    No. 19-333, 2020 WL 2838575 (Del. Ch. May 29, 2020).............................8, 15, 16

*In re Shorenstein Hays-Nederlander Theatres LLC Appeals*,
    213 A.3d 39 (Del. 2019) ............................................................................. *passim*

*Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*,
    943 F.3d 49 (1st Cir. 2019)..................................................................................31

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
    563 F.3d 1271 (Fed. Cir. 2009)........................................................................2, 18

*Truinject Corp. v. Nestle Skin Health, S.A.*,
    No. 19-592, 2019 WL 6828984 (D. Del. Dec. 13, 2019) ............................. *passim*

*Truinject Corp. v. Nestle Skin Health, S.A.*, No. 19-592, 2020 WL 70981, at *12
    (D. Del. Jan. 7, 2020)................................................................................. *passim*

*United States v. Stanford*,
    883 F.3d 500 (5th Cir. 2018) ..............................................................................26

*VLSI Tech. LLC v. Intel Corp.*,
    87 F.4th 1332 (Fed. Cir. 2023) ....................................................................... *passim*

*VLSI Tech. LLC v. Intel Corp.*,
    No. 5:17-cv-5671-BLF (N.D. Cal. Dec. 20, 2023) ....................................................8

*Voigt v. Metcalf*,
    No. 18-0828, 2020 WL 614999 (Del. Ch. Feb. 10, 2020) ........................................25

*You Map, Inc. v. Snap Inc.*,
    No. 20-162, 2021 WL 106498 (D. Del. Jan. 12, 2021) ...........................................11

## Statutes and Rules

Del. Code. Ann. tit. 8, § 203(c)(4) ....................................................................25

Fed. R. Civ. P. 56 ........................................................................................31

Investment Advisers Act of 1940 .......................................................................29

35 U.S.C. § 261 ...........................................................................................17

## Table of Expert Report Exhibits

Rebuttal Report of Shane C. Goodwin ...............................................................Exhibit A

Rebuttal Report of Eric C. Chaffee.................................................................. Exhibit B

Rebuttal Report of Mark J. Chandler................................................................ Exhibit C

Rebuttal Report of Ryan Sullivan ..................................................................Exhibit D

Rebuttal Report of Audra L. Boone................................................................. Exhibit E

Rebuttal Report of Bill Post .......................................................................Exhibit F

Rebuttal Report of Norman J. Harrison...............................................................Exhibit G

\* Unless otherwise noted, internal citations and subsequent history are omitted, and emphasis is added.

** Numbered exhibits (Ex. __) are attached to the Declaration of Charlotte J. Wen. Lettered exhibits are set forth above for convenience and have been attached to the Declarations of Shane C. Goodwin, Eric C. Chaffee, Mark J. Chandler, Ryan Sullivan, Audra L. Boone, Bill Post, and Norman J. Harrison.

## I.     INTRODUCTION

This Court already evaluated and rejected Intel's argument that it obtained a free license to all of VLSI's patents through a 2012 settlement agreement ("Finjan Settlement") between Intel and non-parties Finjan Software, Inc. and Finjan, Inc. (collectively, "Finjan"). The Court ruled that "[t]he case law and the Finjan Settlement make clear that VLSI is not bound by the Finjan License with Intel. VLSI was not a party to the Finjan License and it is not an affiliate of Finjan." Ex. 1 (Dkt. 686, Case No. 6:21-cv-57-ADA, at 6 (Mar. 18, 2022)) ("2022 Albright Order"). None of the material facts or law supporting that ruling have changed, and Intel cannot meet its burden of proving otherwise. Intel's license argument thus still fails as a matter of law for at least four separate reasons, each of which is fatal to Intel's defense.

*First*, VLSI was not party to the Finjan Settlement, was not a signatory to the Finjan Settlement, was not mentioned in the Finjan Settlement, did not exist until four years after Finjan and Intel executed the Finjan Settlement, was not created by Finjan, never owned any patents originating with Finjan, and never agreed to be bound by the Finjan Settlement. SOF ¶¶ 4–5, 8.[1] As this Court has found, with narrow exceptions, "Delaware law provides that a non-party to a contract is not bound by that contract," even if the contract purports to bind non-signatory affiliates. 2022 Albright Order at 6; *Alliance Data Sys. Corp. v. Blackstone Cap. Partners V L.P.*, 963 A.2d 746, 760–61 (Del. Ch. 2009) (holding that "the ordinary rule is that only the formal parties to a contract are bound by its terms").

There is no basis to depart from the "ordinary rule" on the undisputed facts here. Delaware law permits non-signatories to be bound only if a signatory had ***actual authority*** to bind the non-signatory, or if the non-signatory ***agreed to be bound*** by the contract. *See In re Shorenstein Hays-*

---

[1] Citations to the Statement of Facts ("SOF") refer to numbered paragraphs in Section II.

*Nederlander Theatres LLC Appeals*, 213 A.3d 39, 53, 57 (Del. 2019). It is undisputed that neither Finjan nor Intel have ever had authority to bind VLSI; and VLSI has never adopted or assumed the Finjan Settlement. SOF ¶¶ 5–6. Accordingly, no matter its terms, the Finjan Settlement cannot bind VLSI as a matter of black-letter contract law.

**Second**, under federal law, Finjan could not have granted Intel a license to VLSI's patents, because "one cannot convey what one does not own." *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009); *see also* 2022 Albright Order at 7 ("Finjan did not own the asserted [VLSI] patents at the time of the Finjan Settlement, meaning it could not have licensed something it did not own."). Finjan has never owned VLSI's patents.

**Third**, even assuming contrary to fact and law that VLSI is somehow subject to the Finjan Settlement, the Finjan Settlement's license grant only includes "Finjan's Patents," a defined term whose plain language excludes VLSI's patents. Ex. 2 §§ 1.4, 1.10. For example, the Finjan Settlement explicitly excludes from "Finjan's Patents" any patent that "Finjan" cannot license without "the requirement to pay consideration ▓▓▓▓▓▓▓▓▓▓." *Id.* The undisputed facts show that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓ for licensing proceeds from VLSI's patent portfolio. SOF ¶ 4. NXP is a "▓▓ ▓▓▓▓" to the Finjan Settlement, SOF ¶ 8, so ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ excludes VLSI's patents from the Finjan Settlement's license grant, particularly here, where a jury has found that Intel owes over $948 million in damages for its infringement of the '983 Patent. *See* Dkt. 690. The Finjan Settlement's definition of "Finjan's Patents" is independently fatal to Intel's argument.

**Fourth**, the Finjan Settlement's own terms show that VLSI is not bound. As this Court already found, VLSI is not Finjan's "Affiliate" under the Finjan Settlement, because Finjan neither controls, nor is under common control with, VLSI. *See* 2022 Albright Order at 5 ("VLSI has no

relationship to Finjan whatsoever."). It is undisputed that Finjan does not control VLSI, and VLSI does not control Finjan. SOF ¶ 5. And contrary to Intel's assertions, VLSI and Finjan are also **not** controlled by FIG LLC ("Fortress"). Intel's arguments fail as a matter of law because they rely on inaccurate attorney argument about Fortress's role with respect to VLSI and to Finjan. As this Court already explained, "Fortress provides VLSI with capital funding. Fortress serves as an asset manager for several investment funds that own VLSI's parent company, CF VLSI Holdings LLC, and these investment funds therefore indirectly own VLSI. However, VLSI is ***independently run by its CEO and Board*** and is ***legally distinct from Fortress***." Ex. 3 (Dkt. 684, Case No. 6:21-cv-57-ADA, at 1 (Mar. 18, 2022)) ("Unclean Hands Order").

Intel's license defense fails for each of these four independent reasons. VLSI respectfully moves the Court for summary judgment in VLSI's favor on Intel's license defense. Upon resolution of Intel's license defense, and of the parties' pending post-trial motions (which this Court heard on December 11, 2023, Dkt. 818), this case may proceed to final judgment.

## II.    STATEMENT OF UNDISPUTED FACTS

Intel's attempt to circumvent its adjudged infringement of VLSI's '983 Patent relies entirely on the Finjan Settlement, a November 20, 2012 agreement that Intel, Finjan Software Inc., and Finjan Inc. entered into to settle and dismiss two cybersecurity patent litigations filed by Finjan against McAfee, Inc. ("McAfee"), a (now former) subsidiary of Intel. The events surrounding the Finjan Settlement predated VLSI's formation by four years, and the instant case by seven years.

### A.    VLSI Technology LLC

1.    VLSI was established as a Delaware limited liability company in 2016. Ex. 4 (LLC Agmt.). VLSI's Chief Executive Officer is Michael Stolarski, a veteran patent licensing attorney who was the Director of IP Licensing and Litigation at Motorola for over twenty years. Ex. 5 (Stolarski Dep.) at 29:1–7; Ex. 6 (Ale Rpt.) ¶ 36; Ex. A (Goodwin Rpt.) ¶¶ 30–31. VLSI also has

a Board of Directors, which is currently comprised of Mr. Stolarski, Eran Zur, and Ami Patel Shah. Ex. 7 (Zur Dep.) at 19:12–20:9; Ex. 6 (Ale Rpt.) ¶ 36.

2.     VLSI is 100% owned by CF VLSI Holdings LLC ("VLSI Holdings"), which in turn is owned by ten investment fund entities (the "VLSI ownership funds"). Ex. 8 (CF VLSI LLC Agmt). The VLSI ownership funds have provided all of VLSI's capital funding to date, and are owned by hundreds of outside investors, including institutional investors such as retirement funds and endowment funds. Ex. 9 (Stolarski Decl.) ¶¶ 7, 10; Ex. 10 (Perryman Rpt.) ¶ 32. VLSI's corporate structure and ownership, including that of the VLSI ownership funds, have not changed since 2016. Ex. A (Goodwin Rpt.) ¶¶ 52–59; Ex. 6 (Ale Rpt.) ¶¶ 30–35.

3.     The VLSI ownership funds are Fortress-managed funds. Ex. A (Goodwin Rpt.) ¶¶ 62–67; Ex. 6 (Ale Rpt.) ¶¶ 31–33. Fortress retains an indirect, *de minimis* ownership interest in VLSI, VLSI Holdings, and the VLSI ownership funds. Ex. 9 (Stolarski Decl.) ¶ 10; Ex. 11 (Zur Dep.) at 120:21–121:10, 123:7–21 ("[Fortress] do[es]n't have any direct interest in VLSI."); Ex. 12 (Slan Dep.) at 42:4–6 ("[VLSI] is not actually owned by Fortress, it is owned by Fortress-managed funds[.]"); *id.* at 98:15–24; Ex. 6 (Ale Rpt.) ¶¶ 31–33; Ex. A (Goodwin Rpt.) ¶ 64.

4.     In 2016, VLSI entered into a Patent Purchase and Cooperation Agreement ("PPCA") with NXP. Ex. 13. The PPCA has been twice amended, in 2017 and in 2018. Exs. 14, 15. Through the PPCA and its amendments, NXP agreed to assign to VLSI a portfolio of semiconductor patents. Ex. 13 (PPCA) § 2.1. In exchange for the patents, NXP received an upfront payment of $35 million, Ex. A (Goodwin Rpt.) ¶ 51 & n.121, and a share of "▮▮▮▮▮▮▮" ranging ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 13 (PPCA) §§ 7.1, 7.3; Ex. 14 (PPCA Am. 1) §§ 1(n)–(o); Ex. 15 (PPCA Am. 2) § 1(1). All of VLSI's patents come from NXP.

5.     VLSI has had no business dealings or communications with Finjan. VLSI has no

ownership interest in or control over Finjan, and Finjan has no ownership interest in or control over VLSI. Ex. 9 (Stolarski Decl.) ¶ 6; Ex. 16 (Stolarski Dep.) at 120:2–11; Ex. 17 (Hartstein Dep.) at 96:6–99:14, 98:17–22. ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

*See* Ex. 16 (Stolarski Dep.) at 124:23–125:2.

6.    Upon learning of the Finjan Settlement for the first time in 2020, VLSI confirmed in writing that VLSI is not a party to or bound by the Finjan Settlement. Ex. 18 (Hattenbach-Tompros Emails); Ex. 19 (Lee Letter) at 2.

**B.    The Finjan Companies And Finjan Settlement**

7.    The Finjan companies have been focused on cybersecurity and patent licensing since the mid-1990s. Finjan Holdings Inc. ("Finjan Holdings") is the parent to multiple Finjan entities, including signatory Finjan Inc. Ex. A (Goodwin Rpt.) ¶ 75; Ex. 6 (Ale Rpt.) ¶¶ 41, 44.

8.    The Finjan Settlement was executed on November 20, 2012, and ███████████████ ████████████ as the only three entities that signed the Finjan Settlement: "Intel Corporation," "Finjan Software, Inc.," and "Finjan, Inc." Ex. 2 (Settlement) at 15 & §§ 1.11, 1.12. VLSI did not sign the Finjan Settlement, is not a party to the Finjan Settlement, and did not even exist at the time of the Finjan Settlement. Ex. 20 (Stabinsky Dep.) at 52:19–23.

9.    Before the Finjan Settlement, Intel's subsidiary McAfee had been found liable for willful infringement of two of Finjan's patents. A Delaware court had entered a permanent injunction against McAfee, *Finjan Inc. v. McAfee Inc.*, No. 06-369 (D. Del.), Dkt. 305 at 34, and ordered McAfee to pay Finjan $38 million in damages, *id.*, Dkt. 340, which Intel paid. Finjan also filed a second lawsuit against McAfee asserting the same patent against additional products. *See Finjan Software Ltd. v. McAfee Inc.*, No. 10-593 (D. Del.), Dkt. 1. Under the terms of the Finjan Settlement, Intel paid Finjan ███████████████████████████████████████████████

██████████. Ex. 2 (Settlement) at §§ 2.1, 3.1; Ex.21 (Accounting Memo) at -136.

10. Finjan Holdings was publicly traded from 2014 until 2020. Ex. 6 (Ale Rpt.) ¶ 43; Ex. A (Goodwin Rpt.) ¶ 95. In July 2020, Finjan Holdings merged with CFIP Goldfish Holding LLC ("Goldfish"). The merger was financed by ten investment fund entities (the "Finjan ownership funds"), which own 100% of Goldfish. Ex. 22 (Finjan Merger Agmt.) at 1, 13; Ex. 6 (Ale Rpt.) ¶ 46; Ex. A (Goodwin Rpt.) ¶¶ 98–99.

11. Following the Goldfish merger, Finjan Holdings was ████████████████. Ex. 6 (Ale Rpt.) ¶ 50. Finjan's Board consists of Executive Chairman Phil Hartstein (who served as President and CEO of Finjan from 2013 to 2020), ████████████████. Ex. 23 (James Dep.) 39:3–7; Ex. 10 (Perryman Rpt.) ¶ 45.

12. The Finjan ownership funds are Fortress-managed investment funds that are entirely distinct from the VLSI ownership funds. *Compare* Ex. 24 (CF VLSI Agmt.) at -2068 *with* Ex. 25 (Goldfish Agmt.) at -2109; *see also* Ex. F (Post Rpt.), Exs. 1–2; Ex. 10 (Perryman Rpt.), Appx. D; Ex. 6 (Ale Rpt.) ¶ 46; Ex. 26 (Anderson Dep.) 45:24–46:14, 92:3–93:5.

13. VLSI had no involvement with the Goldfish merger or with Goldfish. Ex. 9 (Stolarski Decl.) ¶¶ 8–9; Ex. 17 (Hartstein Dep.) at 96:16–20.

### III. PROCEDURAL BACKGROUND

Beginning in 2017, VLSI filed a series of patent infringement actions against Intel asserting several of the NXP patents. VLSI's first case was filed in California. VLSI's second case was filed in 2018 in Delaware. Finally, in 2019, VLSI filed the three infringement actions currently pending before this Court. The first case resulted in a $2.18 billion jury verdict and subsequent judgment in favor of VLSI, which is currently stayed on remand from the Federal Circuit; the second case resulted in a defense verdict; and the third case resulted in an over $948 million jury verdict.

Intel asserted its license defense for the first time in August 2020.

A.    **This Court Previously Adjudicated Intel's License Defense And Found That VLSI Is Not Bound By The Finjan Settlement**

In April 2022, this Court became the first to consider Intel's license defense on the merits, and entered a detailed order rejecting Intel's arguments in the context of Intel's request for leave to amend to add and stay the license defense in favor of Delaware. *See* 2022 Albright Order. The Court made numerous findings of fact and law that remain correct and equally dispositive now, including, *inter alia*, that: (1) VLSI is not a party or a signatory to the Finjan Settlement, (2) VLSI is not owned or controlled by any of the parties to the Finjan Settlement, (3) "VLSI . . . is not an affiliate of Finjan" under Delaware law and the plain terms of the Settlement, and (4) "the asserted paten[t]s in this case could not have been licensed to Intel." *Id.* at 6–7. The Court also found that "VLSI has no relationship to Finjan whatsoever," and that "Finjan did not own the asserted [VLSI] patents at the time of the Finjan Settlement, meaning it could not have licensed something it did not own." *Id.* at 5, 7. None of these facts have changed. After the Court entered final judgment in favor of VLSI, Intel appealed to the Federal Circuit.

On December 4, 2023, the Federal Circuit issued a "very narrow holding" reversing this Court's denial of Intel's motion for leave to amend on procedural grounds, and emphasized that "[w]e do not conclude that the license defense is meritorious. . . . [w]e conclude only that the governing law is such that the defense requires additional litigation of the sort that begins once it is added to the case." *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1351–52 (Fed. Cir. 2023). The Federal Circuit explicitly left for this Court to decide "the appropriate processes for deciding the merits of the license defense," suggesting that "a motion to dismiss may suffice." *Id.*

B.    **This Court Has Declined To Adopt The California Court's Non-Binding, Mooted Order On Intel's License Defense**

In August 2023, while the Federal Circuit appeal was pending, VLSI and Intel filed cross-motions for summary judgment on Intel's license defense in the California case. Because this Court

had already found Intel's license defense futile in a binding and appealable judgment, the parties' arguments were focused primarily on *res judicata* rather than a full merits discussion of Intel's license defense. *E.g.*, Ex. 27 (VLSI MSJ) at 4–7; Ex. 28 (Intel Cal. MSJ Opp.) at 11–15. Then, just weeks after the Federal Circuit reversed with its "very narrow holding," the California court denied the parties' cross-motions and, despite the limited record, directly contradicted this Court's prior assessment of the law and facts on multiple grounds. *See* Ex. 29 (Freeman Order), *VLSI Tech. LLC v. Intel Corp.*, No. 17-5671, 2023 WL 9052312 (N.D. Cal. Dec. 20, 2023) ("*VLSI Cal.*"). The order was subsequently mooted, *VLSI Cal.*, 2024 WL 269163, at *1, and Intel has conceded that the order is not binding here. *See, e.g.*, Ex. 30 (7/15/2024 Hr'g Tr.) at 16:15–17.

This Court already declined to adopt Judge Freeman's order. Ex. 31 (7/29/2024 Shultz Email) ("Judge Albright will not be adopting Judge Freeman's order."). No new facts or changes in the law justify reconsideration of this Court's previous, substantive ruling on Intel's license defense. 2022 Albright Order. This issue is now ripe for adjudication once again.

## IV.   INTEL'S LICENSE DEFENSE FAILS AS A MATTER OF LAW

### A.   There Is No Legal Basis To Bind VLSI To The Finjan Settlement

It is undisputed here that VLSI was not a signatory or a party to the Finjan Settlement. *See* SOF ¶ 8. Under Delaware law, the general rule is that non-signatories to an agreement cannot be bound by its terms, ***even if*** the agreement purports to bind "Affiliates" of signatories. *See, e.g.*, *Sheehan v. AssuredPartners, Inc*., No. 19-333, 2020 WL 2838575, at *9 (Del. Ch. May 29, 2020) (non-signatory parent company not bound to agreement entered into by subsidiary even though agreement defined the subsidiary to include "affiliates, subsidiaries, [and] parent companies").

Delaware law permits only limited and narrow exceptions to the general rule: when a signatory had the authority to bind the non-signatory, or when the non-signatory agreed to be bound. But neither Finjan nor Intel have ever had the authority to enter into a contract on VLSI's

behalf; and VLSI has never adopted, assumed, or accepted any benefits from the Finjan Settlement. Intel instead argues, contrary to law, that a non-signatory corporate "affiliate" can be bound to an agreement if "under common control with" a signatory. Intel is incorrect.

VLSI cannot be bound by the terms of the Finjan Settlement as a matter of law.

### 1.    The General Rule Is That Non-Signatories To A Contract Cannot Be Bound By That Contract

As this Court previously acknowledged, "Delaware law provides that a non-party to a contract is not bound by that contract," even when the contract purports to bind "affiliates." 2022 Albright Order at 6 (citing *Sheehan*, 2020 WL 2838575; *Alliance Data Sys. Corp. v. Blackstone Cap. Partners V L.P.*, 963 A.2d 746, 760–61 (Del. Ch. 2009) (non-signatory parent company not bound to agreement entered into by subsidiary because "the ordinary rule is that only the formal parties to a contract are bound by its terms"); *see also* 2022 Albright Order at 6 ("[Non-signatories to an agreement are not bound to that agreement] even when the non-party is a close corporate affiliate of the signatory." (citing *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *3–8 (Del. Ch. Nov. 13, 2018) (parent company not liable for contract entered into by wholly-owned subsidiary); *Kuroda v. SPJS Holdings, LLC*, No. 4030, 2010 WL 4880659, at *3–8 (Del. Ch. Nov. 30, 2010) (arbitration clause not binding on non-signatory affiliate))).

The default rule has very limited exceptions and cannot be circumvented with contractual language purporting to bind "affiliates" that do not otherwise fall into those limited exceptions. *See, e.g.*, *Truinject Corp. v. Nestle Skin Health, S.A.*, No. 19-592, 2019 WL 6828984, at *9–10 (D. Del. Dec. 13, 2019) (non-signatory subsidiary not bound to agreement entered into by another subsidiary owned by a shared parent company, despite agreement purporting to bind signatories' "Affiliates" under common control). This longstanding rule—and its limited exceptions—square with the principles of equity and mutual assent that undergird black-letter contract law. Permitting

non-signatories to be bound to contracts as a matter of course could "degrade customs and practices that form the foundations of contract law" and "the requirement of mutual assent." Ex. B (Chaffee Rpt.) ¶ 78. Parties thus cannot freely contract around Delaware's default rule.

Here, it is undisputed that VLSI is not a party to or signatory of the Finjan Settlement, is not named or otherwise referenced in the Finjan Settlement, has never agreed to be bound by the Finjan Settlement, never authorized Finjan to act on its behalf, and is not an alter ego of Finjan. *See* SOF ¶¶ 5–6, 8. Thus, under controlling Delaware law, VLSI's status as a non-signatory and non-party to the Finjan Settlement means that it ***cannot be bound*** by the Finjan Settlement, regardless of its terms. Neither the relevant facts nor the law have changed since the Court's 2022 Albright Order. Intel's license defense still fails as a matter of law.

### 2.      No Exceptions To The General Rule Apply Here

Delaware law does not allow a non-signatory corporate "affiliate" to be bound to an agreement ***solely*** because it is "under common control with" a signatory.

#### (a)      Finjan Never Had Authority To Bind VLSI To Any Contract

Non-signatory "affiliates" can be bound to agreements if the signatory has the authority to enter into an agreement on behalf of the non-signatory, such as when the signatory ***is an alter ego*** of the non-signatory, ***is an agent of*** the non-signatory, or ***owns or controls*** the non-signatory. *See, e.g.*, *Laborers' Int'l Union of North Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d. Cir. 1994) ("The moment [non-signatory] FWC conceded that it was [signatory] FWEC's alter ego, the central question of whether it could be compelled to arbitrate the dispute was affirmatively answered."); *Bramble Constr. Co., Inc. v. Exit Realty, LLC*, 2009 WL 3069686 (Del. Super. Ct. Aug 27, 2009) (non-signatory liable for breach of contract as an alter ego); *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, No. 10948, 2016 WL 4401038, at *18 (Del. Ch. Aug. 18, 2016) (non-party bound to agreement was under signatory's control); *MicroStrategy Inc.*

*v. Acacia Rsch. Corp.*, No. 5735, 2010 WL 5550455, at *12 (Del. Ch. Dec. 30, 2010) (signatory's "wholly owned subsidiary" bound to signatory's agreement); *Truinject*, 2020 WL 70981, at *12 (non-signatory not bound because signatory lacked "actual or apparent authority" to do so).

These exceptions are grounded in sound policy and the principle of mutual assent. If a non-signatory is an "alter ego" of a signatory, or empowered a signatory to enter into a contract on its behalf, the "non-signatory" has, as a practical matter, assented to the contract. "Allowing such [non-signatories] to be bound respects the reasonable expectations of the contracting part[ies] and prevents fraud or unjust enrichment." Ex. A (Goodwin Rpt.) ¶ 242. Similarly, a direct "control" exception "prevents parent corporations from . . . creating new subsidiaries . . . to circumvent the parent company's own contractual obligations." *Id.* ¶ 244. Otherwise, "any entity could easily circumvent duties it freely undertook" by simply creating additional subsidiaries. *Id.*

Intel has never contended, nor could it, that Finjan and VLSI are alter egos, that VLSI authorized Finjan to take any action on its behalf, or that Finjan owns or controls VLSI. SOF ¶¶ 5, 13. Finjan has never had any authority to bind VLSI to the Finjan Settlement, either in 2012, before VLSI existed, or anytime thereafter. SOF ¶¶ 5, 8, 13. This exception thus does not apply.

        (b)    <u>Neither VLSI Nor Fortress Assumed Or Adopted The Contract</u>

A non-signatory affiliate can also bind itself to a contract after the fact, by affirmatively adopting or otherwise assuming the contract, provided the contract so allows. *See, e.g.*, *You Map, Inc. v. Snap Inc.*, No. 20-162, 2021 WL 106498, at *10 (D. Del. Jan. 12, 2021) (to adopt a contract, "a person must 'manifest[] assent that the act shall affect the person's legal relations' or engage in 'conduct that justifies a reasonable assumption that the person so consents'"); *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001) (non-signatory not bound to agreement when "there is no evidence that [non-signatory] embraced the Agreement"); *Arcadia Bioscis., Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 390

- 11 -

(S.D.N.Y. 2019) ("Even where an 'agreement purport[s] to bind successors and assigns of the parties to the agreement, an assignee or successor will not be bound to the terms of a contract absent an affirmative assumption of the duties under the contract.'"); *Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 344 (Del. Ch. 2003). This exception "is entirely consistent with the concept of a contract as a mutually beneficial exchange." Ex. A (Goodwin Rpt.) ¶ 238.

Intel has contended that both Fortress and VLSI have somehow implicitly adopted or assumed the Finjan Settlement. But the undisputed facts show that VLSI has never taken any action that could be construed as VLSI agreeing to be bound—to the contrary, VLSI has consistently maintained that VLSI is *not* bound. SOF ¶¶ 5–6. VLSI has also never used the Finjan Settlement to affirmatively extract a benefit from Intel nor accepted any benefits therefrom, such as payments or value transfers from Intel. Ex. 20 (Stabinsky Dep.) at 39:19–24; Ex. 9 (Stolarski Decl.) ¶ 6; Ex. 17 (Hartstein Dep.) at 99:5–9; Ex. A (Goodwin Rpt.) ¶ 222. Similarly, Fortress has never taken any action that could be construed as agreeing to be bound by the Finjan Settlement. Indeed, ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Ex. 22 (Merger Agmt.) §§ 10.08, 10.12(a), 10.12(b), 4.07.

VLSI and Fortress have never affirmatively adopted the Finjan Settlement.

(c)    <u>There Is No Exception For Non-Signatories "Under Common Control" With A Signatory</u>

Intel attempts, contrary to settled law, to broaden the scope of the exceptions to *also* bind non-signatory "affiliates" who later come under "common control" with a signatory. Delaware law, however, is clear that entities cannot even bind their non-signatory *parents*, let alone further-flung corporate affiliates. *Alliance Data Sys.*, 963 A.2d at 760–61; 2022 Albright Order at 6 ("[Non-signatories to an agreement are not bound] even when the non-party is a close corporate

affiliate of the signatory.") (citing Delaware authorities). This, too, makes sense: lawfully-registered entities are presumed to be separate, and—absent an agency or alter ego relationship—cannot act or enter agreements on behalf of other such entities without consent. *Alliance Data Sys.*, 963 A.2d at 769 ("Delaware law respects corporate formalities, absent a basis for veil-piercing[.]").

For example, in *Truinject Corp. v. Nestle Skin Health, S.A.*, a Delaware court explicitly rejected the argument that Intel makes here. The dispute centered on whether Galderma Labs, a signatory to agreements with Truinject Medical, could bind non-signatory Nestlé Skin Health, Inc. to those agreements, given that both Galderma Labs and Nestlé Skin Health, Inc. were arguably under the common control of non-signatory Nestlé Skin Health, S.A. *Truinject*, 2020 WL 70981, at *12. The court answered in the negative, finding "no allegations . . . plausibly supporting a conclusion that Galderma Labs (a Texas partnership indirectly owned by Nestlé Skin Health, S.A. through multiple layers of corporate formalities) had authority to sign for Nestlé Skin Health, Inc. (a subsidiary of Nestlé Skin Health, S.A.)." *Id.* In other words, the fact that a non-signatory affiliate was under common control with a signatory was ***not*** enough to overcome the default rule, even though the agreements purported to bind "affiliates" "under common control." *Id.* So too here: Finjan lacks any authority to bind VLSI, SOF ¶¶ 5, 8, and the facts at bar are even more attenuated than those in *Truinject*: unlike Galderma Labs and Nestlé Skin Health, Inc., VLSI and Finjan are not subsidiaries of a common parent. VLSI has been owned by the VLSI ownership funds since 2016, SOF ¶ 2; and Finjan has been owned by the Finjan ownership funds since 2020. SOF ¶ 10. The VLSI ownership funds are entirely different from the Finjan ownership funds. SOF ¶ 12.

In support of its erroneous assertions about Delaware law, Intel misinterprets *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, claiming that *Shorenstein*—which pre-dates *Truinject*—broadens the narrow "authority" exception to encompass any non-signatories

*under common control with* a signatory. Ex. 32 (Intel Cal. Rep.) at 13; Ex. 33 (Intel App. Br.) at 70. But *Shorenstein* concerns whether an individual that uses an LLC as an alter ego owes fiduciary and contractual duties to that LLC under the terms of its LLC agreement. 213 A.3d 39 (Del. 2019).

In *Shorenstein*, the Delaware Supreme Court faced a unique set of facts and circumstances involving the Nederlander and Hays families, their respective closely-held companies, and an LLC agreement establishing a joint Hays-Nederlander enterprise, in which both families agreed to "maximize the economic success" and "avoid conflicts of interest" to the LLC. 213 A.3d at 40, 44. At issue was whether companies controlled by Carole Hays owed and thereby breached fiduciary and contractual duties to the Hays-Nederlander LLC, given that (a) neither the companies nor Ms. Hays were signatory members; (b) Ms. Hays was a successor-in-interest to her deceased father, a founding signatory, *id.* at 63; (c) Ms. Hays personally "insist[ed] that a clause be put in the [LLC] agreement to prevent competition by the Nederlanders," *id.* at 44 n.17; and (d) Ms. Hays was an officer of, and personally controlled and used, the Hays-Nederlander LLC to her benefit as an alter ego, *id.* at 45–46, 53, 57–58, 42 n.3.

The *Shorenstein* court concluded that the non-signatory Hays-controlled "affiliates" owed duties to the Hays-Nederland LLC because they were both created by and "***under the control of a party to the agreement***" (here, Ms. Hays, as an alter ego of the Hays-Nederlander LLC itself). *Id.* at 57 n.86. The court reasoned that holding otherwise would unfairly permit the Hayses to avoid their contracted-for non-competition obligations to the Nederlanders (while at the same time requiring the Nederlanders to avoid competing with the Hayses), and cited cases standing only for the proposition that a non-signatory affiliate may be bound to a contract if it is ***controlled by a signatory***. *See id.* at 57–58 & n.86 ("[T]he agreement imposed obligations on a contractually-defined affiliate that was under the control of a party to the agreement.") (citing

*Medicalgorithmics*, 2016 WL 4401038, at \*18)[2]; *Shorenstein*, 213 A.3d at 57 n.86 ("[T]he agreement would apply to later-acquired or formal entities owned or controlled by the parties to the agreement.") (citing *MicroStrategy*, 2010 WL 5550455, at \*12). Indeed, the Federal Circuit's decision noted that, in *Shorenstein*, "the Delaware Supreme Court cited two nonprecedential decisions of the Delaware Chancery Court that are to the same effect, describing them as involving contract provisions covering certain affiliates and non-signatories who were, or came to be, ***owned or under the control of a signatory party***." 87 F.4th at 1352 (cleaned up).[3]

 *Shorenstein* in no way broadens the exceptions discussed *supra* §§ (a)–(b). *Shorenstein*

---

[2] *Medicalgorithmics* contains language suggesting that a non-party was bound to the agreement at issue because it was "under common control" with a signatory to the agreement. 2016 WL 4401038 at \*18. However, the non-party was indisputably under the control of a signatory, who was also acting as an agent of the non-party. *Id.* at \*18, \*19 & n.223. Indeed, *Shorenstein* itself described the holding in *Medicalgorithmics* as "where an agreement included 'Affiliates' within the definition of 'Parties,' the agreement imposed obligations on a contractually-defined affiliate that ***was under the control of a party to the agreement***." 213 A.3d at 57 n.86.

[3] The Federal Circuit merely found that "under the authorities presented and arguments made on whether VLSI, as a non-party, could be bound by the 2012 license agreement, we do not think that there is a sufficiently clear answer for there to be a determination of futility." 87 F.4th at 1352. Because of the number of issues on appeal, "the authorities presented and arguments made" were brief: the Federal Circuit was only asked to consider whether this Court's decision denying Intel's motion for leave to amend was an abuse of discretion, ***not*** the underlying merits of Intel's defense. For example, the parties' original motion to amend briefing did not even mention *Shorenstein*, and the appeal briefing contained only a minimal discussion. Ex. 33 (Intel's Op. Br.) at 70; Ex. 34 (VLSI's Resp. Br.) at 68–69; Ex. 35 (Intel's Rep. Br.) at 32. The Federal Circuit explicitly did not make any determinations on the merits of Intel's defense, stating that "[w]e do not conclude that the license defense is meritorious" and "we do not prejudge the answer to [whether VLSI, as a non-party, could be bound by the 2012 license agreement] or the answer to other questions about whether VLSI's particular circumstances bring it within the contract's terms." 87 F.4th at 1351– 52. A closer examination of *Shorenstein* and subsequent cases, including *Truinject*—which was not before the Federal Circuit—compels only the already established conclusion that non-party affiliates may nevertheless be bound to an agreement if they are under a signatory's control, regardless of contractual language. *See, e.g.*, *Truinject*, 2020 WL 70981, at \*12; *Sheehan*, 2020 WL 2838575, at \*9. The Federal Circuit correctly surmised as much, stating that "[p]erhaps it makes a difference [under the caselaw] whether the affiliate sought to be bound . . . was controlled by the signatory, rather than merely under common control, even when the contractual definition of 'affiliate' includes the common-control situation." 87 F.4th at 1352.

merely applied these well-established exceptions—on control, veil-piercing, agency, and adoption—to bind Ms. Hays and her closely-held and controlled companies to a non-competition provision she had personally bargained for and benefitted from. 213 A.3d at 57. The court also found that Ms. Hays and her co-defendants breached their fiduciary duties to the Hays-Nederlander LLC, and were thus also appropriately bound to the LLC agreement under veil-piercing principles. *Id.* at 53. In other words, *Shorenstein* bound the non-signatory Hays companies to the LLC agreement because they were controlled by Ms. Hays, who was an officer of the LLC, used the LLC to her own benefit, and was herself bound through veil-piercing principles, and who had taken affirmative action to assume the agreement's obligations. No such facts exist here. To the contrary, the only connection between VLSI and Finjan is the fact that the VLSI ownership funds and Finjan ownership funds have separately engaged Fortress as an investment adviser. SOF ¶ 12.

Significantly, no subsequent Delaware cases have extended *Shorenstein* to bind non-signatory affiliates that are merely under common control with a signatory. Every Delaware court to consider the question since *Shorenstein*—including in cases considered by this Court, *see* 2022 Albright Order at 6—has in fact expressly rejected Intel's argument (and Judge Freeman's conclusion, *see* Ex. 29 at 14) that a contract can bind non-signatory affiliates ***not*** under the control of a signatory. *See, e.g.*, *Sheehan*, 2020 WL 2838575, at *9 (Del. Ch. May 29, 2020) (declining to bind non-signatory parent to subsidiary's agreement because "this definition [with 'affiliates'] does not transform these entities into parties to the Employment Agreements. Only the parties that signed the Employment Agreements had obligations thereunder."); *Truinject*, 2020 WL 70981, at *12 (D. Del. Jan. 7, 2020) (declining to bind a non-signatory subsidiary to a fellow subsidiary's agreement, even though the agreement purported to bind all "affiliates").

This Court should decline Intel's request to misconstrue established Delaware law.

### 3. Intel's Defense Fails As A Matter Of Law

In sum, under controlling law, VLSI is not bound to the terms of the Finjan Settlement, regardless of the Finjan Settlement's definition of "Affiliate." The general rule against binding non-signatories cannot be circumvented with contractual language alone. While there are exceptions to the general rule, none apply here: VLSI is not an alter ego of a signatory, never authorized a signatory to act on its behalf, is not under a signatory's control, and never took any affirmative action to adopt or assume the Finjan Settlement. No exception to the general rule allows non-signatory affiliates merely "under common control" with a signatory to be bound.

VLSI respectfully requests the Court enter summary judgment on Intel's license defense.

### B. Finjan Could Not Have Granted Licenses To VLSI's Patents

The Finjan Settlement provides that the agreement "shall be interpreted in accordance with and governed by federal law or, where applicable, the laws of the State of Delaware." Ex. 2 § 11.4. While Delaware law governs the question of whether a non-signatory is bound to a contract, the issue of whether Finjan has the *right* to grant a license to patents it did not own is a substantive patent issue governed by *federal* law. Indeed, when the Federal Circuit considered the 2022 Albright Order, it *sua sponte* suggested that federal patent law regarding ownership and assignment of patent rights might prove determinative. *See VLSI*, 87 F.4th at 1352 ("Nor do we prejudge whether . . . any federal patent-law question is involved." (citing 35 U.S.C. § 261 ("Applications for patent, patents, or any interest therein, ***shall be assignable in law by an instrument in writing***.")). Neither federal nor state law allow a license under these circumstances: state law precludes VLSI from being bound to the terms of the Finjan Settlement, and federal law precludes Finjan from granting licenses to VLSI's patents.

### 1. Federal Law Governs The Right To Grant Patent Licenses

Federal patent law applies "where the interpretation of a contract is 'intimately bound up'

with an issue of patent law," *Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, 940 F.3d 1372, 1380 (Fed. Cir. 2019), such as "the question of standing in patent cases," *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1320 n.1 (Fed. Cir. 2017) (quoting *Abraxis Biosci., Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010)), including the right to grant a license, *In re CFLC, Inc.*, 89 F.3d 673, 677–78 (9th Cir. 1996) (While "construction of a patent license is generally a matter of state contract law . . . '[t]he ***right*** of the patent owner to license the use of his invention is a creature of federal common law . . . .'") (cited with approval in *Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1328 (Fed. Cir. 2002)); *see also Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 438 (6th Cir. 2009) (state law governs "whether a merger results in the transfer of an intellectual property license," but "must yield to the federal common law rule prohibiting such unauthorized transfers").

### 2.     Finjan Had No Power To License VLSI's Patents

Every case analyzing the right of a party to license a corporate affiliate's patents under federal law has held that, absent express, written authorization from the patentee, one cannot license patents one does not own, regardless of the corporate relationship. *See TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009) ("[O]ur analysis begins with the premise that one cannot convey what one does not own. This principle is particularly important in patent licensing . . . ."); *see also Abraxis*, 625 F.3d at 1366 ("Common corporate structure does not overcome the requirement that ***even between a parent and a subsidiary***, an appropriate written assignment is necessary to transfer legal title from one to the other."). This Court has already held the same. 2022 Albright Order at 7 ("Finjan did not own the asserted patents at the time of the Finjan Settlement, meaning it could not have licensed something it did not own.").

This standard is even more exacting than the Delaware rule against binding non-signatories: under federal law, even parent companies cannot license or assert their subsidiaries'

patents. For example, in *Control Laser Corp. v. Smith*, the court explained that, just as a corporate parent lacks standing to sue on its subsidiary's patents, it likewise cannot grant licenses to those patents because a parent, despite controlling a subsidiary, does not possess "equitable title in a subsidiary's patents." 705 F. Supp. 3d 1006, 1013 (N.D. Cal. 2023) (quoting *Digitech Image Techs., LLC v. Newegg Inc.*, No. 12-1688, 2013 WL 1871513, at *4 (C.D. Cal. May 3, 2013)). Thus, where it was "undisputed that [the patentee] ha[d] exclusive rights to the" asserted patent, the patentee's corporate parent "could not have duly authorized Defendant to distribute the [accused product] without *a prior written assignment* from [the patentee]" because the grant of a license would "surrender[] the patentee's right to exclude . . . under the patent." *Id.* Likewise, here, **Finjan** could not have licensed **VLSI's** patents to Intel under federal law. VLSI undisputedly owns the '983 Patent, and Finjan has never procured a written assignment, or any authorization, from VLSI. SOF ¶¶ 4, 5, 8. Finjan thus could not have "surrender[ed] [VLSI's] right to exclude [Intel] under [all of VLSI's] patent[s]." *Smith*, 705 F. Supp. 3d at 1013.

*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, is also instructive, and involved three key entities: Medtronic AVE ("AVE"), which sued ACS for patent infringement, and a third party, Bard, which had previously covenanted not to sue ACS on behalf of Bard and its "Affiliates." 247 F.3d 44, 49 (3d Cir. 2001). During the *Medtronic AVE* litigation, AVE acquired Bard's business, leading ACS to argue that the Bard-ACS covenant was binding on AVE as to AVE's own patents. *Id.* at 50. Applying Federal Circuit law, the Third Circuit explained that AVE "had to adhere to the covenant not to sue on **Bard's** claims." *Id.* at 60. As to AVE's own patents, however, AVE "did not by accepting the assignments from Bard limit its rights under the patents involved in this action which it did not obtain from Bard." *Id.* In other words, even though Bard granted ACS a covenant on its and its "Affiliates" patents, and even though AVE later

acquired Bard's business, that covenant did not extend to AVE's patents under federal law. Here, likewise, even if the Finjan Settlement could bind **VLSI** under **Delaware** law (and it cannot), the Finjan Settlement still could not license VLSI's **patents** under **federal** law.

Similarly, in *Mars, Inc. v. TruRx LLC*, the plaintiff acquired a third party that had previously executed a settlement agreement with the defendant. No. 13-526, 2016 WL 4034789, at *1 (E.D. Tex. Mar. 1, 2016), *report and recommendation adopted*, 2016 WL 4055676 (E.D. Tex. Apr. 29, 2016). The settlement concededly purported to bind the plaintiff as a "successor" to the third party. *Id.* at *3. Relying on *Medtronic*, however, the court explained that "it is black-letter law that a party cannot release claims it does not own." *Id.* The court granted summary judgment that the patents were not licensed, relying only on the fact that the third party "never owned or had any interest in the patents-in-suit." *Id.*; *see also* 2016 WL 4055676, at *3 (calling lack of ownership "the dispositive consideration"). Here, too, Finjan has never owned or had any interest in VLSI's patents, and therefore could not have licensed them no matter what the Finjan Settlement states.

### C.     VLSI's Patents Are Not "Finjan's Patents" As Defined In The Finjan Settlement

Intel's license defense also fails for the additional, independent reason that VLSI's patents do not fall within the scope of the Finjan Settlement's license grant. That grant is limited to "Finjan's Patents," which the Finjan Settlement defines in Section 1.10 as:

> Patent Rights that are owned or controlled . . . by Finjan or to which Finjan has the right to grant licenses . . . ███████████████████████████ ████████████████████████████████ **without the** **_requirement_ to pay consideration** ███████████ ██████ for the grant of a license ████████████ .

Ex. 2 § 1.10 (omitting capture period language). In other words, the Finjan Settlement does not license any patents for which there is a "requirement to pay consideration ████████." *Id.* Here, VLSI has a "requirement to pay consideration to" NXP, a "third person" to the Finjan

Settlement. SOF ¶ 4. Thus, none of VLSI's patents are "Finjan's Patents" under the Finjan Settlement, *regardless* of whether VLSI can be considered an "Affiliate" of Finjan.

### 1. VLSI Owes "The Requirement To Pay Consideration" To NXP For The Grant Of A License To VLSI's Patents

The PPCA between VLSI and NXP was structured as a cooperative agreement, whereby VLSI would assume all efforts to license patents previously owned by NXP, and NXP would share in the profits of such licensing ventures. SOF ¶ 4. The PPCA reflects this intent in myriad ways, including most notably in Section 7.3, "███████████████" Ex. 13. In exchange for the patents, NXP received an upfront payment and a████████████████ ██████████████████████ ████████████████████ *Id.*; Ex. 14 (PPCA Am. 1) § 1(o).

Thus, under these undisputed facts, the PPCA's requirement to share ███████████ with NXP is a "requirement to pay consideration" to a "third person" under the terms of the Finjan Settlement. This "requirement" exists as to VLSI's entire portfolio, because the "consideration" that VLSI paid to NXP includes both the upfront payments *and* a future share of █████████ VLSI's obligation to share future licensing profits with NXP exists *regardless* of whether or not money has already changed hands, and is thus a "requirement to pay consideration." *Movora, LLC v. Gendreau*, No. N23C-05-034, 2024 WL 1675370, at *5 (Del. Super. Apr. 18, 2024) ("[T]he definition of consideration itself is broad and *not limited to money*."). VLSI's patents are thus

---

[4] The PPCA ██████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ Ex. 14 (PPCA Am. 1) § 1.1(bb).████████████████████ ████████████████████████████████████████ *Id.* § 1.1(t).

[5] VLSI has also already made upfront payments totaling $35 million for its patent portfolio, SOF ¶ 4, which itself is "consideration" "paid" to a "third person" under this section.

excluded from the definition of "Finjan's Patents," and from the scope of the license grant.

(a)    None of VLSI's Patents Are "Finjan's Patents"

Intel's attorney expert, John Ale, argues that VLSI owes no "consideration" to NXP to license the VLSI patents to Intel because "VLSI would [only] pay NXP if VLSI makes a profit, and then, ███████████████████████████████████████" Ex. 6 (Ale Rpt.) ¶ 106. But as noted above, this argument is inconsistent with Delaware law.

Under Delaware law, an interest in future patent licensing profits constitutes "consideration." *See, e.g.*, *Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, 630 F. Supp. 2d 365, 367 (D. Del. 2007) (characterizing as "consideration" a $1.5 million dollar upfront payment "plus fifty percent of any ***Net Proceeds*** to Fairchild as a result of any claims or causes of action asserted against Power Integrations as a result of the enforcement of" the patents at issue). NXP's interest in the ███████████ from VLSI's licensing efforts was part of NXP's bargained-for consideration in exchange for the transfer of rights to NXP's patents. *Movora*, 2024 WL 1675370, at *5 & n.77 (consideration is "[s]omething (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promisee; that which motivates a person to do something, esp. to engage in a legal act" (quoting BLACK'S LAW DICTIONARY)). Therefore, the "requirement to pay consideration"—that is, VLSI's requirement to pay NXP future profits— always exists regardless of whether VLSI ever pays NXP any actual money.

In *Movora*, for example, the court determined that the "use of the word 'paid' [in a purchase agreement] does not necessarily limit that phrase to the forms of consideration that involved a transfer of money." 2024 WL 1675370, at *5. The dispute centered on patent infringement indemnification owed by a company's sellers to its buyers, the amount of which turned on the "aggregate consideration paid" by the buyers. The sellers argued that some "categories of consideration were not 'paid'" and could "[be] excluded"—namely, an outstanding "Contingent

Closing Note" and a non-monetary grant of "Buyer Units" (equivalent to a 26.3% interest in the company). *Id.* at *4–5. The court disagreed, finding the sellers' argument too reliant on

> an *exceptionally narrow* definition of 'paid.' . . . [Other] equally viable definitions of 'paid' do not indicate that the relevant consideration must be money and, therefore, could be satisfied by the Buyer Units and Contingent Closing Note. Similarly, the Court notes that the definition of 'consideration' itself is broad and not limited to money. In sum, the phrase 'aggregate *consideration paid* by the Buyer for the Units' *can reasonably be interpreted to include all of the value conferred by [Buyer] in exchange for the ownership of VOI*.

*Id*. at *5. Here, too, the Finjan Settlement's "requirement to pay consideration ███████████" includes "all of the value conferred by" VLSI in exchange for ownership of the NXP patents—thus excluding VLSI's patents from the Finjan Settlement's license grant to Intel.

(b)    <u>VLSI's '983 Patent Is Not "Finjan's Patent[]"</u>

A jury already found that Intel infringes the '983 Patent and owes a reasonable royalty in the amount of over $948 million to VLSI for that infringement. Dkt. 690. It cannot reasonably be disputed that, if Intel were required to pay that amount, NXP would be owed a tremendous amount in "consideration" for VLSI's licensing of the '983 Patent. Ex. C (Chandler Rpt.) ¶ 43. VLSI thus certainly is "require[d] to pay consideration" to NXP as a result of the jury's $948 million verdict, thereby excluding the '983 Patent from "Finjan's Patents" under Section 1.10.

**2.    VLSI Could Not Have Licensed Its Patents To Intel For Free**

Intel and Mr. Ale also argue that VLSI does not owe "consideration" because "VLSI entered into three covenants not to sue Intel" and "[a]ll three of those covenants not to sue Intel specifically provide that 'neither party is paying any amount to the other party.'" Ex. 6 (Ale Rpt.) ¶ 106. As a threshold matter, Intel's reference to the "covenants not to sue" must be disregarded. The terms ████████████████████████████████████████████

- 23 -

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ Ex. 36 (███████████████) at 4; Ex. 37 at 5 (same); Ex. 38 at 4 (same).

Moreover, a jury in this matter has already found that Intel owes over $948 million for infringement of the '983 Patent. Dkt. 690. Intel's contention that "VLSI could grant Intel a royalty-free license to the asserted patents, under which NXP indisputably would be owed nothing," Ex. 28 (Intel Cal. MSJ Opp.) at 5–6, wholly disregard the adjudicated value of the '983 Patent—value that VLSI's experts calculated and that VLSI itself proposed at trial as the value of the '983 Patent license to Intel. Granting Intel a free license to the '983 Patent would make no sense, would be fundamentally contrary to the purpose of the PPCA, and would violate the implied covenant of good faith and fair dealing inherent in the PPCA, which applies when (1) a contract lacks express terms addressing a potential breach, *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005); and (2) one party has "frustrat[ed] the fruits of the bargain that the [other] party reasonably expected," *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

Here, the PPCA does not allow VLSI to grant a license to Intel, an NXP-competitor, for free. The undisputed facts show that the PPCA's purpose included collecting licensing proceeds ███████████████████████████████. *See, e.g.*, Ex. 39 (Stolarski Dep.) at 146:12–14, 148:22–149:3, Ex. 13 (PPCA) at -19045. NXP "reasonably expects" (and expressly bargained for) a share of VLSI's licensing revenues, which VLSI itself valued at over $948 million. Now that a jury has adopted that same number, VLSI would be acting "unreasonably" if it gave a '983 Patent license to Intel for free. *See* Dkt. 690. VLSI cannot reasonably repudiate its own longstanding value determinations and the resulting jury verdict without "frustrating the fruits of the bargain that [NXP] reasonably expected." *Nemec*, 991 A.2d at 1126.

### D.    VLSI's Patents Have Not Been Licensed To Intel Because VLSI Is Not An "Affiliate" Of Finjan

Each of the arguments outlined in §§ IV.A–C independently foreclose Intel's defense. But Intel's defense also fails because Finjan and VLSI are not "Affiliates" under the Finjan Settlement.

The Finjan Settlement defines an "Affiliate," "in relation to a specified Person," as "(i) any Person that, now or hereafter, directly or indirectly, through one or more entities, controls or is controlled by, or is under common control with, such specified Person . . . ." Ex. 2 § 1.2. The Finjan Settlement mirrors Delaware law in defining "control" as requiring that an entity have "the power to direct the management and policies of a Person, whether through the ownership of any percentage of voting interests of such person, through contract or otherwise." *Id.*; Del. Code. Ann. tit. 8, § 203(c)(4) (defining "Control" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person"); *Amadeus Glob. Travel Distrib., S.A. v. Orbitz, LLC*, 302 F. Supp. 2d 329, 336–37 (D. Del. 2004) ("Delaware law . . . require[s] that control be actual."); *Voigt v. Metcalf*, No. 18-0828, 2020 WL 614999, at *11 (Del. Ch. Feb. 10, 2020) ("One method of pleading control . . . is to allege that a defendant has the ability to exercise a majority of the corporation's voting power. . . . Another means of pleading control is to allege facts that support a reasonable inference that the defendant in fact 'exercise[d] control over the business affairs of the corporation.'").[6]

Applying the Delaware control standard, Intel cannot establish that Fortress controls VLSI, or that Fortress controls Finjan, let alone that VLSI and Finjan are under Fortress's "common

---

[6] The non-binding Freeman Order erroneously reasoned that statutory and case-law "definitions [of control] are not relevant," and purported to apply "the plain meaning of these commonly understood terms" to find a material dispute of fact. Ex. 29 (Freeman Order) at 16. In doing so, the Freeman Order ignored that the Finjan Settlement adopted in whole the ***statutory*** "definition" of "control" under Delaware law, and thus clearly erred by purporting to apply "the plain meaning" of "control" while simultaneously rejecting case law examining that very same plain meaning.

control." Yet for Intel to prevail on its license defense, it must show all three.

### 1. VLSI Is Controlled By Its CEO And Board Of Directors

VLSI is not controlled by Fortress, but by its CEO and its Board of Directors. As this Court has already found, "VLSI is ***independently run by its CEO and Board*** and is legally distinct from Fortress." Ex. 3 (Unclean Hands Order) at 1. None of the underlying facts have changed since that order, which Intel did not appeal, and the Court need not reconsider those findings. *See Savidge v. Pharm-Save, Inc.*, 570 F. Supp. 3d 518, 521 (W.D. Ky. 2021) ("Under the law-of-the-case doctrine, . . . issues, once decided, should be reopened only in extraordinary circumstances.'" (quoting *Hayden v. Rhode Island*, 13 F. App'x 301, 302 (6th Cir. 2001))); *United States v. Stanford*, 883 F.3d 500, 515 (5th Cir. 2018) ("The law-of-the-case doctrine and its related waiver doctrine leads us to conclude that [an issue] is forfeited because the issue was germane to the case prior to and during the appeal and [defendant] failed to raise it during that time."). Also unchanged is the fact that Fortress owns at most a *de minimis* interest in VLSI, and therefore cannot exercise control of VLSI through "ownership" of voting interests. SOF ¶ 3.

VLSI's CEO manages VLSI's day-to-day operations. *E.g.*, Ex. 40 (Shah Dep.) at 70:17–25 ("███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████"); Ex. 11 (Zur Dep.) at 141:9–22; Ex. 16 (Stolarski Dep.) at 53:15–55:24, 56:22–58:24; Ex. 41 (Perryman Dep.) at 145:23–25 ("It's my understanding Mr. Stolarski handles the day-to-day affairs of VLSI."); Ex. A (Goodwin Rpt.) ¶¶ 33–35, 286–95 (evidence of VLSI's CEO's managerial control); Ex. B (Chaffee Rpt.) ¶¶ 128–37 (similar); Ex. D (Sullivan Rpt.) ¶¶ 57–64 (similar). It is undisputed that VLSI's CEO is independent of both Fortress and Finjan: he has never been employed by Fortress, Ex. 5 (Stolarski Dep.) at 100:24–101:12 , Ex. 11 (Zur Dep.) at 40:16–19, and had never heard of the entities involved in the Finjan merger prior to Intel's assertion of its license defense. Ex. 9

(Stolarski Decl.) ¶ 9.

VLSI's Board of Directors has approval authority over major business decisions. Ex. 42 (VLSI 2d LLC Agmt.) § 4.1; Ex. 5 (Stolarski Dep.) at 108:10–109:8 ("[T]he board of directors is the ultimate decision maker at VLSI."); Ex. 43 (Stolarski Dep.) at 34:21–35:2 ("[Board members] have a fiduciary duty to VLSI and the investors in VLSI, correct."). VLSI's Board includes Mr. Stolarski, Mr. Zur, and Ms. Shah. SOF ¶ 1. While Mr. Zur and Ms. Shah are employees of Fortress, their undisputed testimony is that they sit on the board to act in the best interests of VLSI's shareholders, not Fortress. Ex. 40 (Shah Dep.) at 48:12–20 ("Q . . . Your appointment to the board of VLSI Technology, LLC relates to your work at Fortress, correct? A. My role on the VLSI board is to make the best decisions for VLSI Technology."); Ex. 7 (Zur Dep.) at 19:15–18 ("I, in my capacity as managing the investment for the investors, sit on the VLSI Board. So does my colleague, Ami Patel Shah."); Ex. 44 (Lowenstein Dep.) at 120:6–11 ([W]hen they are acting as members of the Board, they are doing so to advance the interests of VLSI and VLSI's ultimate investors. And I confirmed that specifically in a conversation with Mr. Zur and a separate conversation with Ms. Shah."); *id.* at 214:19–215:10.

Intel has asserted that VLSI is nevertheless under the control of Fortress because "Fortress" purportedly has a contractual right to appoint members of the Board, and two members are "Fortress" personnel. But **VLSI Holdings**, not **Fortress**, has the right to appoint VLSI's board members. Ex. 42 (VLSI 2d LLC Agmt.) §§ 1.7, 4.2 (identifying and defining "CF VLSI Holdings" as the entity with the right to appoint the board). Moreover, VLSI's board members have testified that their duties are owed to VLSI's investors, and, as a matter of Delaware law, "[a]s a director, [the board member's] duties run to [VLSI] and its stockholders, not to [Fortress]." *Partners Healthcare Sols. Holdings, L.P. v. Universal Am. Corp.*, No. 9593, 2015 WL 3794535, at *6, *9

(Del. Ch. June 17, 2015) ("Indeed, the very notion that a corporate director could be 'controlled' by a single shareholder is repugnant to the law of this state."); *see Klaassen v. Allegro Dev. Corp.*, No. 8626, 2013 WL 5967028, at *12 (Del. Ch. Nov. 7, 2013) ("[T]he fact that [an entity] appoints or elects a majority of the directors does not entitle [that entity] to control the board . . . so as to undermine the directors' independence." (citing *Aronson v. Lewis*, 473 A.2d 805, 815–16 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000))).

### 2. Finjan Holdings Is Controlled By Its Executive Chairman And Board of Directors

Fortress likewise does not control Finjan. Finjan Holdings is controlled by its Board of Directors and its Executive Chairman, who does not work for Fortress, has no involvement with VLSI, and who has served as the President and Chief Executive Officer of Finjan Holdings since 2013, seven years before the Goldfish merger. Ex. 17 (Hartstein Dep.) at 17:22–18:16; 19:10–16, 21:6–22:1, 108:23–109:4; Ex. A (Goodwin Rpt.) ¶¶ 322–23 (discussing role of Finjan's independent Executive Chairman, who has no relationship to Fortress); Ex. B (Chaffee Rpt.) ¶ 164 (similar); Ex. E (Boone Rpt.) ¶ 75 (similar); Ex. D (Sullivan Rpt.) ¶¶ 65–70 (similar).

Finjan is owned not by Fortress, but by the Finjan ownership funds. The Fortress personnel that serve on Finjan's board of directors do so as ***agents of Finjan and Finjan's ultimate owners***. *Id.* at 109:5–109:18; Ex. A (Goodwin Rpt.) ¶¶ 322, 324 (discussing independence of Finjan's board from Fortress); Ex. B (Chaffee Rpt.) ¶ 165 (similar); Ex. E (Boone Rpt.) ¶ 77–82 (similar); Ex. D (Sullivan Rpt.) ¶¶ 65, 69–70 (discussing independence of Finjan from Fortress).

### 3. VLSI And Finjan Are Not Affiliates "Under Common Control"

Intel's allegations that "Fortress" controls VLSI, that "Fortress" controls Finjan, and that VLSI and Finjan are "under common control," are erroneous attorney conclusions drawn from undisputed facts. Those facts show that Fortress is a global investment manager that is registered

and subject to regulation under the Investment Advisers Act of 1940. Ex. 45 (Hille Rpt.) ¶ 27; Ex. B (Chaffee Rpt.) ¶¶ 48, 116. VLSI is a portfolio company of the VLSI ownership funds, SOF ¶ 3; and Finjan is a portfolio company of the separate and non-overlapping Finjan ownership funds, SOF ¶ 12. As this Court found, "VLSI is responsible for patent licensing and enforcement, while Fortress provides VLSI with capital funding. Fortress serves as an asset manager for several investment funds that own VLSI's parent company, CF VLSI Holdings LLC, and these investment funds therefore indirectly own VLSI." Ex. 3 (Unclean Hands Order) at 1. Similarly, Finjan is responsible for its patent enforcement business and receives capital funding from the Finjan ownership funds, facilitated by employees of Fortress. *See* SOF ¶¶ 7, 12.

As a result of this critical context, Fortress owes fiduciary duties to its managed funds and investor accounts, including the duties of utmost good faith, loyalty, and full and fair disclosure. *E.g.*, *Robare Grp., Ltd. v. Sec. & Exch. Comm'n*, 922 F.3d 468, 472 (D.C. Cir. 2019); *see also* Ex. F (Post Rpt.) ¶¶ 50–57 (impact of fiduciary duties on investment advisers); Ex. G (Harrison Rpt.) ¶¶ 99–104 (similar); Ex. B (Chaffee Rpt.) ¶¶ 75, 88–89, 140, 144, 146, 150 (board decision making in light of fiduciary duties); Ex. A (Goodwin Rpt.) ¶¶ 39–42, 273, 277–78, 301–06 (similar).

It is undisputed that employees of Fortress have provided administrative, compliance, and legal services to VLSI, as well as to Finjan after the Goldfish merger. *E.g.*, Ex. 43 (Stolarski Dep.) at 30:19–24 ("Fortress is an investment manager . . . [that] continues to provide services to VLSI Technology"); Ex. 16 (Stolarski Dep.) at 53:15–55:24; 56:22–58:24; Ex. 44 (Lowenstein Dep.) at 139:2–142:14; Ex. A (Goodwin Rpt.) ¶¶ 41, 110–18, 273–74; Ex. F (Post Rpt.) ¶¶ 50–57; Ex. G (Harrison Rpt.) ¶¶ 99–104. Intel disregards, however, that when Fortress employees perform services for VLSI and Finjan, they do so ***not*** on behalf of "Fortress," but as agents serving separate principals: namely, the VLSI ownership funds on one hand, and the Finjan ownership funds on the

other. Ex. F (Post Rpt.) ¶¶ 46–48; Ex. A (Goodwin Rpt.) ¶¶ 108, 110–20, 315–20 (collecting evidence). As such, the services they provide and the actions they take cannot be attributed to and do not inure to the benefit of "Fortress," but to the respective funds. Intel's arguments regarding "common control" ignore Fortress's status as an investment advisor to the respective funds:



Ex. F (Post Rpt.) ¶ 71; *see also* Ex. A (Goodwin Rpt.) ¶¶ 39–42, 273, 277–78, 301–06.

Intel also incorrectly conflates the corporate structures of Fortress, VLSI, and Finjan with a structure in which a parent company exerts common control over two subsidiaries. *See, e.g.*, Ex. 6 (Ale Rpt.) ¶¶ 74, 80. But Intel's experts have themselves submitted organizational charts that make clear that this is not the case. Ex. 10 (Perryman Rpt.), Ex. D. Intel's expert, James Hille, contended that a parent company "███████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████." Ex. 46 (Hille Dep.) at 94:17–96:5. But Mr. Hille also admitted that as an investment adviser subject to fiduciary duties, "█████████████████████████████████████████████████████ ██████████████████████████████████████████████████." *Id.*

Thus, as a matter of law and under the explicit terms of the Finjan Settlement, the fact that the VLSI ownership funds and Finjan ownership funds have each independently hired Fortress as an investment manager does not remotely show that VLSI and Finjan are under common control.[7]

---

[7] To give but one example of why Intel's theory of "control" is erroneous, if the Court appointed Professional 1 as receiver for Company A, and then in an unrelated case appointed the same

*See, e.g.*, *Amadeus Glob. Travel*, 302 F. Supp. 2d at 336–37 ("Delaware law . . . require[s] that control be actual."); *Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 943 F.3d 49, 56–60 (1st Cir. 2019). Put another way, because Fortress employees interact with VLSI and Finjan as a result of separate arrangements with the VLSI ownership funds and the Finjan ownership funds, respectively, Fortress ***itself*** does not possess the "common" "power to direct the management and policies of" both Finjan and VLSI.

Accordingly, because Fortress is legally prohibited from exercising any such common control, it is legally erroneous to contend that, as the investment adviser for entirely ***separate*** owners, Fortress could exercise "common control" over both VLSI and Finjan.

## V.    CONCLUSION

For each of the four independent reasons above, VLSI respectfully requests that the Court grant VLSI's motion for summary judgment on Intel's license defense pursuant to Fed. R. Civ. P. 56.

---

Professional 1 as receiver for Company B, under Intel's theory, Company A and Company B would now be under "common control" such that a license to Company A's patents would also be a license to Company B's patents and vice versa. Obviously, that is not the law.

Dated: February 21, 2025

By:

_____/s/ Charlotte J. Wen_____

Morgan Chu (*pro hac vice*)
Benjamin W. Hattenbach (*pro hac vice*)
Iian D. Jablon (*pro hac vice*)
Alan J. Heinrich (*pro hac vice*)
Ian Robert Washburn (*pro hac vice*)
Amy E. Proctor (*pro hac vice*)
Elizabeth C. Tuan (*pro hac vice*)
Charlotte J. Wen (*pro hac vice*)
Benjamin Monnin (*pro hac vice*)
Jordan Nafekh (*pro hac vice*)
Grant W. Gabriel (*pro hac vice*)
**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, California  90067
Telephone: (310) 277-1010
Facsimile: (310) 203-7199
mchu@irell.com
bhattenbach@irell.com
ijablon@irell.com
aheinrich@irell.com
iwashburn@irell.com
aproctor@irell.com
etuan@irell.com
cwen@irell.com
bmonnin@irell.com
jnafekh@irell.com
ggabriel@irell.com

Babak Redjaian (*pro hac vice*)
Thomas Horn (*pro hac vice*)
**IRELL & MANELLA LLP**
840 Newport Center Drive, Suite 400
Newport Beach, California  92660
Telephone: (949) 760-0991
Facsimile: (949) 760-5200
bredjaian@irell.com
thorn@irell.com

J. Mark Mann (Texas Bar No. 12926150)
mark@themannfirm.com
G. Blake Thompson (Texas Bar No. 24042033)
blake@themannfirm.com
**MANN | TINDEL | THOMPSON**
300 W. Main Street
Henderson, TX 75652
Telephone: (903) 657-8540
Facsimile: (903) 657-6003

Andy Tindel (Texas Bar No. 20054500)
atindel@andytindel.com
**MANN | TINDEL | THOMPSON**
112 E. Line Street, Suite 304
Tyler, Texas 75702
Telephone: (903) 596-0900
Facsimile: (903) 596-0909

*Attorneys for VLSI Technology LLC*

**<u>CERTIFICATE OF SERVICE</u>**

A true and correct copy of the foregoing instrument and its attachments was served or delivered electronically via email, to all counsel of record, on February 21, 2025.

<u>        */s/ Grant W. Gabriel*        </u>
Grant W. Gabriel