**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

VLSI TECHNOLOGY LLC,

        Plaintiff,

    v.

INTEL CORPORATION,

        Defendant.

Civil Action No. 1:19-cv-00977-ADA

<span style="color:red">**PUBLIC VERSION**</span>

█████████████████

**INTEL CORPORATION'S MOTION FOR JUDGMENT AS A MATTER OF LAW**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(B)**
**THAT INTEL IS LICENSED TO THE ASSERTED PATENT**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................. 2

       A.     2012 Patent License Agreement ............................................................. 2

       B.     Fortress Creates VLSI ............................................................................. 3

       C.     Fortress Affiliates Acquire Finjan Holdings, Inc. And Its Wholly-Owned
              Subsidiary Finjan, Inc. ........................................................................... 4

       D.     Intel's License Defense .......................................................................... 5

III.   ARGUMENT ...................................................................................................... 7

       A.     VLSI Is Bound By The License Under Delaware Law. .......................... 8

       B.     Federal Law Poses No Bar To The License Binding VLSI. ................. 14

       C.     VLSI's Patents Fall Under The Definition Of "Finjan's Patents." ....... 16

IV.    CONCLUSION ................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abraxis Bioscience, Inc. v. Navinta LLC*,
    625 F.3d 1359 (Fed. Cir. 2010).................................................................................15

*American International Group v. Bank of America Corp.*,
    712 F.3d 775 (2d Cir. 2013).....................................................................................19

*Aronson v. Quick Point Pencil Co.*,
    440 U.S. 257 (1979)...............................................................................................14

*Cincom Systems, Inc. v. Novelis Corp.*,
    581 F.3d 431 (6th Cir. 2009) ............................................................................ 15-16

*Control Laser Corp. v. Smith*,
    705 F. Supp. 3d 1006 (N.D. Cal. 2023) ..................................................................15

*CSH Theatres, L.L.C. v. Nederlander of San Francisco Associates*,
    No. 9380-VCMR, 2018 WL 3646817 (Del. Ch. July 31, 2018) .............................10

*Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V. v.*
    *Sirius XM Radio Inc.*,
    940 F.3d 1372 (Fed. Cir. 2019).............................................................................15

*In re CFLC, Inc.*,
    89 F.3d 673 (9th Cir. 1996) ...................................................................................15

*In re Shorenstein Hays-Nederlander Theatres LLC Appeals*,
    213 A.3d 39 (Del. 2019) ................................................................................ *passim*

*International Nutrition Co. v. Horphag Research Ltd.*,
    257 F.3d 1324 (Fed. Cir. 2001)..............................................................................14

*Lockhart v. United States*,
    577 U.S. 347 (2016)...............................................................................................19

*Mars, Inc. v. TruRx LLC*,
    No. 6:13-cv-526-RWS-KNM, 2016 WL 4055676 (E.D. Tex. Mar. 1, 2016) .........15

*Medicalgorithmics S.A. v. AMI Monitoring, Inc.*,
    No. 10948-CB, 2016 WL 4401038 (Del. Ch. Aug. 18, 2016)..........................11, 12

*Medtronic AVE, Inc. v. Advanced Cardiovascular Systems, Inc.*,
    247 F.3d 44 (3d Cir. 2001).....................................................................................15

*Medtronic AVE, Inc. v. Cordis Corp.*,
   No. 03-402-SLR, 2003 WL 23112268 (D. Del. Dec. 11, 2003)........................................ 12-13

*MicroStrategy Inc. v. Acacia Research Corp.*,
   No. 5735-VCP, 2010 WL 5550455 (Del. Ch. Dec. 30, 2010)..................................................12

*Oyster Optics, LLC v. Infinera Corp.*,
   843 F. App'x 298 (Fed. Cir. 2021) ...............................................................................12, 14

*Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*,
   284 F.3d 1323 (Fed. Cir. 2002).....................................................................................14, 15

*TransCore, LP v. Electronic Transaction Consultants Corp.*,
   563 F.3d 1271 (Fed. Cir. 2009)...........................................................................................18

*VLSI Technology LLC v. Intel Corp.*,
   No. 6:21-cv-57, 2022 WL 1261322 (W.D. Tex. Mar. 18, 2022)...............................................5

*VLSI Technology LLC v. Intel Corp.*,
   No. 5:17-cv-5671, 2023 WL 9052312 (N.D. Cal. Dec. 20, 2023) ................................. *passim*

*VLSI Technology LLC v. Intel Corp.*,
   No. 5:17-cv-5671, 2024 WL 269163 (N.D. Cal. Jan. 24, 2024)...............................................6

*VLSI Technology LLC v. Intel Corp.*,
   87 F.4th 1332 (Fed. Cir. 2023) ............................................................................................5

## Statutes

35 U.S.C. § 261 ...........................................................................................................................15

## Other Authorities

*Acquisitions and IP Licenses: Looking Out for Poison Pill Affiliate*,
   249 N.Y.L.J. 2 (2013) ..........................................................................................................13

## I.    INTRODUCTION

Now that the jury's verdict has established that VLSI Technology LLC ("VLSI") and Finjan LLC are under the common control of Fortress Investment Group ("Fortress"), the express terms of the 2012 Patent License Agreement ("License") should be enforced as written and judgment should be entered in favor of Intel. Fortress, which formed and controls VLSI, acquired control of Finjan LLC in 2020. That acquisition triggered Intel's rights pursuant to the License, which grants Intel a "perpetual, irrevocable license" to "Finjan's Patents." DTX-1 [License] Preamble, §§ 3.1, 4.1, 4.2, 5.1. The License (1) defines "Finjan's Patents" to include "all Patent Rights that are owned or controlled at any time on or after November 6, 2012" by "Finjan," *id.* § 1.10; (2) defines "Finjan" to include not only Finjan Inc. and Finjan Software, Inc. (the "Finjan Parties") but also their "Affiliates," *id.*, Preamble; and (3) defines "Affiliates" to include any company that "now or hereafter, directly or indirectly through one or more entities, controls or is controlled by, or is under common control with" the Finjan Parties, *id.*, §§ 1.2, 1.13. The License's plain language thus grants Intel a license to patents owned by companies under common control with Finjan LLC (which was formerly known as Finjan, Inc.)—which, given the jury's verdict, includes VLSI.

This Court previously determined that "[w]hether Intel is licensed to the asserted patent under the Finjan License has underlying factual issues (*i.e.*, whether Finjan and VLSI are under common control of Fortress) but is ultimately a question of law for the judge that is to be determined by the court, either on a pretrial motion for summary judgment or on a motion for judgment as a matter of law at the close of evidence and after the jury verdict." Dkt. 905 at 2. A jury has now resolved the underlying factual issue of common control by determining that Intel proved by a preponderance of the evidence that Fortress controlled both VLSI and Finjan LLC (formerly known as Finjan, Inc.). Dkt. 959 [Verdict] 1. With that critical question determined, all

that remains is to resolve certain legal arguments that VLSI has made. Those arguments are all contrary to either the text of the License, controlling law, or both. Intel asks that the Court finally put those arguments to rest, by holding that: (1) non-signatory entities meeting the definition of "Affiliates" (as defined by the License), including later acquired or formed "Affiliates" like VLSI, are bound by the agreement; and (2) Intel has a license to VLSI's patents. *See VLSI Tech. LLC v. Intel Corp.*, 2023 WL 9052312, at *8, 11 (N.D. Cal. Dec. 20, 2023).

Based on the jury's verdict and under the unambiguous terms of the Finjan License, Intel is licensed to U.S. Patent No. 7,606,983 (the "Asserted Patent"), and Intel respectfully requests that the Court grant this motion and enter judgment in its favor.

## II.    BACKGROUND

### A.    2012 Patent License Agreement

On November 20, 2012, the Finjan Parties, signing "on behalf of their respective Affiliates," granted to Intel a "perpetual, irrevocable license" to "Finjan's Patents," defined to include "all Patent Rights that are owned or controlled at any time on or after November 6, 2012 by Finjan…." DTX-1 [License] §§ 3.1, 1.10, Preamble. "Finjan" is defined by the License to include the Finjan Parties and their "Affiliates." *Id.* at Preamble. "Affiliates" is defined to include "any Person that, *now or hereafter*, directly or indirectly through one or more entities, controls or is controlled by, or *is under common control* with" a specified Person. *Id.* § 1.2 (emphases added). "Control" is broadly defined to "mean[] the possession, direct or indirect, of the power to direct the management and polices of a Person, whether through the ownership of any percentage of voting interests of such Person, through contract or otherwise." *Id.* The plain language of the License therefore extends the license to patents owned by "Affiliates" of the Finjan Parties, including entities that "now or hereafter" are "under common control" with the Finjan Parties. In exchange, Intel agreed to pay the Finjan Parties ██████ and gave the Finjan Parties and their

Affiliates a release and an ongoing ███████████████████████████████████████
████████████████████████████████████████████████████  *Id.* §§ 2.1, 2.5, 5.2.

### B.    Fortress Creates VLSI

In 2016, Fortress created VLSI.  DTX-45 [VLSI Marketing Rpt.] at 3; 5/27/25 Trial Tr. [Zur] 166:12-13, 170:4-9, 181:8-11; *id.* [Slan] 251:21-253:13, 253:23-254:7; *id.* [Shah] 260:25-261:3, 261:19-21, 262:7-14, 273:19-21; 5/28/25 Trial Tr. [Zur] 531:11-12, 566:22-567:8; *id.* [Perryman] 446:4-446:8.  Since VLSI's creation, Fortress has controlled VLSI in multiple ways, including through (1) Fortress having the power to appoint and remove VLSI's board members, (2) Fortress employees, who are paid by Fortress and not VLSI, constituting a majority of VLSI's board, and (3) Fortress exercising ultimate approval over funding and spending for VLSI.  Dkt. 959 [Verdict]; 5/27/25 Trial Tr. [Zur] 154:4-12, 155:16-156:10, 157:15-158:6, 179:15-180:3, 183:16-184:17, 186:10-12, 186:17-190:18, 191:19-193:20, 194:11-14, 213:15-17, 214:5-21, 240:11-17, 241:14-242:13, 246:10-17; *id.* [Slan] 254:8-17, 254:22-255:4, 255:19-256:6, 256:12-20, 257:11-258:10; *id.* [Shah] 262:19-25, 268:17-22, 269:18-22, 286:19-288:5; *id.* [Ale] 134:7-13, 135:16-23, 141:7-11, 142:8-20, 143:9-144:19, 145:18-25; 5/28/25 Trial Tr. [Stolarski] 389:14-390:4, 390:17-22, 392:12-19, 394:3-14, 395:24-396:3, 398:7-20, 401:4-401:19; *id.* [Brogden] 362:2-10, 363:22-364:4, 365:8-10, 365:11-366:1, 366:7-367:4, 367:17-368:8; *id.* [James] 416:2-15; *id.* [Perryman] 444:24-452:2, 478:7-482:11; *id.* [Zur] 558:13-22, 558:24-563:17, 564:1-564:20, 567:9-23, 571:3-572:7; 5/29/25 Trial Tr. [Zur] 639:13-641:14, 642:10-643:9, 644:1-15; DTX-2 [VLSI's Second Amended LLC Agreement] §§ 4.1, 4.2, 4.3; DTX-7 [8/17/16 Furstein Email]; DTX-11 [3/31/20 Brogden Email]; DTX-12 [2/20/20 Brogden Email]; DTX-13 [7/7/20 Quish Email]; DTX-14 [6/2/20 Quish Email]; DTX-16 [1/17/18 Brogden Email]; DTX-17 [1/26/18 Moreland Email]; DTX-45 [VLSI Marking Rpt.] 5; DTX-46 [1/26/18 Moreland Email]

3; DTX-70 [CF VLSI Holdings LLC Agreement]; DTX-217 [FCO MA MI LP Agreement] 8, 12, 16, 50 (§ 6.1(a)), 51 (§ 6.1(d)(i)), 53 (§ 6.1(e)); DDX5.11-5.13; DDX5.16; DDX6.3; DDX6.6.

### C.    Fortress Affiliates Acquire Finjan Holdings, Inc. And Its Wholly-Owned Subsidiary Finjan, Inc.

In July 2020, after Fortress was afforded the ability to conduct due diligence, Fortress-controlled Goldfish Holdings LLC acquired Finjan Holdings, Inc. and its wholly-owned subsidiary Finjan, Inc.  DTX-8 [Fortress Affiliates Complete Their Acquisition of Finjan]; DTX-3 [Finjan Holdings LLC Agreement] 1; DTX-64 [Schedule Tender Offer]; DTX-269 [Finjan Enters into Agreement to Be Acquired by Affiliates of Fortress]; 5/27/25 Trial Tr. [Zur] 194:23-196:3, 238:19-23; *id.* [Shah] 261:4-8.  Fortress then converted Finjan Holdings, Inc. and Finjan, Inc. to Finjan Holdings LLC and Finjan LLC, respectively.  Dkt. 918 [Joint Pretrial Order] ¶ 27; *see* 5/27/25 Trial Tr. [Zur] 195:25-196:3, 238:19-239:5.  Since the acquisition, Fortress has controlled Finjan LLC in multiple ways, including through (1) Fortress having the power to appoint and remove Finjan LLC's and Finjan Holdings LLC's board members, (2) Fortress employees, who are paid by Fortress and not Finjan LLC or Finjan Holdings LLC, constituting a majority of Finjan LLC's and Finjan Holdings LLC's boards, and (3) Fortress exercising ultimate approval over funding and spending for Finjan LLC and Finjan Holdings LLC.  Dkt. 959 [Verdict]; 5/27/25 Trial Tr. [Zur] 207:2-208:12, 209:2-23, 211:13-212:3, 213:18-24, 214:9-11, 214:17-21, 240:11-241:1, 241:21-242:13, 244:24-245:5, 246:10-17; *id.* [Ale] 134:7-13, 135:16-23, 141:7-11, 142:8-20, 143:9-144:19, 145:18-25; 5/28/25 Trial Tr. [Anderson] 373:3-11, 374:7-376:20, 377:8-10; *id.* [Hartstein] 379:25-380:10, 406:2-11, 408:3-11; *id.* [James] 411:10-14, 412:11-413:15, 414:8-415:6, 415:11-18, 416:16-417:3, 417:14-418:4; *id.* [Perryman] 452:3-455:22, 482:12-17; *id.* [Zur] 557:17-558:22, 565:11-24, 567:24-569:23, 570:1-23, 572:8-11; 5/29/25 Trial Tr. [Zur] 644:1-15; DTX-3 [Finjan Holdings LLC Agreement] 1-2, 5-6; DTX-25 [Finjan LLC Agreement] 2-3; DTX-19

[10/5/20 Anderson Letter]; DTX-20 [1/6/21 Anderson Letter]; DTX-21 [1/11/21 Brogden Email];

DTX-23 [4/5/21 Anderson Email]; DTX-24 [4/5/21 Anderson Letter]; DTX-64 [Schedule Tender

Offer] 8, 11-12; DTX-65 [10/5/20 Brogden Email]; DTX-66 [10/5/20 Anderson Letter]; DTX-71

[CFIP Goldfish Holdings LLC Agreement]; DDX5.23; DDX6.3; DDX6.6.

### D.    Intel's License Defense

Intel first moved to add its license defense in *VLSI Technology LLC v. Intel Corp.*, No.

6:21-cv-57 (W.D. Tex.) ("*VLSI I*") on November 10, 2020. Dkt. 348-2. Intel then moved to add

its license defense in this case on February 2, 2021. Dkt. 425-1. The Court denied Intel's motion

to amend in *VLSI I* on March 18, 2022, finding that (1) Intel's motion was untimely, and (2) Intel's

motion was futile because VLSI did not sign the License. *VLSI Tech. LLC v. Intel Corp.*, 2022

WL 1261322, at *2-3 (W.D. Tex. Mar. 18, 2022). The Court then also denied Intel's motion to

amend in this case on November 7, 2022. Dkt. 651 at 2.

On December 4, 2023, the Federal Circuit reversed the Court's denial of Intel's motion to

amend in *VLSI I*. *See VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1350 (Fed. Cir. 2023). The

Federal Circuit held that there was no undue delay in the filing of Intel's motion and found that

this Court's conclusion that Intel's defense was futile was "wrong as a matter of law." *Id.* at 1350-

51. The Federal Circuit explained that the governing law requires "additional litigation" of the

defense, with a "fuller analysis of the governing law that has yet occurred, or more fact-based

litigation." *Id.* at 1351.

After the Federal Circuit's decision, the Northern District of California's decision on the

parties' cross motions for summary judgment addressed various legal questions now before this

Court. *See VLSI Tech. LLC v. Intel Corp.*, 2023 WL 9052312 (N.D. Cal. Dec. 20, 2023). The

California court concluded that, (1) "under Delaware law in certain circumstances, a nonsignatory

created after a contract is signed can still be bound by the contract"; (2) "non-signatory entities

meeting the definition of 'Affiliates' (as defined by the [Patent] License Agreement) of the Finjan Parties can be bound by the agreement, including later acquired or formed 'Affiliates'"; (3) should a fact finder find that Fortress controls Finjan LLC, then "any entities controlled by Fortress are bound [by the] Finjan License Agreement"; and (4) "patents belonging to Affiliates of Finjan, as defined by the Finjan License Agreement, are subject to the license to Intel described therein." *Id.* at *5, *6, *8, *11. Thus, the court concluded that "under Delaware law, Intel's license defense may prevail if it can prove to a jury that Fortress and VLSI are 'Affiliates' of Finjan [LLC] under the terms of the Finjan License Agreement." *Id.* at *11. In other words, Intel's "license defense may succeed if Intel proves that VLSI and Finjan [LLC] are under common control of Fortress." *Id.* at *9.

Like this Court, the California court concluded that "[w]hether VLSI and the Finjan Parties are under common control by Fortress" such that they are "Affiliates" under the terms of the License "is an issue of fact" that "a jury must resolve." *Id.* at *10. But before a jury could resolve this issue in California, VLSI unilaterally granted Intel a covenant not to enforce the only two patents remaining for trial, and the California court found that this covenant mooted Intel's affirmative license defense. *See VLSI Tech. LLC v. Intel Corp.*, 2024 WL 269163, at *5 (N.D. Cal. Jan. 24, 2024).

After the Federal Circuit's mandate issued in *VLSI I*, Intel filed an unopposed motion to add its license defense in this case. Dkt. 827. The Court granted Intel's motion, Dkt. 829, and Intel added the license defense on April 17, 2024, Dkt. 830. The Court later denied the parties' motions for summary judgment. Dkt. 905. The Court explained that "[w]hether Intel is licensed to the asserted patent under the Finjan License has underlying factual issues (*i.e.*, whether Finjan and VLSI are under common control of Fortress) but is ultimately a question of law for the judge

that is to be determined by the court, either on a pretrial motion for summary judgment or on a motion for judgment as a matter of law at the close of the evidence and after the jury verdict." *Id.* at 2. The Court explained that "[h]aving considered the parties' briefing and oral arguments at the summary judgment stage, the Court is of the opinion that the better course would be to proceed to trial on the issue of common control." *Id.*

From May 27-29, 2025, the Court held a jury trial on the issue of common control. On May 29, 2025, a jury returned a verdict in Intel's favor, finding that Intel had proved by a preponderance of the evidence that Fortress controlled both VLSI and Finjan LLC (formerly known as Finjan, Inc.). Dkt. 959 [Verdict] 1.

## III.    ARGUMENT

The Finjan License expressly and unambiguously grants Intel a "perpetual, irrevocable license" to "all Patent Rights that are owned or controlled at any time on or after November 6, 2012" by "Finjan," which is defined to include both the Finjan Parties and their "Affiliates." DTX-1 [License] Preamble, §§ 1.2, 1.10, 3.1; *see also VLSI Tech. LLC v. Intel Corp.*, 2023 WL 9052312, at *11 (N.D. Cal. Dec. 20, 2023). As the California court previously determined, the Finjan License thus gives Intel a broad license to the patents of then-current *and future* "Affiliates" of the Finjan Parties. *VLSI Tech.*, 2023 WL 9052312, at *11. The License defines "Affiliates" to include any company that "now or hereafter, directly or indirectly through one or more entities, controls or is controlled by, or is under common control with" the Finjan Parties. DTX-1 [License] §§ 1.2, 1.13. The jury's finding that VLSI and Finjan LLC are under Fortress's common control necessarily means VLSI is an "Affiliate" of the Finjan Parties under the License. Because the License grants Intel a "perpetual, irrevocable license" to "all Patent Rights that are owned or controlled at any time on or after November 6, 2012" by the Finjan Parties and their Affiliates,

Intel has a license to all patent rights that are owned or controlled by VLSI. Therefore, Intel has a license to the Asserted Patent.

At summary judgment, VLSI attempted to escape the rights that Intel obtained under the Finjan License by arguing that (1) VLSI cannot be bound by the License under Delaware law because VLSI is not a signatory, (2) federal law precludes the license from applying to VLSI, and (3) VLSI's patents are excluded from the scope of "Finjan's Patents" because third-party NXP is entitled to consideration. Intel respectfully submits that the Court should reject VLSI's legal arguments, grant Intel's motion, and hold that Intel is licensed to the Asserted Patent.

### A.    VLSI Is Bound By The License Under Delaware Law.

Black-letter Delaware law establishes that "a nonsignatory created after a contract is signed can still be bound by the contract." *VLSI Tech.*, 2023 WL 9052312, at *5; *see In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 57 (Del. 2019). In *Shorenstein*, the Delaware Supreme Court held that, where an agreement covered signatories and "Affiliates" of those signatories, non-signatory, later-created entities satisfying the definition of "Affiliate" were bound by the agreement at issue. 213 A.3d at 57.

*Shorenstein* involved multiple parties, including Carole Hays; CSH Theatres LLC ("CSH"), which was controlled by Hays and her family; and Nederlander of San Francisco Associates ("Nederlander"). 213 A.3d at 42. CSH and Nederlander entered into an LLC Agreement, becoming equal members of Shorenstein Hays-Nederlander Theatres LLC ("SHN"). *Id.* The agreement prohibited any "Shorenstein Entity" from staging a competing theatrical production within 100 miles of San Francisco without first offering the opportunity to SHN. *Id.* at 47-48. The preamble to the agreement defined "Shorenstein Entity" as CSH and any "Permitted Transferee." *Id.* at 48. "Permitted Transferee" was further defined to include an "Affiliate" of a

member, including any person that was controlled by or ***under common control with*** the member. *Id.*

Nederlander brought a breach of contract action after CSH Curran LLC, an entity that did not exist when the LLC Agreement was signed, announced plans to stage competing productions. 213 A.3d at 49; Dkt. 883-7 [CSH Theatres Pretrial Stipulation] 31 (¶ 3). Nederlander argued that the LLC Agreement applied to nonsignatory CSH Curran because it was an affiliate of signatory CSH by virtue of the common control indirectly exercised by nonsignatory Carole Shorenstein Hays and her family. 213 A.3d at 49, 51. The Delaware Supreme Court agreed, holding that the plain language of the agreement "impose[d] obligations" on "affiliates" of CSH as defined in the agreement. *Id.* at 57. The Delaware Supreme Court rejected the arguments that "only formal parties—CSH and Nederlander—are bound by the terms of the LLC agreement" and noted that "[c]ontracts may impose obligations on affiliates in this context." *Id.* Therefore, the LLC Agreement was binding on other entities under Hays's control who were "Affiliates" of CSH. *Id.* at 57-58.

The common control in *Shorenstein* was indirect and exercised largely through an investment committee that set policies for the separate trusts that owned CSH and CSH Curran:



*CSH Theatres, L.L.C. v. Nederlander of San Francisco Assocs.*, 2018 WL 3646817, at \*24 (Del. Ch. July 31, 2018) (highlighting added).

Depicted below in simplified form, this common control linked the entities together as "affiliates" and bound them all to the LLC agreement.



The facts of this case are analogous to *Shorenstein*.  Like in *Shorenstein*, where the definition of "Shorenstein Entity" encompassed the signatory and its affiliates, the License here defines "Finjan" to encompass the signatory Finjan entities and their affiliates.  DTX-1 [License] Preamble.  Like in *Shorenstein*, where the definition of "Affiliate" included any entity "under common control with the subject Person," 213 A.3d at 48, 51, the License here defines "Affiliates" to include "any Person that, ***now or hereafter***, directly or indirectly through one or more entities, controls or is controlled by, or ***is under common control*** with" a specified Person, DTX-1 [License] § 1.2 (emphases added).  Indeed, the Finjan License's "now or hereafter" language is even more explicit in covering after-created entities.  Thus, just as the Delaware Supreme Court held that the LLC agreement bound the later-created CSH Curran LLC as an affiliate of signatory CSH due to the common control of the Hayses, *Shorenstein*, 213 A.3d at 51, 57-58, the License agreement here binds VLSI as an affiliate of Finjan LLC due to the common control of Fortress.

For this reason, the California court explained that "[l]ike the non-signatory Hayses who controlled the signatory party CSH and other entities in *Shorenstein*, if it is proven that Fortress controls the signatory party Finjan and other entities, then Fortress can be bound along with other entities it controls."  *VLSI Tech.*, 2023 WL 9052312, at *6.  Therefore, "like the 'entities [the Hayses] control,' which the *Shorenstein* trial court found were bound by the LLC Agreement, any entities controlled by Fortress are bound [by the] Finjan License Agreement."  *Id.*

Other Delaware decisions have similarly found non-signatory affiliates bound by agreements they did not sign based on the text of the agreements.  For example, in *Shorenstein*, the Delaware Supreme Court favorably cited *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *18 (Del. Ch. Aug. 18, 2016) for the proposition that "where an agreement included 'Affiliates' within the definition of 'Parties,' the agreement imposed obligations on a

contractually-defined affiliate that was under the control of a party to the agreement." *Shorenstein*, 213 A.3d at 57 n.86.  *Medicalgorithmics* had held that "although Spectocor did not sign the [agreement], it is bound by its terms because the contract binds 'Affiliates,' which includes entities such as Spectocor that are 'under common control' with [the agreement's signatory]."  2016 WL 4401038, at *18.  Likewise, *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *12 (Del. Ch. Dec. 30, 2010), held that where an agreement defines the term "affiliate" to include "any entity which either party now or hereafter, directly or indirectly, owns or controls," the phrase "now or hereafter" contemplates the agreement would apply to later-acquired or formed entities owned or controlled by the parties to the agreement, even though not signatories.  *See also VLSI Tech.*, 2023 WL 9052312, at *6 ("Both the *Shorenstein* and *MicroStrategy* courts held that the respective agreements imposed obligations on non-signatory affiliates.").

Courts have also found that a non-signatory can be bound as an affiliate, even when the entity did not exist at the time the contract was executed.  That was true in *Shorenstein*, where CSH Curran was not created until years after the LLC Agreement.  *See supra* p. 9.  It was also true in *MicroStrategy*, where the court held that "[t]he phrase 'now or hereafter' … unambiguously contemplates that the Agreement would apply to later acquired or formed entities owned or controlled by the parties to the Agreement."  2010 WL 5550455, at *12 (rejecting argument that entity was not bound by agreement because it "was not formed until after the Effective Date" of agreement).  Likewise, in *Oyster Optics, LLC v. Infinera Corp.*, 843 F. App'x 298, 300-302 (Fed. Cir. 2021), the Federal Circuit held that a patent agreement granting a license to the signatories and "their Affiliates" applied to an entity created after the agreement was signed because the definition of "Affiliates" included "any Person, now or in the future" who "has Control of a Party hereto."  And in *Medtronic AVE, Inc. v. Cordis Corp.*, 2003 WL 23112268, at *3 (D. Del. Dec.

11, 2003), *vacated in part on other grounds*, 100 F. App'x 865 (3d Cir. 2004), the court held that "[b]ased on the plain language" of the contract, "the parties intended for companies that become controlled by [the plaintiff's parent] after the Effective Date to be subject to all of the terms of the Agreement."

Therefore, VLSI's argument that it was not a signatory to the License is legally irrelevant, as is any argument that VLSI was formed after the License's effective date.  Indeed, that the License defines "Affiliates" as companies that "now or ***hereafter***" are "under common control with" the Finjan Parties shows that the License specifically contemplates covering entities—like VLSI—that did not exist at the time that the License was executed.  DTX-1 [License] § 1.2 (emphasis added).  As the California court explained, the "now or hereafter" language in the definition of "Affiliates" "'unambiguously contemplates' later acquired and formed entities" and "Delaware law … allows later-formed entities to be bound."  *VLSI Tech.*, 2023 WL 9052312, at *7.  An entity that satisfies the definition of "Affiliate" under the License, even if later-acquired or created, is legally bound by its terms.

Notably, as the California court found, this situation is "not novel."  *VLSI Tech.*, 2023 WL 9052312, at *8.  Indeed, a New York Law Journal article from 2013 warned that "[w]hen a target's contracts purport to bind its affiliates or subsidiaries, the ramifications of an acquisition of or substantial investment in the target may be significant," including because the "[b]uyer may find that its—and its affiliate entities'—intellectual property is unexpectedly subject to an outgoing license grant on terms it did not negotiate with a party to whom it may not want to be a licensor." *Acquisitions and IP Licenses:  Looking Out for Poison Pill Affiliate*, 249 N.Y.L.J. 2 (2013).  It is undisputed that Fortress had an opportunity to conduct due diligence before its affiliate acquired Finjan Holdings and Finjan LLC, and in conducting due diligence, Fortress had its outside counsel

review the License.  *See* DTX-64 [Schedule Tender Offer] 38-40; Dkt. 941 at 1-2; *see also* 5/28/25 Trial Tr. [Perryman] 484:9-485:12.  Fortress then chose to make VLSI and Finjan LLC affiliates even though the License clearly stated that it covered future affiliates.

For the foregoing reasons, this Court should hold, as the California court previously held, that "non-signatory entities meeting the definition of 'Affiliates' (as defined by the Finjan License Agreement) of the Finjan Parties"—which include non-signatory entities that are under "common control" with the Finjan Parties—are "bound by the agreement, including later acquired or formed 'Affiliates.'"  *VLSI Tech.*, 2023 WL 9052312, at *8.  And as explained above, because a jury has found that VLSI and Finjan LLC are under Fortress's common control, VLSI is bound by the License as an "Affiliate" of Finjan LLC.

### B.    Federal Law Poses No Bar To The License Binding VLSI.

VLSI's argument, made for the first time at summary judgment, that federal law precludes the license from applying to VLSI should be rejected.  Delaware law applies here because "the interpretation of patent license contracts is generally governed by state law."  *Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1328 (Fed. Cir. 2002).  "State law is not displaced merely because the contract relates to intellectual property," *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979), and "who owns patent rights, and on what terms, typically is a question exclusively for state courts and not one arising under United States patent laws," *International Nutrition Co. v. Horphag Rsch. Ltd.*, 257 F.3d 1324, 1329 (Fed. Cir. 2001); *see also Oyster Optics*, 843 F. App'x at 300 (applying state law to hold that the plain terms of a contract granting a license to an entity's "Affiliates" applied to an entity that later acquired control).

Indeed, VLSI has repeatedly told courts that Delaware law governs Intel's license defense and there is "no federal question … because Intel is seeking a declaration only with respect to its purported rights under the Finjan Settlement—a question of state law." *Intel Corp. v. VLSI Tech.*,

No. 1:24-cv-803, Dkt. 13 at 18 (D. Del. Sept. 16, 2024); *see also id.* at 14 ("Intel's claim, however, raises only state-law questions[.]"); *VLSI Tech. v. Intel Corp.*, No. 5:17-cv-05671, Dkt. 872-1 at 7 (N.D. Cal. Feb. 23, 2024) ("[T]he Finjan License requires the application of Delaware law.").

The cases VLSI cited on summary judgment are distinguishable because they involve a small group of specific issues far more entwined with federal law than the issue here. *Rhone Poulenc* applied federal law to a bona fide purchaser defense in the "unique situation in which a federal patent statute explicitly governs the bona fide purchaser rule in some situations," such that application of state law would conflict with Congress's intent not to extend the defense to the situation before the court. 284 F.3d at 1328. Other cases relate to the express federal statutory requirement in 35 U.S.C. § 261 that assignments of patents must be in writing. *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1366 (Fed. Cir. 2010) (discussing patent assignment in context of standing analysis); *Control Laser Corp. v. Smith*, 705 F. Supp. 3d 1006, 1011-1012, 1014 (N.D. Cal. 2023). VLSI's remaining cases are also easily distinguishable.[1] None of these cases, or any other case, displaces the License's binding effect on VLSI under Delaware law.

---

[1] In *Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, "German law" would have applied under the agreement's choice-of-law clause if the parties had not waived their right to rely on foreign law, and the court defaulted to the application of federal law because the parties did "not argue for application of any particular state's law" and only "discuss[ed] U.S. law generally." 940 F.3d 1372, 1378, 1380 (Fed. Cir. 2019). In *In re CFLC, Inc.*, the Ninth Circuit acknowledged that "most questions with respect to the construction of patent licenses are governed by state law," but then created, in the context of a bankruptcy proceeding, a novel rule of federal common law based on two regional circuit cases that predate the Federal Circuit's creation. 89 F.3d 673, 677-679 (9th Cir. 1996). In *Medtronic AVE, Inc. v. Advanced Cardiovascular Systems, Inc.*, the non-signatory AVE did "not dispute that it is bound," but the language of the arbitration clauses did not cover AVE's own patent infringement claims because the agreements covered only past or then-current claims of the signatory Bard, and therefore AVE's later-acquired claims did not fall within the scope of the agreements. 247 F.3d 44, 55, 60-61 (3d Cir. 2001). In *Mars, Inc. v. TruRx LLC*, the court relied on Texas law alongside *Medtronic* and gave no indication that state law had been displaced. 2016 WL 4055676, at *3 (E.D. Tex. Mar. 1, 2016). Finally, *Cincom Systems, Inc. v. Novelis Corp.*, was a copyright case in

**C.     VLSI's Patents Fall Under The Definition Of "Finjan's Patents."**

The License defines "Finjan's Patents" to "mean all Patent Rights that are owned or controlled at any time on or after November 6, 2012 by Finjan or to which Finjan has the right to grant licenses and that have a first effective filing date or priority date during the Capture Period ████████████████████████████████████████████ ██████████████ without the requirement to pay consideration ████████████████ ███████████████ for the grant of a license ██████████████." DTX-1 [License] § 1.10. As explained above, the definition of "Finjan" in the License's Preamble includes the Finjan Parties and their Affiliates. *See supra* p. 7. Because "Affiliates" are included within the definition of "Finjan," patents "that are owned or controlled" by "Affiliates" of the Finjan Parties are licensed to Intel under the License. Therefore, because VLSI is an Affiliate of the Finjan Parties, patents "that are owned or controlled" by VLSI are licensed to Intel under the License.

VLSI argued before trial that its patents are excluded from the scope of "Finjan's Patents" because third-party NXP is allegedly entitled to consideration. This argument fails as a matter of law for multiple reasons.

***First***, there is no requirement that VLSI pay third-party NXP consideration for the grant of a license under the License agreement. VLSI claims that under the Patent Purchase and Cooperation Agreement ("PPCA") through which it purchased the asserted patents from NXP Semiconductors ("NXP"), VLSI supposedly cannot license the asserted patents to Intel without VLSI paying consideration to NXP. But VLSI has never identified any provision in the PPCA that requires VLSI to pay consideration to NXP if the License covers patents acquired from NXP.

───────────────

which the discussion of applying federal law to "promote creativity" was dicta given that the "plain text of the license" mandated the same result. 581 F.3d 431, 437 (6th Cir. 2009).

Nor could VLSI identify such a requirement, as the PPCA does not require VLSI to pay NXP consideration for the grant of a license to VLSI's patents under the Finjan License.

The PPCA does not obligate VLSI to obtain any revenues (or profits) at all and thus does not require VLSI to pay consideration to NXP for the grant of any particular license, much less for a grant of a license to VLSI's patents under the Finjan License. At most, the PPCA includes a general profit-sharing arrangement between VLSI and NXP that is based on VLSI's "███████ ████████████████," if any, derived from the entire patent portfolio purchased from NXP. DTX-48 [PPCA] § 7.3 ("Allocation of Profits"), § 1.1(t) (defining "Gross Revenues"), § 1.1(bb) (defining "Net Profits"); Dkt. 872-39 [PPCA Amendment No. 1] § (o). NXP is entitled to a profit share of those ████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████████████." DTX-48 [PPCA] §§ 1.1(bb), 1.1(t), 7.3; Dkt. 872-39 [PPCA Amendment No. 1] § (o). Where there are no net profits, no payment is owed to NXP: A percentage of zero is still zero.

Moreover, the PPCA explicitly provides that VLSI "██████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████." DTX-48 [PPCA] § 7.4 (emphasis added). The PPCA further provides that VLSI "██████████████████████████████████ ██████████████████" *Id.* (emphasis added). The language in the PPCA thus shows that the asserted patents can be licensed to Intel without paying consideration to NXP. The California court reached the same determination when it determined that "NXP is not a 'third person' owed

consideration" under the terms of the License. *VLSI Tech.*, 2023 WL 9052312, at *11. As the California court explained, "[n]othing in the PPCA requires VLSI to maximize the license payments or royalties, or even extract any payment whatsoever from a licensee." *Id.*

In fact, in multiple suits involving patents that VLSI acquired from NXP through the PPCA, VLSI has granted Intel a covenant not to sue, and dismissed its claims against Intel with prejudice, for no payment. Dkt. 872-40 [*VLSI Tech.*, No. 17-cv-5671, Dkt. 801 (N.D. Cal. Jan. 16, 2024)] 1 ("[N]either party is paying any amount to the other party."); Dkt. 872-41 [*VLSI Tech.*, No. 17-cv-5671, Dkt. 459 (N.D. Cal. Apr. 18, 2023)] A-2 (same); Dkt. 872-42 [*VLSI Tech. LLC v. Intel Corp.*, No. 18-cv-966, Dkt. 998 (D. Del. Dec. 27, 2022)] 2 (same). It is well established that covenants not to sue constitute licenses. *See, e.g.*, *TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009) ("[T]his court and its predecessors have on numerous occasions explained that a non-exclusive patent license is equivalent to a covenant not to sue."). NXP is indisputably owed nothing for this grant of the equivalent of license rights to Intel—because there were no resulting "█████████." Indeed, ██████████████████████ ██████████████████████████████████████. Dkt. 872-43 [Lowenstein Dep. Ex. 8]. VLSI's past granting of covenants thus confirms that VLSI "has no 'requirement to pay consideration' to NXP under the terms of the PPCA." *VLSI Tech.*, 2023 WL 9052312, at *11.

***Second***, VLSI's argument regarding compensation to NXP fails for the independent reason that it is based on a misinterpretation of the License. There are two categories of patents that fall under the definition of "Finjan's Patents": "all Patent Rights

> [1] that are owned or controlled at any time on or after November 6, 2012 by Finjan
>
> ***or***
>
> [2] to which Finjan has the right to grant licenses."

18

DTX-1 [License] § 1.10 (emphasis and bracketed numbers added).  Here, VLSI's patents are *owned* by "Finjan," as defined to include "Affiliates" such as VLSI, and thus clause [1] applies.

The carve-out of patents for which Finjan would have to pay consideration to a third party for the grant of a license applies only to those patent rights described in clause [2], i.e., patent rights "to which Finjan has the right to grant licenses."  That much is clear from the plain language of the License:

> "Finjan's Patents" shall mean all Patent Rights [1] that are owned or controlled at any time on or after November 6, 2012 by Finjan or [2] to which ***Finjan has the right to grant licenses*** and that have a first effective filing date or priority date during the Capture Period ███████████████████████████████████████ ██████████████████████████████████ ithout the requirement to pay consideration ████████ ████████ for the grant of a license ██████████████.

DTX-1 [License] § 1.10 (bold, italics, and underlining added).  Because the carve-out only refers to those patent rights to which "***Finjan has the right to grant licenses***," the carve-out does not apply to the separate category of patent rights "***that are owned or controlled … by Finjan***."  This plain language interpretation is reinforced by the placement of the carveout for third-party consideration ***after*** the second category of patent rights described in the definition of Finjan's Patents (i.e., those "to which Finjan has the right to grant licenses") with no punctuation separating those clauses.  *See Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("a limiting clause or phrase … should ordinarily be read as modifying only the noun or phrase that it immediately follows"); *American Int'l Grp. v. Bank of Am. Corp.*, 712 F.3d 775, 781-782 (2d Cir. 2013) ("When there is no comma," the modifier "is ordinarily understood to apply only to its last antecedent.").  Extending the carve-out to patents "that are owned or controlled" by Finjan would collapse the License's distinction between patents "owned or controlled … ***or*** to which Finjan has the right to grant licenses."

19

## IV.    CONCLUSION

For the foregoing reasons, Intel respectfully requests that the Court grant judgment as a matter of law that Intel is licensed to the Asserted Patent.

Dated: June 27, 2025

Respectfully submitted,

/s/ *Joseph J. Mueller*

Mary V. Sooter (*Pro Hac Vice*)
WILMER CUTLER PICKERING
  HALE & DORR LLP
1225 17th Street
Suite 2600
Denver, Colorado 80202
Tel: (720) 274-3135
Email: mindy.sooter@wilmerhale.com

Thomas G. Saunders (*Pro Hac Vice*)
Joshua L. Stern (*Pro Hac Vice*)
Steven J. Horn (*Pro Hac Vice*)
WILMER CUTLER PICKERING
  HALE & DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel: (202) 663-6000
Email: thomas.saunders@wilmerhale.com
Email:  joshua.stern@wilmerhale.com
Email: steven.horn@wilmerhale.com

William F. Lee (*Pro Hac Vice*)
Joseph J. Mueller (*Pro Hac Vice*)
Louis W. Tompros (*Pro Hac Vice*)
Kate Saxton (*Pro Hac Vice*)
WILMER CUTLER PICKERING
  HALE & DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Email: william.lee@wilmerhale.com
Email: joseph.mueller@wilmerhale.com
Email: louis.tompros@wilmerhale.com
Email: kate.saxton@wilmerhale.com

Harry Lee Gillam, Jr.
Texas State Bar No. 07921800
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas 75670
Tel: (903) 934-8450
Email: gil@gillamsmithlaw.com

*Attorneys for Intel Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel are being served with a copy of the foregoing document via electronic mail on June 27, 2025.

/s/ *Joseph J. Mueller*
Joseph J. Mueller (*Pro Hac Vice*)
WILMER CUTLER PICKERING HALE
  & DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Email: joseph.mueller@wilmerhale.com