**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| VLSI TECHNOLOGY LLC,<br><br>               Plaintiff,<br><br>v.<br><br>INTEL CORPORATION,<br><br>               Defendant. | Civil Action No. 1:19-cv-00977-ADA<br><br><span style="color:red">**PUBLIC VERSION**</span><br><br>███████████████ |

**INTEL CORPORATION'S OPPOSITION TO VLSI TECHNOLOGY LLC'S
RENEWED RULE 50(B) MOTION FOR JUDGMENT
<u>AS A MATTER OF LAW AS TO INTEL'S LICENSE DEFENSE</u>**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................ 2

        A.      2012 Patent License Agreement ............................................................ 2

        B.      VLSI And Finjan LLC (Formerly Known As Finjan, Inc.) Are "Affiliates"
                That Were Under The Common Control Of Fortress. ............................. 3

        C.      Intel's License Defense ........................................................................... 3

III.    ARGUMENT ..................................................................................................... 5

        A.      Federal Law Poses No Bar To The License Binding VLSI. ................... 6

        B.      Delaware Law Binds VLSI To The License. ......................................... 8

                1.      Non-signatories that are under common control with the Finjan
                        Parties, including later-acquired or -formed non-signatories, are
                        "Affiliates" that are bound by the License under Delaware Law. .............. 9

                2.      Delaware law and the License's clear terms foreclose VLSI's
                        arguments. ................................................................................... 11

        C.      VLSI's Patents Fall Under The Definition Of "Finjan's Patents." ...................... 14

        D.      The Jury's Verdict Is Supported By Substantial Evidence And Means that
                VLSI Is An "Affiliate" Of Finjan Under The License. ........................... 18

                1.      The jury's verdict finding that VLSI and Finjan LLC are under
                        Fortress's common control is supported by substantial evidence. ............ 18

                        a.      Substantial evidence supported the jury's finding that
                                Fortress controlled VLSI at all times since VLSI's creation
                                in 2016. ........................................................................... 19

                        b.      Substantial evidence supported the jury's finding that
                                Fortress controlled Finjan LLC at all times since Finjan's
                                acquisition in 2020. ......................................................... 21

                        c.      VLSI ignores the overwhelming evidence of control. .................. 23

                2.      The Court should reject VLSI's arguments regarding fiduciary
                        duties. ........................................................................................... 25

                3.      The Court should reject VLSI's "actual exercise" of "control"
                        arguments. ..................................................................................... 27

4.     The Court should reject VLSI's arguments about the jury verdict addressing the wrong time period. ........................................................... 29

IV.     CONCLUSION ................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abraxis Bioscience, Inc. v. Navinta LLC*,
  625 F.3d 1359 (Fed. Cir. 2010)..............................................................................6

*AG Mobile Holdings, L.P. v. H.I.G. Mobile, L.P.*,
  No. 2023-1103 MAA, 2025 WL 501088 (Del. Ch. Feb. 13, 2025).......................13

*Airborne Health, Inc. v. Squid Soap, LP*,
  984 A.2d 126 (Del. Ch. 2009)...............................................................................16

*Alliance Data Systems Corp. v. Blackstone Capital Partners V L.P.*,
  963 A.2d 746 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009)..................... 12-13

*Amadeus Global Travel Distribution, S.A. v. Orbitz, LLC*,
  302 F. Supp. 2d 329 (D. Del. 2004)...............................................................26, 28

*Aronson v. Quick Point Pencil Co.*,
  440 U.S. 257 (1979).................................................................................................6

*In re CFLC, Inc.*,
  89 F.3d 673 (9th Cir. 1996) .....................................................................................7

*Control Laser Corp. v. Smith*,
  705 F. Supp. 3d 1006 (N.D. Cal. 2023) ..................................................................6

*Digitech Image Technologies, LLC v. Newegg, Inc.*,
  No. 2:12-cv-01688-ODW, 2013 WL 1871513 (C.D. Cal. May 3, 2013)................8

*Fairchild Semiconductor Corp. v. Power Integrations, Inc.*,
  630 F. Supp. 2d 365 (D. Del. 2007).......................................................................15

*Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V. v.
  Sirius XM Radio Inc.*,
  940 F.3d 1372 (Fed. Cir. 2019)...............................................................................6

*i4i Ltd. Partnership v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010)................................................................................30

*International Nutrition Co. v. Horphag Research Ltd.*,
  257 F.3d 1324 (Fed. Cir. 2001)...............................................................................6

*Ivanhoe Partners v. Newmont Mining Corp.*,
  535 A.2d 1334 (Del. 1987) .....................................................................................25

*Kahn v. Lynch Communication Systems, Inc.*,
    638 A.2d 1110 (Del. 1994) .................................................................25

*Kaplan v. Centex Corp.*,
    284 A.2d 119 (Del. Ch. 1971)..............................................................26

*Klaassen v. Allegro Development Corp.*,
    No. 8626-VCL, 2013 WL 5967028 (Del. Ch. Nov. 7, 2013) .................................28

*Kuroda v. SPJS Holdings, L.L.C.*,
    No. 4030-CC, 2010 WL 4880659 (Del. Ch. Nov. 30, 2010)..................................13

*Lockhart v. United States*,
    577 U.S. 347 (2016)........................................................................17

*Mars, Inc. v. TruRx LLC*,
    No. 6:13-cv-526-RWS, 2016 WL 4034789 (E.D. Tex. Mar. 1, 2016) ....................................8

*McCaig v. Wells Fargo Bank (Texas), N.A.*,
    788 F.3d 463 (5th Cir. 2015) ............................................................29

*Medicalgorithmics S.A. v. AMI Monitoring, Inc.*,
    No. 10948-CB, 2016 WL 4401038 (Del. Ch. Aug. 18, 2016)..........................................11, 12

*Medtronic AVE, Inc. v. Advanced Cardiovascular Systems, Inc.*,
    247 F.3d 44 (3d Cir. 2001)..................................................................8

*MicroStrategy, Inc. v. Acacia Research Corp.*,
    No. 5735-VCP, 2010 WL 5550455 (Del. Ch. Dec. 30, 2010)............................. 5, 8-9, 11, 12

*Movora, LLC v. Gendreau*,
    No. N23C-05-034 MAA, 2024 WL 1675370 (Del. Super. Apr. 18, 2024)............................15

*Oyster Optics, LLC v. Infinera Corp.*,
    843 F. App'x 298 (Fed. Cir. 2021) .......................................................7, 11

*P&TI Acquisition Co., Inc. v. Morgenthaler Partners VII, LP*,
    No. N18C-08-059 AML, 2019 WL 2070449 (Del. Super. Ct. May 9, 2019) ........................28

*Partners Healthcare Solutions Holdings, L.P. v. Universal America Corp.*,
    No. 9593-VCG, 2015 WL 3794535 (Del. Ch. June 17, 2015) ...................................28

*Polara Engineering Inc. v. Campbell Co.*,
    894 F.3d 1339 (Fed. Cir. 2018)............................................................29

*Puga v. RCX Solutions, Inc.*,
    922 F.3d 285 (5th Cir. 2019) .............................................................27

*Radio Corp. of America v. Philadelphia Storage Battery Co.*,
6 A.2d 329 (Del. 1939) ................................................................................27

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000) ....................................................................................18

*Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*,
284 F.3d 1323 (Fed. Cir. 2002).......................................................................6

*Russell v. Plano Bank & Trust*,
130 F.3d 715 (5th Cir. 1997) .......................................................................29

*Sheehan v. Assured Partners, Inc.*
No. 2019-0333-AML, 2020 WL 2838575 (Del. Ch. May 29, 2020) ....................13

*In re Shorenstein Hays-Nederlander Theatres LLC Appeals*,
213 A.3d 39 (Del. 2019) .......................................................................*passim*

*Sun Capital Partners III, LP v. New England Teamsters & Trucking Industry Pension Fund*,
943 F.3d 49 (1st Cir. 2019)..........................................................................26

*T-Rex Prop. AB v. Regal Entertainment Group*,
No. 6:16-cv-927-JDK, 2019 WL 5558061 (E.D. Tex. Oct. 29, 2019) .................16

*TransCore, LP v. Electronic Transaction Consultants Corp.*,
563 F.3d 1271 (Fed. Cir. 2009).......................................................................8

*Truinject Corp. v. Nestle Skin Health, S.A.*,
2020 WL 70981 (D. Del. Jan. 7, 2020)...........................................................13

*United States v. Lopez-Escobar*,
920 F.2d 1241 (5th Cir. 1991) .....................................................................29

*Vivint Solar, Inc. v. Lundberg*,
No. 2020-0988-PAF, 2024 WL 2755380 (Del. Ch. May 30, 2024)......................28

*VLSI Technology LLC v. Intel Corp.*,
87 F.4th 1332 (Fed. Cir. 2023) ..................................................................4, 8

*VLSI Technology LLC v. Intel Corp.*,
No. 17-CV-05671-BLF, 2023 WL 9052312 (N.D. Cal. Dec. 20, 2023) ........*passim*

*VLSI Technology LLC v. Intel Corp.*,
No. 17-cv-05671-BLF, 2024 WL 269163 (N.D. Cal. Jan. 24, 2024).......................4

*Voigt v. Metcalf*,
No. 2018-0828-JTL, 2020 WL 614999 (Del. Ch. Feb. 10, 2020) .................25, 28

*Walther v. Lone Star Gas Co.*,
  952 F.2d 119 (5th Cir. 1992) ................................................................30

*WickFire, LLC v. Woodruff*,
  989 F.3d 343 (5th Cir. 2012) ................................................................30

**Statutes and Rules**

35 U.S.C. § 261 ..........................................................................................6, 7

35 U.S.C. § 281 ............................................................................................8

Del. Code Ann. tit. 6, § 18-1101 ..............................................................27

Federal Rule of Civil Procedure 50 ..........................................................18

**Other Authorities**

*Acquisitions and IP Licenses: Looking Out for Poison Pill Affiliate*,
  249 N.Y.L.J. 2 (2013) ......................................................................12, 13

**Exhibits**

The exhibits cited in this opposition as "Ex. __" are attached to the Declaration of Steven J. Horn filed as an attachment to this opposition.

## I.    INTRODUCTION

As explained in Intel's motion for judgment as a matter of law (Dkt. 964), now that the jury's verdict has established that VLSI and Finjan LLC are under common control of Fortress, the unambiguous terms of the 2012 Patent License Agreement ("License") mean that Intel is licensed to U.S. Patent No. 7,606,983 (the "Asserted Patent").  The Court should thus enforce the express terms of the License and enter judgment in Intel's favor.  VLSI's JMOL motion (Dkt. 965) does not dispute that the License's plain language covers non-signatories that are under common control with a signatory.  Instead, VLSI argues that the Court should effectively nullify that plain language and should disregard the jury's verdict.  But VLSI cites no authority nullifying such contract language, and the overwhelming record supports the jury's verdict.

*First*, VLSI incorrectly argues that federal law precludes the License from including the Asserted Patent.  Federal law does not support nullifying the unambiguous contractual language at issue here.  And, contrary to VLSI's arguments, Delaware law applies to determining the scope and effect of the License in this case.

*Second*, VLSI wrongly argues that it cannot be bound to the License under Delaware law.  The plain text of the License applies to future affiliates of the Finjan Parties.  Under Delaware law, non-signatory entities meeting the License's definition of "Affiliates," including later-acquired or -formed "Affiliates," can be bound by the agreement.  *See In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 57 (Del. 2019); *VLSI Tech. LLC v. Intel Corp.*, 2023 WL 9052312, at *6 (N.D. Cal. Dec. 20, 2023) ("[I]f it is proven that Fortress controls the signatory party Finjan and other entities, then Fortress can be bound along with other entities it controls.").

*Third*, VLSI wrongly argues that the Asserted Patent is not one of "Finjan's Patents" under the License's terms.  The License's definitions make clear that patents belonging to "Affiliates" of the Finjan Parties are subject to the License.  In addition, the PPCA between VLSI and NXP

1

shows that the Asserted Patent can be licensed to Intel under the License without a requirement to pay consideration to NXP. *VLSI*, 2023 WL 9052312, at *11. In any event, VLSI's consideration argument fails for the independent reason that it is based on a misinterpretation of the License.

**Finally**, VLSI argues against the overwhelming evidence supporting the jury's verdict that VLSI and Finjan LLC were under Fortress's common control. For example, the record demonstrated that Fortress controlled VLSI and Finjan LLC by, among other things, controlling their boards and finances. Unable to overcome this evidence, VLSI relies on arguments that were waived, are incorrect as a matter of law, and/or conflict with the record.

The Court should deny VLSI's motion for JMOL and grant Intel's motion for JMOL.

## II.    BACKGROUND

VLSI's background section provides a one-sided account of the case that overlooks the key facts that give rise to Intel's license defense: (1) the plain text of the License; and (2) Fortress's common control over VLSI and Finjan LLC.

### A.    2012 Patent License Agreement

On November 20, 2012, Intel entered into the License with the Finjan Parties, "signing on their own behalf and on behalf of their respective Affiliates." DTX-1 [License] Preamble. The License granted Intel a "perpetual, irrevocable license" to "Finjan's Patents," defined to include "all Patent Rights that are owned or controlled at any time on or after November 6, 2012 by Finjan…." *Id.* §§ 3.1, 1.10, Preamble. "Finjan" is defined by the License to include the Finjan Parties and their "Affiliates." *Id.* at Preamble. "Affiliates" is defined to include "any Person that, **now or hereafter**, directly or indirectly through one or more entities, controls or is controlled by, or **is under common control** with" a specified Person. *Id.* § 1.2 (emphases added). "Control" is broadly defined to "mean[] the possession, direct or indirect, of the power to direct the management and polices of a Person, whether through the ownership of any percentage of voting

interests of such Person, through contract or otherwise." *Id.* The plain language of the License therefore extends the license to patents owned by "Affiliates" of the Finjan Parties, including entities that "now or hereafter" are "under common control" with the Finjan Parties.

**B.      VLSI And Finjan LLC (Formerly Known As Finjan, Inc.) Are "Affiliates" That Were Under The Common Control Of Fortress.**

Fortress is a New York investment management company that focuses on making "control-oriented" private equity investments.  5/27 Tr. [Hille] 101:11-21, 102:7-107:19; *id.* [Zur] 158:13-16, 159:7-11, 164:7-166:3, 245:16-19; 5/28 Tr. [Goodwin] 517:1-518:6; DTX-161; DTX-162; DTX-278.  VLSI and Finjan LLC are two examples of Fortress's control-oriented investments.

In 2016, Fortress created VLSI.  Since then, Fortress has controlled VLSI in multiple ways, including through (1) the power to appoint and remove VLSI's board members; (2) Fortress employees, who are paid by Fortress and not VLSI, constituting a majority of VLSI's board; and (3) Fortress exercising ultimate approval over VLSI's funding and spending. *See infra* pp. 19-21.

In July 2020, after Fortress conducted due diligence, Fortress-controlled CFIP Goldfish Holdings acquired Finjan Holdings, Inc. and its wholly-owned subsidiary Finjan, Inc.  Fortress then converted Finjan Holdings, Inc. and Finjan, Inc. to Finjan Holdings LLC ("FHL") and Finjan LLC, respectively.  Since the acquisition, Fortress has controlled Finjan LLC in multiple ways, including through (1) the power to appoint and remove Finjan LLC's and FHL's board members; (2) Fortress employees, who are paid by Fortress and not Finjan LLC or FHL, constituting a majority of Finjan LLC's and FHL's boards; and (3) Fortress exercising ultimate approval over funding and spending for Finjan LLC and FHL. *See infra* pp. 21-23.

**C.      Intel's License Defense**

Fortress's acquisition of control over Finjan LLC in July 2020 brought Finjan LLC and VLSI under common control as "Affiliates," triggering Intel's rights under the License.  Intel

asserted its license defense shortly after that acquisition. The Court initially denied Intel's motion to add the license defense, Dkt. 651 at 2, but later allowed Intel to add the defense, Dkt. 829, after the Federal Circuit reversed the Court's denial of Intel's motion to amend in *VLSI I*, *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1350 (Fed. Cir. 2023).[1]

Before Intel's license defense was added in this case, the Northern District of California's decision on the parties' cross motions for summary judgment addressed various legal questions now before this Court. *See VLSI*, 2023 WL 9052312. The California court concluded that (1) "non-signatory entities meeting the definition of 'Affiliates' (as defined by the [License]) of the Finjan Parties can be bound by the agreement, including later acquired or formed 'Affiliates'"; (2) should a fact finder find that Fortress controls Finjan LLC, then "any entities controlled by Fortress are bound [by the] Finjan License Agreement"; and (3) "patents belonging to Affiliates of Finjan, as defined by the Finjan License Agreement, are subject to the license to Intel described therein." *Id.* at *5, *6, *8, *11. Thus, the court concluded that Intel's "license defense may succeed if Intel proves that VLSI and Finjan [LLC] are under common control of Fortress." *Id.* at *9.

Like this Court, the California court concluded that "[w]hether VLSI and the Finjan Parties are under common control by Fortress" such that they are "Affiliates" under the terms of the License "is an issue of fact" that "a jury must resolve." *Id.* at *10. But before a jury could resolve this issue in California, VLSI unilaterally granted Intel a covenant not to enforce the two patents remaining for trial, and the California court found that this covenant mooted Intel's license defense. *See VLSI Tech. LLC v. Intel Corp.*, 2024 WL 269163, at *5 (N.D. Cal. Jan. 24, 2024).

---

[1] VLSI points (Mot. 4) to certain alleged "findings of fact and law" in the Court's order denying Intel's motion to amend in *VLSI I* that VLSI wrongly asserts "remain correct and dispositive now." The Court did not make findings of fact in its order denying Intel's motion to amend, and the order was reversed in any event. Nor did the Court make formal findings in its unclean hands order in *VLSI I*; the portions cited by VLSI (Mot. 3) are dicta in the background. Dkt. 873-4 at 1-2. VLSI also ignores that the underlying record has changed with more discovery since those orders.

On February 21, 2025, VLSI and Intel filed cross motions for summary judgment in this case.  Dkt. 872; Dkt. 873.  The Court denied both motions.  Dkt. 905.  The Court decided to hold a trial on the issue of common control and explained that "[w]hether Intel is licensed to the asserted patent under the Finjan License has underlying factual issues (*i.e.*, whether Finjan and VLSI are under common control of Fortress) but is ultimately a question of law for the judge that is to be determined by the court, either on a pretrial motion for summary judgment or on a motion for judgment as a matter of law at the close of the evidence and after the jury verdict."  *Id.* at 2.

On May 29, 2025, after a trial on the issue of common control, a jury returned a verdict in Intel's favor, finding that Intel had proved by a preponderance of the evidence that Fortress controlled both VLSI and Finjan LLC (formerly known as Finjan, Inc.).  Dkt. 959 at 1.

## III.   ARGUMENT

The License unambiguously grants Intel a "perpetual, irrevocable license" to "all Patent Rights that are owned or controlled at any time on or after November 6, 2012" by "Finjan," which is defined to include both the Finjan Parties and their "Affiliates."  DTX-1 [License] Preamble, §§ 1.2, 1.10, 3.1; *see VLSI*, 2023 WL 9052312, at *11.  The License defines "Affiliates" to include any entity that "now or ***hereafter***, directly or indirectly through one or more entities, controls or is controlled by, or is ***under common control*** with" the Finjan Parties.  DTX-1 [License] § 1.2.  As the California court determined, under Delaware law, "non-signatory entities meeting the definition of 'Affiliates' (as defined by the [License]) of the Finjan Parties can be bound by the agreement, including later acquired or formed 'Affiliates.'"  *VLSI*, 2023 WL 9052312, at *8 (citing *Shorenstein*, 213 A.3d at 58; *MicroStrategy, Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *12 (Del. Ch. Dec. 30, 2010)).  The jury's finding that VLSI and Finjan LLC are under common control means VLSI is an "Affiliate" of the Finjan Parties under the License, and that Intel has a license to the Asserted Patent.  The Court should reject VLSI's arguments otherwise.

A.      **Federal Law Poses No Bar To The License Binding VLSI.**

Unable to refute the License's plain language, VLSI wrongly argues (Mot. 5-8) that federal law precludes the License from granting rights to VLSI's patents.  But federal law does not require nullifying the plain language at issue here.  State law, not federal law, governs the scope and effect of the License.  Although the choice-of-law clause refers to both "federal law" and "the laws of the State of Delaware," DTX-1 [License] § 11.4, Delaware law applies here because "the interpretation of patent license contracts is generally governed by state law," *Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1328 (Fed. Cir. 2002).  "State law is not displaced merely because the contract relates to intellectual property," *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979), and "who owns patent rights, and on what terms, typically is a question … for state courts and not one arising under" federal patent law, *International Nutrition Co. v. Horphag Rsch. Ltd.*, 257 F.3d 1324, 1329 (Fed. Cir. 2001).

The cases VLSI cites to support its argument that federal law applies are distinguishable.  Most involve a small group of specific issues far more entwined with federal law than the issue here.  For example, *Rhone Poulenc*, 284 F.3d at 1328, applied federal law to a bona fide purchaser defense in the "unique situation in which a federal patent statute explicitly governs the bona fide purchaser rule in some situations," such that applying state law would conflict with Congress's intent not to extend the defense to the situation before the court.  Other cases VLSI cites relate to the express federal statutory requirement in 35 U.S.C. § 261 that assignments of patents must be in writing.  *Abraxis Biosc., Inc. v. Navinta LLC*, 625 F.3d 1359, 1364-66 (Fed. Cir. 2010) (discussing patent assignment in standing analysis); *Control Laser Corp. v. Smith*, 705 F. Supp. 3d 1006, 1011-14 (N.D. Cal. 2023).  In *Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, 940 F.3d 1372, 1378, 1380 (Fed. Cir. 2019), the Federal Circuit indicated that "German law" would have applied under the agreement's choice-of-law

clause if the parties had not waived their right to rely on foreign law, and the court defaulted to the application of federal law because the parties did "not argue for application of any particular state's law" and only "discuss[ed] U.S. law generally."  In *In re CFLC, Inc.*, 89 F.3d 673, 677-679 (9th Cir. 1996), the Ninth Circuit acknowledged that "most questions with respect to the construction of patent licenses are governed by state law," but then created, in the context of a bankruptcy case, a novel rule of federal common law based on cases that predate the Federal Circuit's creation.

None of these cases mandates the application of federal law to the issues before this Court. This case does not involve the assignment of legal title to a patent in contravention of § 261, Article III standing, or a situation like *Fraunhofer-Gesellschaft* where there was no other law to apply. Intel is merely arguing that it has a license under the agreement the Finjan Parties signed on behalf of their "Affiliates," and the question of whether a non-signatory affiliate can be bound to an agreement is a quintessential question of state law.  Indeed, in *Oyster Optics, LLC v. Infinera Corp.*, 843 F. App'x 298, 300 (Fed. Cir. 2021), the Federal Circuit applied state law to hold that the plain terms of a contract granting a license to an entity's "Affiliates" applied to an entity that later acquired control.  And VLSI has itself told courts that Delaware law governs Intel's license defense and there is "***no federal question***" because Intel seeks "***a declaration only with respect to its purported rights under the Finjan Settlement—a question of state law***."  *Intel Corp. v. VLSI Tech.*, No. 1:24-cv-803, Dkt. 13 at 18 (D. Del. Sept. 16, 2024) (emphases added); *see id.* at 14 ("Intel's claim, however, raises only state-law questions[.]"); *VLSI Tech. v. Intel Corp.*, No. 5:17-cv-05671, Dkt. 868 at 7 (N.D. Cal. Feb. 23, 2024) ("[T]he Finjan License requires the application of Delaware law.").  The Federal Circuit's statement that it was not prejudging "whether … any federal patent-law question is involved" does not affirmatively suggest any departure from the application of state law.  Mot. 5-6 (quoting *VLSI*, 87 F.4th at 1352 and citing 35 U.S.C. § 261).  In

fact, the Federal Circuit primarily discussed Delaware law and also mentioned "certification of a legal question to the Delaware Supreme Court." *VLSI*, 87 F.4th at 1352.

VLSI's remaining cases also miss the mark. In *TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271, 1274-1275 (Fed. Cir. 2009), the Federal Circuit said "one cannot convey what one does not own" merely to indicate that a license only conveys freedom from suit and thus is no different from a covenant not to sue for purposes of applying patent exhaustion. In *Digitech Image Technologies, LLC v. Newegg, Inc.*, 2013 WL 1871513, at *5 (C.D. Cal. May 3, 2013), the district court merely held that Newegg lacked statutory standing under 35 U.S.C. § 281 to sue for infringement of a patent it did not own. And in *Medtronic AVE, Inc. v. Advanced Cardiovascular Systems, Inc.*, 247 F.3d 44, 60-61 (3d Cir. 2001), the court found that the arbitration clauses in two agreements did not cover non-signatory assignee AVE's own patent infringement claims because the agreements covered ***only past or current*** claims of the signatory Bard, and therefore AVE's ***later-acquired*** claims did not fall within the scope of the agreements.[2]

## B.    Delaware Law Binds VLSI To The License.

The License expressly and unambiguously defines "Affiliates" to include entities that "now or ***hereafter***, directly or indirectly through one or more entities, controls or is controlled by, or is ***under common control*** with" the Finjan Parties. DTX-1 [License] § 1.2. Under Delaware law, "non-signatory entities meeting the definition of 'Affiliates' (as defined by the [License]) of the Finjan Parties can be bound by the agreement, including later acquired or formed 'Affiliates.'" *VLSI*, 2023 WL 9052312, at *5 (citing *Shorenstein*, 213 A.3d at 58; *MicroStrategy*, 2010 WL

---

[2] Another problem with VLSI's reliance on *Medtronic* is that it applied federal law because the "Federal Arbitration Act provides a framework for the development of a body of uniform federal law governing contracts within its scope." 247 F.3d at 54. Although *Medtronic* was discussed in *Mars, Inc. v. TruRx LLC*, 2016 WL 4034789, at *3 (E.D. Tex. Mar. 1, 2016), the *Mars* report and recommendation also cited Texas law and gave no indication that state law had been displaced.

5550455, at *12).  Now that the jury has found that Fortress controls the Finjan Parties and VLSI, according to Delaware law, VLSI is bound under the unambiguous terms of the License.

> **1.  Non-signatories that are under common control with the Finjan Parties, including later-acquired or -formed non-signatories, are "Affiliates" that are bound by the License under Delaware Law.**

Black-letter Delaware law establishes that "a nonsignatory created after a contract is signed can still be bound by the contract."  *VLSI*, 2023 WL 9052312, at *5; *see Shorenstein*, 213 A.3d at 57.  The Delaware Supreme Court has held that, where an agreement covered signatories and "Affiliates" of those signatories, non-signatory, later-created entities satisfying the definition of "Affiliate" were bound by the agreement at issue.  213 A.3d at 57.  In *Shorenstein*, CSH Theatres LLC ("CSH") and Nederlander of San Francisco Associates ("Nederlander") entered into an LLC agreement, becoming equal members of Shorenstein Hays-Nederlander Theatres LLC ("SHN").  *Id.* at 42, 57.  The agreement prohibited any "Shorenstein Entity" from staging a competing theatrical production within 100 miles of San Francisco without first offering the opportunity to SHN.  *Id.* at 47-48.  The preamble to the agreement defined "Shorenstein Entity" as CSH and any "Permitted Transferee," and defined "Permitted Transferee" to include an "Affiliate" of a member, including any person controlled by or ***under common control with*** the member.  *Id.* at 48.

Nederlander brought a breach of contract action after CSH Curran LLC, an entity that ***did not exist when the LLC agreement was signed***, announced plans to stage competing productions.  213 A.3d at 49.  Nederlander argued that the LLC agreement applied to non-signatory CSH Curran because it was an affiliate of signatory CSH by virtue of the common control exercised by non-signatory Carole Shorenstein Hays and her family.  *Id.* at 49, 51.  The Delaware Supreme Court agreed, holding that the agreement "impose[d] obligations" on "affiliates" of CSH as defined in the agreement.  *Id.* at 57.  The Delaware Supreme Court specifically rejected the arguments that "only formal parties—CSH and Nederlander—are bound by the terms of the LLC agreement,"

noting that "*[c]ontracts may impose obligations on affiliates in this context*." *Id.* (emphasis added). Therefore, other entities under the Hayses' control would be "Affiliates" of CSH and bound by the LLC agreement. *Id.* at 57-58. As Intel explained in its JMOL motion, the common control in *Shorenstein* was indirect and exercised largely through an investment committee that set policies for the separate trusts that owned CSH and CSH Curran. *See* Dkt. 964 at 9-11.

This case is analogous to *Shorenstein*. Like in *Shorenstein*, where the definition of "Shorenstein Entity" encompassed the signatory and its affiliates, the License here defines "Finjan" to encompass the signatory Finjan entities and their affiliates. DTX-1 [License] Preamble. Like in *Shorenstein*, where the definition of "Affiliate" included any entity "under common control with the subject Person," 213 A.3d at 48, 51, the License here defines "Affiliates" to include "any Person that, *now or hereafter*, directly or indirectly through one or more entities, controls or is controlled by, or *is under common control* with" a specified Person, DTX-1 [License] § 1.2 (emphases added). Thus, just as the Delaware Supreme Court held that the LLC agreement bound the later-created CSH Curran LLC as an affiliate of signatory CSH due to the common control of the Hayses, *Shorenstein*, 213 A.3d at 51, 57-58, the License agreement here binds VLSI as an affiliate of Finjan LLC due to the common control of Fortress.

For this reason, the California court explained that "[l]ike the non-signatory Hayses who controlled the signatory party CSH and other entities in *Shorenstein*, if it is proven that Fortress controls the signatory party Finjan and other entities, then Fortress can be bound along with other entities it controls." *VLSI*, 2023 WL 9052312, at *6. Therefore, "like the 'entities [the Hayses] control,' which the *Shorenstein* trial court found were bound by the LLC Agreement, any entities controlled by Fortress are bound [by the] Finjan License Agreement." *Id.*[3]

---

[3] Other cases have similarly found non-signatory affiliates bound by agreements they did not sign,

### 2. Delaware law and the License's clear terms foreclose VLSI's arguments.

VLSI's counterarguments should be rejected.  **First**, contrary to VLSI's argument that a non-signatory can be bound only when a non-signatory authorized or adopted a contract (Mot. 12-15), the Delaware Supreme Court has concluded that non-signatory entities that are under common control and thus satisfy the definition of "Affiliate" can be bound by an agreement.  *Shorenstein*, 213 A.3d at 57; *supra* pp. 9-10.  None of the lower court decisions cited by VLSI (Mot. 12, 14, 17) can or does displace the Delaware Supreme Court's ruling in *Shorenstein*.

**Second**, VLSI misinterprets *Shorenstein*, arguing that the decision turned on the fact that the Hayses (1) "were intimately involved in the management of both SHN and CSH" and (2) "were found as a matter of law to have breached their fiduciary duties and acted to their personal benefit." Mot. 15-16.  But the facts that VLSI plucks from the opinion's background sections (Mot. 16) were relevant only to resolving an ambiguity in the agreement not present here and the merits of the breach of fiduciary duty claims, which are not relevant to this case.  *Shorenstein*, 213 A.3d at 49-58.  The court's analysis of the "threshold" (and relevant) question of whether CSH Curran was bound by the LLC agreement that Nederlander argued it had breached merely "[a]ppl[ied] th[e] principles" concerning contract interpretation to conclude that the LLC agreement bound all CSH affiliates that are under common control.  *Id.* at 56-58; *supra* pp. 9-10.  The court found no intimate

---

even when those entities did not exist when the contract was signed. *See, e.g.*, *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *18 (Del. Ch. Aug. 18, 2016) (holding agreement including "Affiliates" within definition of "Parties" "binds 'Affiliates,' which includes [non-signatory] entities … 'under common control' with [agreement's signatory]"); *MicroStrategy*, 2010 WL 5550455, at *12 (where agreement defines term "affiliate" to include "any entity which either party now or hereafter, directly or indirectly, owns or controls," phrase "now or hereafter" contemplates agreement would apply to later-acquired or -formed non-signatories owned or controlled by parties to agreement); *see also VLSI*, 2023 WL 9052312, at *6 ("Both the *Shorenstein* and *MicroStrategy* courts held that their respective agreements imposed obligations on non-signatory affiliates."); *Oyster Optics*, 843 F. App'x at 300-01 (holding patent agreement granting license to signatories and "their Affiliates," defined as "any Person, now or in the future" who "has Control of a Party hereto," applied to later-created non-signatory entity).

management or violation of fiduciary duties necessary to that determination.[4]  And here, that determination can be made based on the plain language of the License.  *Supra* pp. 1-3, 5, 8-10.

As VLSI acknowledges (Mot. 16), *Shorenstein* does not apply any "adoption" or "alter ego" tests and the opinion does not even use those terms.  *See* 213 A.3d at 56-58.  Yet VLSI appears to insist that *Shorenstein* nevertheless imposes a requirement of adoption for "affiliate"-type contract provisions—despite *Shorenstein* never saying that—by arguing that *Shorenstein* bound "a family to the terms of a contract that *the family itself had purposefully negotiated*."  Mot. 16-17.  But *Shorenstein*'s key holding—that the LLC agreement bound newly formed non-signatory *CSH Curran* (and not just the Hayses)—was based on the language of the LLC agreement, and the court cited extrinsic evidence only to address what was, at most, a slight ambiguity in the *Shorenstein* LLC agreement that is not present here.  213 A.3d at 51-52, 56-58; *supra* pp. 9-10.[5]  *Shorenstein* did not base its decision on who **negotiated** the agreement.[6]

*Third*, VLSI's cited lower court cases (Mot. 12, 14, 17) wherein non-signatories were not bound "are all distinguishable."  *VLSI*, 2023 WL 9052312, at *7.  Unlike *Shorenstein*, the provision at issue in *Alliance Data Systems Corp. v. Blackstone Capital Partners V L.P.* (a pre-*Shorenstein*

---

[4] In any event, as the jury's verdict reflects, Fortress *was* intimately involved in VLSI's and Finjan LLC's management.  *Infra* pp. 18-23.

[5] VLSI's attempt (Mot. 12-13) to rewrite *Medicalgorithmics* and *MicroStrategy* similarly fails.  *Medicalgorithmics* did not rely on an "alter ego" or "agent" theory, but instead relied on the plain language of the agreement signed by AMI, which was under common control with non-signatory Spectocor.  2016 WL 4401038, at *18.  And *MicroStrategy* held that a later-created affiliate was nonetheless bound after expressly rejecting an alter ego theory.  2010 WL 5550455, at *12.

[6] Although adoption is not required, the facts here *do* show adoption by Fortress, which the jury found controls VLSI.  Fortress's outside counsel reviewed the License and Fortress decided to acquire control of Finjan Holdings anyway.  *See* DTX-64 [Schedule Tender Offer] 38-40; Dkt. 941 at 1-2; 5/28 Tr. [Perryman] 484:9-485:12.  And VLSI received a benefit through Intel's agreement ███████████████████████████████████████ Dkt. 872-2 [License] § 2.5.  Contrary to VLSI's assertion (Mot. 14), Fortress had every reason to know that Fortress and VLSI could be bound as this situation is "not novel."  *See VLSI*, 2023 WL 9052312, at *8; *Acquisitions and IP Licenses:  Looking Out for Poison Pill Affiliate*, 249 N.Y.L.J. 2 (2013).

case which *Shorenstein* did not approve of or even cite) did not involve a term defined to include "Affiliates." 963 A.2d 746, 760 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009). Similarly, the agreement in *Sheehan v. Assured Partners, Inc.*, 2020 WL 2838575, at *9 (Del. Ch. May 29, 2020), did not define "affiliates" to include companies that later become affiliates, and, unlike the License here, did not say the parties were "signing … on behalf of their respective Affiliates," DTX-1 [License] Preamble. The agreement analyzed in the Report and Recommendation in *Truinject Corp. v. Nestle Skin Health, S.A.*, 2020 WL 70981, at *9-12 (D. Del. Jan. 7, 2020), did not define "Affiliates." Neither did the agreement in *Kuroda v. SPJS Holdings, L.L.C.*, 2010 WL 4880659, at *3 (Del. Ch. Nov. 30, 2010). And *AG Mobile Holdings, L.P. v. H.I.G. Mobile, L.P.*—VLSI's only case citing *Shorenstein*—dealt with whether the plaintiff sufficiently pleaded that certain non-signatories "adopt[ed]" a contract. 2025 WL 501088, at *16 (Del. Ch. Feb. 13, 2025*). AG Mobile* cited *Shorenstein* as support for the broad proposition that "[a] party 'does not have to be a signatory of a contract [] to become bound by it,'" not for the narrow argument that express or implicit adoption are the only way non-signatories could be bound to an agreement. *Id.* at *16 & n.199. Nor could *AG Mobile*, or any of the other cases cited by VLSI, have displaced or altered the holding of *Shorenstein*.

   *Finally*, the Court should reject VLSI's policy argument for its (incorrect) understanding of Delaware law. *See* Mot. 13. Investors, consumers, and companies remain free (as VLSI and Fortress were) to set the terms of their contracts and to conduct due diligence on potential affiliates to avoid the scenario that Fortress has placed VLSI in. *See Acquisitions and IP Licenses: Looking Out for Poison Pill Affiliate*, 249 N.Y.L.J. 2 (2013); DTX-64 [Tender Offer] 38-40; Dkt. 941 at 1-2; 5/28 Tr. [Perryman] 484:9-485:12. Under VLSI's position, Fortress could negate the "Affiliate" provision in the License by acquiring control of Finjan LLC.

13

### C.    VLSI's Patents Fall Under The Definition Of "Finjan's Patents."

VLSI's arguments that its patents do not fall within the scope of the definition of "Finjan's Patents" are incorrect and should be rejected.  The definition of "Finjan's Patents" includes any patents "owned or controlled" by "Finjan," and "Finjan" is defined to include "Affiliates" of the Finjan Parties.  Because VLSI is an Affiliate of Finjan LLC (formerly known as Finjan, Inc.), VLSI's patents fall under the definition of "Finjan's Patents" and are licensed to Intel.

*First*, VLSI is incorrect that there is a requirement that VLSI pay third-party NXP consideration for the grant of a license under the Finjan License.  VLSI claims that under the PPCA through which it purchased patents from NXP, VLSI is required to pay consideration in the form of certain "upfront payments" to NXP and has an "obligation to share future 'Net Profits.'"  Mot. 9.  But neither provision of the PPCA requires VLSI to pay NXP consideration "for the grant of a license" to VLSI's patents *under the Finjan License*.  DTX-1 [License] § 1.10.

The PPCA does not obligate VLSI to obtain any revenues (or profits) at all and thus does not require VLSI to pay consideration to NXP for the grant of any particular license, much less for a grant of a license to VLSI's patents under the Finjan License.  At most, the PPCA includes a general profit-sharing arrangement between VLSI and NXP that is based on VLSI's "█████ ████████████████," if any, derived from the entire patent portfolio purchased from NXP. DTX-48 [PPCA] §§ 7.3, 1.1(t), § 1.1(bb); Dkt. 872-39 [PPCA Amendment No. 1] § (o).  NXP is entitled to a profit share of those Gross Revenues only if there are any profits left after VLSI first recoups its ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ DTX-48 [PPCA] §§ 1.1(bb), 1.1(t), 7.3; Dkt. 872-39 [PPCA Amendment No. 1] § (o).  Where there are no net profits, no payment is owed to NXP:  A percentage of zero is still zero.

Moreover, the PPCA explicitly provides that VLSI ███████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

█████████████████████████████████████ DTX-48 [PPCA] § 7.4 (emphasis added).

The PPCA further provides that VLSI ███████████████████████████████████████

███████████████████ *Id.* (emphasis added). The language in the PPCA thus shows that the

Asserted Patent can be licensed to Intel without paying consideration to NXP. The California

court reached the same determination when it determined that "NXP is not a 'third person' owed

consideration" under the terms of the License. *VLSI*, 2023 WL 9052312, at *11.

VLSI argues that "VLSI already has paid consideration to NXP." Mot. 9. But that

consideration was paid for the purchase of VLSI's patents, and thus indisputably does not qualify

as a "requirement ***to pay consideration*** ████████████████ … ***for the grant of a license under this***

***[License]***." DTX-1 [License] § 1.10 (emphases added). Indeed, the License specifically

contemplates "Finjan's Patents" covering patents that are later "███████████████." *Id.* § 3.4.

VLSI also argues that "'consideration' includes an interest in future patent licensing

profits" and thus "the 'requirement to pay consideration' always exists regardless of whether VLSI

ever pays NXP any future profits." Mot. 9-10. But VLSI's argument focuses on the wrong issue.

Under the License, the question is whether VLSI is required "to pay" NXP consideration "for the

grant of a license ***under this [Finjan License]***," DTX-1 [License] § 1.10 (emphasis added), not

whether VLSI has promised NXP a portion of its potential future profits more generally.[7]  NXP is

---

[7] VLSI's reliance (Mot. 9-10) on *Movora, LLC v. Gendreau*, 2024 WL 1675370, at *4-5 (Del. Super. Ct. Apr. 18, 2024), is thus misplaced. Unlike in *Movora*, the question here is not how much consideration VLSI generally owes NXP. Similarly, *Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, 630 F. Supp. 2d 365, 367 (D. Del. 2007), is not helpful because it simply characterized certain payments as consideration without discussing any issue relevant to this case.

entitled to no payment when VLSI generates no revenue, and VLSI made no promises to make any effort to earn a profit. *Supra* pp. 14-15. There is thus no requirement for VLSI to pay NXP any consideration—whether monetary or otherwise—for a license "under this Agreement."

Indeed, NXP has not received any payment under Section 7.3 of the PPCA to date because VLSI has yet to generate any revenue. Dkt. 872-43 [Lowenstein Dep. Ex. 8]; *see* Dkt. 883-8 [Lowenstein Dep.] 161:4-11. VLSI argues that this will change if it collects on the jury's damages award in this case. Mot. 10-11. But that award is subject to post-trial motions (Dkts. 712, 713), and Intel will owe no damages if Intel's license defense is successful. *See T-Rex Prop. AB v. Regal Ent. Grp.*, 2019 WL 5558061, at *5 (E.D. Tex. Oct. 29, 2019) ("A party cannot infringe a Patent to which it has a valid license."). More to the point, any such damages award would not be a payment owed "for the grant of a license **under this [Finjan License]**," and thus it would not remove the Asserted Patent from the definition of "Finjan's Patents."

VLSI asserts that the PPCA does not allow VLSI to grant a license to Intel "for free" and that granting such a license "would be fundamentally contrary to the purpose of the PPCA," Mot. 11-12, but VLSI's position is contradicted by the PPCA's provisions, *supra* pp. 14-15. The implied covenant of good faith and fair dealing, Mot. 11, cannot override these contractual provisions. *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 147-48 (Del. Ch. 2009). Indeed, VLSI has already shown its willingness to drop infringement claims and grant licenses for no monetary payment. VLSI's covenants not to sue for patents that VLSI acquired through the PPCA further confirm that VLSI is not "required" to pay NXP consideration every time VLSI grants rights to its patents. VLSI argues that these covenants "███████████████████████" in ███████████████████," evidently hoping that it can mislead the Court about the PPCA while hiding the counterevidence. Mot. 11. But the parties publicly disclosed that VLSI

granted Intel covenants not to sue without any exchange of money. Dkt. 872-42; Dkt. 872-40; Dkt. 872-41. There is nothing improper with the Court relying on these public disclosures—which are fully consistent with the PPCA's terms—and VLSI cites no authority otherwise.

*Second*, VLSI's consideration argument fails for the independent reason that VLSI's interpretation of the definition of "Finjan's Patents" is wrong. Two categories of patents fall under the definition of "Finjan's Patents": "all Patent Rights [1] that are owed or controlled at any time on or after November 6, 2012 by Finjan *or* [2] to which Finjan has the right to grant licenses." DTX-1 [License] § 1.10 (emphasis, bracketed numbers added). Here, VLSI's patents are *owned* by "Finjan," as defined to include "Affiliates" such as VLSI, and thus clause [1] applies.

The carve-out of patents for which Finjan would have to pay consideration to a third party applies only to those patent rights described in clause [2], i.e., patent rights "to which Finjan has the right to grant licenses." That much is clear from the plain language of the License:

> "Finjan's Patents" shall mean all Patent Rights [1] that are owned or controlled at any time on or after November 6, 2012 by Finjan or [2] to which ***Finjan has the right to grant licenses*** and that have a first effective filing date or priority date during the Capture Period ██████████████████████████████████ without the requirement to pay consideration ██████ for the grant of a license under this Agreement.

DTX-1 [License] § 1.10 (bold, italics, underlining added). Because the carve-out only refers to those patents to which "***Finjan has the right to grant licenses***," the carve-out does not apply to the separate category of patents "***that are owned or controlled … by Finjan***." This plain language interpretation is reinforced by the placement of the carve-out for third-party consideration *after* the second category of patent rights described in the definition of "Finjan's Patents" (i.e., those "to which Finjan has the right to grant licenses") with no punctuation separating those clauses. *See Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("a limiting clause or phrase … should

ordinarily be read as modifying only the noun or phrase that it immediately follows").

> **D.**     **The Jury's Verdict Is Supported By Substantial Evidence And Means that VLSI Is An "Affiliate" Of Finjan Under The License.**

The Court may grant JMOL only when, after "a party has been fully heard on an issue during a jury trial[,] … the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000).  Here, the jury determined that Intel proved by a preponderance of the evidence that at some point after November 20, 2012, Fortress controlled both VLSI and Finjan LLC (formerly known as Finjan, Inc.).  Dkt. 959 at 1.  Now that the jury's verdict has established that VLSI and Finjan LLC were under common control of Fortress, the express terms of the License mean that VLSI is an "Affiliate" of the Finjan Parties under the License.  *See* DTX-1 [License] § 1.2; *supra* pp. 2-3, 5, 8-10.  The jury's verdict is amply supported by substantial evidence that VLSI and Finjan LLC were under Fortress's common control.  *See infra* pp. 18-24.  Unable to refute the jury's well-supported verdict, VLSI makes irrelevant and unsupported arguments that are inconsistent with the law and the facts.

> **1.  The jury's verdict finding that VLSI and Finjan LLC are under Fortress's common control is supported by substantial evidence.**

The License defines "control" as "the possession, direct or indirect, of the power to direct the management and policies of a Person, whether through the ownership of any percentage of voting interests of such Person, through contract or otherwise."  DTX-1 [License] § 1.2.  Eran Zur, who is the Head of Intellectual Property at Fortress and has simultaneously served on both the VLSI and Finjan LLC boards, testified at trial that "in the nine years that VLSI has existed" and "in the five years since the Finjan acquisition, Fortress Investment Group has had the power to direct management and policies at each of the two companies."  5/28 Tr. [Zur] 558:13-22; *see also* 5/27 Tr. [Zur] 246:5-13.  Mr. Zur's testimony alone provides substantial evidence to support the

jury's verdict. Moreover, the jury's verdict was overwhelmingly supported by additional evidence that showed that Fortress controlled VLSI and Finjan LLC.

> a.  *Substantial evidence supported the jury's finding that Fortress controlled VLSI at all times since VLSI's creation in 2016.*

Fortress has controlled VLSI since 2016 when Fortress created VLSI to acquire patents from NXP. DTX-45 [VLSI Marking Rpt.] 3, 5; 5/27 Tr. [Zur] 166:12-13, 170:4-9, 181:8-11; *id.* [Slan] 251:21-253:13, 253:23-254:7; *id.* [Shah] 260:25-261:3, 261:19-21, 262:7-14, 273:19-21; 5/28 Tr. [Zur] 531:11-12, 566:22-567:8; *id.* [Perryman] 446:4-446:8. Fortress led the negotiations to purchase patents from NXP. 5/27 Tr. [Slan] 251:21-254:7. Fortress employees signed the PPCA with NXP, VLSI's LLC agreement, and VLSI parent CF VLSI Holdings' LLC agreement. DTX-2 [VLSI's Second Amended LLC Agreement] 45; DTX-48 [PPCA] 33-35; DTX-70 [CF VLSI Holdings Agreement] 6-8; 5/27 Tr. [Zur] 174:20-177:19, 243:5-11; *id.* [Shah] 283:10-286:4. All the initial officers of CF VLSI Holdings were Fortress employees. DTX-70 [CF VLSI Holdings Agreement] 10; 5/27 Tr. [Zur] 179:11-180:3; 5/28 Tr. [James] 416:2-15. And in an internal Fortress document, Fortress stated that "***Fortress controls [VLSI]***." DTX-45 [VLSI Marking Rpt.] 5 (emphasis added); 5/28 Tr. [Zur] 567:9-23.

The evidence presented at trial demonstrated that Fortress has controlled VLSI by, among other things, controlling VLSI's board. VLSI's board is the ultimate decision-maker for VLSI that makes decisions regarding everything of importance to the company. DTX-2 [VLSI's Second Amended LLC Agreement] 22 § 4.1(i)-(iii); 5/27 Tr. [Zur] 184:18-188:18, 189:17-190:18; *id.* [Slan] 255:19-256:6 (explaining that VLSI's board has to approve "all important decisions" for VLSI); *id.* [Hille] 99:2-100:10; *id.* [Ale] 140:11-147:7; 5/28 Tr. [Stolarski] 389:10-13 ("[T]he board of directors is the ultimate decision-maker at VLSI."); *id.* [Bain] 328:12-330:22, 335:9-23, 336:16-337:19, 359:16-24. Fortress has always had the power to appoint and remove board

members for VLSI. 5/27 Tr. [Zur] 183:16-184:17, 186:10-12, 191:19-192:5, 241:14-242:7; *id.*

[Slan] 256:16-20 ("Fortress, through VLSI Holdings, can assign board members. And ultimately,

it is those board members that control the company."); DTX-2 [VLSI's Second Amended LLC

Agreement] 22 (§ 4.2(b)); DDX6.6. Fortress employees, who are compensated by Fortress, have

always constituted a majority of VLSI's board, and the Fortress-controlled majority has always

had the power to act on behalf of VLSI. 5/27 Tr. [Zur] 188:19-189:16, 192:6-11, 192:23-193:1,

194:11-14, 214:12-16, 242:8-13, 244:14-245:5; *id.* [Slan] 254:22-255:4; *id.* [Shah] 269:18-22,

286:20-25; 5/28 [Bain] 327:15-328:11, 359:25-360:2; *id.* [Stolarski] 389:14-390:4; DTX-2

[VLSI's Second Amended LLC Agreement] 23 (§ 4.3(b)), 50 (Ex. D); DDX6.3; DDX6.6.[8]

  The evidence presented at trial also demonstrated that Fortress has controlled VLSI in other

ways, such as by controlling VLSI's finances. 5/28 Tr. [Perryman] 444:24-445:8, 451:21-452:2,

482:9-11; *see id.* at 432:13-444:23; 5/27 Tr. [Hille] 100:11-24; *id.* [Zur] 193:12-14. For example,

Fortress implemented "an independent CFO function" that gave it "more operational control than

[Fortress] usually ha[s]" in private equity investments. DTX-7 [8/17/16 Furstein Email]; 5/28 Tr.

[Perryman] 446:13-448:3. Fortress also required VLSI's CEO to prepare and generate a budget

on a quarterly basis and required board approval for any variations in the budget before any

payments are made. DTX-7 [8/17/16 Furstein Email]; 5/28 Tr. [Perryman] 448:4-16. Fortress

maintained direct access to VLSI's bank account, kept limited operational funds in that account,

and then replenished it as necessary as long as VLSI is following guidelines set by Fortress. DTX-

7 [8/7/16 Furstein Email]; 5/28 Tr. [Perryman] 448:17-21; *id.* [Brogden] 365:15-366:1; *id.*

---

[8] Originally, Fortress employees Eran Zur, Ami Patel Shah, and Aaron Slan were part of a four-member board for VLSI. DTX-2 [VLSI's Second Amended LLC Agreement] 50 (Ex. D); 5/27 Tr. [Shah] 287:1-14; 5/28 Tr. [Zur] 571:3-19. After Mr. Slan left Fortress, Fortress removed him from VLSI's board, which is now a three-member board that still is a majority of Fortress employees. 5/27 Tr. [Shah] 287:15-288:5; 5/28 Tr. [Zur] 571:20-572:7.

[Stolarski] 395:24-396:3, 398:7-20; 5/27 Tr. [Slan] 257:11-258:10; DDX5.11; DDX5.13.  Fortress employees were responsible for overseeing VLSI's expenses, approving VLSI's funding requests, and handling the payment process.  5/28 Tr. [Perryman] 450:16-451:20; *id.* [Brogden] 363:22-364:4, 367:7-368:8; *id.* [Stolarski] 390:17-22, 395:8-18; DTX-11 [3/31/20 Brogden Email]; DTX-12 [2/20/20 Brogden Email]; DTX-13 [7/7/20 Quish Email]; DTX-14 [6/2/20 Quish Email]; DTX-16 [1/17/18 Brogden Email]; DTX-17 [1/26/18 Moreland Email].[9]

> b. *Substantial evidence supported the jury's finding that Fortress controlled Finjan LLC at all times since Finjan's acquisition in 2020.*

Fortress has controlled Finjan LLC (formerly known as Finjan, Inc.) since July 2020 when Fortress-controlled Goldfish Holdings acquired Finjan Holdings, Inc. and its wholly-owned subsidiary Finjan, Inc.  DTX-8; DTX-3 [FHL LLC Agreement] 1; DTX-64 [Schedule Tender Offer]; DTX-269; 5/27 Tr. [Zur] 194:23-196:3, 238:19-23; *id.* [Shah] 261:4-8.  Fortress conducted due diligence as part of the acquisition.  DTX-64 [Schedule Tender Offer] 38-40.  After the acquisition, Fortress converted Finjan Holdings, Inc. and Finjan, Inc. to FHL and Finjan LLC, respectively.  Dkt. 918 [Joint Pretrial Order] ¶ 27; *see* 5/27 Tr. [Zur] 195:25-196:3, 238:19-239:5.  Fortress employees signed the LLC agreements for FHL and Goldfish Holdings.  DTX-3 [FHL LLC Agreement] 10; DTX-71 [Goldfish LLC Agreement] 7-8; 5/27 Tr. [Zur] 200:19-203:9, 208:18-209:1.  All the initial managers and officers of Goldfish Holdings were also Fortress employees.  DTX-71 [Goldfish LLC Agreement] 10-11; 5/27 Tr. [Zur] 203:22-205:3; 5/28 Tr. [James] 416:16-417:3.  And in connection with the tender offer statement that was submitted to the SEC as part of the acquisition, Fortress represented to the SEC that Goldfish Holdings is

---

[9] The evidence presented at trial also showed that Fortress has controlled VLSI by always having all powers, including voting powers, of the general partners for the funds that are invested in VLSI. 5/27 Tr. [Ale] 134:7-13, 135:3-136:1; 5/28 Tr. [Perryman] 478:7-482:11; *id.* [Zur] 558:24-563:17, 564:1-24; 5/29 Tr. [Zur] 639:13-641:14, 644:1-15; DTX-217 [FCO MA MI LP Agreement] 8, 12, 16, 27 (§ 2.3(m)), 38-39 (§ 3.6), 50 (§ 6.1(a)), 51 (§ 6.1(d)(i)), 53 (§ 6.1(e)), 72 (§ 9.1).

controlled by Fortress, and it wanted to "acquire control of … Finjan." DTX-64 [Schedule Tender Offer] 8, 11, 12; 5/28 Tr. [James] 414:13-415:6; *id.* [Zur] 567:24-570:23.

The trial evidence demonstrated that Fortress has controlled Finjan LLC and FHL by, among other things, controlling their respective boards. The respective boards are the ultimate decision-makers for Finjan LLC and FHL that make decisions regarding everything of importance to those companies. DTX-3 [FHL's LLC Agreement] 2 (§ 8(a)), 5-6 (§ 8(m)); DTX-25 [Finjan LLC Agreement] 2 (§ 8(a)), 5-6 (§ 8(m)); 5/27 Tr. [Zur] 207:2-14; 5/28 Tr. [Anderson] 377:8-10; *id.* [Hartstein] 406:2-11. Since the acquisition, Fortress has always had the power to appoint and remove board members for FHL and Finjan LLC. 5/27 Tr. [Zur] 211:13-212:3, 241:14-242:7, 244:24-245:5; 5/28 Tr. [Anderson] 372:20-373:2; *id.* [James] 411:10-14; DTX-3 [FHL's LLC Agreement] 2 (§ 8(b)); DTX-25 [Finjan LLC Agreement] 2 (§ 8(b)). Since the acquisition, Fortress employees, who are compensated by Fortress, have always constituted a majority of FHL's and Finjan LLC's boards, and the Fortress-controlled majority has always had the power to act on behalf of FHL and Finjan LLC. 5/27 Tr. [Zur] 207:15-208:12, 209:2-23, 213:12-214:21, 240:11-241:1, 242:8-13, 244:24-245:5; 5/28 Tr. [Anderson] 374:7-10; *id.* [Hartstein] 379:25-380:10, 406:2-11, 408:3-11; *id.* [James] 412:11-15, 414:8-12, 415:11-18, DTX-3 [FHL's LLC Agreement] 2-3 (§§ 8(b), 8(d), 8(e)); DTX-25 [Finjan LLC Agreement] 2-3 (§§ 8(b), 8(d), 8(e)).[10]

The evidence presented at trial also demonstrated that Fortress has controlled Finjan LLC by controlling its finances. 5/28 Tr. [Perryman] 452:7-10, 455:19-22, 482:12-14; *see id.* at 432:13-444:23; 5/27 Tr. [Hille] 100:11-24; *id.* [Zur] 211:13-212:3. For example, Fortress employees

---

[10] Originally, Fortress employees Eran Zur, Erez Levy, and Jonathan James were part of three-member boards for FHL and Finjan LLC. 5/27 Tr. [Zur] 207:20-208:12, 209:13-16; DTX-3 at 2 (§ 8(b)); DTX-25 at 2 (§ 8(b)). The FHL and Finjan LLC boards are now five-member boards with a majority of three Fortress employees. 5/27 Tr. [Zur] 209:17-23; 5/28 Tr. [Anderson] 374:7-10; *id.* [Hartstein] 379:25-380:10, 408:3-11; *id.* [James] 412:11-15, 414:8-12; *id.* [Zur] 572:8-11.

maintained access to FHL's bank account and provided approval for funding for FHL and Finjan LLC.  5/28 Tr. [Perryman] 452:14-453:20; *id.* [Anderson] 373:3-11, 374:11-376:20; *id.* [James] 412:16-413:24; 417:14-418:4; DTX-19 [10/5/20 Anderson Letter]; DTX-20 [1/6/21 Anderson Letter]; DTX-21 [1/11/21 Brogden Email]; DTX-23 [4/5/21 Anderson Email]; DTX-24 [4/5/21 Anderson Letter]; DTX-64 [Schedule Tender Offer] 8, 11-12; DTX-65 [10/5/20 Brogden Email]; DTX-66 [10/5/20 Anderson Letter].  And a majority of the Fortress-controlled board had to approve financial transactions for FHL and Finjan LLC, including "the incurrence of any costs … with respect to any transaction to which the company is a party by which the assets of the company are bound," the incurrence of any refinancing, the establishment of any cash reserves, any material change in accounting methods, any decision with respect to any tax-related matters, the decision to provide indemnification and/or advancement of expenses, the operating plan and the capital budget, and any licenses or employee benefit programs.  5/28 Tr. [Perryman] 453:21-455:18; DTX-25 [Finjan LLC Agreement] 5-6 (§ 8(m)); DTX-3 [FHL's LLC Agreement] 5-6 (§ 8(m).).[11]

### c.  *VLSI ignores the overwhelming evidence of control.*

VLSI's argument (Mot. 27-30) that Intel presented insufficient evidence of control ignores the overwhelming evidence showing Fortress's control over VLSI and Finjan LLC.  VLSI cannot overturn a jury verdict by pointing to isolated, self-serving testimony that is contradicted by other evidence.  Indeed, VLSI is wrong that Mr. Zur never testified that Fortress controls VLSI or Finjan LLC.  *See* 5/28 Tr. [Zur] 558:13-22.  In any event, the jury had ample basis to find control regardless of any self-interested denials.  *Supra* pp. 18-23.  VLSI's argument that Intel "used evidentiary shortcuts," Mot. 28, is belied by the evidence.  VLSI's complaint regarding Fortress representing itself as a "control-oriented investor," Mot. 28-29, is also misplaced.  The evidence

---

[11] The evidence also showed that Fortress has controlled Finjan LLC through the general partners for the Fortress funds invested in FHL.  5/28 Tr. [Zur] 565:11-24; 5/29 Tr. [Zur] 644:1-15.

showed that not only does Fortress market itself as a "control-oriented" manager, *supra* p. 3, but Fortress delivered on its promise by controlling both VLSI and Finjan LLC, *supra* pp. 18-23.  And VLSI's assertion that Fortress's "document preparation, accounting and support services, and the use of a mailing address[] is not evidence of control," Mot. 29, fails to view the evidence in the light most favorable to the verdict and understates Fortress's role, *supra* pp. 3, 18-23.

VLSI also is wrong to argue that Fortress never controlled VLSI after July 2020.  *See* Mot. 29-30.  While some documents and deposition testimony may have predated July 2020, the evidence presented at trial confirmed that VLSI's control continued:  VLSI's governing document remains in effect today, 5/27 Tr. [Zur] 187:6-12, 188:11-12; 5/28 Tr. [Bain] 325:4-326:15; VLSI's board is still the ultimate decision-maker for VLSI, *supra* p. 19; Fortress has always had the power to appoint and remove VLSI board members, *supra* p. 20; Fortress employees have always constituted a majority of VLSI's board, *supra* p. 20; and Fortress has maintained financial control of VLSI, *supra* pp. 20-21; *see* 5/28 Tr. [Perryman] 450:9-11.

VLSI also incorrectly asserts (Mot. 30) that "Intel failed to establish any link between [Fortress] and Finjan LLC, Goldfish, or the Finjan investor funds."  As noted above, the record demonstrated that Fortress has controlled Finjan LLC since July 2020, including based on evidence that Fortress controlled Finjan LLC's board and finances.  *Supra* pp. 21-23.[12]

\*      \*      \*

Therefore, substantial evidence supported the jury's verdict that "at any point after November 20, 2012, Fortress Investment Group controlled both VLSI Technology LLC and Finjan LLC (formerly known as Finjan, Inc.)."  Dkt. 959 at 1.  Because VLSI and Finjan LLC were under

---

[12] Fortress's representation to the SEC that it "controls" and is an "affiliate" of Goldfish Holdings, the parent of Finjan LLC's parent, DTX-64 [Schedule Tender Offer] 3, 8, is sufficient alone to support the jury's finding that Fortress controls Finjan LLC, as it demonstrates that Finjan LLC and Fortress are affiliates "under interpretations of the Exchange Act," DTX-1 [License] § 1.2.

common control of Fortress, VLSI is an "Affiliate" of the Finjan Parties under the License.

### 2. The Court should reject VLSI's arguments regarding fiduciary duties.

As a threshold matter, the Court should reject VLSI's improper attempt to re-litigate the Court's ruling that excluded from trial VLSI's irrelevant arguments concerning Fortress's fiduciary duties. *See* Mot. 17-19. Whether the Court's evidentiary ruling "deprived" the jury of "context" is not an argument for judgment as a matter of law. In any event, VLSI's arguments regarding fiduciary duties do not provide a legal basis for granting judgment to VLSI.

***First***, as the Court correctly concluded, fiduciary duties are irrelevant to the issue of common control. Dkt. 921 [5/14 Hr'g Tr.] 61:20-23, 62:3-4.[13] Contrary to VLSI's position (Mot. 18-19), the License's definition of "control" does not require the controlling party to act entirely in its own self-interest. *See* DTX-1 [License] § 1.2. Instead, as VLSI's own experts have admitted, there is no inconsistency between owing fiduciary duties and Fortress controlling VLSI and Finjan LLC. *See, e.g.*, Dkt. 878-9 [Boone Dep.] 138:21-139:5. Notably, Delaware courts regularly impose a fiduciary duty precisely ***because*** an entity exercises control. For example, a minority stockholder that would otherwise be free to act entirely in its own interest "owes a fiduciary duty" if it "exercises control over the business affairs of the corporation," thereby imposing on the minority stockholder the same fiduciary duty as a majority stockholder. *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994) (quoting *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987)); *see Voigt v. Metcalf*, 2020 WL 614999, at *11 (Del. Ch. Feb. 10, 2020) ("Delaware law imposes fiduciary duties on those who effectively control a corporation."); *see also* Dkt. 883-3 [Ale Rpt.] ¶ 83; Dkt. 878 [Intel *Daubert*] 21-23.

---

[13] VLSI wrongly asserts that the Court precluded discussion of fiduciary duties because they are "legal" in nature. *See* Mot. 18. Although it also would have been improper for VLSI to raise fiduciary duties at trial because they raised legal issues, Dkt. 878 at 17-21, the Court correctly precluded them from trial on the independent basis that they are irrelevant, Dkt. 921 at 62:3-4.

VLSI's entire argument hinges on a single parenthetical in a decision that VLSI wrongly argues requires control to be exercised in every case "in such a way as to comport with the wishes or interest of the corporation (or persons) doing the controlling." *Amadeus Glob. Travel Distrib., S.A. v. Orbitz, LLC*, 302 F. Supp. 2d 329, 335-336 (D. Del. 2004) (quoting *Kaplan v. Centex Corp.*, 284 A.2d 119, 123 (Del. Ch. 1971)).  But as noted above, the License here does not define control as requiring it to be exercised in a way to comport with the controlling party's interests.  *Supra* pp. 2-3, 25.  Moreover, *Amadeus* does not stand for the proposition that an entity owing fiduciary duties to its investors cannot also exercise control over portfolio companies.  Instead, *Amadeus* merely rejected a theory that attempted to prove control by aggregating the voting powers of three distinct companies.  302 F. Supp. 2d 329 at 336-337.[14]  Contrary to VLSI's suggestion (Mot. 19), a finding of common control does not "subvert the legislative intent of the Advisers Act" or "render every portfolio company as 'under common control.'"  Instead, as noted above, VLSI's experts and Delaware courts have recognized that fiduciary duties and control can coexist.  *Supra* p. 25.

**Second**, even if the License required "control" to be exercised for the controlling party's own benefit (which it does not), Fortress's interests were aligned with its investors' interests such that it would also be acting for its own benefit.  The record showed that Fortress has an ownership interest in the funds that own VLSI and Finjan LLC, and that Fortress's investors ask it to "put money and skin in the game" so that its "interests were aligned with the other investors."  5/27 Tr. [Zur] 239:7-240:3, 247:12-248:16; 5/28 Tr. [Perryman] 472:20-473:22; *id.* [Zur] 564:25-565:10.[15]

---

[14] VLSI's reliance (Mot. 22) on *Sun Capital Partners III, LP v. New England Teamsters & Trucking Industry Pension Fund*, 943 F.3d 49 (1st Cir. 2019), is also misplaced.  That case did not involve Delaware law or the Investment Advisers Act, but instead involved a pension law's definition of "common control" for determining whether funds formed a "partnership-in-fact."

[15] The jury was not required to credit Fortress's vague, hearsay example of "refus[ing] to take direction from FIG's majority shareholder and from other funds."  Mot. 22 (emphasis omitted).  In any event, whatever the unspecified request to Eran Zur was, it reflected the understanding that Fortress generally controls portfolio companies.

***Third***, VLSI's request is too late; VLSI never moved to obtain a pre-verdict judgment based on fiduciary duties and never requested that the Court resolve the question of what fiduciary duties were owed and to whom.  *See Puga v. RCX Sols., Inc.*, 922 F.3d 285, 290 (5th Cir. 2019) (arguments cannot be raised for the first time in a post-trial Rule 50(b) motion).  Under VLSI's theory, VLSI needs to at least show that Fortress (1) owed such duties and (2) did not breach them.  But even now, VLSI fails to explain why Fortress employees on VLSI's board owe fiduciary duties that are not waived based on the VLSI LLC agreement.  *See* DTX-2 [VLSI Second Amended LLC Agreement] 23 (§ 4.5); Del. Code Ann. tit. 6, § 18-1101.  Although VLSI asserts that any "contract provision" that is "inconsistent with" the Investment Advisers Act "is preempted and void," it does not develop that argument and cites only to a single regulation indicating that certain waivers "would be inconsistent with"—but not necessarily preempted by—the Act.  Mot. 20 (citing 84 Fed. Reg. at 33,672).  Moreover, to the extent that Fortress employees on VLSI's and Finjan LLC's boards owe fiduciary duties under the Investment Advisers Act, it is only because they are serving in their capacity as ***Fortress*** employees, as opposed to as independent board members.

### 3.  The Court should reject VLSI's "actual exercise" of "control" arguments.

The License defines "control" to mean "the possession, direct or indirect, of the power to direct the management and policies of a Person, whether through the ownership of any percentage of voting interests of such Person, through contract or otherwise."  DTX-1 [License] § 1.2.  Instead of analyzing whether Fortress possesses "the ***power*** to direct the management and policies of a Person," *id.* (emphasis added), VLSI attempts to redefine "control" based on extrinsic sources.  But "where the parties define the words or terms which they intend to use, the contract will be interpreted according to such definitions if free from ambiguity."  *Radio Corp. of Am. v. Philadelphia Storage Battery Co.*, 6 A.2d 329, 334 (Del. 1939); *see VLSI*, 2023 WL 9052312, at *10 (rejecting VLSI's attempts to rely "on authorities outside the contract for the meaning of

control" and applying the plain meaning of "control" as defined by the License).

VLSI principally relies on an unpublished Superior Court of Delaware case to argue that the License's "definition of 'control' should be interpreted in view of the related Delaware caselaw." Mot. 24-25 (citing *P&TI Acq. Co., Inc. v. Morgenthaler Partners VII, LP*, 2019 WL 2070449, at *4-7 (Del. Super. Ct. May 9, 2019)). But in *P&TI*, the parties **agreed** to apply the meaning of control Delaware courts apply when deciding whether a corporation has a controlling stockholder. 2019 WL 2070449, at *1, *4. VLSI also cites *Amadeus* for its statement that Delaware law "require[s] that control be actual," Mot. 24, but that case merely rejected the argument that multiple distinct companies could aggregate ownership of shares to demonstrate control. 302 F. Supp. 2d at 336-337. And VLSI's other cited cases (Mot. 25-26) did not involve agreements that defined "control." *See Vivint Solar, Inc. v. Lundberg*, 2024 WL 2755380, at *17 (Del. Ch. May 30, 2024); *Voigt v. Metcalf*, 2020 WL 614999, at *12-13 (Del. Ch. Feb. 10, 2020).

In any event, Intel **has** shown that Fortress actually exercised control over both VLSI and Finjan LLC. *Supra* pp. 18-23. VLSI's cited cases in fact support this conclusion. For example, in *Voigt v. Metcalf*, the Delaware Chancery Court explained that "[a]n obvious source of influence that can lead to an inference of actual control is existence of relationships between the alleged controller and members of a company's board of directors" and "the ability of an alleged controller to designate directors … is an indication of control." 2020 WL 614999, at *13-14.[16] Here, as

---

[16] VLSI's other cases do not undermine that conclusion. *See VLSI*, 2023 WL 9052312, at *10. Although a party **argued** in *Partners Healthcare Sols. Holdings, L.P. v. Universal Am. Corp.* that a director cannot be controlled by a single shareholder, the court did not expressly adopt that argument; it found only that mere appointment of a single board member—with nothing more— does not establish control. 2015 WL 3794535, at *7, *9 (Del. Ch. June 17, 2015). *Klaassen v. Allegro Dev. Corp.* similarly observed only that under general corporate-law principles, majority ownership does not itself establish control—but went on to recognize that the "unique features of an entity-specific … agreement" can establish control where it effectively gives one entity "a right … to **control the board**." 2013 WL 5967028, at *12 (Del. Ch. Nov. 7, 2013) (emphasis added).

noted above, Fortress exercised actual control over VLSI and Finjan LLC by controlling their boards. *Supra* pp. 19-20, 22. The record here also went far beyond board control. Fortress also exercised actual control over VLSI and Finjan LLC by controlling their finances. *Supra* pp. 20-21, 22-23. Moreover, Fortress created VLSI, a Fortress-controlled entity acquired Finjan Holdings, Fortress represented to the SEC that it controlled Finjan Holdings' parent Goldfish Holdings, and Fortress stated in internal documents that it controlled VLSI. *Supra* pp. 19, 21-22. Mr. Zur testified that in his capacity as the head of intellectual property for Fortress, he was "actually managing VLSI." 5/27 Tr. [Zur] 157:17-158:6. And the record included examples where Fortress in fact caused VLSI to take certain actions. 5/28 Tr. [Stolarski] 400:3-10; DTX-132 [11/16/16 Shah Email]. Any reasonable jury would credit this overwhelming evidence that Fortress actually exercised control over both VLSI and Finjan LLC.

### 4. The Court should reject VLSI's arguments about the jury verdict addressing the wrong time period.

VLSI waived any complaint regarding the time period for the verdict form because VLSI itself proposed a verdict form that, like the final verdict form, would have asked the jury about control "on or after November 20, 2012." *See* Ex. 1; Ex. 2 at 3; Dkt. 949-1 at 3; *McCaig v. Wells Fargo Bank (Texas), N.A.*, 788 F.3d 463, 476 (5th Cir. 2015) ("A party cannot complain on appeal of errors which he himself induced the district court to commit." (quoting *United States v. Lopez-Escobar*, 920 F.2d 1241, 1246 (5th Cir. 1991))). Moreover, VLSI did not raise this objection to the Court before the jury's verdict and instead lodged a general objection to the final jury instructions and verdict form "for all of the reasons that [VLSI] stated on the record relating to Delaware case law," which only addressed VLSI's misguided arguments regarding the definition of control. 5/29 Tr. 649:21-650:15; *see Russell v. Plano Bank & Trust*, 130 F.3d 715, 719-720 (5th Cir. 1997); *Polara Eng'g Inc. v. Campbell Co.*, 894 F.3d 1339, 1354-1355 (Fed. Cir. 2018).

In any event, the Court's verdict form correctly followed the language of the License by asking the jury whether there was common control "at any point after November 20, 2012." The License defines "Affiliates" to mean "any Person that, **now [i.e., November 20, 2012] or hereafter**, directly or indirectly through one or more entities, controls or is controlled by, or is under common control with, such specified Person." DTX-1 [License] § 1.2 (emphasis added).

VLSI's argument that it is **factually** impossible for Fortress to have controlled VLSI and Finjan LLC before the Finjan acquisition is not a basis for JMOL. The Court "must assume that the jury considered all the evidence in reaching its decision," and rested its decision on the ground with sufficient factual support. *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 126 (5th Cir. 1992); *see also WickFire, LLC v. Woodruff*, 989 F.3d 343, 359 (5th Cir. 2012) (same); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849-50 (Fed. Cir. 2010) (same). The only theory Intel presented at trial, and the theory on which the jury necessarily based its verdict, was that VLSI and Finjan LLC were under Fortress's common control after Fortress acquired control of Finjan LLC in July 2020. *Supra* pp. 18-24. Indeed, VLSI's counsel emphasized during closing arguments that "before July of 2020, no one can construct any kind of argument, no matter how creative as a lawyer that they might be, that there was common control or that somehow VLSI is an affiliate of Finjan," and that it was "only by July 2020 … that Intel says, okay, we've got an argument." 5/29 Tr. [VLSI Closing] 705:4-13. The evidence established that "in the nine years that VLSI has existed" and "in the five years since the Finjan acquisition, Fortress Investment Group has had the power to direct management and policies at each of the two companies." 5/28 Tr. [Zur] 558:13-22.

## IV.    CONCLUSION

For the foregoing reasons, Intel respectfully requests that the Court deny VLSI's motion.

Dated: July 18, 2025

Respectfully submitted,

/s/ *Joseph J. Mueller*

Mary V. Sooter (*Pro Hac Vice*)
WILMER CUTLER PICKERING
  HALE & DORR LLP
1225 17th Street
Suite 2600
Denver, Colorado 80202
Tel: (720) 274-3135
Email: mindy.sooter@wilmerhale.com

Thomas G. Saunders (*Pro Hac Vice*)
Joshua L. Stern (*Pro Hac Vice*)
Steven J. Horn (*Pro Hac Vice*)
WILMER CUTLER PICKERING
  HALE & DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel: (202) 663-6000
Email: thomas.saunders@wilmerhale.com
Email:  joshua.stern@wilmerhale.com
Email: steven.horn@wilmerhale.com

William F. Lee (*Pro Hac Vice*)
Joseph J. Mueller (*Pro Hac Vice*)
Louis W. Tompros (*Pro Hac Vice*)
Kate Saxton (*Pro Hac Vice*)
WILMER CUTLER PICKERING
  HALE & DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Email: william.lee@wilmerhale.com
Email: joseph.mueller@wilmerhale.com
Email: louis.tompros@wilmerhale.com
Email: kate.saxton@wilmerhale.com

Harry Lee Gillam, Jr.
Texas State Bar No. 07921800
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas 75670
Tel: (903) 934-8450
Email: gil@gillamsmithlaw.com

*Attorneys for Intel Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel are being served with a copy of the foregoing document via electronic mail on July 18, 2025.

/s/ *Joseph J. Mueller*

Joseph J. Mueller (*Pro Hac Vice*)
WILMER CUTLER PICKERING HALE
  & DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Email: joseph.mueller@wilmerhale.com