# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

VLSI TECHNOLOGY LLC,

        Plaintiff,

   v.

INTEL CORPORATION,

        Defendant.

Civil Action No. 1:19-cv-00977-ADA
**PUBLIC VERSION**

███████████████████

## DEFENDANT INTEL CORPORATION'S RESPONSE TO
## PLAINTIFF VLSI TECHNOLOGY LLC'S  PROPOSED FINDINGS OF FACT AND
## CONCLUSIONS OF LAW REGARDING INTEL'S LICENSE DEFENSE

i

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................... 1

II.   UNDISPUTED PROCEDURAL BACKGROUND.................................... 1

III.  UNDISPUTED PROVISIONS FROM FINJAN LICENSE ............................ 4

IV.   UNDISPUTED FACTS REGARDING THE PATENT PURCHASE AND
      COOPERATION AGREEMENT.......................................................... 5

V.    SUBSTANTIAL EVIDENCE SUPPORTING THE JURY'S VERDICT ...................... 6

      A.    Fortress Investment Group.................................................... 6
      B.    Fortress Has Controlled VLSI Since VLSI's Creation In 2016............................ 6
            1.    Fortress created VLSI in 2016. ............................................ 6
            2.    Since VLSI's creation, Fortress has always controlled VLSI.................... 8

      C.    Fortress Has Controlled Finjan LLC (Formerly Known As Finjan, Inc.) Since The
            Finjan Acquisition In July 2020............................................... 16
            1.    Fortress-controlled Goldfish Holdings acquires Finjan Holdings, Inc. and
                  its wholly-owned subsidiary Finjan, Inc. ................................. 16
            2.    Since the acquisition, Fortress has controlled Finjan LLC (formerly known
                  as Finjan, Inc.) in multiple ways. ..................................... 17

VI.   CONCLUSIONS OF LAW ................................................................ 24

      A.    Intel Is Licensed To U.S. Patent No. 7,606,983 (The "Asserted Patent") Under
            The Unambiguous Terms Of The License.......................................... 24
      B.    VLSI Is Bound By The License Under Delaware Law. ............................... 25
      C.    Federal Law Poses No Bar To The License Binding VLSI............................ 31
      D.    VLSI's Patents Fall Under The Definition Of "Finjan's Patents."...................... 32

VII.  CONCLUSION ......................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraxis Bioscience, Inc. v. Navinta LLC,*
  625 F.3d 1359 (Fed. Cir. 2010)................................................................32

*Airborne Health, Inc. v. Squid Soap, LP,*
  984 A.2d 126 (Del. Ch. 2009)................................................................35

*American International Group v. Bank of America Corp.,*
  712 F.3d 775 (2d Cir. 2013)................................................................36

*Arcadia Biosciences, Inc. v. Vlimorin & Cie,*
  356 F. Supp. 3d 379 (S.D.N.Y. 2019)................................................................30

*Aronson v. Quick Point Pencil Co.,*
  440 U.S. 257 (1979)................................................................31

*In re CFLC, Inc.,*
  89 F.3d 673 (9th Cir. 1996) ................................................................32

*Control Laser Corp. v. Smith,*
  705 F. Supp. 3d 1006 (N.D. Cal. 2023) ................................................................32

*CSH Theatres, L.L.C. v. Nederlander of San Francisco Associates,*
  No. 9380-VCMR, 2018 WL 3646817 (Del. Ch. July 31, 2018) ...........................27

*E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates S.A.S.,*
  269 F.3d 187 (3d Cir. 2001)................................................................30

*Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.,*
  940 F.3d 1372 (Fed. Cir. 2019)................................................................32

*International Nutrition Co. v. Horphag Research Ltd.,*
  257 F.3d 1324 (Fed. Cir. 2001)................................................................31

*Kuroda v. SPJS Holdings, L.L.C.,*
  No. 4030-CC, 2010 WL 4880659 (Del. Ch. Nov. 30, 2010)................................30

*Lockhart v. United States,*
  577 U.S. 347 (2016)................................................................36

*Medicalgorithmics S.A. v. AMI Monitoring, Inc.,*
  No. 10948-CB, 2016 WL 4401038 (Del. Ch. Aug. 18, 2016)................................25

*MicroStrategy, Inc. v. Acacia Research Corp.*,
No. 5735-VCP, 2010 WL 5550455 (Del. Ch. Dec. 30, 2010)..........................................24, 25

*Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*,
284 F.3d 1323 (Fed. Cir. 2002).........................................................................................31, 32

*Sheehan v. Assured Partners, Inc.*
No. 2019-0333-AML, 2020 WL 2838575 (Del. Ch. May 29, 2020) ......................................30

*In re Shorenstein Hays-Nederlander Theatres LLC Appeals*,
213 A.3d 39 (Del. 2019) ................................................................................................. *passim*

*T-Rex Property AB v. Regal Entertainment Group*,
No. 6:16-cv-927-JDK, 2019 WL 5558061 (E.D. Tex. Oct. 29, 2019) ....................................34

*Truinject Corp. v. Nestle Skin Health, S.A.*,
No. 19-592-LPS, 2020 WL 70981 (D. Del. Jan. 7, 2020) ......................................................30

*VLSI Technology LLC v. Intel Corp.*,
No. 6:21-cv-57-ADA, 2022 WL 1261322 (W.D. Tex. Mar. 18, 2022)......................................1

*VLSI Technology LLC v. Intel Corp.*,
No. 17-cv-05671-BLF, 2023 WL 9052312 (N.D. Cal. Dec. 20, 2023)......................... *passim*

*VLSI Technology LLC v. Intel Corp.*,
No. 17-cv-05671-BLF, 2024 WL 269163 (N.D. Cal. Jan. 24, 2024) .......................................3

*VLSI Technology LLC v. Intel Corp.*,
87 F.4th 1332 (Fed. Cir. 2023) ..........................................................................................1, 2

*Wenske v. Blue Bell Creameries, Inc.*,
No. 2017-0699-JRS, 2018 WL 5994971 (Del. Ch. Nov. 13, 2018) .......................................30

*You Map, Inc. v. Snap Inc.*,
No. 20-00162-CFC, 2021 WL 106498 (D. Del. Jan. 12, 2021)..............................................30

**Statutes**

35 U.S.C. § 261.....................................................................................................................32

**Other Authorities**

*Acquisitions and IP Licenses:  Looking Out for Poison Pill Affiliate*
249 N.Y.L.J. 2 (2013) ...........................................................................................................29

## I.    __INTRODUCTION__

Defendant Intel Corp. ("Intel") submits the following Response to Plaintiff VLSI Technology LLC's ("VLSI") Proposed Findings of Fact and Conclusions of Law Regarding Intel's License Defense, Dkt. 967.  As Intel has explained in the accompanying motion to strike, there is no legal basis for VLSI's proposed findings of fact and conclusions of law, and it contravenes both the parties' negotiated stipulation and established prior practice.  Therefore, VLSI's filing—and the more than 40 references to the filing in VLSI's Rule 50(b) motion—should be struck from the record.  To the extent that the Court finds it appropriate to consider VLSI's submission, Intel disputes VLSI's proposed findings of fact and conclusions of law and respectfully requests that the Court consider Intel's Response to VLSI's Proposed Findings of Fact and Conclusions of Law.

## II.    __UNDISPUTED PROCEDURAL BACKGROUND__

FF1.    Intel first moved to add its license defense in *VLSI Technology LLC v. Intel Corp.*, No. 6:21-cv-57 (W.D. Tex.) ("*VLSI I*") on November 10, 2020.  Dkt. 348-2.

FF2.    Intel moved to add its license defense in this case on February 2, 2021.  Dkt. 425-1.

FF3.    This Court denied Intel's motion to amend in *VLSI I* on March 18, 2022, finding that (1) Intel's motion was untimely, and (2) Intel's motion was futile because VLSI did not sign the License.  *VLSI Tech. LLC v. Intel Corp.*, 2022 WL 1261322, at *2-3 (W.D. Tex. Mar. 18, 2022).  This Court then also denied Intel's motion to amend in this case on November 7, 2022. Dkt. 651 at 2.

FF4.    On December 4, 2023, the Federal Circuit reversed this Court's denial of Intel's motion to amend in *VLSI I.  See VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1350 (Fed. Cir. 2023).  The Federal Circuit held that there was no undue delay in the filing of Intel's motion and found that this Court's conclusion that Intel's defense was futile was "wrong as a matter of law."

*Id*. at 1350-51.   The Federal Circuit explained that the governing law requires "additional litigation" of the defense, with a "fuller analysis of the governing law that has yet occurred, or more fact-based litigation." *Id*. at 1351.

FF5.    After the Federal Circuit's decision, the Northern District of California's decision on the parties' cross motions for summary judgment addressed various legal questions now before this Court. *See VLSI Tech. LLC v. Intel Corp*., 2023 WL 9052312 (N.D. Cal. Dec. 20, 2023).

FF6.    The California court concluded that: (1) "under Delaware law in certain circumstances, a nonsignatory created after a contract is signed can still be bound by the contract"; (2) "non-signatory entities meeting the definition of 'Affiliates' (as defined by the [Patent] License Agreement) of the Finjan Parties can be bound by the agreement, including later acquired or formed 'Affiliates'"; (3) should a fact finder find that Fortress controls Finjan LLC, then "any entities controlled by Fortress are bound [by the] Finjan License Agreement"; and (4) "patents belonging to Affiliates of Finjan, as defined by the Finjan License Agreement, are subject to the license to Intel described therein." *Id*. at *5, *6, *8, *11.

FF7.    Thus, the California court concluded that "under Delaware law, Intel's license defense may prevail if it can prove to a jury that Fortress and VLSI are 'Affiliates' of Finjan [LLC] under the terms of the Finjan License Agreement." *Id*. at *11.   In other words, Intel's "license defense may succeed if Intel proves that VLSI and Finjan [LLC] are under common control of Fortress." *Id*. at *9.

FF8.    Like this Court, the California court concluded that "[w]hether VLSI and the Finjan Parties are under common control by Fortress" such that they are "Affiliates" under the terms of the License "is an issue of fact" that "a jury must resolve." *Id*. at *10.   But before a jury could resolve this issue in California, VLSI unilaterally granted Intel a covenant not to enforce the only

two patents remaining for trial, and the California court found that this covenant mooted Intel's affirmative license defense. *See VLSI Tech. LLC v. Intel Corp.*, 2024 WL 269163, at *5 (N.D. Cal. Jan. 24, 2024).

FF9.    After the Federal Circuit's mandate issued in *VLSI I*, Intel filed an unopposed motion to add its license defense in this case. Dkt. 827.

FF10.   This Court granted Intel's motion, Dkt. 829, and Intel added the license defense on April 17, 2024, Dkt. 830.

FF11.   On February 21, 2025, the parties filed cross motions for summary judgment on Intel's license defense. Dkts. 872, 873.

FF12.   The Court denied the parties' motions for summary judgment on April 10, 2025. Dkt. 905. This Court explained that "[w]hether Intel is licensed to the asserted patent under the Finjan License has underlying factual issues (*i.e.*, whether Finjan and VLSI are under common control of Fortress) but is ultimately a question of law for the judge that is to be determined by the court, either on a pretrial motion for summary judgment or on a motion for judgment as a matter of law at the close of the evidence and after the jury verdict." *Id.* at 2.

FF13.   This Court explained that "[h]aving considered the parties' briefing and oral arguments at the summary judgment stage, the Court is of the opinion that the better course would be to proceed to trial on the issue of common control." *Id.*

FF14.   From May 27-29, 2025, this Court held a jury trial on the issue of common control.

FF15.   On May 29, 2025, a jury returned a verdict in Intel's favor, finding that Intel had "prove[d] by a preponderance of the evidence that, at any point after November 20, 2012, Fortress Investment Group controlled both VLSI Technology LLC and Finjan LLC (formerly known as Finjan, Inc.)." Dkt. 959 [Verdict] 1.

III.    **UNDISPUTED PROVISIONS FROM FINJAN LICENSE**

FF16.   On November 20, 2012, Finjan Software, Inc. and Finjan, Inc. (together, the "Finjan Parties"), "each signing on their own behalf and on behalf of their respective Affiliates," granted to Intel a "perpetual, irrevocable license" to "Finjan's Patents."   DTX-1 [License] §§ 3.1, Preamble.

FF17.   "Finjan's Patents" is defined to include "all Patent Rights that are owned or controlled at any time on or after November 6, 2012 by Finjan or to which Finjan has the right to grant licenses and that have a first effective filing date or priority date during the Capture Period ██████████████████████████████████████████████████ ████████████████   without the requirement to pay consideration ███████████████████ ██████████████████████████████████████████   DTX-1 [License] § 1.10.

FF18.   "Finjan" is defined by the License to include the Finjan Parties and their "Affiliates."   DTX-1 [License] Preamble.

FF19.   "Affiliates" is defined to include "any Person that, ***now or hereafter***, directly or indirectly through one or more entities, controls or is controlled by, or ***is under common control*** with" a specified Person.   DTX-1 [License] § 1.2 (emphases added).

FF20.   "Control" is defined to "mean[] the possession, direct or indirect, of the power to direct the management and polices of a Person, whether through the ownership of any percentage of voting interests of such Person, through contract or otherwise."   DTX-1 [License] § 1.2.

FF21.   The plain language of the License therefore extends the license to patents owned by "Affiliates" of the Finjan Parties, including entities that "now or hereafter" are "under common control" with the Finjan Parties.

FF22.   In exchange for the "perpetual, irrevocable license" to "Finjan's Patents," Intel agreed to pay the Finjan Parties ██████████   and gave the Finjan Parties and their Affiliates a

release and an ongoing " ███████████████████████████████

██████████████████████    DTX-1 [License] §§ 2.1, 2.5, 5.2.

## IV.    UNDISPUTED FACTS REGARDING THE PATENT PURCHASE AND COOPERATION AGREEMENT

FF23.  VLSI purchased its patent portfolio from NXP Semiconductors ("NXP") through the Patent Purchase and Cooperation Agreement ("PPCA").

FF24.  The PPCA includes a general profit-sharing arrangement between VLSI and NXP that is based on VLSI's "aggregate amount of Gross Revenues," if any, derived from the entire patent portfolio purchased from NXP.  DTX-48 [PPCA] § 7.3 ("Allocation of Profits"), § 1.1(t) (defining "Gross Revenues"), § 1.1(bb) (defining "Net Profits"); Dkt. 872-39 [PPCA Amendment No. 1] § (o).  NXP is entitled to a profit share of those Gross Revenues only if there are any profits left after VLSI first recoups its "fees, costs, expenses, and taxes paid or incurred by [VLSI] or invoiced to [VLSI] (including formation costs, transaction fees, operational costs, contingent fees, revenue sharing and management incentives) and net of all reasonable reserves for on-going operations."  DTX-48 [PPCA] §§ 1.1(bb), 1.1(t), 7.3; Dkt. 872-39 [PPCA Amendment No. 1] § (o).

FF25.  The PPCA provides that VLSI "██████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████."  DTX-48 [PPCA] § 7.4.

FF26.  The PPCA further provides that VLSI "██████████████████

██████████████."  DTX-48 [PPCA] § 7.4.

FF27.   NXP has not received any payment under Section 7.3 of the PPCA to date because VLSI has yet to generate any revenue.  Dkt. 872-43 [Lowenstein Dep. Ex. 8]; *see* Dkt. 883-8 [Lowenstein Dep.] 161:4-11.

FF28.   In multiple suits involving patents that VLSI acquired from NXP through the PPCA, Intel and VLSI have filed public stipulations of dismissal that indicate that VLSI has granted Intel covenants not to sue, and dismissed its claims against Intel with prejudice, for no payment. Dkt. 872-40 [*VLSI Tech.*, No. 17-cv-5671, Dkt. 801 (N.D. Cal. Jan. 16, 2024)] 1 ("[N]either party is paying any amount to the other party."); Dkt. 872-41 [*VLSI Tech.*, No. 17-cv-5671, Dkt. 459 (N.D. Cal. Apr. 18, 2023)] A-2 (same); Dkt. 872-42 [*VLSI Tech. LLC v. Intel Corp.*, No. 18-cv-966, Dkt. 998 (D. Del. Dec. 27, 2022)] 2 (same).

## V.     SUBSTANTIAL EVIDENCE SUPPORTING THE JURY'S VERDICT

### A.     Fortress Investment Group

FF29.   Fortress Investment Group ("Fortress") is a New York investment management company that focuses on making "control-oriented" private equity investments.  5/27/25 Tr. [Hille] 101:11-21, 102:7-107:19; *id.* [Zur] 158:13-16, 159:7-11, 164:7-166:3, 245:16-19; 5/28/25 Tr. [Goodwin] 517:1-518:6; DTX-161; DTX-162; DTX-278.

FF30.   Fortress's office is located at 1345 Avenue of the Americas, 46th Floor, New York, New York 10105. 5/27/25 Tr. [Zur] 161:25-163:4; DTX-309.

### B.     Fortress Has Controlled VLSI Since VLSI's Creation In 2016.

#### 1.     Fortress created VLSI in 2016.

FF31.   In 2016, Fortress created VLSI to acquire patents from NXP Semiconductors N.V. ("NXP").  DTX-45 [VLSI Marking Rpt.] 3 ("Fortress created VLSI … in order to acquire a base portfolio of 20 patent families[.]"); *id.* at 5 ("Fortress formed VLSI … to acquire a set of patents … from NXP."); 5/27/25 Tr. [Zur] 166:12-13, 170:4-9, 181:8-11; *id.* [Slan] 251:21-253:13, 253:23-

254:7; *id.* [Shah] 260:25-261:3, 261:19-21, 262:7-14, 273:19-21; 5/28/25 Tr. [Zur] 531:11-12, 566:22-567:8; *id.* [Perryman] 446:4-446:8.

FF32.  Fortress created VLSI three days before entering into an agreement to purchase the patents from NXP.  *See* DTX-2 [VLSI's Second Amended LLC Agreement] §1.1; DTX-48 [Patent Purchase and Cooperation Agreement, June 30, 2016] at Preamble.

FF33.  Fortress led the negotiations to purchase patents from NXP.  5/27/25 Tr. [Slan] 251:21-254:7.  The Fortress employees involved in the negotiations with NXP were Aaron Slan, Ami Patel Shah, and Eran Zur.  5/27/25 Tr. [Slan] 252:25-253:13.

FF34.  A Fortress employee signed the Patent Purchase and Cooperation Agreement with NXP on behalf of VLSI.  DTX-48 [PPCA] 33-35; 5/27/25 Tr. [Shah] 283:10-286:4; DTX-310.

FF35.  A Fortress employee signed VLSI parent CF VLSI Holdings' LLC Agreement on behalf of the Fortress funds that own CF VLSI Holdings.  DTX-70 [CF VLSI Holdings LLC Agreement] 6-8; 5/27/25 Tr. [Zur] 174:20-177:19, 243:5-11; DTX-310.  All the initial officers of CF VLSI Holdings were Fortress employees.  DTX-70 [CF VLSI Holdings Agreement] 10; 5/27/25 Tr. [Zur] 179:11-180:3; 5/28/25 Tr. [James] 416:2-15.  The address of CF VLSI Holdings is Fortress's address: 1345 Avenue of the Americas, 46th Floor, New York, New York.  DTX-70 [CF VLSI Holdings LLC Agreement] 1; 5/27/25 Tr. [Zur] 172:17-173:1.  Each of the ten Fortress funds that own CF VLSI Holdings also list their address as Fortress's address:  1345 Avenue of the Americas, 46th Floor, New York, New York.  DTX-70 [CF VLSI Holdings LLC Agreement] 9; 5/27/25 Tr. [Zur] 177:20-178:7.

FF36.  A Fortress employee signed VLSI's LLC agreement.  DTX-2 [VLSI's Second Amended LLC Agreement] 45.  VLSI has also "used the addresses of Fortress Investment Group,"

1345 Avenue of the Americas, 46th Floor, New York, New York. 5/27/25 [Stolarski] Tr. 393:07-20.

FF37. Fortress has an ownership interest in the funds that own VLSI, and Fortress's investors ask it to "put money and skin in the game" so that its "interests were aligned with the other investors." 5/27/25 Tr. [Zur] 239:7-240:3, 247:12-248:16; 5/28/25 Tr. [Perryman] 472:20-473:22; *id*. [Zur] 564:25-565:10.

### 2.     Since VLSI's creation, Fortress has always controlled VLSI.

FF38. Since VLSI's creation, Fortress has controlled VLSI in multiple ways, including through (1) Fortress having the power to appoint and remove VLSI's board members; (2) Fortress employees, who are paid by Fortress and not VLSI, constituting a majority of VLSI's board; and (3) Fortress exercising ultimate approval over funding and spending for VLSI. Dkt. 959 [Verdict]; 5/27/25 Tr. [Zur] 154:4-12, 155:16-156:10, 157:15-158:6, 179:15-180:3, 183:16-184:17, 186:10-12, 186:17-190:18, 191:19-193:20, 194:11-14, 213:15-17, 214:5-21, 240:11-17, 241:14-242:13, 246:10-17; *id.* [Slan] 254:8-17, 254:22-255:4, 255:19-256:6, 256:12-20, 257:11-258:10; *id.* [Shah] 262:19-25, 268:17-22, 269:18-22, 286:19-288:5; *id.* [Ale] 134:7-13, 135:16-23, 141:7-11, 142:8-20, 143:9-144:19, 145:18-25; 5/28/25 Tr. [Stolarski] 389:14-390:4, 390:17-22, 392:12-19, 394:3-14, 395:24-396:3, 398:7-20, 401:4-401:19; *id.* [Brogden] 362:2-10, 363:22-364:4, 365:8-10, 365:11-366:1, 366:7-367:4, 367:17-368:8; *id.* [James] 416:2-15; *id.* [Perryman] 444:24-452:2, 478:7-482:11; *id.* [Zur] 558:13-22, 558:24-563:17, 564:1-564:20, 567:9-23, 571:3-572:7; 5/29/25 Tr. [Zur] 639:13-641:14, 642:10-643:9, 644:1-15; DTX-2 [VLSI's Second Amended LLC Agreement] §§ 4.1, 4.2, 4.3; DTX-7 [8/17/16 Furstein Email]; DTX-11 [3/31/20 Brogden Email]; DTX-12 [2/20/20 Brogden Email]; DTX-13 [7/7/20 Quish Email]; DTX-14 [6/2/20 Quish Email]; DTX-16 [1/17/18 Brogden Email]; DTX-17 [1/26/18 Moreland Email]; DTX-45 [VLSI Marking Rpt.] 5; DTX-46 [1/26/18 Moreland Email] 3; DTX-70 [CF VLSI Holdings LLC Agreement];

DTX-217 [FCO MA MI LP Agreement] 8, 12, 16, 50 (§ 6.1(a)), 51 (§ 6.1(d)(i)), 53 (§ 6.1(e));

DDX5.11-5.13; DDX5.16; DDX6.3; DDX6.6.

FF39.  In an internal Fortress document, Fortress stated that "Fortress controls [VLSI]."

DTX-45 [VLSI Marking Rpt.] at 5 ("…Fortress controls the company…"); *id.* (describing

Fortress's "full control over and management of the patent monetization process"); 5/28/25 Tr.

[Zur.] 567:9-23.

FF40.  Fortress employee and VLSI board member Mr. Zur, who at one time was on both

the VLSI and Finjan LLC boards, testified that "in the nine years that VLSI has existed … Fortress

Investment Group has had the power to direct the management and policies at" VLSI.  5/28/25 Tr.

[Zur] 558:13-22; 5/27/25 Tr. [Zur] 214:5-21.  Indeed, Mr. Zur explained that, in his capacity as

the head of intellectual property for Fortress, he has "the power to direct management and policies

of VLSI," and that he was "actually managing VLSI."  5/27/25 Tr. [Zur] 157:17-158:6, 246:14-

17.

### a.  Fortress has controlled VLSI by controlling VLSI's board, which is the ultimate decisionmaker for VLSI.

### (i)  Fortress has controlled VLSI's board by having the power to appoint and remove VLSI's board members.

FF41.  Fortress has always had the power to appoint and remove board members for VLSI.

5/27/25 Tr. [Zur] 183:16-184:17, 186:10-12, 191:19-192:5, 241:14-242:7; *id.* [Slan] 256:16-20;

DTX-2 [VLSI's Second Amended LLC Agreement] 22 (§ 4.2(b)); DDX6.6.

FF42.  VLSI's Second Amended LLC Agreement, which is the governing document for

VLSI, provides that "[t]he Fortress Member shall appoint each of the members of the Board."

DTX-2 [Second Amended VLSI Tech. LLC Agreement] § 4.2(b).

FF43.  VLSI's Second Amended LLC Agreement also provides that "[t]he removal from

the Board (with or without cause) of any Manager shall occur and shall only be permitted upon

the written request of the Fortress Members."   DTX-2 [Second Amended VLSI Tech. LLC Agreement] § 4.2(c).

FF44.   Former Fortress employee and former VLSI board member Aaron Slan testified that "Fortress through VLSI holdings can assign board members and ultimately it is those board members that control the company."  5/27/25 Tr. [Slan] 256:16-20.

FF45.   Fortress employee and VLSI board member Eran Zur testified that it is his "decision which individuals are going to be Board members of VLSI" and that he appointed VLSI's board members, including himself.  5/27/25 Tr. [Zur] 184:5-9, 186:2-12.

> **(ii)     Fortress has controlled VLSI's board through Fortress employees, who are paid by Fortress and not VLSI, constituting a majority of VLSI's board.**

FF46.  Full-time Fortress employees, who are compensated by Fortress, have always constituted a majority of VLSI's board, and the Fortress-controlled majority has always had the power to act on behalf of VLSI.  5/27/25 Tr. [Zur] 188:19-189:16, 192:6-11, 192:23-193:1, 194:11-14, 214:12-16, 242:8-13, 244:14-245:5; *id.* [Slan] 254:22-255:4; *id.* [Shah] 269:18-22, 286:20-25; 5/28/25 Tr. [Bain] 327:15-328:11, 359:25-360:2; *id.* [Stolarski] 389:14-390:4; DTX-2 [VLSI's Second Amended LLC Agreement] 23 (§ 4.3(b)), 50 (Ex. D); DDX6.3; DDX6.6.

FF47.   Eran Zur agreed that there are "thousands upon thousands of people who are qualified to sit on the board of VLSI," who have "never worked a day at Fortress" but "he chose" Fortress employees for the majority of VLSI's board.  5/27/25 Tr. [Zur] 244:18-245:5.

FF48.   The Fortress employees on VLSI's board are compensated by Fortress, not VLSI. 5/27/25 Tr. [Shah] 286:20-25.

FF49.  The VLSI board originally was composed of the three Fortress employees— Mr. Zur, Ms. Shah, Mr. Slan—and the individual they selected to serve as its first CEO, Mr.

Stolarski.  DTX-2 [VLSI's Second Amended LLC Agreement] 50 (Ex. D); 5/27/25 Tr. [Shah] 287:1-14; 5/28/25 Tr. [Zur] 571:3-19.

FF50.  When Mr. Slan ceased his employment at Fortress, Fortress "took him off the board" of VLSI.  5/28/25 Tr. [Zur] 571:20-572:3.

FF51.  Since Mr. Slan's departure from Fortress, the VLSI board has had only three members: Mr. Zur and Ms. Shah, both from Fortress, and Mr. Stolarski.  5/28/25 Tr. [Zur] 572:4-572:7; *id.* [Stolarski] 389:14-18; 5/27/25 Tr. [Shah] 262:19-25.

### (iii) The Fortress-controlled board is the ultimate decision-maker for VLSI.

FF52.  The Fortress-controlled board is the ultimate decisionmaker for VLSI that makes decisions regarding everything of importance to the company.  DTX-2 [VLSI's Second Amended LLC Agreement] 22 (§ 4.1); 5/27/25 Tr. [Zur] 184:18-188:18, 189:17-190:18; *id.* [Slan] 255:19-256:6; *id.* [Hille] 99:2-100:10; *id.* [Ale] 140:11-147:7; 5/28/25 Tr. [Stolarski] 389:10-13; *id.* [Bain] 328:12-330:22, 335:9-23, 336:16-337:19, 359:16-24.

FF53.  Former VLSI CEO Michael Stolarski testified that "[t]he board of directors is the ultimate decision-maker at VLSI."  5/28/25 Tr. [Stolarski] 389:10-13.

FF54.  Former Fortress employee and VLSI board member Aaron Slan testified that the VLSI board "ma[de] decisions regarding anything that was important to the company."  5/27/25 Tr. [Slan] 255:19-24.

FF55.  Fortress employee and VLSI board member Eran Zur agreed that "[u]nder the governing documents, the power to direct the management and policies of VLSI Technologies resides in the board" and that the Board "has the ultimate authority over decision-making."  5/27/25 Tr. [Zur] 184:18-188:18, 189:17-190:18.

FF56.  VLSI's governing document provides that, for VLSI's board to act, a majority vote of the total board members is necessary.    DTX-2 [VLSI's Second Amended LLC Agreement] 23 (§ 4.3(b)); 5/27/25 [Zur] Tr. 189:5-15; *see id.* [Ale] 141:21-142:20.

FF57.  VLSI's governing document provides that "[t]he business and affairs of the company shall be managed under the direction of[] the Board."  DTX-2 [VLSI's Second Amended LLC Agreement] 22 (§ 4.1(i)); 5/27/25 Tr. [Zur] 186:17-187:12.

FF58.  VLSI's governing document provides that "[a]ll management powers over the business and affairs of the company shall be vested in the Board."  DTX-2 [VLSI's Second Amended LLC Agreement] 22 (§ 4.1(ii)); 5/27/25 Tr. [Zur] 187:13-188:22.

FF59.  VLSI's governing document provides that the VLSI "board shall have the power, in its sole discretion, to bind or take any action on behalf of the Company or to exercise any rights and powers" of VLSI.  DTX-2 [VLSI's Second Amended LLC Agreement] 22 (§ 4.1(iii)); 5/27/25 Tr. [Zur] 187:23-188:12.

FF60.  Mr. Slan testified that the VLSI board also had to approve not only "all important decisions," but also "anything of relevance," including hiring accounting and tax firms and "strategy" on maintaining and licensing patents.  5/27/25 Tr. [Slan] 255:25-256:6.

FF61.  The Fortress employees on VLSI's board could terminate VLSI's CEO.  5/27/25 Tr. [Shah] 268:11-13; 5/28/25 Tr. [Stolarski] 401:4-7; DTX-84 [VLSI Management Services Agreement] 2-3 (§§ 5(c), 5(d)).

FF62.  The Fortress employees on VLSI's board could "say no" to the decisions of VLSI's CEO.  5/27/25 Tr. [Zur] 193:15-20.

FF63.  Fortress employee Steven Brogden testified that Mr. Stolarski "operate[d] under the board of directors of VLSI."  5/28/25 [Brogden] Tr. 365:8-10.

FF64.  As VLSI's CEO, Mr. Stolarski "would seek the board's approval for any particular agreement" VLSI would enter "with respect to the [patent] portfolio."  5/28/25 Tr. [Stolarski] 392:12-19.

FF65.  Ms. Shah once emailed Mr. Stolarski, "Have everyone stop what they are working on and only work on those patents owned by VLSI.  No other work is to be done."  5/28/25 Tr. [Stolarski] 401:12-16.  Mr. Stolarski obliged.  *Id.* at 401:17-19.

FF66.  When VLSI's first CEO, Mr. Stolarski, resigned from that role, Fortress employees approved the hiring of VLSI's subsequent, and current, CEO, Scott Bain.  5/27/25 Tr. [Zur] 194:1-5; 5/28/25 Tr. [Bain] 337:17-23.

FF67.  Ms. Shah testified that VLSI's current CEO Mr. Bain "advises the board and the board makes a decision."  5/27/25 Tr. [Shah] 268:17-22.

FF68.  Mr. Stolarski forwarded at least one invitation to a VLSI board meeting to two *additional* Fortress employees who were not even on the VLSI board: Jonathan James and Courtney Quish.  5/28/25 Tr. [Stolarski] 393:24-394:14; DTX 125 [Stolarski Email (October 22, 2020)].  At the time of that VLSI board meeting, Mr. James, a Fortress attorney, was on Finjan's board.  DTX-3 [Finjan Holdings LLC Agreement] 2-3 (§ 8(b)); 5/27/25 Tr. [Zur] 207:20-208:12.

### b.    Fortress has controlled VLSI by controlling VLSI's finances.

FF69.  Expert witness Ray Perryman explained at trial that "[f]rom a financial perspective, … Fortress Investment Group does have control over VLSI" and that "[i]f you just follow the money, what you find is that Fortress Investment Group does have substantial financial control over VLSI Technology."  5/28/25 Tr. [Perryman] 444:24-445:8, 451:21-452:2.

FF70.  Mr. Zur testified that Fortress "can approve funding or approve spending" at VLSI.  5/27/25 Tr. [Zur] 193:12-14.

FF71.  Fortress implemented "an independent CFO function" that would give it "more operational control than [Fortress] usually ha[s]" in private equity investments.  DTX-7 [8/17/16 Furstein Email] 1-2; *see also* 5/28/25 Tr. [Perryman] 445:15-447:21.

FF72.  Fortress required VLSI's CEO to prepare and generate a budget on a quarterly basis and required board approval for any variations in the budget before any payments are made.  DTX-7 [8/17/16 Furstein Email]; 5/27/25 [Slan] Tr. 257:11-258:10; 5/28/25 Tr. [Perryman] 448:4-16.

FF73.  Fortress "maintain[ed] direct access to VLSI's bank account," "only ke[pt] limited operational funds in" VLSI's bank account, and then replenished it as necessary as long as VLSI is following guidelines set by Fortress.  DTX-7 [8/17/16 Furstein Email] 2; 5/28/25 Tr. [Perryman] 448:17-21; *id.* [Brogden] 365:15-366:1; *id.* [Stolarski] 395:24-396:3, 398:7-20; 5/27/25 Tr. [Slan] 257:11-258:10; DDX5.11; DDX5.13.

FF74.  Individuals employed by Fortress, and not by VLSI, including Steven Brogden and Fortress attorneys Michelle Moreland and Courtney Quish, have overseen VLSI's expenses, approved VLSI's fundings requests, and handled the payment process.  5/28/25 Tr. [Perryman] 450:16-451:20; *id.* [Brogden] 363:22-364:4, 367:7-368:8; *id.* [Stolarski] 390:17-22, 395:8-18; DTX-11 [3/31/20 Brogden Email] ("Please confirm your OK with payment of the below expenses and Approve in [payment system]."); DTX-12 [2/20/20 Brogden Email] ("The two invoices Michele approved should have been sent out yesterday. The ones you received last week should be go out next Monday. I'm getting Michele's OK today."); DTX-13 [7/7/20 Quish Email] ("The June expenses for VLSI are summarized below … Please confirm your OK to pay."); DTX-14 [6/2/20 Quish Email] ("Here are the May expenses. Please confirm your OK."); DTX-16 [1/17/18 Brogden Email] ("Here is the December 2017 funding request sent to Ami for approval to pay

expenses incurred in November 2017."); DTX-17 [1/26/18 Moreland Email] ("Please approve these expenses and confirm OK to request a $335K funding to cover them.").

FF75.  "[S]omeone at Fortress" would issue all payments "on behalf of [VLSI's] investors and VLSI."  5/28/25 Tr. [Stolarski] 395:8-15.

### c.    Fortress has controlled VLSI by controlling the general partners for the funds that are invested in VLSI.

FF76.  Fortress has controlled VLSI by always having all powers, including voting powers, of the general partners for the funds that are invested in VLSI.  5/27/25 Tr. [Ale] 134:7-13, 135:3-136:1; 5/28/25 Tr. [Perryman] 478:7-482:11; *id.* [Zur] 558:24-563:18, 564:1-20; 5/29/25 Tr. [Zur] 639:13-641:14, 644:1-15; DTX-217 [FCO MA MI LP Agreement] 8, 12, 16, 27 (§ 2.3(m)), 38-39 (§ 3.6), 50 (§ 6.1(a)), 51 (§ 6.1(d)(i)), 53 (§ 6.1(e)), 72 (§ 9.1).

FF77.  For example, the Amended and Restated Limited Partnership Agreement of FCO MA MI LP, which is one of the ten Fortress funds that owns CF VLSI Holdings, provides that

███████████████████████████████████████████████████████████████████████

███████████████."  DTX-217 [FCO MA MI LP Agreement] 8; 5/28/25 Tr. Perryman 478:12-21, 479:16-21; *id.* [Zur] 559:24-560:8.

FF78.  The Amended and Restated Limited Partnership Agreement of FCO MA MI LP further provides that ████████████████████████████████.  DTX-217 [FCO MA MI LP Agreement] 8; 5/28/25 Tr. Perryman 478:22-479:21; *id.* [Zur] 560:9-19.

FF79.  The Amended and Restated Limited Partnership Agreement of FCO MA MI LP provides that ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████.”   DTX-217 [FCO MA MI LP Agreement] 50 (§ 6.1(a)); 5/28/25 Tr. [Perryman] 479:22-480:15; *id.* [Zur] 561:10-19; 5/29/25 Tr. [Zur] 640:10-642:14.

FF80.  The Amended and Restated Limited Partnership Agreement of FCO MA MI LP provides that ████████████████████████████████████████

████████████████████████████████████████████

██████████████████   DTX-217 [FCO MA MI LP Agreement] 53 (§ 6.1(e)); 5/28/25 Tr. [Perryman] 481:8-14; *id.* [Zur] 562:10-563:6.

FF81.  Eran Zur agreed that Fortress is in fact the general partner of FCO MA MI LP. 5/28/25 Tr. [Zur] 560:14-19, 561:20-562:9, 563:7-9; 5/29/25 Tr. [Zur] 642:10-15.

FF82.  Eran Zur agreed that "██████████████████████████" the Amended and Restated Limited Partnership Agreement of FCO MA MI LP "████████████████

████████.”  5/28/25 Tr. [Zur] 564:1-4; *see* 5/29/25 Tr. [Zur] 642:10-15.

FF83.  Eran Zur agreed that Fortress is in fact the general partner for all of the limited partnerships that are invested in CF VLSI Holdings LLC.  5/28/25 Tr. [Zur] 560:20-561:4.

FF84.  Eran Zur agreed that all of the funds that are invested in CF VLSI Holdings have given Fortress Investment Group all the powers of the general partner since their creations.  5/28/25 Tr. [Zur] 564:1-24, 565:11-24; 5/29/25 Tr. [Zur] 642:22-644:18.

### C.   Fortress Has Controlled Finjan LLC (Formerly Known As Finjan, Inc.) Since The Finjan Acquisition In July 2020.

#### 1.   Fortress-controlled Goldfish Holdings acquires Finjan Holdings, Inc. and its wholly-owned subsidiary Finjan, Inc.

FF85.  In July 2020, Fortress-controlled Goldfish Holdings acquired Finjan Holdings, Inc. and its wholly-owned subsidiary Finjan, Inc.  DTX-8 [Fortress Affiliates Complete Their Acquisition of Finjan]; DTX-3 [Finjan Holdings LLC Agreement] 1; DTX-64 [Schedule Tender

Offer]; DTX-269 [Finjan Enters into Agreement to Be Acquired by Affiliates of Fortress]; 5/27/25 Tr. [Zur] 194:23-196:3, 238:19-23; *id.* [Shah] 261:4-8.

FF86.   Fortress conducted due diligence as part of the acquisition.   DTX-64 [Schedule Tender Offer] 38-40.

FF87.   After the acquisition, Fortress converted Finjan Holdings, Inc. and Finjan, Inc. to Finjan Holdings LLC and Finjan LLC, respectively.   Dkt. 918 [Joint Pretrial Order] ¶ 27; *see* 5/27/25 Tr. [Zur] 195:25-196:3, 238:19-239:5.

FF88.   Fortress employees signed the LLC agreements for Finjan Holdings and Goldfish Holdings.   DTX-3 [Finjan Holdings LLC Agreement] 10; DTX-71 [Goldfish Holdings LLC Agreement] 7-8; 5/27/25 Tr. [Zur] 200:19-203:11, 208:18-209:1.

FF89.   All the initial managers and officers of CFIP Goldfish Holdings were also Fortress employees. DTX-71 [Goldfish Holdings LLC Agreement] 10-11; 5/27/25 Tr. [Zur] 203:22-205:3; 5/28/25 Tr. [James] 416:16-417:3.

FF90.   Fortress has an ownership interest in the funds that own Finjan LLC, and Fortress's investors ask it to "put money and skin in the game" so that its "interests were aligned with the other investors." 5/27/25 Tr. [Zur] 239:7-240:3, 247:12-248:16; 5/28/25 Tr. [Perryman] 472:20-473:22; *id.* [Zur] 564:25-565:10.

## 2.    Since the acquisition, Fortress has controlled Finjan LLC (formerly known as Finjan, Inc.) in multiple ways.

FF91.   Since the Finjan acquisition in July 2020, Fortress has controlled Finjan LLC in multiple ways, including through (1) Fortress having the power to appoint and remove Finjan LLC's and Finjan Holdings LLC's board members; (2) Fortress employees, who are paid by Fortress and not Finjan LLC or Finjan Holdings LLC, constituting a majority of Finjan LLC's and Finjan Holdings LLC's boards; and (3) Fortress exercising ultimate approval over funding and

spending for Finjan LLC and Finjan Holdings LLC.  Dkt. 959 [Verdict]; 5/27/25 Tr. [Zur] 207:2-208:12, 209:2-23, 211:13-212:3, 213:18-24, 214:9-11, 214:17-21, 240:11-241:1, 241:21-242:13, 244:24-245:5, 246:10-17; *id.* [Ale] 134:7-13, 135:16-23, 141:7-11, 142:8-20, 143:9-144:19, 145:18-25; 5/28/25 Tr. [Anderson] 373:3-11, 374:7-376:20, 377:8-10; *id.* [Hartstein] 379:25-380:10, 406:2-11, 408:3-11; *id.* [James] 411:10-14, 412:11-413:15, 414:8-415:6, 415:11-18, 416:16-417:3, 417:14-418:4; *id.* [Perryman] 452:3-455:22, 482:12-17; *id.* [Zur] 557:17-558:22, 565:11-24, 567:24-569:23, 570:1-23, 572:8-11; 5/29/25 Tr. [Zur] 644:1-15; DTX-3 [Finjan Holdings LLC Agreement] 1-2, 5-6; DTX-25 [Finjan LLC Agreement] 2-3; DTX-19 [10/5/20 Anderson Letter]; DTX-20 [1/6/21 Anderson Letter]; DTX-21 [1/11/21 Brogden Email]; DTX-23 [4/5/21 Anderson Email]; DTX-24 [4/5/21 Anderson Letter]; DTX-64 [Schedule Tender Offer] 8, 11-12; DTX-65 [10/5/20 Brogden Email]; DTX-66 [10/5/20 Anderson Letter]; DTX-71 [Goldfish Holdings LLC Agreement]; DDX5.23; DDX6.3; DDX6.6.

FF92.  Fortress represented to the SEC that Goldfish Holdings is controlled by Fortress, and that it wanted to "acquire control of … Finjan."  DTX-64 [Schedule Tender Offer] 8, 11, 12; 5/28/25 Tr. [James] 414:13-415:6; *id.* [Zur] 567:24-570:23.

FF93.  Mr. Zur, a Fortress employee who at one time served on both VLSI's and Finjan's boards, agreed that "in the five years since the Finjan acquisition, Fortress Investment Group has had the power to direct the management and policies" at Finjan LLC.  5/28/25 Tr. [Zur] 558:13-23; 5/27/25 Tr. [Zur] 214:5-21 (describing being on both VLSI and Finjan's boards).

FF94.  The address of Fortress-controlled Goldfish Holdings is Fortress's address: 1345 Avenue of the Americas 46th Floor, New York, NY 10105.  DTX-3 [Finjan Holdings LLC Agreement] 2 (§ 7).  The address for nine of the ten Fortress funds that own Goldfish Holdings is

also Fortress's address:  1345 Avenue of the Americas 46th Floor, New York, NY 10105.  DTX-71 [Goldfish Holdings LLC Agreement] 9 (Schedule A).

> **a.      Fortress has controlled Finjan LLC and Finjan Holdings LLC by controlling their respective boards, which are the ultimate decisionmakers for Finjan LLC and Finjan Holdings LLC.**
>
> **(i)      Fortress has controlled Finjan LLC's and Finjan Holdings LLC's boards by having the power to appoint and remove Finjan LLC's and Finjan Holdings LLC's board members.**

FF95.  Since Goldfish Holdings acquired Finjan Holdings in 2020, Fortress has always had the power to appoint and remove board members for Finjan Holdings LLC and Finjan LLC. 5/27/25 Tr. [Zur] 211:13-212:3, 241:14-242:7, 244:24-245:5; DTX-3 [Finjan Holdings LLC Agreement] 2-3 (§§ 8(b), 8(f)) (giving Fortress-controlled Goldfish Holdings the power to appoint and remove board members); DTX-25 [Finjan LLC Agreement] 2-3 (§§ 8(b), 8(f)) (similar); 5/28/25 Tr. [Anderson] 372:20-373:2; *id.* Tr. [James] 411:10-14.

FF96.  Finjan Holdings LLC's LLC Agreement, which is the governing document for Finjan Holdings LLC, provides that board members "shall be designated by" Fortress-controlled Goldfish Holdings.  DTX-3 [Finjan Holdings LLC Agreement] 2 (§ 8(b)).

FF97.  Finjan Holdings LLC's LLC Agreement provides that any board member "may be removed at any time, with or without cause, by" Fortress-controlled Goldfish Holdings.  DTX-3 [Finjan Holdings LLC Agreement] 3 (§ 8(f)).

FF98.  Finjan LLC's LLC Agreement, which is the governing document for Finjan LLC, provides that board members "shall be designated by" Finjan Holdings LLC.  DTX-25 [Finjan LLC Agreement] 2 (§ 8(b)).

FF99.  Finjan LLC's LLC Agreement provides that any board member "may be removed at any time, with or without cause, by" Finjan Holdings.  DTX-25 [Finjan LLC Agreement] 3 (§ 8(f)).

FF100. Former Finjan Holdings LLC CFO Jevan Anderson testified that Fortress "appointed representatives to [Finjan Holdings LLC's] board of directors."  5/28/25 Tr. [Anderson] 372:20-373:2.

FF101. Eran Zur agreed that Fortress has the power to appoint and remove board members for Finjan LLC.  5/27/25 Tr. [Zur] 211:13-212:3, 241:14-242:7, 244:24-245:5.

> **(ii)** **Fortress has controlled Finjan LLC's and Finjan Holdings LLC's boards by having Fortress employees constitute a majority of Finjan LLC's and Finjan Holdings LLC's boards.**

FF102. Since the acquisition in 2020, Fortress employees, who are compensated by Fortress, have always constituted a majority of Finjan Holdings LLC's and Finjan LLC's boards, and the Fortress-controlled majority has always had the power to act on behalf of Finjan Holdings LLC and Finjan LLC.  5/27/25 Tr. [Zur] 207:15-208:12, 209:2-23, 213:5-24, 214:9-11, 214:17-21, 240:11-241:1, 242:8-13, 244:24-245:5; 5/28/25 Tr. [Anderson] 374:7-10; *id.* [Hartstein] 379:25-380:10, 406:2-11, 408:3-11; *id.* [James] 412:11-15, 414:8-12, 415:11-18, DTX-3 [Finjan Holdings LLC Agreement] 2-3 (§§ 8(b), 8(d), 8(e)); DTX-25 [Finjan LLC Agreement] 2-3 (§§ 8(b), 8(d), 8(e)).

FF103. Eran Zur agreed that there are "thousands upon thousands of people who are qualified to sit on" the Finjan boards and that he "chose to put a majority" of Fortress employees on the Finjan board.  5/27/25 Tr. [Zur] 244:24-245:5.

FF104. The Fortress employees on Finjan's board are compensated by Fortress, not Finjan. 5/28/25 Tr. [James] 415-11-18.

FF105. The Finjan Holdings and Finjan LLC boards originally had three members, all of whom were Fortress employees: Mr. Zur, Erez Levy, and Jonathan James.  5/27/25 Tr. [Zur] 207:20-208:12, 209:13-16; DTX-3 [Finjan Holdings LLC Agreement] 2 (§ 8(b)); DTX-25 [Finjan LLC Agreement] 2 (§ 8(b)).

FF106. The Finjan Holdings LLC and Finjan LLC boards are now five-member boards with a majority of three Fortress employees (Mr. Levy, Mr. James, and Lin Chen).  5/27/25 Tr. [Zur] 209:17-23; 5/28/25 Tr. [Anderson] 374:7-10; *id.* [Hartstein] 379:25-380:10, 408:3-11; *id.* [James] 412:11-15, 414:8-12; *id.* [Zur] 572:8-11.

> **(iii)** **The Fortress-controlled boards are the ultimate decisionmakers for Finjan Holdings LLC and Finjan LLC.**

FF107. The respective boards are the ultimate decisionmakers for Finjan LLC and Finjan Holdings LLC that make decisions regarding everything of importance to those companies.  DTX-3 [Finjan Holdings LLC Agreement] 2 (§ 8(a)), 5-6 (§ 8(m)); DTX-25 [Finjan LLC Agreement] 2 (§ 8(a)), 5-6 (§ 8(m)); 5/27/25 Tr. [Zur] 207:2-14; 5/28/25 Tr. [Anderson] 377:8-10; *id.* [Hartstein] 406:2-11.

FF108.  Former Finjan Holdings LLC CFO Jevan Anderson testified that the Finjan boards make all decisions on behalf of Finjan.  5/28/25 Tr. [Anderson] 377:8-10.

FF109.  Finjan Holdings LLC's governing document provides that "the Board shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the Purpose, including all powers, statutory or otherwise, possessed by managers of a limited liability company under the laws of the State of Delaware."  DTX-3 [Finjan Holdings LLC Agreement] 2 (§ 8(a)); 5/27/25 Tr. [Zur] 207:2-14.

FF110.  Finjan LLC's governing document provides that "the Board shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the Purpose,

including all powers, statutory or otherwise, possessed by managers of a limited liability company under the laws of the State of Delaware." DTX-25 [Finjan LLC Agreement] 2 (§ 8(a)).

FF111. Finjan Holdings LLC's governing document provides that the approval of the majority of the board is required for many activities, including "the appointment or removal of the chief executive officer … or any other senior executive of" Finjan and the "the sale, lease, transfer, encumbrance or other disposition of any patent of the Company." DTX-3 [Finjan Holdings LLC Agreement] 5-6 (§ 8(m)).

FF112. Finjan LLC's governing document provides that the approval of the majority of the board is required for many activities, including "the appointment or removal of the chief executive officer … or any other senior executive of" Finjan and "the sale, lease, transfer, encumbrance or other disposition of any patent of the Company." DTX-25 [Finjan LLC Agreement] 5-6 (§ 8(m)).

### b. Fortress has controlled Finjan Holdings LLC and Finjan LLC by controlling their finances.

FF113. Expert witness Ray Perryman testified at trial that Fortress controlled the finances of Finjan LLC. 5/28/25 Tr. [Perryman] 452:7-10, 455:19-22, 482:12-14.

FF114. Fortress employees maintained access to Finjan Holdings LLC's bank account and provided approval for funding for Finjan Holdings LLC and Finjan LLC. 5/28/25 Tr. [Perryman] 452:14-453:20; *id.* [Anderson] 373:3-11, 374:11-376:20; *id.* [James] 412:16-413:24; 417:14-418:4; DTX-19 [10/5/20 Anderson Letter] ("Finjan is requesting that Fortress fund our operating account with an amount equal to $5 million."); DTX-20 [1/6/21 Anderson Letter] ("Finjan is requesting that Fortress fund our operating account with an amount equal to $5 million."); DTX-21 [1/11/21 Brogden Email] (instructing Mr. Anderson to write a letter to Fortress in order to request funding for Finjan); DTX-23 [4/5/21 Anderson Email] ("We are now quite low on cash and require additional funding from Fortress."); DTX-24 [4/5/21 Anderson Letter] ("Finjan is

requesting that Fortress fund our operating account with an amount equal to $5 million."); DTX-64 [Schedule Tender Offer] 8, 11-12; DTX-65 [10/5/20 Brogden Email]; DTX-66 [10/5/20 Anderson Letter].

FF115. A majority of the Fortress-controlled board had to approve financial transactions for Finjan Holdings LLC and Finjan LLC, including "the incurrence of any costs … with respect to any transaction to which the company is a party by which the assets of the company are bound," the incurrence of any refinancing, the establishment of any cash reserves, any material change in accounting methods, any decision with respect to any tax-related matters, the decision to provide indemnification and/or advancement of expenses, the operating plan and the capital budget, and any licenses or employee benefit programs.  5/28/25 Tr. [Perryman] 453:21-455:18; DTX-25 [Finjan LLC Agreement] 5-6 (§ 8(m)); DTX-3 [Finjan LLC Agreement] 5-6 (§ 8(m)).

> ### c.     Fortress has controlled Finjan LLC by having all the powers for the general partners for the Fortress funds that are invested in Goldfish Holdings.

FF116. Fortress has controlled Finjan LLC by having all the powers for the general partners for the Fortress funds that are invested in Goldfish Holdings (and thus invested in Finjan Holdings and Finjan LLC).  5/28/25 Tr. [Zur] 565:11-24; 5/29 Tr. [Zur] 644:1-18.

FF117.  Eran Zur testified that Fortress is the general partner for the web of entities that are invested in Finjan LLC.  5/29 Tr. [Zur] 644:1-18.

FF118.  Eran Zur testified that Fortress has the power to control all the Fortress funds that are invested in the Finjan entities in the same way that Fortress has the power to control all the Fortress funds that are invested in VLSI.  5/28/25 Tr. [Zur] 565:11-24; 5/29 Tr. [Zur] 644:1-18.

## VI.    CONCLUSIONS OF LAW

### A.    Intel Is Licensed To U.S. Patent No. 7,606,983 (The "Asserted Patent") Under The Unambiguous Terms Of The License.

CL1.    The License expressly and unambiguously grants Intel a "perpetual, irrevocable license" to "all Patent Rights that are owned or controlled at any time on or after November 6, 2012" by "Finjan," which is defined to include both the Finjan Parties and their "Affiliates." DTX-1 [License] Preamble, §§ 1.2, 1.10, 3.1; *see also VLSI Tech. LLC v. Intel Corp.*, 2023 WL 9052312, at *11 (N.D. Cal. Dec. 20, 2023).

CL2.    The License defines "Affiliates" to include entities that "now or ***hereafter***, directly or indirectly through one or more entities, controls or is controlled by, or is ***under common control*** with" the Finjan Parties. DTX-1 [License] § 1.2 (emphases added).

CL3.    Under Delaware law, "non-signatory entities meeting the definition of 'Affiliates' (as defined by the [License]) of the Finjan Parties can be bound by the agreement, including later acquired or formed 'Affiliates.'" *VLSI*, 2023 WL 9052312, at *5 (citing *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 57-58 (Del. 2019); *MicroStrategy, Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *12 (Del. Ch. Dec. 30, 2010)).

CL4.    As the jury found, VLSI and Finjan LLC are under common control because at a point after November 20, 2012, Fortress controlled both VLSI and Finjan LLC. Dkt. 959 [Verdict] 1.

CL5.    The jury's finding that VLSI and Finjan LLC are under Fortress's common control is supported by substantial evidence and means that VLSI is an "Affiliate" of the Finjan Parties under the License. *See* Dkt. 959 [Verdict] 1; DTX-1 [License] § 1.2; *supra* § V.

CL6.    Because (1) the License grants Intel a "perpetual, irrevocable license" to "all Patent Rights that are owned or controlled at any time on or after November 6, 2012" by the Finjan Parties

and their Affiliates and (2) VLSI is an "Affiliate" of the Finjan Parties, Intel is licensed to all patent rights that are owned or controlled by VLSI.

CL7.    The Asserted Patent is a patent right that is owned or controlled by VLSI.

CL8.    Therefore, Intel is licensed to the Asserted Patent under the License.

**B.    VLSI Is Bound By The License Under Delaware Law.**

CL9.    Black-letter Delaware law establishes that "a nonsignatory created after a contract is signed can still be bound by the contract." *VLSI Tech. LLC v. Intel Corp.*, 2023 WL 9052312, at *5 (N.D. Cal. Dec. 20, 2023); *see In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 57 (Del. 2019); *see also Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *18 (Del. Ch. Aug. 18, 2016) (holding that agreement that included "Affiliates" within the definition of "Parties" "binds 'Affiliates,' which includes [non-signatory] entities … that are 'under common control' with [the agreement's signatory]"); *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *12 (Del. Ch. Dec. 30, 2010) (finding where an agreement defines the term "affiliate" to include "any entity which either party now or hereafter, directly or indirectly, owns or controls," the phrase "now or hereafter" contemplates the agreement would apply to later-acquired or formed entities owned or controlled by the parties to the agreement, even though not signatories).

CL10.    In *Shorenstein*, the Delaware Supreme Court held that, where an agreement covered signatories and "Affiliates" of those signatories, non-signatory, later-created entities satisfying the definition of "Affiliate" were bound by the agreement at issue.  213 A.3d at 57.

CL11.    *Shorenstein* involved multiple parties, including Carole Hays; CSH Theatres LLC ("CSH"), which was controlled by Hays and her family; and Nederlander of San Francisco Associates ("Nederlander").  213 A.3d at 42.  CSH and Nederlander entered into an LLC agreement, becoming equal members of Shorenstein Hays-Nederlander Theatres LLC ("SHN").

*Id.*  The agreement prohibited any "Shorenstein Entity" from staging a competing theatrical production within 100 miles of San Francisco without first offering the opportunity to SHN.  *Id.* at 47-48.  The preamble to the agreement defined "Shorenstein Entity" as CSH and any "Permitted Transferee."  *Id.* at 48.  "Permitted Transferee" was further defined to include an "Affiliate" of a member, including any person that was controlled by or under common control with the member. *Id.*  Nederlander brought a breach of contract action after CSH Curran LLC, an entity that did not exist when the LLC agreement was signed, announced plans to stage competing productions. *Shorenstein*, 213 A.3d at 49; Dkt. 883-7 [CSH Theatres Pretrial Stipulation] 31 (¶ 3).  Nederlander argued that the LLC agreement applied to nonsignatory CSH Curran because it was an affiliate of signatory CSH by virtue of the common control indirectly exercised by nonsignatory Carole Shorenstein Hays and her family.  *Shorenstein*, 213 A.3d at 49, 51.

CL12.  The Delaware Supreme Court agreed, holding that the agreement "impose[d] obligations" on "affiliates" of CSH as defined in the agreement.  *Shorenstein*, 13 A.3d at 57.  The Delaware Supreme Court rejected the arguments that "only formal parties—CSH and Nederlander—are bound by the terms of the LLC agreement" and noted that "[c]ontracts may impose obligations on affiliates in this context."  *Id.*  Therefore, the LLC agreement was binding on other entities under the Hayses' control who were "Affiliates" of CSH.  *Id.* at 57-58.

CL13.   The common control in *Shorenstein* was indirect and exercised largely through an investment committee that set policies for the separate trusts that owned CSH and CSH Curran:



*CSH Theatres, L.L.C. v. Nederlander of San Francisco Assocs.*, 2018 WL 3646817, at *24 (Del. Ch. July 31, 2018) (highlighting added).

CL14.   Depicted below in simplified form, this common control linked the entities together as "affiliates" and bound them all to the LLC agreement.



CL15.   The facts of this case are analogous to *Shorenstein*. Like in *Shorenstein*, where the definition of "Shorenstein Entity" encompassed the signatory and its affiliates, the License here

defines "Finjan" to encompass the signatory Finjan entities and their affiliates. DTX-1 [License] Preamble. Like in *Shorenstein*, where the definition of "Affiliate" included any entity "under common control with the subject Person," 213 A.3d at 48, 51, the License here defines "Affiliates" to include "any Person that, ***now or hereafter***, directly or indirectly through one or more entities, controls or is controlled by, or ***is under common control*** with" a specified Person, DTX-1 [License] § 1.2 (emphases added). Indeed, the Finjan License's "now or hereafter" language is even more explicit in covering after-created entities. Thus, just as the Delaware Supreme Court held that the LLC agreement bound the later-created CSH Curran LLC as an affiliate of signatory CSH due to the common control of the Hayses, *Shorenstein*, 213 A.3d at 51, 57-58, the License agreement here binds VLSI as an affiliate of Finjan LLC due to the common control of Fortress.

CL16. Therefore, "like the 'entities [the Hayses] control,' which the *Shorenstein* trial court found were bound by the LLC Agreement, any entities controlled by Fortress are bound [by the] Finjan License Agreement." *VLSI Tech.*, 2023 WL 9052312, at *6.

CL17. Under Delaware law, an entity that satisfies the definition of "Affiliate" under the License, even if later-acquired or created, is legally bound by it terms.

CL18. Contrary to VLSI's argument that a non-signatory can be bound only when a non-signatory authorized or adopted a contract, the Delaware Supreme Court has concluded that non-signatory entities that are under common control and thus satisfy the definition of "Affiliate" can be bound by an agreement. *See Shorenstein*, 213 A.3d at 56-58; *VLSI Tech.*, 2023 WL 9052312, at *5-6.

CL19. The Court rejects VLSI's reading of *Shorenstein*. The facts that VLSI plucks from the *Shorenstein* opinion's background sections were relevant only to resolving an ambiguity in the agreement not present here and the merits of the breach of fiduciary duty claims, which are not

relevant to this case. *Shorenstein*, 213 A.3d at 49-58. The *Shorenstein* court's analysis on the "threshold" (and relevant) question of whether CSH Curran was bound by the LLC agreement that Nederlander argued it had breached merely "[a]ppl[ied] th[e] principles" concerning contract interpretation to conclude that the LLC agreement bound all CSH affiliates that are under common control. *Id.* at 56-58. The court found no intimate management or violation of fiduciary duties necessary to that determination. And here, that determination can be made based on the plain language of the License. *See* DTX-1 [License] Preamble, §§ 1.2, 1.10. *Shorenstein* did not apply any "adoption" or "alter ego" tests and the opinion does not even use those terms. *See* 213 A.3d at 56-58. *Shorenstein*'s key holding—that the LLC agreement bound newly formed non-signatory *CSH Curran* (and not just the Hayses)—was based on the language of the LLC agreement and the court cited extrinsic evidence only to address what was, at most, a slight ambiguity in the *Shorenstein* LLC agreement that is not present here. 213 A.3d at 51-52, 56-58. *Shorenstein* did not base its decision on who negotiated the agreement.

CL20. Although adoption is not required, the Court finds that the facts here do show adoption by Fortress, which controls VLSI. Fortress's outside counsel reviewed the License and Fortress decided to acquire control of Finjan Holdings anyway. *See* DTX-64 [Schedule Tender Offer] 38-40; Dkt. 941 at 1-2; 5/28 Tr. [Perryman] 484:9-485:12. And ███████████████ ███████████████████████████████████████████" Dkt. 872-2 [License] § 2.5. Fortress had every reason to know that Fortress and VLSI could be bound as this situation is "not novel." *See VLSI*, 2023 WL 9052312, at *8; *Acquisitions and IP Licenses: Looking Out for Poison Pill Affiliate*, 249 N.Y.L.J. 2 (2013).

CL21. The cases that VLSI points to where a non-signatory party was not bound by a contract are all distinguishable. Unlike *Shorenstein*, the provision at issue in *Alliance Data*

*Systems Corp. v. Blackstone Capital Partners V L.P.* (a pre-*Shorenstein* case which *Shorenstein* did not approve of or even cite) did not involve a term defined to include "Affiliates." 963 A.2d 746, 760 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009). Similarly, the agreement in *Sheehan v. Assured Partners, Inc.* 2020 WL 2838575, at *9 (Del. Ch. May 29, 2020), did not define "affiliates" to include companies that later become affiliates, and, unlike the License here, did not say the parties were "signing … on behalf of their respective Affiliates," DTX-1 [License] Preamble. The agreement analyzed in the Report and Recommendation in *Truinject Corp. v. Nestle Skin Health, S.A.*, 2020 WL 70981, at *9-12 (D. Del. Jan. 7, 2020), did not define "Affiliates." Neither did the agreement in *Kuroda v. SPJS Holdings, L.L.C.*, 2010 WL 4880659, at *3 (Del. Ch. Nov. 30, 2010). The contract provisions in *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *5 (Del. Ch. Nov. 13, 2018), "by their terms, impose[d] no contractual obligation on" the non-signatory parent company. *Arcadia Biosciences, Inc. v. Vlimorin & Cie*, 356 F. Supp. 3d 379, 391-393 (S.D.N.Y. 2019), applied New York law (and not Delaware law) and recognized that "there are cases in which parties can bind non-parties to a contract." *You Map, Inc. v. Snap Inc.*, 2021 WL 106498, at *10 (D. Del. Jan. 12, 2021), analyzed the issue of ratification and did not give any indication that the contract at issue applied to "Affiliates." And in *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates S.A.S.*, 269 F.3d 187, 196-97 (3d Cir. 2001), the agreement signed by DuPont's subsidiaries did not purport to bind "Affiliates" to the arbitration clause. None of these cases considered *Shorenstein*. Nor could these decisions displace the holding of the Delaware Supreme Court on an issue of Delaware law.

CL22. For the foregoing reasons, "non-signatory entities meeting the definition of 'Affiliates' (as defined by the Finjan License Agreement) of the Finjan Parties"—which include non-signatory entities that are under "common control" with the Finjan Parties—are "bound by

the agreement, including later acquired or formed 'Affiliates.'" *VLSI Tech.*, 2023 WL 9052312, at *8.

CL23.  As explained above, because a jury has found that VLSI and Finjan LLC are under Fortress's common control, VLSI is bound by the License as an "Affiliate" of Finjan LLC.

### C.     Federal Law Poses No Bar To The License Binding VLSI.

CL24.  Delaware law, not federal law, applies to the License and the adjudication of Intel's license defense.

CL25.  Delaware law applies because "the interpretation of patent license contracts is generally governed by state law." *Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.,* 284 F.3d 1323, 1328 (Fed. Cir. 2002).  "State law is not displaced merely because the contract relates to intellectual property." *Aronson v. Quick Point Pencil Co*., 440 U.S. 257, 262 (1979).  "[W]ho owns patent rights, and on what terms, typically is a question exclusively for state courts and not one arising under United States patent laws." *International Nutrition Co. v. Horphag Rsch. Ltd.*, 257 F.3d 1324, 1329 (Fed. Cir. 2001).

CL26.  The Federal Circuit's decision in *Oyster Optics, LLC v. Infinera Corp*., supports the application of state law here.  843 F. App'x 298, 300-302 (Fed. Cir. 2021).  In *Oyster Optics,* the Federal Circuit applied state law to hold that a patent agreement granting a license to the signatories and "their Affiliates" applied to an entity created after the agreement was signed because the definition of "Affiliates" included "any Person, now or in the future" who "has Control of a Party hereto."  843 F. App'x at 298, 300-302.

CL27.  Notably, VLSI has repeatedly told courts that Delaware law governs Intel's license defense and there is "no federal question … because Intel is seeking a declaration only with respect to its purported rights under the Finjan Settlement—a question of state law." *Intel Corp. v. VLSI Tech.*, No. 1:24-cv-803, Dkt. 13 at 18 (D. Del. Sept. 16, 2024); *see also id.* at 14 ("Intel's claim,

however, raises only state-law questions[.]"); *VLSI Tech. v. Intel Corp.*, No. 5:17-cv-05671, Dkt. 868 at 7 (N.D. Cal. Feb. 23, 2024) ("[T]he Finjan License requires the application of Delaware law.").

CL28.  VLSI's arguments regarding the application of federal law fail; its cited cases are inapplicable because they concern a small group of specific issues far more entwined with federal law than the issue here.  *Rhone Poulenc* applied federal law to a bona fide purchaser defense in the "unique situation in which a federal patent statute explicitly governs the bona fide purchaser rule in some situations," such that application of state law would conflict with Congress's intent not to extend the defense to the situation before the court.  284 F.3d at 1328.  Other cases relate to the express federal statutory requirement in 35 U.S.C. § 261 that assignments of patents must be in writing.  *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1366 (Fed. Cir. 2010) (discussing patent assignment in context of standing analysis); *Control Laser Corp. v. Smith*, 705 F. Supp. 3d 1006, 1011-1012, 1014 (N.D. Cal. 2023) (discussing patent assignment between parent and subsidiary).  VLSI's remaining cases are also easily distinguishable.[1]  None of these cases, or any other case, displaces the License's binding effect on VLSI under Delaware law.

## D.     VLSI's Patents Fall Under The Definition Of "Finjan's Patents."

CL29.  The License defines "Finjan's Patents" to "mean all Patent Rights that are owned or controlled at any time on or after November 6, 2012 by Finjan or to which Finjan has the right

---

[1] In *Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, "German law" would have applied under the agreement's choice-of-law clause if the parties had not waived their right to rely on foreign law, and the court defaulted to the application of federal law because the parties did "not argue for application of any particular state's law" and only "discuss[ed] U.S. law generally."  940 F.3d 1372, 1378, 1380 (Fed. Cir. 2019).  In *In re CFLC, Inc.*, the Ninth Circuit acknowledged that "most questions with respect to the construction of patent licenses are governed by state law," but then created, in the context of a bankruptcy proceeding, a novel rule of federal common law based on two regional circuit cases that predate the Federal Circuit's creation.  89 F.3d 673, 677-679 (9th Cir. 1996).

to grant licenses and that have a first effective filing date or priority date during the Capture Period

█████████████████████████████████████████████████████████████████████████████

██████████████████    without the requirement to pay consideration ██████████████████

██████████████████████    for the grant of a license under ███████████████.”  DTX-1 [License] § 1.10.

CL30.  The definition of "Finjan" in the License's Preamble includes the Finjan Parties and their Affiliates.  DTX-1 [License] Preamble.  Because "Affiliates" are included within the definition of "Finjan," patents "that are owned or controlled" by "Affiliates" of the Finjan Parties are licensed to Intel under the License.

CL31.  Therefore, because VLSI is an Affiliate of the Finjan Parties, patents "that are owned or controlled" by VLSI are licensed to Intel under the License.

CL32.  VLSI's arguments that its patents are excluded from the scope of "Finjan's Patents" fail.  There is no requirement that VLSI pay third-party NXP consideration for the grant of a license under the License agreement.

CL33.  The PPCA does not ████████████████████████████████████████████ and thus does not require VLSI to pay consideration to NXP for the grant of any particular license, much less for a grant of a license to VLSI's patents under the Finjan License.  At most, the PPCA includes a general profit-sharing arrangement between VLSI and NXP that is based on VLSI's "aggregate amount of Gross Revenues," if any, derived from the entire patent portfolio purchased from NXP. DTX-48 [PPCA] § 7.3 ("Allocation of Profits"), § 1.1(t) (defining "Gross Revenues"), § 1.1(bb) (defining "Net Profits"); Dkt. 872-39 [PPCA Amendment No. 1] § (o).  NXP is entitled to a profit share of those Gross Revenues only if there are any profits left after VLSI first recoups its "fees, costs, expenses, and taxes paid or incurred by [VLSI] or invoiced to [VLSI] (including formation costs, transaction fees, operational costs, contingent fees, revenue sharing and management

incentives) and net of all reasonable reserves for on-going operations." DTX-48 [PPCA] §§ 1.1(bb), 1.1(t), 7.3; Dkt. 872-39 [PPCA Amendment No. 1] § (o). Where there are no net profits, no payment is owed to NXP: A percentage of zero is still zero.

CL34. Moreover, the PPCA explicitly provides that VLSI "



." DTX-48 [PPCA] § 7.4 (emphasis added). The PPCA further provides that VLSI "                                                        " *Id*. (emphasis added). The language in the PPCA thus shows that the asserted patents can be licensed to Intel without paying consideration to NXP.

CL35. VLSI's arguments regarding "consideration" focus on the wrong issue. Under the License, the question is whether VLSI is required "to pay" NXP consideration "for the grant of a license ***under this [Finjan License]***," DTX-1 [License] § 1.10 (emphasis added), not whether VLSI has promised NXP a portion of its potential future profits more generally. NXP is entitled to no payment when VLSI generates no revenue, and VLSI made no promises to make any effort to earn a profit. There is thus no requirement for VLSI to pay NXP any consideration—whether monetary or otherwise—for a license "under this Agreement." *See* DTX-1 [License] § 1.10.

CL36. The Court also rejects VLSI's reliance on the jury's damages award. Intel owes no damages because the Court finds that it is licensed to the Asserted Patent. *See T-Rex Prop. AB v. Regal Ent. Grp.*, 2019 WL 5558061, at *5 (E.D. Tex. Oct. 29, 2019) ("A party cannot infringe a Patent to which it has a valid license."). In any event, any payment pursuant to a verdict is not a requirement to pay NXP any consideration—whether monetary or otherwise—for a license "under this Agreement." *See* DTX-1 [License] § 1.10.

CL37. The Court also disagrees with VLSI that it cannot grant a free license. Indeed, VLSI's position is contradicted by the PPCA's provisions. As noted above, the PPCA explicitly provides that VLSI ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███" DTX-48 [PPCA] § 7.4 (emphasis added). The PPCA further provides that VLSI "███ ███ ████████████████████████████████████████." *Id.* (emphasis added). The implied covenant of good faith and fair dealing cannot override these contractual provisions. *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 147 (Del. Ch. 2009). Indeed, VLSI has already shown its willingness to drop infringement claims and grant licenses for no monetary payment. VLSI's covenants not to sue for patents that VLSI acquired through the PPCA further confirm that VLSI is not "required" to pay NXP consideration every time VLSI grants rights to its patents. *See* Dkt. 872-42 [Stipulation of Dismissal in D. Del.]; Dkt. 872-40 [Stipulation of Dismissal for the '806 and '672 Patents]; Dkt. 872-41 [Stipulation of Dismissal for the '014 Patent].

CL38. VLSI cannot rely on any consideration that it has already paid to NXP. That consideration was paid for the purchase of VLSI's patents, and thus does not qualify as a "requirement to pay consideration to any ████████ … for the grant of a license under this [License]." DTX-1 [License] § 1.10. Indeed, the License specifically contemplates "Finjan Patents" covering patents that are later "████████████████." *Id.* § 3.4.

CL39. Therefore, "NXP is not a 'third person' owed consideration" under the terms of the License and "[n]othing in the PPCA requires VLSI to maximize the license payments or royalties, or even extract any payment whatsoever from a licensee." *VLSI Tech.*, 2023 WL 9052312, at *11.

CL40.  VLSI's argument regarding compensation to NXP also fails because it is based on misinterpretation of the License.  There are two categories of patents that fall under the definition of "Finjan's Patents": "all Patent Rights

> [1] that are owned or controlled at any time on or after November 6, 2012 by Finjan
>
> *or*
>
> [2] to which Finjan has the right to grant licenses."

DTX-1 [License] § 1.10 (emphasis and bracketed numbers added).  Here, VLSI's patents are owned by "Finjan," as defined to include "Affiliates" such as VLSI, and thus clause [1] applies.

CL41.  The carve-out of patents for which Finjan would have to pay consideration to a third party for the grant of a license applies only to those patent rights described in clause [2], i.e., patent rights "to which Finjan has the right to grant licenses."  Because the carve-out only refers to those patent rights to which "***Finjan has the right to grant licenses***," the carve-out does not apply to the separate category of patent rights "***that are owned or controlled … by Finjan***."  This plain language interpretation is reinforced by the placement of the carveout for third-party consideration ***after*** the second category of patent rights described in the definition of Finjan's Patents (i.e., those "to which Finjan has the right to grant licenses") with no punctuation separating those clauses.  *See Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("a limiting clause or phrase … should ordinarily be read as modifying only the noun or phrase that it immediately follows"); *American Int'l Grp. v. Bank of Am. Corp*., 712 F.3d 775, 781-782 (2d Cir. 2013) ("When there is no comma," the modifier "is ordinarily understood to apply only to its last antecedent.").  Extending the carve-out to patents "that are owned or controlled" by Finjan would collapse the License's distinction between patents "owned or controlled … ***or*** to which Finjan has the right to grant licenses."  *See* DTX-1 [License] § 1.10.

## VII.    <u>CONCLUSION</u>

CL42.  The Court holds that Intel is licensed to the Asserted Patent.

Dated: July 18, 2025

Respectfully submitted,

/s/ *Joseph J. Mueller*

Mary V. Sooter (*Pro Hac Vice*)
WILMER CUTLER PICKERING
  HALE & DORR LLP
1225 17th Street
Suite 2600
Denver, Colorado 80202
Tel: (720) 274-3135
Email: mindy.sooter@wilmerhale.com

Thomas G. Saunders (*Pro Hac Vice*)
Steven J. Horn (*Pro Hac Vice*)
WILMER CUTLER PICKERING
  HALE & DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel: (202) 663-6000
Email: thomas.saunders@wilmerhale.com
Email: steven.horn@wilmerhale.com

William F. Lee (*Pro Hac Vice*)
Joseph J. Mueller (*Pro Hac Vice*)
Louis W. Tompros (*Pro Hac Vice*)
Kate Saxton (*Pro Hac Vice*)
WILMER CUTLER PICKERING
  HALE & DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Email: william.lee@wilmerhale.com
Email: joseph.mueller@wilmerhale.com
Email: louis.tompros@wilmerhale.com
Email: kate.saxton@wilmerhale.com

Harry Lee Gillam, Jr.
Texas State Bar No. 07921800
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas 75670
Tel: (903) 934-8450
Email: gil@gillamsmithlaw.com

*Attorneys for Intel Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel are being served with a copy of the foregoing document via electronic mail on July 18, 2025.

/s/ *Joseph J. Mueller*

Joseph J. Mueller (*Pro Hac Vice*)
WILMER CUTLER PICKERING HALE
  & DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Email: joseph.mueller@wilmerhale.com